## PRIVATE PLACEMENT MEMORANDUM



## Prepetition Solicitation of Votes with Respect to a Prepackaged Plan of Reorganization

You are receiving this Private Placement Memorandum (the "Memorandum") from Merchants Mortgage & Trust Corporation, LLC (the "Company") because you are the holder (the "Holder" or, collectively, the "Holders") of one or more of the following securities previously issued by the Company:

(i)     2012EX Subordinated Debentures, Series 2012AEX Subordinated Debentures, and the Series 2016 Subordinated Debentures (collectively, the "Debentures"), and/or

(ii)     outstanding preferred units ("Existing Preferred Units"), and/or

(iii)     outstanding common units ("Existing Common Units").

The Debentures, Existing Preferred Units and Existing Common Units are collectively referred to as the "Outstanding Securities." The Holders of the Debentures are referred to as the "Debenture Holders." The Holders of the Existing Preferred Units are referred to as the "Existing Preferred Unit Holders." The Holders of the Existing Common Units are referred to as the "Existing Common Unit Holders."

The materials that you are receiving consist of the Disclosure Statement, the Prepackaged Chapter 11 Plan ("Plan of Reorganization" or "Plan") attached to the Disclosure Statement as Schedule 1, this Memorandum attached to the Disclosure Statement as Schedule 2, and a ballot or ballots for voting on the Plan.

The Plan proposes that the Holders of the Outstanding Securities exchange their Outstanding Securities for new securities to be issued pursuant to the Plan and this Memorandum (the "Offers"). Accordingly, the Holders of the Outstanding Securities are entitled to vote on the Plan.

This solicitation ("Solicitation") of votes from the Holders of the Outstanding Securities is being conducted to obtain sufficient acceptances of the Plan prior to the Company filing a voluntary Chapter 11 bankruptcy case ("Case") pursuant to Title 11 of the United States Code ("Bankruptcy Code"). The Company intends to file the Case in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court"). The pre-bankruptcy Solicitation is being made prior to the filing of the Case pursuant to Section 1125(g) of the Bankruptcy Code.

The purpose of the Disclosure Statement and this Memorandum is to describe the Plan treatment of the Holders of the Outstanding Securities and thereby permit such Holders to make a reasonably informed decision when voting on the Plan.  You should carefully review the Disclosure Statement, the Plan and this Memorandum before casting your ballot or ballots.

As the Holder of one or more of the Outstanding Securities, you are entitled to vote on the Plan.  If you hold more than one form of the Outstanding Securities, you are entitled to vote in each class in which you hold Outstanding Securities, and you will be provided with a different ballot for voting in each such class.

### Brief Explanation of Chapter 11 of the Bankruptcy Code

Chapter 11 is the principal reorganization Chapter of the Bankruptcy Code.  Pursuant to Chapter 11, the Company's business affairs may be reorganized for the benefit of its creditors and equity holders.  The Plan is the legal document which accomplishes the reorganization.  The Disclosure Statement and this Memorandum are the documents that describe the Plan treatment of the Holders of the Outstanding Securities.  At such time as the Bankruptcy Court approves the Plan, the Plan will become binding on the Company, its creditors and all of the Holders of the Outstanding Securities.

### Preparation of the Plan, Disclosure Statement and Memorandum

The Plan, Disclosure Statement and Memorandum have been jointly prepared by the Company with the assistance of its Chapter 11 insolvency counsel, securities counsel and tax counsel:

| | | |
|---|---|---|
| Joel Laufer, Esq. | Henry F. Schlueter, Esq. | George C. Howell, III |
| Laufer and Padjen LLC | David Stefanski, Esq. | Hunton & Williams LLP |
| 5290 DTC Parkway | Schlueter & Associates, P.C. | 951 E. Byrd Street |
| Suite 150 | 1050 17th St., Suite 150 | Richmond, VA 23219 |
| Englewood, CO 80111 | Denver, CO 80265 | Telephone: (804) 788 8793 |
| Telephone:  (303) 830 3172 | Telephone: (303) 292 3883 | Facsimile: (804) 343 4535 |
| Facsimile:  (303) 830 3135 | Facsimile: (303) 296 8880 | ghowell@hunton.com |
| e-mail:  jl@jlrplaw.com | das@schlueterintl.com | |
| | | |
| INSOLVENCY COUNSEL | SECURITIES COUNSEL | TAX COUNSEL |

### Transmittal of the Plan, Disclosure Statement, Memorandum and Ballot(s)

The Company is furnishing this Disclosure Statement, Plan, Memorandum and ballot to all Holders of the Outstanding Securities. The Disclosure Statement, Plan and Memorandum are to be used by the Holders of the Outstanding Securities solely in connection with their evaluation of the Plan. Use of the Disclosure Statement, Plan and Memorandum for any other purpose is not authorized.  The Disclosure Statement, Plan and Memorandum may not be reproduced or provided to anyone other than advisors to the Holders of Outstanding Securities without the prior written consent of the Company.

ii

## Voting Deadline

**The Voting Deadline ("Voting Deadline") for the Holders of the Outstanding Securities to accept or reject the Plan is noon Mountain Standard Time on December 19, 2011.** Ballots accepting or rejecting the Plan must be <u>received</u> by the Voting Deadline to be counted. The Voting Deadline may be extended in writing on a Holder by Holder basis in the sole discretion of the Company. A ballot will be counted if it (i) is received on or before the Voting Deadline, (ii) has been duly completed, (iii) has been duly executed, and (iv) has been tendered by the Holder of one or more of the Outstanding Securities. Notwithstanding the foregoing, if a ballot is received that does not reflect on its face that the Holder is either accepting or rejecting the Plan, such a ballot will be deemed to be an acceptance of the Plan. **Ballots may be submitted by mail, hand delivery, facsimile or electronically to the Company's insolvency counsel described above**.

## Timing of the Filing of Chapter 11 Case

Upon acceptance of the Plan by the Holders of the Outstanding Securities, the Company shall file its Chapter 11 Case in the Bankruptcy Court. The Company anticipates the Chapter 11 Case shall be filed shortly after the Voting Deadline. You will receive subsequent notice of the filing date ("Filing Date") of the Chapter 11 Case. The Company anticipates that it will exit the bankruptcy approximately 60 to 90 days after the Filing Date.

## Filing of Plan and Disclosure Statement with the Bankruptcy Court

At or shortly after the Filing Date of the Chapter 11 Case, the Company expects to (i) file the Disclosure Statement, Plan and Memorandum with the Bankruptcy Court, (ii) seek an order of the Bankruptcy Court approving (A) the Disclosure Statement, including the Memorandum, as having contained "adequate information" as of the date of the Disclosure Statement pursuant to Section 1125(a) of the Bankruptcy Code, and (B) the pre-bankruptcy Solicitation as having been in compliance with Section 1125(b) of the Bankruptcy Code, and (iii) seek an order of the Bankruptcy Court confirming and approving the Plan. As of the date of the Disclosure Statement, the Plan, the Memorandum and the Disclosure Statement have not been filed with or reviewed by the Bankruptcy Court, nor have they been approved by the Securities and Exchange Commission ("SEC") or any state securities commission. Because no Chapter 11 Case has yet been commenced, the Disclosure Statement and the Memorandum have not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code.

## Summary of the Plan Treatment of the Holders of Outstanding Securities

The Plan places the Holders of the Outstanding Securities into three different Plan classes described below and provides for different treatment for each of the three classes under the Plan:

Class 4 - Debenture Holders

Class 5 - Existing Preferred Unit Holders

Class 6 - Existing Common Unit Holders

Upon the terms and subject to the conditions set forth in the Plan and this Memorandum and the exhibits attached thereto, the Company proposes the following Plan treatment of the Holders of the Outstanding Securities:

(i)    Class 4 - Debenture Holders.

The Debenture Holders shall exchange their respective Debentures for newly issued preferred A units ("Preferred A Units"). Each Debenture Holder shall receive one Preferred A Unit for each $1,000.00 of Allowed Claim (as defined below) represented by the principal amount of the Debentures held by such Debenture Holder. The Debenture Holders and the number of Preferred A Units to be issued to each Debenture Holder are set forth in **Appendix 1** attached to the Plan.

(ii)    Class 5 - Existing Preferred Unit Holders.

The Existing Preferred Unit Holders shall exchange their respective Existing Preferred Units for newly issued common A units ("Common A Units"). The Existing Preferred Unit Holders shall receive one Common A Unit for each Existing Preferred Unit. The Existing Preferred Unit Holders and the number of Common A Units to be issued to each Existing Preferred Unit Holder are set forth in **Appendix 2** attached to the Plan.

(iii)    Class 6 - Existing Common Unit Holders.

The Existing Common Unit Holders shall exchange their respective Existing Common Units for newly issued common B units ("Common B Units"). The Existing Common Unit Holders shall receive one Common B Unit for each Existing Common Unit. The Existing Common Unit Holders and the number of Common B Units to be issued to each Existing Common Unit Holder are set forth in **Appendix 3** attached to the Plan.

**Voting and Acceptance of the Plan**

Only impaired classes are entitled to vote on the Plan.  Classes 4, 5 and 6 are impaired equity under the Plan.  Accordingly, classes 4, 5 and 6 are entitled to vote on the Plan.

Class 4 - Debenture Holders

Class 4 is an impaired creditor class consisting of the Debenture Holders.  An impaired class of creditors has accepted the Plan if at least two-thirds (2/3) in dollar amount and a majority in number of the creditors voting on the Plan have cast a vote to accept the Plan.

Class 5 - Existing Preferred Unit Holders

Class 5 is an impaired class consisting of the Existing Preferred Unit Holders.  Class 5 will have accepted the Plan if at least two-thirds of the units held by the Existing Preferred Unit Holders voting on the Plan have cast a vote to accept the Plan.

Class 6 - Existing Common Unit Holders

Class 6 is an impaired class consisting of the Existing Common Unit Holders.  Class 6 will have accepted the Plan if at least two-thirds of the units held by the Existing Common Unit Holders voting on the Plan have cast a vote to accept the Plan.

Ballots Received Prior to the Voting Deadline

The Company intends to use all ballots accepting the Plan that were timely received pursuant to this Solicitation to seek approval of the Plan by the Bankruptcy Court. Votes in favor of the Plan also may be used by the Company as acceptances to any modifications to the Plan, provided such modifications do not materially and adversely affect the treatment of the class or classes affected by the modifications.

The Company, in its sole discretion, may file with the Bankruptcy Court a motion to strike a ballot if (i) the person or entity tendering the ballot is not a member or a representative of a class entitled to vote on the Plan, (ii) the ballot was not properly completed and signed or contains information inconsistent with the Company's books and records, or (iii) the ballot was not received on or before the Voting Deadline.

**Class 4 Allowed Claims and Class 5 and 6 Allowed Interests
and the Claims Bar Date**

As described below, the Holders of Outstanding Securities shall hold Allowed Claims and Allowed Interests pursuant to the terms of the Plan. An Allowed Claim means the amount of your Claim as reflected in the Company's books and records.  An Allowed Interest means the number of units held by an Existing Preferred Unit Holder or an Existing Common Unit Holder as reflected in the Company's books and records.

(i)      Class 4 - Debenture Holders.

Debenture Holders shall hold Allowed Claims in the amounts set forth in **Appendix  1** attached to the Plan.

(ii)      Class 5 - Existing Preferred Unit Holders.

Existing Preferred Unit Holders are deemed to hold an Allowed Interest based on the number of Existing Preferred Units held by each Existing Preferred Unit Holder as set forth in **Appendix** 2.

(iii)      Class 6 - Holders of Existing Common Units.

Existing Common Unit Holders are deemed to hold an Allowed Interest based on the number of Existing Common Units held by each Existing Common Unit Holder as set forth in **Appendix** 3.

If you are the Holder of Outstanding Securities and your holdings are not listed on **Appendix  1**,   **Appendix 2** and/or **Appendix 3**, then you should file a Proof of Claim or Proof of Interest with the Bankruptcy Court prior to the claims bar date ("Bar Date") described below.

Similarly, if you are the Holder of Outstanding Securities and your holdings are listed on **Appendix  1**,   **Appendix 2** and/or **Appendix 3**, but you do not agree with the amount of the Allowed Claim or Allowed Interest listed therein, then you should file a Proof of Claim or Proof of Interest with the Bankruptcy Court prior to the Bar Date described below.

**Claims Bar Date**

The Company shall file a motion with Bankruptcy Court at or shortly after the Filing Date requesting the Bankruptcy Court set a Bar Date for classes 4, 5 and 6 to file a proof of Claim or proof of Interest.  You will be given subsequent notice of the Bar Date.

The Company may file objections to a proof of Claim or proof of Interest not later than 30 days after the Bar Date. If the Company does not file an objection to a proof of Claim or proof of Interest, such proof of Claim or proof of Interest automatically shall be deemed an Allowed Claim or an Allowed Interest.

The Company may file objections to a Proof of Claim or Proof of Interest at any time prior to 30 days after the Bar Date. If the Company does not file an objection to a Proof of Claim or Proof of Interest prior to 30 days after the Bar Date, such Proof of Claim or Proof of Interest automatically shall be deemed an Allowed Claim or an Allowed Interest.

### Requirements for Confirmation of the Plan

If classes 4, 5 and 6 accept the Plan, the Plan can be confirmed by the Bankruptcy Court if the Bankruptcy Court finds that the Plan meets the requirements for Confirmation as set forth in Section 1129(a) of the Bankruptcy Code. The Bankruptcy Code requirements for Confirmation of the Plan are complex. Accordingly, if you have any questions concerning the Confirmation requirements, the Company recommends that you consult with your counsel.

### Effect of Confirmation And Discharge

If the Bankruptcy Court orders Confirmation of the Plan, the Plan will be binding upon the Company, its creditors and the Holders of the Outstanding Securities. If the Bankruptcy Court approves the Plan, the Plan will be binding upon you even if you did not vote on the Plan or you voted against the Plan.

### Confirmation Hearing

After the filing of the Disclosure Statement, the Plan and the Memorandum with the Bankruptcy Court, the Bankruptcy Court will schedule a Confirmation hearing to consider approval of the Plan. You will receive a subsequent notice of the date and time of said hearing. You are not required to attend the Confirmation hearing.

### Issuance of Securities under the Plan

The Plan provides for the issuance of securities pursuant to this Memorandum and Section 1145 of the Bankruptcy Code. The Holders of Outstanding Securities are receiving securities under the Plan and therefore should carefully read this Memorandum in its entirety prior to voting on the Plan. The Plan, this Disclosure Statement and the Memorandum have not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary should not be relied upon.

### Disclaimers

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THIS MEMORANDUM, AS WELL AS THE

APPENDICES AND EXHIBITS THERETO IN THEIR ENTIRETY.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT OR THE MEMORANDUM AND THE PLAN, THE TERMS OF THE PLAN ARE CONTROLLING.

THE COMPANY HAS NOT COMMENCED A CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME.  BECAUSE NO BANKRUPTCY CASE HAS BEEN COMMENCED, THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AND THIS MEMORANDUM HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  NONETHELESS, IF A CHAPTER 11 CASE IS SUBSEQUENTLY FILED, THE COMPANY INTENDS TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AND THE MEMORANDUM AS OF THE DATE OF THE DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND DETERMINING THAT THE PREFILING DATE SOLICITATION OF VOTES ON THE PLAN BY MEANS OF THE DISCLOSURE STATEMENT AND THIS MEMORANDUM COMPLIED WITH SECTION 1126(b) OF THE BANKRUPTCY CODE.

THE COMPANY INTENDS TO CONTINUE OPERATING ITS BUSINESS IN CHAPTER 11 IN THE ORDINARY COURSE AND WILL PAY ANY DEBTS INCURRED AFTER THE FILING DATE OF THE CHAPTER 11 CASE IN THE ORDINARY COURSE OF BUSINESS.

THE COMPANY CURRENTLY INTENDS TO SEEK TO IMPLEMENT THE PLAN AS OF THE UNIT TRANSFER DATE, AS THAT TERM IS DEFINED IN THE PLAN. HOWEVER, THERE CAN BE NO ASSURANCE AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN WILL OCCUR.

NO PERSON IS AUTHORIZED BY THE COMPANY IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THE PLAN OTHER THAN AS CONTAINED IN THE DISCLOSURE STATEMENT AND THIS MEMORANDUM. IF SUCH INFORMATION OR REPRESENTATION IS GIVEN OR MADE, IT MAY NOT BE RELIED UPON.

THE DISCLOSURE STATEMENT AND THIS MEMORANDUM DO NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY PARTY DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH HIS/HER/ITS OWN ADVISORS.

THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AND THIS MEMORANDUM, INCLUDING THE INFORMATION REGARDING THE COMPANY'S HISTORY, BUSINESS AND OPERATIONS, IS INCLUDED SOLELY FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN.  THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AND THIS MEMORANDUM MAY NOT BE USED FOR ANY OTHER PURPOSE, AND THE DISCLOSURE STATEMENT, THE PLAN AND THIS MEMORANDUM ARE NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN

SETTLEMENT NEGOTIATIONS.

THE DISCLOSURE STATEMENT AND THIS MEMORANDUM MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN. NOTHING STATED THEREIN CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY. NOTHING THEREIN SHALL BE ADMISSIBLE IN ANY BANKRUPTCY COURT, CASE, ARBITRATION OR OTHER PROCEEDING INVOLVING THE COMPANY OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE COMPANY OR ITS CREDITORS OR EQUITY HOLDERS.

EXCEPT WITH RESPECT TO THE "FINANCIAL PROJECTIONS" SET FORTH IN THIS MEMORANDUM, AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN (INCLUDING WITH RESPECT TO THE PLEADINGS THE COMPANY EXPECTS TO FILE IN THE CHAPTER 11 CASE), THE DISCLOSURE STATEMENT AND THIS MEMORANDUM DO NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AND THIS MEMORANDUM. ACCORDINGLY, THE DELIVERY OF THE DISCLOSURE STATEMENT AND THIS MEMORANDUM WILL NOT, UNDER ANY CIRCUMSTANCES, IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE OF THE DISCLOSURE STATEMENT AND THIS MEMORANDUM.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION CONTAINED HEREIN HAS BEEN PROVIDED BY THE COMPANY. THE COMPANY HAS MADE EVERY EFFORT TO INSURE THE INFORMATION CONTAINED HEREIN IS ACCURATE. COUNSEL FOR THE COMPANY MAKES NO REPRESENTATIONS AS TO THE ACCURACY OF THE INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT OR THIS MEMORANDUM.

UNLESS SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM.

THE DISCLOSURE STATEMENT AND THIS MEMORANDUM CONTAIN CERTAIN FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN. WHEN USED IN THIS MEMORANDUM, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL," "MAY," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS GENERALLY IDENTIFY FORWARD-LOOKING STATEMENTS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL RESULTS. ALTHOUGH THE

COMPANY BELIEVES THAT ITS PROJECTIONS, INTENTIONS AND EXPECTATIONS REFLECTED IN THE FORWARD-LOOKING STATEMENTS ARE REASONABLE, THE COMPANY CANNOT BE SURE THAT THEY WILL BE ACHIEVED.   THESE STATEMENTS ARE ONLY PREDICTIONS AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE OR RESULTS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE CONTEMPLATED BY A FORWARD-LOOKING STATEMENT. ALL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO THE COMPANY OR PERSONS ACTING ON ITS BEHALF ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS SET FORTH IN THE DISCLOSURE STATEMENT AND THIS MEMORANDUM. FORWARD-LOOKING STATEMENTS SPEAK ONLY AS OF THE DATE ON WHICH THEY ARE MADE. EXCEPT AS REQUIRED BY LAW, THE COMPANY EXPRESSLY DISCLAIMS ANY OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE. ALL HOLDERS OF THE OUTSTANDING SECURITIES SHOULD CAREFULLY READ AND CONSIDER THE DISCLOSURE STATEMENT, THE PLAN AND THIS MEMORANDUM BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE OFFER OF SECURITIES AS PROVIDED IN THE PLAN SHALL CONSTITUTE A PUBLIC OFFERING AS PROVIDED IN SECTION 1145(c) OF THE BANKRUPTCY CODE.   A REGISTRATION STATEMENT RELATING TO THE SECURITIES TO BE ISSUED UNDER THE PLAN WILL NOT BE FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.   THE ISSUANCE OF SECURITIES UNDER THE PLAN IS EXEMPT FROM REGISTRATION WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION AS PROVIDED IN SECTION 1145(a) OF THE BANKRUPTCY CODE AND PURSUANT TO APPLICABLE NON-BANKRUPTCY SECURITIES LAWS GOVERNING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN AND THIS MEMORANDUM.   THE DISCLOSURE STATEMENT AND THIS MEMORANDUM HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS ANY SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

UNTIL FORTY (40) DAYS AFTER THE DISTRIBUTION OF SECURITIES UNDER THE PLAN, ALL DEALERS EFFECTING TRANSACTIONS IN THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN SHALL AT THE TIME OF, OR PRIOR TO, THE TRANSACTION DELIVER TO THE PURCHASER A COPY OF THE DISCLOSURE STATEMENT AND THIS MEMORANDUM.   THE DELIVERY OF THE DISCLOSURE STATEMENT AND THIS MEMORANDUM SHALL NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF.

NO DEALER, SALESMAN OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS (PARTICULARLY AS TO THE FUTURE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN) OTHER THAN THOSE CONTAINED IN THE DISCLOSURE STATEMENT AND THIS MEMORANDUM.   ANY INFORMATION OR REPRESENTATION NOT HEREIN

CONTAINED SHOULD NOT AND CANNOT BE RELIED UPON.

PURSUANT TO SECTION 1125(e) OF THE BANKRUPTCY CODE, ANY PERSON, INCLUDING THE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, ATTORNEYS AND ACCOUNTANTS OF THE COMPANY, WHO SOLICITS OR PARTICIPATES IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE IN THE OFFER OF SECURITIES UNDER THE PLAN DESCRIBED IN THE DISCLOSURE STATEMENT AND THIS MEMORANDUM SHALL NOT BE LIABLE ON ACCOUNT OF SUCH SOLICITATION OR PARTICIPATION FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION ENACTED BY THE UNITED STATES OR ONE OF ITS STATES GOVERNING THE OFFER, ISSUANCE, SALE OR PURCHASE OF SECURITIES.

SEE THE SECTION OF THIS MEMORANDUM ENTITLED "RISK FACTORS" FOR A DISCUSSION OF RISK FACTORS WHICH SHOULD BE CONSIDERED WHEN EVALUATING THE PLAN.

THE INFORMATION CONTAINED IN THIS MEMORANDUM IS AS OF THE DATE SET FORTH BELOW.

THE DATE OF THIS MEMORANDUM IS NOVEMBER 16, 2011.

**TABLE OF CONTENTS**

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS** ........................... **XV**

**SUMMARY** ...................................................................................................................................... **1**
OVERVIEW ......................................................................................................................................... 1
THE COMPANY AND ITS BUSINESS ..................................................................................................... 1
RECENT DEVELOPMENTS .................................................................................................................... 5
BUSINESS RESTRUCTURING STRATEGY ............................................................................................... 6
SUMMARY OF THE RESTRUCTURING STRATEGY .................................................................................. 6
FUTURE CAPITAL RAISES AND INCENTIVE UNITS ............................................................................... 7
THE SOLICITATION OF OFFERS AND THE ISSUANCE OF THE NEWLY ISSUED UNITS ............................... 8
RISK FACTORS .................................................................................................................................... 8

**RISK FACTORS** ............................................................................................................................. **15**
BUSINESS RISKS RELATING TO THE COMPANY AND ITS LEGACY LOAN PORTFOLIO ............................ 17
INVESTMENT RISKS RELATING TO THE NEWLY ISSUED UNITS ........................................................... 37
RISKS RELATING TO EACH OF THE PREFERRED A UNITS, COMMON A UNITS AND COMMON B UNITS ... 39
RISKS RELATING TO RETIREMENT PLAN INVESTORS .......................................................................... 41
TAXATION RISK FACTORS .................................................................................................................. 41

**DESCRIPTION OF THE PREFERRED A UNITS** ................................................................... **44**
GENERAL .......................................................................................................................................... 44
RANKING .......................................................................................................................................... 44
DISTRIBUTIONS OF CASH FLOW FROM OPERATIONS ......................................................................... 45
DISTRIBUTIONS OF CASH FLOW FROM LIQUIDATION ........................................................................ 46
VOTING RIGHTS ................................................................................................................................ 46

**DESCRIPTION OF THE COMMON A UNITS** ......................................................................... **47**
GENERAL .......................................................................................................................................... 47
RANKING .......................................................................................................................................... 47
DISTRIBUTIONS OF CASH FLOW FROM OPERATIONS ......................................................................... 48
DISTRIBUTIONS OF CASH FLOW FROM LIQUIDATION ........................................................................ 48
VOTING RIGHTS ................................................................................................................................ 49

**DESCRIPTION OF THE COMMON B UNITS** ......................................................................... **50**
GENERAL .......................................................................................................................................... 50
RANKING .......................................................................................................................................... 50
DISTRIBUTIONS OF CASH FLOW FROM OPERATIONS ......................................................................... 51
DISTRIBUTIONS OF CASH FLOW FROM LIQUIDATION ........................................................................ 51
VOTING RIGHTS ................................................................................................................................ 52

**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ................... **53**
    B.    U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS AND INTERESTS ........... 54

**TAX RAMIFICATIONS** .............................................................................................................. **61**

**ABILITY TO WITHDRAW AS A MEMBER FROM THE COMPANY** ............................... **63**

**USE OF PROCEEDS** ..................................................................................................................... **64**

**THE COMPANY** ............................................................................................................................ **64**
ORGANIZATION AND BACKGROUND ................................................................................................... 64
RESIDENTIAL DEPARTMENT .............................................................................................................. 67
COMMERCIAL LOAN DEPARTMENT .................................................................................................... 68

RECREATIONAL LOAN DEPARTMENT ................................................................................... 69
CURRENT REAL ESTATE MARKET AND IMPACT ON THE COMPANY ..................................... 70
ABILITY TO RAISE NEW CAPITAL AND SUBORDINATED DEBT ............................................ 71
THE COMPANY'S UNDERWRITING GUIDELINES ................................................................. 74
OWNERSHIP OF THE COMPANY'S LOAN PORTFOLIO .......................................................... 76
GEOGRAPHIC AND CUSTOMER CONCENTRATION ............................................................... 77
LOAN SERVICING ............................................................................................................. 78

**THE AMENDED AND RESTATED OPERATING AGREEMENT** ....................................... **81**
CLASSES OF MEMBERS ...................................................................................................... 81
WITHDRAWAL OF MEMBERS; ADMISSION OF ADDITIONAL MEMBERS ............................. 81
VOTING RIGHTS OF MEMBERS .......................................................................................... 82
THE MANAGEMENT COMMITTEE; DESIGNATION OF MANAGERS ...................................... 82
DECISIONS OF THE MANAGEMENT COMMITTEE ................................................................ 83
ESTABLISHMENT OF RESERVES BY THE MANAGEMENT COMMITTEE ................................ 84
AUTHORIZED UNITS .......................................................................................................... 84
CAPITAL CONTRIBUTIONS ................................................................................................. 84
WITHDRAWAL OF CONTRIBUTIONS; INTEREST ON CONTRIBUTIONS ................................ 84
DISTRIBUTIONS OF CASH FLOW FROM OPERATIONS .......................................................... 85
FUTURE ISSUANCES OF MEMBERSHIP INTERESTS AND DILUTION TO THE MEMBERS .......... 86
TRANSFERS OF MEMBERSHIP INTERESTS ........................................................................... 87
LIMITS ON MANAGEMENT'S LIABILITY; INDEMNIFICATION ............................................. 87
TRANSACTIONS WITH AFFILIATES ..................................................................................... 88
OTHER ACTIVITIES OF MEMBERS, MANAGEMENT COMMITTEE AND OFFICERS ................. 88
DISSOLUTION OF COMPANY; LIQUIDATION AND DISTRIBUTION OF ASSETS ...................... 88
AMENDMENTS ................................................................................................................... 88
POWER OF ATTORNEY ....................................................................................................... 89
ACCOUNTING, RECORDS AND REPORTS ............................................................................. 89
CERTAIN TAX AUDITS AND TAX CLAIMS .......................................................................... 90
DISPUTE RESOLUTION ....................................................................................................... 91

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
OPERATIONS** ............................................................................................................... **91**
OVERVIEW ....................................................................................................................... 91
SELECTED CONSOLIDATED FINANCIAL INFORMATION ..................................................... 95
RESULTS OF OPERATIONS .................................................................................................. 97
LIQUIDITY AND CAPITAL RESOURCES ............................................................................... 98
THE COMPANY'S LINES OF CREDIT AND FINANCINGS ....................................................... 99
THE COMPANY'S ALLOWANCE FOR POSSIBLE LOAN LOSSES AND BAD DEBT EXPERIENCE AND VALUATION
RESERVES FOR OREO ..................................................................................................... 102
WRITE DOWNS/VALUATION ALLOWANCES AND EXPENDITURES FOR PROPERTIES ACQUIRED IN FORECLOSURE . 103
NON-PERFORMING ASSETS AND REAL ESTATE OWNED .................................................... 104
REGULATION OF THE COMPANY'S BUSINESS .................................................................... 104
EMPLOYEES ..................................................................................................................... 109
FACILITIES ...................................................................................................................... 110

**COMPANY CAPITALIZATION** ............................................................................................ **110**

**THE COMPANY'S MANAGERS, EXECUTIVE OFFICERS AND CERTAIN COMMON MEMBERS ... 113**
MANAGERS AND EXECUTIVE OFFICERS ........................................................................... 113
BIOGRAPHIES OF THE CURRENT MANAGERS AND EXECUTIVE OFFICERS ......................... 114
AUDIT COMMITTEE ......................................................................................................... 116
EMPLOYMENT AGREEMENTS WITH EXECUTIVE OFFICERS ............................................... 116
EXECUTIVE COMPENSATION ............................................................................................ 118
RELATED PARTY TRANSACTIONS ..................................................................................... 119
RELATED PARTIES OWNERSHIP OF OUTSTANDING SECURITIES, NEWLY ISSUED SECURITIES AND RIGHT TO VOTE
ON THE PLAN .................................................................................................................. 125
COMMON UNITS OWNED BY MANAGERS, EXECUTIVE OFFICERS AND CERTAIN COMMON MEMBERS .................. 126

**OWNERSHIP OF UNITS FOLLOWING THE OFFERING** ...................................................................**127**

    Units Owned by Managers, Executive Officers and Certain Common Members ................................ 127

**TERMS OF THE OFFERING**.............................................................................................................**127**

    General........................................................................................................................................... 127

    Restricted Resale............................................................................................................................ 128

**REPORTS TO HOLDERS OF NEWLY ISSUED UNITS** ..................................................................**128**

**FINANCIAL STATEMENTS** ............................................................................................................**128**

**FINANCIAL PROJECTIONS**............................................................................................................**128**

**INDUSTRY AND MARKET DATA** ..................................................................................................**128**

**LEGAL PROCEEDINGS**...................................................................................................................**129**

**RELEASE** .........................................................................................................................................**129**

**ADDITIONAL INFORMATION** .......................................................................................................**129**

<u>Exhibits</u>

| | |
|---|---|
| Exhibit A | Internally Prepared Consolidated Financial Statements for the Company for the fiscal years ended December 31, 2010 and 2009 and Unaudited Consolidated Financial Statements for the nine-month periods ended September 30, 2011 and 2010 |
| Exhibit B | Seventh Amended and Restated Operating Agreement |
| Exhibit C | Financial Projections |
| Exhibit D | Liquidation Analysis |

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

Certain statements contained in this Memorandum are "forward-looking statements" within the meaning of applicable federal securities laws.  All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipate," "believe," "could," "expect," "estimate," "forecast," "intend," "plan," "potential," "project," "target" and similar expressions are generally intended to identify forward-looking statements.  A forward-looking statement is a projection about a future event or result, and whether the statement comes true is subject to many risks and uncertainties.  The forward-looking statements included in this Memorandum, including the "Projections of Certain Financial Data Following Consummation of Plan of Reorganization," attached hereto as Exhibit C, and the "Liquidation Analysis," attached hereto as Exhibit D, are made only as of the date of this Memorandum.  The actual results or activities of the Company will likely differ from projected results or activities of the Company as described in this Memorandum, and such differences could be material.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results and performance of the Company to be different from any future results, performance and achievements expressed or implied by these statements.  You should review carefully all information included in this Memorandum. In addition to the factors discussed under "**RISK FACTORS**" beginning on page 15, the following important factors could affect future results, causing the results to differ materially from those expressed in the forward-looking statements in this document:

- Risks associated with the continued decline in the value of real estate securing the Company's loans and in the values of real estate owned, including its non-performing or questionable loans, for loan loss reserve purposes and the real estate owned valuation allowance to determine the amount the Company may have to write down as a result of the impairment of these assets and the resulting charge to its earnings;

- Credit risks inherent in the Company's operations;

- Risks associated with the general economy and the market for real estate properties;

- Risks associated with the Company's Senior Lenders (as defined below) failing to cooperate with the pay down of their loans without accelerating the amounts due thereunder;

- Risks associated with changes in interest rates;

- Risks associated with assets that are leveraged;

- Risks that the Company will be unsuccessful in its efforts to effectuate a comprehensive restructuring of its capital structure or the Plan of Reorganization;

- Risks if the Company seeks protection under the Bankruptcy Code; and

- Risks that a bankruptcy filing will harm our customer relationships and cause the Company to lose revenues.

These factors are not all of the important factors that could cause actual results to differ materially from those expressed in the forward-looking statements in this Memorandum. Furthermore, other unknown or unpredictable factors that are not set forth above or in the section under "**RISK FACTORS**" also could have material adverse effects on the Company's future results. The forward-looking statements in this Memorandum are made only as of the date of this Memorandum, and the Company does not intend to, nor does it have any obligation to, update or provide to Investors any forward-looking statements to reflect subsequent events or circumstances.

In light of the significant uncertainties inherent in forward-looking statements, the inclusion of any of these statements in this Memorandum should not be regarded as a representation by the Company or any other person that the Company's objectives or plans will be achieved.

[REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

## SUMMARY

*This summary highlights some basic information contained, or incorporated by reference, in this Memorandum to help you understand our business and the Plan. It does not contain all of the information that is important to you. You should carefully read this Memorandum to understand fully the terms of the Plan of Reorganization, as well as the information incorporated by reference herein. You should pay special attention to the information in the section entitled "**RISK FACTORS**" beginning on page 15 and the section entitled "Cautionary Statement Regarding Forward-Looking Statements."*

**Overview**

Through the consummation of the Plan of Reorganization, the Company intends to restructure its capital structure, improve its liquidity position, enhance its capital levels, while providing adequate time to execute its business restructuring strategy. Upon the terms and subject to the conditions set forth in this Memorandum, we are soliciting acceptances of the Plan which will, among other things, have the effect of exchanging the Outstanding Securities for the Preferred A Units, the Common A Units and the Common B Units (collectively the "Newly Issued Units").

In connection with the transactions contemplated by the Plan, you may elect to: (i) vote to approve the Plan; (ii) vote to reject the Plan; or (iii) take no action with respect to the Plan.

If the Company consummates the Plan of Reorganization, the Company will file an action under Chapter 11 of the United States Bankruptcy Code, and assuming the Plan of Reorganization is confirmed by the Bankruptcy Court, the Holders of Outstanding Securities will receive the consideration described in this Memorandum. The effective date and time of the adoption of the Plan, the exchange of the Outstanding Securities for the issuance of the Newly Issued Units will be December 31, 2011 at 12:00 p.m. MST (the "Unit Transfer Date"). The Outstanding Securities will be cancelled on the books and records of the Company on the Unit Transfer Date.

If the Plan of Reorganization is not approved by the Holders of the Outstanding Securities, the Company may need to seek relief under the Bankruptcy Code without the benefit of a plan of reorganization approved by the Holders of the Outstanding Securities, which may require significant and accelerated asset liquidations.

**The Company and Its Business**

Merchants Mortgage & Trust Corporation, LLC, a Colorado limited liability company, is an established interim real estate and mortgage finance company. The Company historically has been a portfolio lender, which makes loans secured by real estate. The Company is often able to charge higher interest rates than commercial banks because of its flexible loan structures, fast underwriting decisions, standardized documents and overall quick closing ability. With limited exceptions, the Company services its own loans.

The Company was formed in 1961 as a corporation and was restructured as a limited liability company in 1995. Lester Gold, who co-founded the Company, served as President and

Chief Executive Officer of the Company until April 1997, when Gary D. Levine joined the Company and became its President and Chief Executive Officer.

Until 2009 the Company retained ownership of almost all loans it originated.  The loans still owned by the Company (the "Legacy Loan Portfolio") were generally originated primarily during the period between 2006 to 2009.  The loans in the Company's Legacy Loan Portfolio fall into three loan departments:   Residential Department, Commercial Loan Department and Recreational Loan Department.

The Company's Residential Loans are short-term specialty mortgages, which include Residential Loans (1-4 Family, "Fix and Flip," "Mini Perms" or "Bridge" loans), Multi-Family Loans (apartment-to-condo conversions or new management fix-up and lease-up loans) and Small Commercial Loans (similar loans on small commercial properties).

Commercial Loans include residential and commercial construction loans (loans to homebuilders and property developers), commercial loans (income property and land acquisition and development loans) and Mezzanine Loans.  The Company ceased originating Mezzanine Loans in 2007.

Recreational Loans include real estate acquisition and development loans and hypothecation loans (loans secured by the developers' portfolio of consumer notes).  The Recreational Loan Department also handles the purchase and sale of consumer notes from developers who have developed recreational properties (typically lots for second homes, vacation and retirement homes or timeshares).

Beginning in 2009, the Company either totally suspended or substantially limited new originations of all loan products except the Residential Department's 1-4 Family loan products, but particularly the Fix and Flip product, and the Company has not been retaining ownership in substantially all of the new originations that it has been making.

The Company began operations by purchasing consumer notes from developers who had developed recreational lots (typically used for second homes, retirement homes, vacation homes or timeshares) and then selling those lots to consumers, providing financing to the buyers by carrying back the buyers' consumer notes.  These are the Company's Recreational Loans that are called "Recreational Indirect Consumer Loans."   The Company also provided Hypothecation Loans to developers secured by the consumer notes in which the developer retained ownership. The business then grew to include other financing for developers, providing loans for acquisition and development of recreational properties to be repaid from sales of lots and/or timeshares. These are the Company's Recreational Loans that are called "Recreational Acquisition and Development Loans" and "Recreational Hypothecation Loans."

In 1997, the Company only offered Recreational Loans.  During 1998 and 1999, the Company's outstanding loan balance approximately doubled after the addition of Gary D. Levine as Chief Executive Officer of the Company and Kim Hubbard as executive vice president and manager of the new Residential Department.  By 1999, the Company was offering a variety of Residential Loans, which included loan products that later evolved into the loans offered by the Company's Commercial Loan Department.  In 2004, the Company formed the Commercial Loan Department.

During the extended economic and real estate crisis beginning in 2007, the performance of the Company's loan portfolio has severely declined. During this time, increasing delinquencies and foreclosures coupled with falling real estate values have resulted in substantial operating losses and severely reduced liquidity to the Company. The Company's Senior Lenders (as defined below) have stopped funding new loans, and the Company has defaulted on certain of its loan agreements with its Senior Lenders due to its operating results and resulting failure to meet financial covenants, as well as the Company's inability to pay off Senior Lender advances against non-performing collateral and its failure to pay off certain of the Senior Indebtedness (as defined below) at maturity. Since 2007, the Company has negotiated and executed amendments to certain of the bank agreements with the Senior Lenders which cure or temporarily waive certain defaults and which allow for the pay down of the amounts due on these credit facilities as the collateral pledged to the Senior Lenders is liquidated. However, as of the date of this Memorandum, the Company is in technical default with certain of its Senior Lenders. "Senior Indebtedness" as used in this Memorandum means the amounts due on indebtedness of the Company outstanding at any time, except: (i) the Debentures; (ii) any indebtedness of the Company to a member, manager, officer or affiliate of the Company, except for Senior Indebtedness to L. Gold Corp. in the maximum principal amount of up to $1,100,000 and to Yosemite Participation Group, LLC in the maximum principal amount of $3,075,000. The holders of the Company's Senior Indebtedness are referred to herein as the "Senior Lenders."

The recession and the continued economic weakness of the economy in general, especially the weak real estate market, accompanied by unavailability of bank credit and the related severe drop in real estate values beginning in 2007 and continuing through the date of this Memorandum, caused the Company to first reduce its origination of new loans beginning in 2009 and has since hampered its ability to increase new loan production.

The equity of the Company, its subordinated debt and cash generated from operations or portfolio liquidations provide the Company with its liquidity. The continuing operations of the Company are dependent upon the Company's ability to maintain liquidity necessary to meet its funding requirements and operating expenses.

The Company services substantially all the loans in its loan portfolio, as well as consumer notes that certain Senior Lenders have purchased from the Company and some consumer notes from developers.

In February 2010, the Company entered into agreements that formed a joint venture between the Company and a group of private equity investors ("PE Investors"). The agreements created a joint venture (the "Joint Venture") whereby BD Funding, LLC, a newly formed limited liability company ("BD Funding") owned 60% by the PE Investors and 40% by the Company, began to purchase and hold substantially all of the Company's newly originated Non-Owner Occupied ("NOO") Residential 1-4 Family loans (primarily Fix and Flip loans). The Joint Venture was capitalized by an initial investment commitment of $20 million from the PE Investors of both a loan and capital investment and a $2.2 million capital investment commitment from the Company. This resulted in an initial funding commitment to purchase new originations of NOO Residential 1-4 Family loans of $22.2 million, of which $2.2 million was a required investment from the Company. During 2010, the PE Investors doubled their commitment. This increase and the corresponding doubling of the Company's commitment resulted in a Joint Venture investment commitment of $44.4 million as of December 31, 2010.

3

During October 2011, the PE Investors again increased their commitment by another $22.2 million, which resulted in a commitment adequate for funding a total purchase of new originations of NOO Residential 1-4 Family Loans of $66.6 million from the inception of the Joint Venture. It is important to note that the loans in the Company's Legacy Loan Portfolio do not include any of the loans that are held by BD Funding.

The Company's responsibilities under the Joint Venture are to market, underwrite, originate and then service the NOO Residential 1-4 Family loans sold to and owned by BD Funding. BD Funding will finance its acquisition of such loans with equity contributions from the PE Investors and the Company and a loan from either an entity owned by the PE Investors or another lender. Under the Joint Venture, the Company earns loan origination fees, servicing fees and a 40% interest in the profits of BD Funding. The PE Investors have a right of first refusal to fulfill all of the Company's financing or capital needs until their investment commitment has expired.

As a result of the Joint Venture, the Company was again able to renew its energies toward the production of NOO Residential 1-4 Family loans during 2010. The Company's new loan originations increased to approximately $40 million during 2010 and $22 million through September 2011, most of which have been sold to BD Funding with a small number being sold to other private investors.

Most of the debt financing utilized by BD Funding has been provided by the PE Investors. There is very limited interest by the banking community to extend credit for real estate lending in today's market, and only three small bank loans have been arranged to date. The debt financing provided by the PE Investors has until recently been at a much higher yield than traditional bank financing. The result is that the Company has to price its new loan originations at historically high levels, which greatly inhibits its ability to increase production. Recently the PE Investors have agreed to reduce their debt pricing for production over a six-month period in an effort to assist in increasing production.

The result is that the Company is continuing to liquidate its Legacy Loan Portfolio in order to pay down its indebtedness, while new loan originations are sold to BD Funding or other private investors.

The Company derives its revenues from interest income, fees charged on loan originations and consumer note purchases, loan servicing fees and gain from sales of consumer notes. During the nine months ended September 30, 2011, the Company had net interest and fee income of $2,856,115 before: (i) its provision for loan losses of $1,444,772; (ii) other losses of $1,749,786 (primarily attributable to the holding, maintaining and selling of other real estate owned ("OREO"); and (iii) operating expenses of $2,513,934, resulting in a net loss of $4,442,557. During the fiscal year ended December 31, 2010, the Company had net interest and fee income of $6,206,426 before: (i) its provision for loan losses of $4,436,690; (ii) other losses of $1,181,302 (primarily attributable to the holding, maintaining and selling of OREO); and (iii) operating expenses of $4,462,440, resulting in a net loss of $7,356,592. The Internally Prepared Consolidated Financial Statements for the Company for the fiscal years ended December 31, 2010 and 2009 and Unaudited Consolidated Financial Statements for the nine-month periods ended September 30, 2011 and 2010 are attached hereto as Exhibit A.

4

In 2010, the Company conducted an exchange offer to exchange all of its outstanding subordinated debt for the Debentures. All but $100,000 of the Company's subordinated debt was exchanged for Series 2012EX and Series 2012AEX debentures. The Series 2012EX and Series 2012AEX debentures are due and payable on December 31, 2012. Due to the Company's limited financial resources and continued loss from operations, the Company does not believe it will be able to repay these debentures and is soliciting acceptances of the Plan in an effort to obtain the highest return of value to the Holders of the Outstanding Securities.

The deterioration of the economy and particularly the real estate sector, the significant increase in foreclosures and the credit crisis have had a significant negative impact on the Company's operations. From January 1, 2008 to December 31, 2010, the Company experienced significant operating losses totaling approximately $40.6 million. As of the date of this Memorandum, there is substantial doubt about the Company's ability to continue as a going concern.

## Recent Developments

*Reentering Consumer Lending Market*

In September 2011, the Company determined to reenter the residential consumer lending market on single family (1-4 unit) owner occupied properties by offering short term (6 to 36 month) loans for purchase/remodel, bridge loans, etc. Prior to the Company's ceasing to make these loans in 2006, it had a long history of originating, underwriting and servicing these loans. The Company determined to reenter this market due to the demand for this product. When the Company offered this product in the past, it represented a significant amount of the Company's total residential and small commercial department volume. For further information on our new consumer loan products, see "The Company" below.

*State of Colorado Licensing Lawsuit*

Mortgage loan originator licensing in Colorado is administered by the Colorado Division of Real Estate (the "DRE"). The Colorado Board of Mortgage Loan Originators (the "Board") has the authority to delegate any enforcement and administrative authority to the director of the DRE.

In June 2011, the Board adopted Rule 1-1-6 (the "Rule") interpreting the statutory term "residential mortgage loan" as including loans obtained by the borrower for business, commercial or investment purposes such as residential construction loans for home builders and "fix and flip" or "fix and hold" loans where the borrower plans to acquire and rehabilitate the property and either sell it or hold it for rental income. As a result of the Rule, some of the Company's employees would need to be licensed as mortgage loan originators and various loan disclosure requirements and other regulations would have to be met for it to continue to offer these loan products.

In August 2011, the Company and three of its employees brought an action under the Colorado Administrative Procedures Act and the Declaratory Judgment Act against the DRE, the director of the DRE and the Board asserting that the Rule is unlawful and should be enjoined

because of a statutory limitation that a loan cannot be regulated as a "residential mortgage loan" unless it is a consumer purpose loan that is primarily for "personal, family and household use" *of the borrower*.  The Company asserts that because its borrowers use such loans primarily for business, commercial or investment purposes, such loans are not subject to Colorado residential lending regulations and are therefore outside the scope of the Board and the DRE's regulatory authority.

For further information on this legal proceeding with the State of Colorado, see "Regulation of the Company's Business" below.

## Business Restructuring Strategy

The Company and its Managers, in consultation with its advisors, have developed and adopted a restructuring strategy, which has the following objectives:

- Revise the Company's capital structure to effect a change in its deficit equity of approximately $13.6 million to positive equity of approximately $11.8 million;

- Increase the likelihood that the Company will be able to arrange lower-priced cost of funds for BD Funding through bank credit facilities, thereby allowing the Company to lower its loan pricing;

- Increase the likelihood that the Company will be able to substantially increase its loan production;

- Increase the likelihood that the Company will be able to raise new equity capital to fund the Company's share of the increased loan portfolio for BD Funding and to fund other loans;

- Continue to efficiently manage the liquidation of the Legacy Loan Portfolio; and

- If each of the items above is consummated and is successful, position the Company for a return to profitability.

By successfully implementing its business restructuring strategy, the Company's goal is to create a sustainable and profitable business model beginning with the adoption of the Plan and the exchange of the Outstanding Securities for the Newly Issued Units in order to increase the equity in the Company.

## Summary of the Restructuring Strategy

The Company's principal objective in restructuring its capital structure is to maximize the value of their investment holdings to the Holders of the Debentures.  The Company believes the implementation of the Restructuring Strategy will:

- Increase the Company's members equity;

- Increase the likelihood of obtaining lower-cost bank financing for BD Funding, which will result in lower loan pricing and increased loan production;

- Increase the likelihood of raising new equity capital in order to fund increased production;

- Minimize business disruptions and potential customer defections by limiting uncertainty as to the viability of the Company as a going concern and the period of time during which the Company is subject to such uncertainty;

- Provide the Company with sufficient operating flexibility to execute the balance of the Company's business restructuring strategy;

- Offer consideration based on position in the existing capital structure; and

- Preserve significantly higher value for the Company than a liquidation of the Company or a bankruptcy filing without an approved plan of reorganization.

The Plan and the Restructuring Strategy  may have the following negative consequences, which include, but are not limited to:

- New business originations may decrease from customers that are concerned about the Company's ability to perform and its long-term viability; and

- Negative impact upon the Company's brand equity due to the negative connotations surrounding any type of bankruptcy filing.

The Company has engaged the services of a public relations professional with the goal of mitigating the consequence of such potential negatives.  Management of the Company believes the advantages of the Restructuring Strategy and the Plan substantially outweigh the disadvantages.

Assuming the Bankruptcy Court confirms the Plan, Management believes that its strong capital position and liquidity profile should afford the Company the best opportunity to execute on its business restructuring strategy, including refinement of its business model and the orderly liquidation of the Legacy Loan Portfolio.  The Company intends to continue its business focus on the liquidation of its Legacy Loan Portfolio, its origination and servicing of loans and its 40% ownership of BD Funding, LLC.  The Company believes that the opportunities in this segment will be even more compelling in the future, as many independent financing companies have not been able to survive the current economic downturn and few banks have the focused sales, underwriting and operational know-how required to serve this niche market.

**Future Capital Raises and Incentive Units**

In the 12 months following the confirmation of the Plan, the Company intends to raise up to $10 million dollars through an offering of securities (the "Subsequent Offering"). Further, the Company anticipates creating a class of limited liability company membership interests that the

Company may grant, issue or otherwise sell to officers, Managers, agents, key employees and consultants to allow them to profit from any future growth of the Company through their efforts (the "Incentive Interests"). The terms and conditions of the Subsequent Offering and the Incentive Interests have not been determined, and the securities to be issued have not been created. Management believes that the Subsequent Offering may consist of an offering of debt that is convertible into limited liability company membership units issued by the Company that will rank senior to the Newly Issued Units in rights of preferences upon distributions and liquidation. The terms and conditions and the seniority of the Incentive Interests in terms of rights of preference upon distributions and liquidations has not been determined. Upon a determination of the Managers to proceed with the Subsequent Offering and the creation of the Incentive Interests and any other future creation of a class of limited liability company membership interests, the Management Committee and a majority of the Holders of the Company's Common B Units at a meeting at which a quorum of the Common B Units are present will be required to amend and restate the Company's Amended and Restated Operating Agreement to authorize and create the new Units that the debt may be converted into from the Subsequent Offering and the creation of the Incentive Interests.. See "**RISK FACTORS**" below.

**The Solicitation of Offers and the Issuance of the Newly Issued Units**

Section 5 of the Securities Act of 1933, as amended (the "Act"), provides generally that no person may offer or sell securities in the United States unless: (i) the securities are exempt from registration; (ii) the transaction is exempt from registration; or (iii) the securities are registered with the SEC. Section 3(a)(9) of the Act provides an exemption from Section 5 for securities exchanged by an issuer exclusively with its existing security holders where no commission is paid for soliciting the exchange. Thus, this pre-petition solicitation of the Plan which will have the effect of issuing the Newly Issued Units falls within the scope of this exemption and is in compliance with the provisions of Section 5 of the Act. Further, this solicitation is further exempt from the registration requirements because it is being made in accordance with Section 4(2) of the Act.

**All exchanges of the Outstanding Securities for the Newly Issued Securities will be effective as of the Unit Transfer Date.**

**Risk Factors**

As a prospective Holder of the Outstanding Securities, you should carefully consider the risk factors described under the caption "**RISK FACTORS**" beginning on page 15 before deciding whether to vote in favor of the Plan of Reorganization. Please carefully review that section, in addition to the other sections of this Memorandum and the Exhibits, prior to voting to approve or reject the Plan of Reorganization.

## Summary of the Newly Issued Units

### *Preferred A Units*

| | |
|---|---|
| Units Offered: | 24,400.214 Preferred A Units as of the Unit Transfer Date |
| Securities Eligible For Exchange: | If the Plan is Confirmed by the Bankruptcy Court, the Debentures including accrued interest thereon will be exchanged for the Preferred A Units. |
| Exchange Rate: | One Preferred A Unit for each $1,000 of principal amount of Debentures held. |
| Preferential Return: | A non-cumulative, non-compounded distribution of 3% on the basis of each Holder's Capital Account (as defined in the Amended and Restated Operating Agreement) (the "Preferential Return"). |
| Distributions of Cash Flow From Operations: | Following the payment of the Preferential Return and the distribution of an aggregate of 11.11% of the Preferential Return to the Holders of the Common A Units and the Common B Units (50% of this amount to the Holders of each of the Common A Units and the Common B Units), Holders of the Preferred A Units are entitled to receive 90% of the Distributable Cash Flow From Operations (as defined in the Amended and Restated Operating Agreement). |
| Ranking: | The Preferred A Units will rank senior to our Junior Units with respect to distributions of assets upon liquidation, dissolution or winding up of the Company.  "Junior Units" means any class or series of our units that ranks junior to the Preferred A Units as to the distribution of our assets upon any liquidation, dissolution or winding up of the Company.  Junior Units include, but are not limited to, our Common A Units and our Common B Units. |
| Liquidation Rights: | Upon any voluntary or involuntary liquidation, dissolution or winding up of the Company, Holders of the Preferred A Units are entitled to receive out of the assets of the Company available for distribution to our members, before any distribution is made to Holders of our Junior Units, a liquidating distribution in an amount equal to $14,319,965, which represents 100% of the net asset value of the Company as of September 30, 2011 (the "Preferred A Units Liquidation Preference"). Following the distribution of the Preferred A Units Liquidation Preference and the distribution of an aggregate of 11.11% of the Preferred A Units Liquidation Preference to the Holders of the Common A Units and the Common B Units (50% of this amount to the Holders of each of the |

9

Common A Units and the Common B Units), to the extent that additional cash is available for distribution, the Holders of the Preferred A Units shall receive 90% of the remaining liquidation proceeds, and the Holders of the Common A Units and Common B Units shall each receive 5% of the remaining liquidation proceeds.  In any such distribution, if our assets are not sufficient to pay the Preferred A Units Liquidation Preference in full to all Holders of the Preferred A Units, the amounts paid to the Holders of Preferred A Units will be paid pro rata in accordance with the respective aggregate liquidation preferences of those Holders.  See the Amended and Restated Operating Agreement, "Description of the Preferred A Units - Liquidation Rights."

Additional Capital
Contributions or
Capital Calls:          The Preferred A Members will not be required to make any additional capital contributions or any "capital calls" to the Company.

Appointment of
 Managers:              The Preferred A Members as a class shall have the right to elect two Managers to the Management Committee. See the Amended and Restated Operating Agreement, "Description of the Preferred A Units - Voting Rights."

Maturity Date/
Redemption Rights:      The Preferred A Units will not have any maturity date, and we are not required to redeem the Preferred A Units.

Preemptive Rights:      Holders of the Preferred A Units will not have any preemptive rights.


For a description of certain considerations that should be taken into account in connection with the Offers, the Plan and in connection with an investment in the Preferred A Units, see "**RISK FACTORS**" beginning on page 15.

## *Common A Units*

| | |
|---|---|
| Units Offered: | 98,833 Common A Units |

Securities Eligible
For Exchange:          If the Plan is Confirmed by the Bankruptcy Court, the Existing Preferred
                       Units will be exchanged for the Common A Units.

Exchange Rate:         One Common A Unit for each Existing Preferred Unit.

Preferential Return:   The Common A Units will have no preferential return.

Ranking:               The Common A Units is a Junior Unit to the Preferred A Units with
                       respect to distributions of assets upon liquidation, dissolution or winding
                       up of the Company and shall rank in pari-passu with the Common B Units.

Distributions of Cash
Flow From
Operations:            Following the payment of the Preferential Return to the Holders of the
                       Preferred A Units, the Holders of the Common A Units and the Common
                       B Units shall collectively be entitled to receive Distributions of Cash Flow
                       From Operations of an aggregate of 11.11% of the Preferential Return
                       (50% of this amount to the Holders of each of the Common A Units and
                       the Common B Units).   Thereafter, to the extent that additional
                       Distributions of Cash Flow From Operations are available for distribution,
                       Holders of the Preferred A Units are entitled to receive 90% of the
                       Distributable Cash Flow From Operations and the Holders of the Common
                       A Units and the Common B Units shall each receive 5% of the
                       Distributable Cash Flow From Operations.

Liquidation Rights:    Following distribution to the Holders of the Preferred A Units equal to
                       100% of the Preferred A Units Liquidation Preference, the Holders of the
                       Common A Units and the Common B Units collectively shall receive up
                       to an aggregate of 11.11% of the Preferred A Units Liquidation Preference
                       (50% of this amount to the Holders of each of the Common A Units and
                       the Common B Units).   Thereafter, the Holders of the Preferred A Units
                       shall receive 90% of the remaining liquidation proceeds, and the Holders
                       of the Common A Units and Common B Units shall each receive 5% of
                       the remaining liquidation proceeds.   See the Amended and Restated
                       Operating Agreement, "Description of the Common A Units - Liquidation
                       Rights."

Additional Capital
Contributions or
Capital Calls:         The Common A Members will not be required to make any additional
                       capital contributions or any "capital calls" to the Company.

| | |
|---|---|
| Appointment of Managers: | The Common A Members as a class shall have the right to elect one Manager to the Management Committee.  See the Amended and Restated Operating Agreement, "Description of the Common A Units - Voting Rights." |
| Maturity Date/ Redemption Rights: | The Common A Units will not have any maturity date, and we are not required to redeem the Common A Units. |
| Preemptive Rights: | Holders of the Common A Units will not have any preemptive rights. |

For a description of certain considerations that should be taken into account in connection with the Offers, the Plan and in connection with an investment in the Common A Units, see "**RISK FACTORS**" beginning on page 15.

### *Common B Units*

Units Offered:           1,029,529 Common B Units

Securities Eligible
For Exchange:            If the Plan is Confirmed by the Bankruptcy Court, the Existing Common
                         Units will be exchanged for the Common B Units.

Preferential Return:     The Common B Units will have no preferential return.

Ranking:                 The Common B Units will be a Junior Unit to the Preferred A Units with
                         respect to distributions of assets upon liquidation, dissolution or winding
                         up of the Company and shall rank in pari-passu with the Common A
                         Units.

Distributions of Cash
Flow From
Operations:              Following the payment of the Preferential Return to the Holders of the
                         Preferred A Units, the Holders of the Common A Units and the Common
                         B Units shall collectively be entitled to receive Distributions of Cash Flow
                         From Operations of an aggregate of 11.11% of the Preferential Return
                         (50% of this amount to the Holders of each of the Common A Units and
                         the Common B Units).   Thereafter, to the extent that additional
                         Distributions of Cash Flow From Operations is available for distribution,
                         Holders of the Preferred A Units are entitled to receive 90% of the
                         Distributable Cash Flow From Operations, and the Holders of the
                         Common A Units and the Common B Units shall each receive 5% of the
                         Distributable Cash Flow From Operations.

Liquidation Rights:      Following distribution to the Holders of the Preferred A Units equal to
                         100% of the Preferred A Units Liquidation Preference, the Holders of the
                         Common A Units and the Common B Units collectively shall receive up
                         to an aggregate of 11.11% of the Preferred A Units Liquidation Preference
                         (50% of this amount to the Holders of each of the Common A Units and
                         the Common B Units).  Thereafter, the Holders of the Preferred A Units
                         shall receive 90% of the remaining liquidation proceeds, and the Holders
                         of the Common A Units and Common B Units shall each receive 5% of
                         the remaining liquidation proceeds.   See the Amended and Restated
                         Operating Agreement, "Description of the Common B Units - Liquidation
                         Rights."

Additional Capital
Contributions or
Capital Calls:           The Common B Members will not be required to make any additional
                         capital contributions or any "capital calls" to the Company.

Appointment of
Managers:   The Common B Members as a class shall have the right to elect two Managers to the Management Committee.  See the Amended and Restated Operating Agreement, "Description of the Common B Units - Voting Rights."

Voting Rights:   Holders of the Common B Units have other voting rights specifically set forth in the Amended and Restated Operating Agreement.  For further information, see the Amended and Restated Operating Agreement, "Description of the Common B Units - Voting Rights."

Maturity:   The Common B Units will not have any maturity date, and we are not required to redeem the Common B Units.

Preemptive Rights:  Holders of the Common B Units will not have any preemptive rights.

   For a description of certain considerations that should be taken into account in connection with the Offers, the Plan and in connection with an investment in the Common B Units, see "**RISK FACTORS**" beginning on page 15.

## RISK FACTORS

*The restructuring transaction contemplated by the Company involves a high degree of risk and uncertainty. You should carefully consider the risks and uncertainties described below, as well as the other information appearing elsewhere in this Memorandum, before making a decision whether to vote to accept the Plan.*

*As discussed above in the summary section of this Memorandum, the Company currently operates in two segments, the liquidation of its Legacy Loan Portfolio and its current ongoing operations. In this Risk Factors section, the Company has separated discussion of certain risks associated with its liquidation of its Legacy Loan Portfolio from those associated with its ongoing operations. However, certain of the risk factors discussed in one section below may in fact be applicable to both the Company's liquidation of its Legacy Loan Portfolio and its ongoing operations. You should read this Risk Factors section with the understanding that risks in one business segment may in fact be applicable to the Company's operations in the other segment.*

**Risks Related to Failure to Consummate the Restructuring Strategy and/or the Plan**

*Our restructuring efforts may not be successful.*

The Company's efforts to improve its consolidated balance sheet and capital structure by decreasing the Company's outstanding debt and significantly reducing its annual interest expense and its obligations to repay these debts through the Plan may not be successful. Accordingly, we cannot assure you that we will be able to achieve our objectives with respect to our business restructuring strategy, regardless of whether the Plan is confirmed by the Bankruptcy Court.

Further, in the event that we are unable to consummate our restructuring efforts, the Company's ability to continue to operate will be in substantial doubt. As of September 30, 2011, the Company has deficit members' equity of approximately $13.6 million. Management of the Company believes that it has minimal ability to raise capital and substantially grow its loan portfolio without the consummation of the Reorganization Strategy and confirmation of the Plan by the Bankruptcy Court. Further, with the Series 2012EX and Series 2012AEX debentures maturing on December 31, 2012 and no liquid assets to repay them, the Company may be forced to liquidate under Chapter 7 of the Bankruptcy Code if the Reorganization Strategy is not effective, there are insufficient votes for the Plan by the holders of the Outstanding Securities or the Plan is not confirmed by the Bankruptcy Court.

*If the Offers are consummated and/or we receive sufficient votes to accept the Plan of Reorganization, as a result of the Bankruptcy Court's approval of the Plan of Reorganization, the Holders of the Outstanding Securities that did not vote or voted to reject the Plan will nevertheless receive the Newly Issued Units in exchange for their Outstanding Securities.*

If we effectuate the restructuring in Bankruptcy Court through the Plan, all Holders of Outstanding Securities will receive the same treatment. If the Plan of Reorganization is

approved, Holders of Outstanding Securities that did not vote or voted to reject the Plan will nevertheless receive Newly Issued Units in exchange for their Outstanding Securities.

*If the Plan is not approved, we may need to seek relief under the Bankruptcy Code without the benefit of a plan of reorganization approved by the Holders of our Outstanding Securities. If we seek bankruptcy relief under such circumstances, Holders of Outstanding Securities may receive consideration, if any, that is substantially less than what is contemplated in the Plan.*

We believe that restructuring through the Plan is critical to our continuing viability. If we do not obtain approval and Confirmation of the Plan, we will likely need to seek relief under the Bankruptcy Code at some point in time without the benefit of a plan of reorganization approved by holders of Claims or Interests.

We believe that seeking relief under the Bankruptcy Code other than in connection with the prepackaged Plan could materially adversely affect the relationships between us and our existing and potential customers, employees, partners and other stakeholders.  For example:

- Senior Lenders may declare their loans in default, accelerate amounts due under the Senior Indebtedness, foreclose upon the collateral for such loans and bring an action against the Company for any deficiency.  Such deficiency would likely be the result of a quick sale value of the collateral and would be a much larger deficiency than if the Company managed the liquidation of the collateral;

- It is likely that such a filing would substantially erode our customers' confidence in our ability to provide financing, and that as a result, there would be a significant and precipitous decline in our revenues and cash flow;

- Personal guarantees issued by the CEO of the Company may not be extended, resulting in the Senior Lender declaring such loan in default and accelerating the amounts due thereunder;

- Employees could be distracted from performance of their duties, or more easily attracted to other career opportunities;

- It may be more difficult to attract or replace key employees;

- Senior Lenders and other partners could seek to terminate their relationships with us, require financial assurances or enhanced returns or refuse to provide credit on the same terms as prior to the reorganization case under Chapter 11 of the Bankruptcy Code;

- If the Plan is not approved, we could be forced to operate in bankruptcy for an extended period of time while we attempt to develop a reorganization plan that could be confirmed;

- If we were not able to confirm and implement a plan of reorganization, we could be forced to liquidate under Chapter 7 of the Bankruptcy Code; and

- Any distributions to you that you may receive in respect of your Outstanding Securities under a liquidation or under a protracted reorganization case or cases under Chapter 11 of the Bankruptcy Code would likely be substantially delayed, and the value of any potential recovery likely would be adversely impacted by such delay.

**Business Risks Relating to the Company and its Legacy Loan Portfolio**

*Bankruptcy.*

Even if we are successful in consummating the Reorganization Strategy and the Plan is Confirmed by the Bankruptcy Court, if the Company is unable to meet its payment obligations on all its indebtedness to its Senior Lenders or other creditors, or if the Company is unable to renew or extend any of its agreements with its Senior Lenders, or if the Company violates any additional covenants under any of its loan agreements and such violation is not waived and the Senior Lenders attempt to enforce their remedies, the Company in all likelihood would again seek protection from its creditors under the federal bankruptcy code. A bankruptcy would have the effect of stopping all collection and enforcement actions against the Company while the Company or a bankruptcy trustee, under court supervision, tries to arranges either a plan of repayment that allows secured creditors to receive current payments plus any past due payments or a sale of assets designed to pay off the creditors to the extent of the proceeds from the sale. Further, it may also result in secured creditors foreclosing on and taking possession of the collateral securing such loans. Another bankruptcy repayment plan or asset sale may not be on terms acceptable to Holders of the Newly Issued Units and may require the Company to liquidate under Chapter 7 of the Bankruptcy Code. There can be no assurance that the Holders of the Newly Issued Units would receive payments during or following bankruptcy. The filing of a bankruptcy may result in a loss of all or a portion of each Holder's investment in the Newly Issued Units.

*The Company's Independent Auditors have issued a Going Concern opinion for the December 31, 2010 and 2009 financial statements.*

The independent auditor's report accompanying the Company's audited December 31, 2010 and 2009 consolidated financial statements contained an explanatory paragraph expressing substantial doubt about the Company's ability to continue as a going concern. The audited December 31, 2010 and 2009 consolidated financial statements have been prepared "assuming that the Company will continue as a going concern," which contemplates that the Company will realize its assets and satisfy its liabilities and commitments in the ordinary course of business. There can be no assurance that the Company will be able to generate sufficient positive cash flow from operations to address all of its cash flow needs and to continue as a going concern. Further, even if the Company is successful in consummating the Reorganization Strategy and the Plan is Confirmed by the Bankruptcy Court, there can be no assurance the Company will not continue to have a going concern opinion for the foreseeable future. If the Company does not continue as a going concern, it will have to cease operations, and you would likely lose all of your investment in the Newly Issued Units.

**Book Value of the Company's Assets may not be equal to liquidation value.**

As of September 30, 2011, the book value of the Company's assets less the senior liabilities was approximately $14,319,965.  However, in the event of a near term liquidation of the Company, it is unlikely that the sale of the assets would result in the Company realizing the full book value thereof.  The economic crisis has been so devastating that the current market for certain of the Company's collateral does not have traditional financing available to buyers, and therefore today's buyers do not include "market participants," who intend to develop the property.  The near term sale of the Company's portfolio "in bulk" or on a "quick sale" basis is the only way to execute a liquidation in a short period of time.  Those buyers are more likely "land bankers" or "speculators" who will only buy at a steep discount.  Depending upon the circumstances surrounding the sale of the assets, such as the timing of the sale, location of the collateral underlying the loan, the market in the location where the real property is located and other factors, it is likely that the amount the Company would receive in a liquidation would be less than that of book value, and in some cases, it could be significantly less than book value.  Accordingly, in the event that the Company was forced to liquidate, it is likely that the Holders of the Preferred A Units would not realize the full Preferred A Units Liquidation Preference of $14,319,965, if any.

**The Company has been, and is currently, in technical default of its Senior Indebtedness with certain of its Senior Lenders, and all of the Senior Lenders have stopped funding new loans.**

The Company has been, and currently is, in technical default with certain of its Senior Lenders (as defined below), and each of them has stopped funding new loans originated by the Company.  Since 2007, the Company has negotiated and executed amendments to the bank agreements with certain of the Senior Lenders which cure or temporarily waive all defaults, extend the agreement and provide for the pay down of the amounts due on these credit facilities as the collateral pledged to the Senior Lenders is liquidated. There can be no assurance the Company will cure its defaults with its Senior Lenders or that its Senior Lenders will continue to extend the maturity dates of the various loan agreements or allow for the pay down of these amounts as the collateral is liquidated and will not declare the loans in default and seek to accelerate the amounts due.  In the event a Senior Lender does not allow for the pay down of these amounts as the collateral is liquidated and a Senior Lender accelerates its debt or brings an action to enforce its remedies as a result of a defaulted loan, the Company may have to file for bankruptcy to protect itself as a result of such defaults or enforcement actions, which may result in a liquidation of the Company and a loss of all of your investment in the Newly Issued Units.

**The Company does not believe that it will be able to obtain a significant amount of financing from Senior Lenders for the foreseeable future.**

Management does not believe the Company will be able to obtain a significant amount of financing from Senior Lenders for the foreseeable future.  Currently, the Company only has a limited number of Senior Lenders that have provided credit facilities to assist with the liquidation of its OREO and non-performing loans.  The Company does not have any credit facilities with Senior Lenders for new loan production.  In the event the Company is unable to find credit lines

to fund the Company's new loans or is unable to find a cheaper source of capital for BD Funding, the loans the Company is able to originate will continue to remain limited, which would have a material adverse effect upon the Company, its results of operations and its ability to achieve profitability.  Further, the Company will be reliant on financing from private investors and the PE Investors in BD Funding to fund its loans and for BD Funding to purchase such loans, and there can be no assurance such investors will continue to make capital available to the Company or will continue to fund its loans.

### *Continued Delinquency and Defaults.*

The loans in the Company's Legacy Loan Portfolio are subject to risks of borrower delinquency and default.  The inability of borrowers to continue making their loan payments, or to repay loans at maturity, reduces liquidity and causes the Company to seek satisfaction of the debt only through the collateral value, which often is inadequate to satisfy the Company's loan to the borrower. During the past three years, the Company has experienced a significant amount of loan delinquencies and foreclosures from its Legacy Loan Portfolio.  As of September 30, 2011, 29.9% of the Company's total loan portfolio, in the aggregate amount of $13,667,661, was delinquent 30 days or more.  It is important to note that the loans in the Company's Legacy Loan Portfolio do not include any of the loans that are held by BD Funding. The amount of loan delinquencies and foreclosures has resulted in a significant amount of real estate owned by the Company, $11.3 million as of September 30, 2011 (asset value net of prior charge-offs and current valuation reserves) and a decrease in the Company's net income.  Further weakness in the economy and in the real estate markets and other factors beyond the Company's control may result in a further increase in the level of delinquencies and defaults, further loss of value in the Company's real estate owned and in the collateral securing its loans, and a further decrease in its net income.  Increased levels of borrower delinquency and default will have a material adverse effect upon the Company and its financial condition.

### *The Company's allowance for loan losses and valuation reserves for OREO may not be adequate to cover actual losses.*

The Company is exposed to the risk that more of its borrowers will be unable to repay their loans according to their terms and the collateral alone which secures the payment of those loans may not be sufficient to assure repayment.  Credit losses are inherent in the lending business and could have a material adverse effect on the Company and its results of operations. The Company makes various assumptions and judgments about the collectability of its loan portfolio and the value of its OREO and provides an allowance for potential losses and valuation reserves for OREO based on a number of factors.  With the dramatic drop in real estate values in recent years the collateral value for loans in the Legacy Loan Portfolio is usually not adequate to recover the loan balance through the collateral value alone.  For non-performing loans and for OREO, the amount carried on the books of the Company, net of any allowance for loan losses or OREO valuation reserves, is what management estimates as the then fair value of the collateral. For performing loans, although the Company maintains historically high loan loss allowances, the loan balance, net of the loan loss allowance is an amount that is often greater than the fair market value of the underlying collateral.  Some value therefore is attributed to borrowers who appear to be good credit risks and who are current in their obligations.  However, if a borrower on a performing loan later defaults, the Company may have a loss significantly greater than its loan loss allowance.  If the Company's assumptions are wrong or if value of the underlying

19

collateral continues to decline, the Company's allowances for these items may not be sufficient to cover its losses, thereby causing the Company to increase these allowances in the future, which will have an adverse effect on its operating results. The Company's allowances for loan losses and valuation reserves for OREO have increased significantly beginning in 2008. During the nine months ended September 30, 2011, the Company added a provision for loan loss expense of approximately $1.4 million and a valuation allowance on OREO expense of approximately $2.0 million. Those amounts were $4,436,690 and $1,242,654, respectively, during the fiscal year ended December 31, 2010. Unless there is improvement in the U.S. economy and in particular the real estate market, the Company expects it will have to continue to add to its loan loss allowance and its valuation reserves for the foreseeable future. The actual amount of future provisions for loan losses and valuation reserves for OREO cannot be determined at any specific point in time and may exceed the amounts of past provisions. Additions to the Company's provision for loan loss expense and valuation reserves for OREO would decrease its net income.

The Company's management intends to continue to conduct periodic reviews of its loans for loan loss reserve purposes and of the carrying value of the real estate the Company owns as a result of defaulted loans. This will include an analysis of the Company's performing and non-performing loans, including the value of the underlying collateral, to determine the additional amount, if any, the Company may have to add to the reserve in the form of a loan loss allowance or to charge off as a result of the impairment of the non-performing assets. It will also include an analysis of the expected value of the real estate owned and the write down or reserve against the carrying value, if needed, to reflect the reduced value caused by the overall decline in real estate values. Impairment of these non-performing assets may result in a charge to the Company's earnings during the period of the review. The last such review was held in September 2011 and resulted in an increase of loan loss reserves and valuation reserves for real estate owned of approximately $2.7 million.

There can be no assurance that in the event that the Company writes down a significant amount of the Company's portfolio, such write-down will not result in a violation of any covenants with its Senior Lenders. The Company expects that, unless there is improvement in the U.S. economy and in particular the real estate market, its impaired loans and OREO will continue to significantly increase for the foreseeable future.

***Impact of Economic and Real Estate Market Conditions on the Company's Residential and Commercial Loan Portfolios.***

The performance of, and the ultimate ability to liquidate, the Company's Residential and Commercial Loans included in the Legacy Loan Portfolio is heavily dependent upon the real estate industry. Real estate loans such as these are generally paid off with (i) a sale of the collateral, (ii) a refinance of the collateral, or (iii) borrower funds. The current economic and real estate crisis with dramatically lower real estate values has had a devastating impact on the availability of all of these alternatives. Many borrowers have used their personal financial resources to continue to service their loans. When they are no longer able to do so, foreclosure and sale of the collateral at the severely reduced values often will not pay off the loan to the Company. The Company's Residential and Commercial Loan Portfolio performance has been, and may continue to be, adversely affected by decreased values of real estate and the current

economic downturn. Any material decline in real estate values reduces the ability of borrowers to use real estate equity to support borrowings and increases the loan-to-value ratios of mortgage loans previously made, thereby weakening collateral coverage and increasing the possibility of a loss in the event of default. With limited exceptions, the Commercial Loan Department has ceased originating new loans. Since 2008, the Company has experienced, and expects to continue to experience, substantial delinquencies, foreclosures and loan losses for the foreseeable future on the Commercial Loans in the Legacy Loan Portfolio. The real estate industry in Colorado and Arizona, where the Company has originated most of its Residential Loan and Commercial Loans in its portfolio, has fluctuated greatly over the last 25 years. The industry is affected by many factors, including interest rates, inflation rates and employment rates. Any further slowdown in the Colorado or Arizona real estate markets or in the overall economies of these states could have a material adverse effect on the Company's Residential and Commercial Loans in its Legacy Loan Portfolio and the Company as a whole.

### Impact of Economic and Real Estate Market Conditions on the Company's Recreational Loan Portfolio.

The Company's Recreational Loans that remain in its Legacy Loan Portfolio relate to recreational real estate such as second homes, vacation homes, retirement homes and timeshare properties, purchases of which are made from a consumer's discretionary income. Consequently, this segment of the Company's loan portfolio has been, and will likely continue to be, adversely impacted by the general decline in the economic conditions that affect not only real estate values but consumer confidence, such as inflation, weakness in the stock market, unemployment rates, increases in interest rates and cost of living increases, all of which affect the level of discretionary income available to consumers. As of the date of this Memorandum, the Company has ceased making Recreational Loans. Declines in the real estate markets in the states in which the Company originated its Recreational Loans continue to pose risks for these types of loans. Due to the decline in real estate values, the amount consumers can borrow, if any, has decreased, and the amount they must pay as a down payment has increased, thereby making recreational real estate purchases less attractive to consumers. This has, in turn, affected the amount developers can borrow for development of recreational properties, as well as their ability to fulfill their recourse obligations to the Company to replace or re-purchase defaulted consumer notes. Furthermore, the Company expects to be adversely affected by the general poor economic conditions for the foreseeable future. The general economic slowdown, and any further slowdown, will continue to have an additional material adverse effect upon the Company's Recreational Loan portfolio and the Company as a whole.

### The Company's Amount of Other Real Estate Owned and Real Estate Collateral.

As of September 30, 2011, 29.9% of the Company's total loan portfolio, in the aggregate amount of $13,667,661, was delinquent 30 days or more. Since 2008, the increase in loan delinquencies and foreclosures caused a significant increase in the amount of real estate taken in foreclosure or in lieu of foreclosure. For 2009, 2010 and the nine months ended September 30, 2011, those amounts are $12.8 million, $7.5 million and $6.6 million, respectively. The net OREO owned by the Company decreased from $13,855,526 as of December 31, 2008 to $11,336,152 as of September 30, 2011 due to the Company's ongoing acquisition of new OREO through foreclosure or other enforcement process and its continual effort to sell such property. Many of the risks of holding mortgage loans are similar to the

risks of investing directly in the real estate securing those loans. If there is a default on the loan, the ultimate extent of the Company's loss, if any, may only be determined after a foreclosure of the loan encumbering the property and, if the Company takes title to the property, upon liquidation of the property. Factors such as the value of real estate in the geographic area where the property is located, title to the property or its physical condition, including environmental considerations, or any damage to the property from its previous occupants and state of construction may make a third party unwilling to purchase the property for a price sufficient to satisfy the obligations with respect to the related loan. In addition to the property condition and maintenance factors, property taxes and insurance add to the out of pocket costs of holding real estate for sale. Foreclosure laws and any future legislation passed by Congress or any state in which the Company does business or has a defaulting loan may delay, prohibit or protract the foreclosure process. In addition, the value of a property may decrease significantly, the condition of a property may deteriorate or the property may be damaged while foreclosure proceedings are pending. Some borrowers may become subject to bankruptcy proceedings, in which case the amount and timing of amounts due may be materially adversely affected. Even if the property provides adequate security for the loan, substantial delays could be encountered in connection with the liquidation of a defaulted loan, and a corresponding delay in the receipt and reinvestment of principal and interest payments could occur. Further, as discussed in the Liquidation Analysis, attached hereto as Exhibit D, the Company believes that if the assets were required to be liquidated in an inefficient manner, the amounts to be received for such assets would be substantially less than the book value of such assets as currently reflected on the Company's financial statements. Continued foreclosures and any increase in foreclosures have had, and will continue to have, a material adverse effect upon the Company and its financial condition for the foreseeable future.

### *The Company has experienced, and expects to continue to experience, losses from operations for the foreseeable future.*

The Company's revenues are dependent upon demand for the loans originated, purchased, sold and serviced by the Company from potential borrowers and BD Funding and any other purchasers of the Company's loans. The weakness of the general economy coupled with the credit crisis and declines in real estate values has resulted in net losses to the Company of $7,356,592 during the fiscal year ended December 31, 2010 and a net loss of $4,442,557 during the nine months ended September 30, 2011. From January 1, 2008 to December 31, 2010, the Company incurred net losses of $40,582,766. The Company expects to incur losses for the foreseeable future as well. Further weakness in the economy, continued declines in real estate values, changes in prevailing interest rates, an increase in "nonperforming assets" as a percent of the Company's Legacy Loan Portfolio, declines in the "spread" between interest income on the Company's outstanding loans and interest expense on the Company's borrowings, more stringent underwriting standards, general economic conditions and changes in the availability of attractive returns on alternative investments are all circumstances that can make loans of the types originated and purchased by the Company decline in value. Declines in the demand for the types of loans offered and serviced by the Company have had, and will continue to have, a material adverse effect upon the Company and its financial condition for the foreseeable future.

*The Company has experienced, and may continue to experience, increased expenses relating to OREO and legal expenses.*

The Company has experienced a continuing significant amount of loan collateral becoming OREO. The Company's OREO requires liquidity to protect its value and the Company's financial interest in these properties. The liquidity requirements include, but are not limited to, taxes, insurance, homeowner or property owner association fees, property maintenance and other third party payment obligations. Often these expenses are significant when the Company first acquires the OREO. Further, the Company must expend capital for legal proceedings and expense associated with the OREO. The expenditure of capital for expenses relating to OREO is currently approximately $60,000 per month and has a material and adverse impact upon our liquidity. The OREO expenses and legal fees are largely beyond the control of the Company and are required in order to protect the Company's financial interest in the collateral. There can be no assurance the Company will not continue to experience the same or greater capital requirements relating to OREO and legal expenses associated with the OREO, which may have a material adverse effect upon the Company and its results of operations.

*Risks associated with certain loans included in the Legacy Loan Portfolio.*

Some of the consumer notes either (i) pledged as collateral to the Company in its Recreational Loan business on hypothecation loans and thereafter pledged by the Company to its banks; (ii) purchased by the Company in its Recreational Loan business and sold with recourse to its banks; or (iii) purchased by the Company in its Recreational Loan business and pledged as collateral to its banks provide for amortized payments based upon a 15-year amortization period with a balloon payment of principal at the end of five to seven years. During the fiscal years ending December 31, 2012 to December 31, 2016, an aggregate of approximately $3,208,000 of the Recreational Loans owned by the Company, purchased by the Company and sold to banks with recourse to the Company or pledged as collateral for the Company's Recreational Loans come due. If the economy does not improve, or if there is further economic weakness or credit continues to be difficult to obtain for whatever reason, the consumer may be unable to make the balloon payment when due and may not be able to refinance the consumer note, especially if interest rates have increased or if the value of the property has declined since the date of the original consumer note. It is unlikely that the Company's banks, to which these consumer notes have been sold or pledged, will consent to any extensions or loan modifications on consumer notes with balloon payments that are due. The Company expects that it will continue to experience defaults and the inability of the consumer borrowers to make the interest or balloon payments due under these loans. The Company's Recreational Loans that are categorized as "Recreational Acquisition and Development Loans" and "Hypothecation Loans" and the Company's Commercial Loans have a greater concentration of credit risk due to the larger size of these loans and the development and marketing risk associated with the real estate securing these loans. The Company is no longer originating these loans, but as of September 30, 2011, $16,971,704 of these loans remain in the Company's Legacy Loans Portfolio.

In the past, the Company offered mezzanine loans ("Mezzanine Loans"), whereby the Company provided equity-like financing on some residential and commercial real estate projects for usually 90%, and in some cases up to 95%, of the projects' cost. The Company ceased making Mezzanine Loans in 2007 and has worked diligently to reduce the amount of, and exposure to, its Mezzanine Loans. However, as of September 30, 2011, the Company still had a

$500,000 Mezzanine Loan outstanding. Mezzanine Loans carried a greater risk because: (i) there is a higher loan-to-value or loan-to-cost ratio for these loans than for the overall product mix of the Company; and (ii) more importantly, Mezzanine Loans are junior liens or second mortgages which rank behind the first mortgage, which are often loans of a substantial amount and which the Company may not wish, or may not have the ability, to pay off in order to protect its collateral position. In the event of a default of a Mezzanine Loan, there is a much greater risk of a total loss than on the first mortgage loans the Company makes. There can be no assurance the Company will not realize additional defaults and additional losses from its Mezzanine Loans, which may be material.

With regard to the Company's Residential Loans and its Recreational Loans that remain as part of the Legacy Loans Portfolio, the Company's due diligence relating to the real property that secures the loan generally relied on the borrower's due diligence efforts in reviewing the condition of title and the exceptions (which consist of covenants and restrictions affecting the real property) thereto, as well as the suitability of the property for the borrower's intended use. The Company generally did not have its legal counsel perform a thorough review of title exceptions for its Residential Loans. Additionally, a current survey of any type is usually not available, nor is it required by the Company if the title insurance company insuring the Company's lien will waive survey exceptions. As a result, many title exception items were not reviewed, and/or cannot be thoroughly reviewed by the Company's legal counsel, and such legal counsel's review, if any, was limited to the patently obvious. Because a survey is typically not provided, accurate acreage of the property cannot generally be determined. As a result, the Company may experience a loss as a result of unknown title exceptions and other due diligence matters that do not, or did not, come to its attention prior to making the Residential Loans and Recreational Loans that remain in its Legacy Loan Portfolio.

### Past Performance May Not be Indicative of the Company's Future Performance.

During the nine months ended September 30, 2011, the net loss was $4,442,567, and during the fiscal year ended December 31, 2010, the net loss was $7,356,592. From January 1, 2008 to December 31, 2010, the Company incurred net losses of $40,582,766. Even with the approval of the Plan by the holders of the Outstanding Securities and the Confirmation of the Plan by the Bankruptcy Court, the Company expects to incur significant losses for the foreseeable future. The Company's financial situation is subject to many risks and uncertainties that are difficult to predict, including, but not limited to, those set forth in this section entitled "**RISK FACTORS**." Accordingly, the Company's past operating history may not be indicative of future performance, and there can be no assurance that the Company will not continue to incur significant losses from operations.

### Financing and Liquidity.

The Company has a constant need for liquidity to fund its lending and purchasing activities. Prior to the downturn in the real estate market and the recession, the Company funded its loan portfolio by borrowing under secured and unsecured lines of credit, a non-recourse revolving financing facility to a wholly-owned subsidiary, borrowings from an affiliate of the Company, the issuance of subordinated debt and through the Company's equity. The Company no longer has those sources of liquidity available to it. The Company's liquidity is currently reliant upon the origination of loans and the sale of such loans to BD Funding, the repayment of

the Company's Legacy Loan Portfolio and any interest income, loan fee income, brokerage and service fees earned to service the principal and interest payments on Company debt. As of the date of this Memorandum, the Company's Senior Lenders have stopped funding new loans and have continually reduced the amount of liquidity that the Company receives out of the Liquidation of its Legacy Loan Portfolio.

As of September 30, 2011, the Company had eight lines of credit or other financial facilities with no available commitments for new loans but had outstanding balances on the Company's lines of credit and financial facilities of $40,086,197.

Continued defaults in the Company's loans, continuing declines in the value of the collateral securing the loans or further deterioration in the Company's results of operations may create events of default under the Company's lines of credit which may prevent the Company from repaying these loans per the agreements or understandings with the Senior Lenders. Further, these agreements periodically need to be renewed or extended by the Senior Lender and the Company. Failure to renew or extend the repayment terms of any of its credit lines or a default under the credit lines that have extended repayment provisions may result in the Company having to repay all of the outstanding principal balance under such credit line on the maturity date of such loans or the Senior Lender may declare the loans in default and accelerate the maturity date for the loan. There can be no assurance the Company would have the funds available to make such payments to its lender or would be able to acquire additional loans or capital to make such payments. Failure to make such payments when they come due may result in the Company defaulting on such payments.

### Liquidity and Developer Reserves.

When the Company purchased indirect consumer loans with recourse from a developer, or made hypothecation loans to a developer secured by consumer loans owned by the developer, the Company generally required the developer to establish a reserve with the Company to secure the developer's obligation to buy back or replace defaulted consumer notes. These reserves may then be used by the Company if the developer fails to buy back or replace defaulted consumer notes. The amount of such reserves reflected on the books of the Company amount to approximately $844,876 at September 30, 2011. These reserves are not required to be segregated for any specific purpose, and therefore are included in the unrestricted cash liquidity of the Company. However, the Company has utilized these reserves and has insufficient liquidity to be able to repay such reserves in the event it was required to do so. Any utilization of developer reserves, or the obligation to repay such reserves to the developer, therefore reduces the available liquidity of the Company.

### Construction Loan Risks.

The Company's Construction Loans that remain in its Legacy Loan Portfolio, which were loans made to finance properties that were not yet constructed, generally involved greater risks than loans on properties that have been constructed. With certain exceptions, the Company has limited origination of new Construction Loans and no longer has unfunded commitments on loans in the Company's Legacy Loan Portfolio. However, in certain isolated cases the Company has determined that a new commitment for a Construction Loan is the best liquidation strategy for an existing collateral. Sale or refinancing of the completed project generally provides the

funds for repayment of a construction loan. While analyses are made to predict the completed market value of the project, these analyses are subject to unanticipated changes over which the Company may have no control. Since market value cannot be determined until a property is actually sold in the marketplace, the market valuation of a proposed construction project can be especially speculative. Declining economic and real estate market conditions can cause the Company's analysis of market valuation of a proposed construction project to be materially adversely affected. Such conditions can also prevent completion of the project, exacerbating any decline in value of the project and may result in these loans not being repaid to the Company. Failure of these loans to be repaid to the Company may have a material adverse effect upon the Company and an investment in the Newly Issued Units.

### Dependence Upon, and Risk of, Large Relationships.

As of September 30, 2011, loans to the 10 largest lending relationships (based on outstanding loan commitments) of the Company totaled approximately $20,121,000, or 46.9%, of the total loan portfolio of the Company; loans to the five largest lending relationships of the Company totaled approximately $14,725,000, or 34.3%, of the total loan portfolio of the Company; and the aggregate loan balance to the largest lending relationship of the Company totaled approximately $5,459,000, or 12.7%, of the total loan portfolio of the Company. A default to, or loss of, any one of these obligors, could have a material adverse effect upon the Company.

### Geographic Concentration.

As of September 30, 2011, approximately $11.3 million, or 49.7%, of the Company's Residential Loan portfolio and approximately $4.3 million, or 40.2%, of the Company's Commercial Loan portfolio was secured by real property in Colorado, and approximately $9.2 million, or 40.7%, of the Company's Residential Loan portfolio and approximately $5.6 million, or 51.8%, of the Company's Commercial Loan portfolio was secured by real property in Arizona.

The Company's Recreational Acquisition and Development Loans and Recreational Hypothecation Loans historically were made to developers in the western United States, with most transactions relating to land in Texas, Colorado, Arizona, New Mexico, Missouri as well as in Virginia. As of September 30, 2011, approximately 82.1% ($5.5 million) of the Company's outstanding loan portfolio for its Recreational Acquisition and Development Loans and Recreational Hypothecation Loans related to land in New Mexico and 17.2% ($1.1 million) to land in Colorado.

Historically, the real estate industry in Texas, Colorado, Arizona, New Mexico, Missouri and Virginia has fluctuated greatly, and as of the date of this Memorandum, all are experiencing significant weakness and reduced values as compared to the previous five years. Any further weakness, or if the real estate market remains stagnant in the Texas, Colorado, Arizona, New Mexico, Missouri and Virginia real estate markets, could have a material adverse effect on the Company's Residential Loan business, its Commercial Loans and Recreational Loans in the Company's portfolio or the Company as a whole.

### *Risk associated with Loans and Investments in the Turtleback Mountain Resort*.

The Company made various loans to entities associated with the development and operation of the Turtleback Mountain Resort (the "Resort"), and the Company is also involved as an owner of certain of those entities associated with the Resort.   The Resort is a lot and home development and golf course project in New Mexico.  The Resort encompasses approximately 1,050 acres, including a completed championship 18-hole golf course, six completed subdivisions with approximately 215 single-family building lots (approximately 99 of which have been sold), and adjacent land with room for approximately 950 additional single-family building lots and other amenities.  Resort lot sales have been negatively impacted by the current economic crisis.  The loans relating to the Resort are the largest assets (the "Turtleback Assets") of the Company and represent approximately $5.5 million or 12.7% of the Company's total assets.  For additional information on the Turtleback Asset, see "Merchants/Turtleback Investors, LLC" in footnote 5 to the internally prepared financial statement of the Company for the fiscal year ended December 31, 2010.  Until the time that enough lots are sold or other income is generated for the project to support itself, the Company may continue to expend capital to hold this asset and make periodic capital calls as the Company has been doing to date.  Due to the capital already invested in the Resort, the high holding costs associated with this asset and the periodic capital calls for the foreseeable future, the Company has a high concentration of risk associated with the Turtleback Asset. The Company is continually evaluating all reasonable options available to it related to this asset, and if market conditions do not improve the Company may be unable or unwilling to expend additional capital to support this asset, which could have a substantial negative impact on the value of the asset and other negative consequences.  Further, the Company is dependent in part on the other capital partners in this asset continuing to make their capital contributions which if they fail to make such capital contributions, increases the capital burden on the Company.  As of the date of this Memorandum, certain capital partners in the Resort have failed to make their capital contributions, which has increased the capital expended by the Company and will likely continue to have the same impact going forward. There can be no assurance that the lots at the Resort will be sold in the foreseeable future, if at all, or that the Company and its other capital partners will make timely capital contributions to continue to hold and develop this asset. There can be no assurance that the Company will realize a return of its capital or a profit on the capital invested in the Resort.

### *Risks Associated with Certain Types of Loans.*

Between 1999 and 2008, the Company increased the number and average principal amount of its loans that are "Commercial Real Estate Loans" and the number and average principal amount of its Recreational Loans that are "Recreational Acquisition and Development Loans." As of the date of this Memorandum, with few exceptions, the Company has ceased originating these loans; however it retains some in its portfolio. The Commercial Real Estate Loans, which are larger commercial loans to land developers, and the Recreational Acquisition and Development Loans, which are larger loans to recreational land developers, have a greater concentration of credit risk than the Company's other loans. Furthermore, the Company also made Mezzanine Loans in the past. The Company has ceased making Mezzanine Loans and has worked diligently to reduce the amount of, and exposure to, its Mezzanine Loans, Commercial Real Estate Loans and Recreational Acquisition and Development Loans.  However, a significant amount of these loans remain in the Company's Legacy Loan Portfolio, and as of September 30,

2011, the Company had outstanding approximately $500,000 of Mezzanine Loans, $10,332,714 of Commercial Real Estate Loans and $6,461,687 of Recreational Acquisition and Development Loans. All of these categories of loans are made up of larger than average loan amounts for the Company and therefore carry a higher "per loan" risk for the Company than other types of loans. Defaults on such larger loans may have a material adverse effect upon the Company and its operations.

### Contingent Repurchase Obligations.

The Company was previously an active purchaser of Recreational Indirect Consumer Loans, many of which remain in the Company's Legacy Loan Portfolio. The Company has ceased purchasing Recreational Indirect Consumer Loans. When purchasing these loans in the past, the Company sold a substantial portion of the consumer notes it purchased in its Recreational Indirect Consumer Loan transactions to banks or other financial institutions. When a bank bought a consumer note from the Company, the bank would pay the Company the outstanding principal amount of the consumer note, unless the interest rate on the note was less than the bank's required yield, in which case the bank paid a discounted amount. The Company's consumer note sales were all with recourse to the Company, whereby the Company is obligated to repurchase any defaulted consumer notes. Generally, the holders of the consumer notes are able to exercise the recourse provisions 60 days after an event of default occurs. As such, the Company was contingently liable at September 30, 2011 and December 31, 2010 for approximately $2.8 million and $4.1 million, respectively, from its note sales. The developer which sold the consumer loans to the Company, in turn, is obligated to repurchase those defaulted consumer notes from the Company. If the Company is required to repurchase a significant amount of these notes in a short period of time the liquidity of the Company might not be adequate to make the repurchase payments. Due to losses suffered by many real estate developers, many developers no longer have the ability to perform under their repurchase obligations. Furthermore, the Company is also no longer honoring its obligation to repurchase these notes. As a result of the Company not honoring its repurchase obligations, the Company risks one or more of its Senior Lenders declaring the Company in default and accelerating the amounts due under its loan.

### Timeshare Risks.

There are consumer notes relating to timeshares in the Company's consumer note portfolios, acquired as part of its Recreational Indirect Consumer Loans or held by the Company as collateral for certain of its other Recreational Loans (the "Timeshare Notes") that are held in the Company's Legacy Loan Portfolio. Timeshare Notes are subject to certain risks associated with time-interval ownership, such as defects in, damage to or changes in conditions of the vacation resort (such as erosion, construction of adjacent or nearby properties or environmental problems), any breach of contract by the property owners' association to provide certain services to the timeshare borrowers (including any breach resulting from a destruction of the resort) or other risks. Timeshare borrowers also are affected by any loss of benefits related to their unit-week(s), such as cessation of the ability of the timeshare borrowers to exchange their time intervals in the resort for time intervals in other unaffiliated resorts. The Company's management believes that any of these conditions or circumstances would likely result in a delay in payment or in default by a substantial number of the borrowers whose timeshares are affected and in a decrease in the value of the timeshare unit(s) pledged as collateral for the Timeshare

Notes. Furthermore, the difficulties in selling foreclosed unit-weeks securing defaulted timeshare notes are likely to be substantially greater than selling foreclosed real estate following default in traditional mortgage loans, and this may materially affect the amounts realized by the Company on defaulted Timeshare Notes. As of September 30, 2011, the Company has $6,188 in Timeshares Notes on its balance sheet. As of September 30, 2011, the Company had sold $109,257 of consumer notes relating to timeshares on a recourse basis (see the discussion on the Company's Contingent Repurchase Obligations and the related risks, above). Generally, the holders of the Timeshare Notes are able to exercise the recourse provisions 60 days after an event of default occurs under the Timeshare Notes. An increase in the level of delinquent or defaulted consumer notes relating to timeshares could have a material adverse effect upon the Company and its financial condition.

### *Estimates of Future Prepayment and Default Rates.*

The Company's revenues include gains from sales of consumer notes purchased by the Company in the "Recreational Indirect Consumer Loan" segment of the Company's Recreational Loan business. The Company's gain is a function of future interest collected over the yield requirement of the purchasing bank. The present value of gains are recorded by the Company at the time of sale, based in part on management's estimates of future prepayment and default rates in light of then-current conditions. If actual prepayments with respect to consumer notes sold occur more quickly than was projected at the time such notes were sold, as can occur when interest rates decline, interest income will be less than expected and earnings will be charged in the current period. Actual defaults of consumer notes sold have been greater than estimated, therefore charge-offs will likely exceed previously estimated amounts, which could result in a charge to earnings. There can be no assurance that interest income will be as estimated, and if less than estimated, earnings will be charged as a result of the inability of the developer to perform under the recourse provisions.

### *Loans in Other States – Credit Risks.*

The borrowers and the collateral for the Company's Recreational Loans in the Company's Legacy Loan Portfolio are in a variety of states, primarily in the western United States. The borrowers and collateral for some of the Company's Residential Loans and Commercial Loans also are in other states, primarily Arizona. The laws of these different states vary, and these variations may adversely impact the Company's ability to collect on its loans if the variations are not taken into account. Examples of these variations include differences in the amount and availability of homestead exemptions and bankruptcy exemptions, the existence of community property laws, differences in foreclosure proceedings and debtors' redemption rights and differing requirements for filing and perfecting security interests in real and personal property. While the Company attempts to take into account the laws of the various states in which it does business, there is a greater risk in making loans in states other than Colorado, and this risk may adversely affect the Company's loans.

### *Environmental Liabilities and other Potential Liabilities Relating to Properties Acquired in Foreclosure.*

In the event that hazardous substances are found to have contaminated properties secured by the Company's loans, the value of the real property may be diminished. If the Company is

forced to foreclose on a defaulted loan on a contaminated property, the Company potentially may become subject to environmental liabilities, even if the Company was not responsible for the contamination.   While the Company has conducted due diligence to discover potential environmental liabilities before the acquisition of any property through foreclosure, hazardous substances or wastes, contaminants or pollutants may be discovered on properties during the Company's ownership or after a sale of the property to a third party.  If hazardous substances are discovered on a property, the Company may be required to remove those substances or sources and clean up the property.  The Company may also be liable to tenants and other users of neighboring properties. In addition, it may be difficult or impossible to sell the property before or following any cleanup.  The assessment of environmental liabilities upon the Company may have a material adverse effect upon its financial condition.

When the Company acquires properties in foreclosure, it also may inherit other problems associated with those properties that may hinder its ability to sell the property or impact the value of the property.  If the Company acquires a property in foreclosure that has environmental issues, zoning or building code violations, issues related to endangered species or their habitat or other problems, the Company or its subsidiary which holds title to the property may be required to fix or mitigate the problem at the Company's expense.  There can be no assurances that this cost to the Company would not substantially exceed the value of the affected properties or the loans secured by the properties or that the Company would have adequate remedies against the prior owners or other responsible parties.  Costs of fixing or mitigating properties with environmental issues, zoning or building code violations, issues related to endangered species or their habitat or other problems may have a material adverse effect upon the Company and its results of operations.

### Business Risks relating only to the Company's Ongoing Operations and with BD Funding

*No Assurance that BD Funding will be successful, will continue to purchase the Company's loans or through its operations the Company will return to profitability.*

In February 2010, the Company entered into agreements that formed a joint venture in BD Funding between the Company and the PE Investors.  BD Funding is owned 60% by the PE Investors and 40% by the Company.  There can be no assurance that the operations conducted in BD Funding will be successful or will result in the Company becoming profitable.  Currently, BD Funding purchases substantially all of the Company's loans it originates and as a result, the Company is dependent upon BD Funding.  There can be no assurance the BD Funding will continue to purchase any (let alone substantially) all of the loans the Company originates or, if BD Funding does not continue to purchase this amount of the loans, that the Company will be able to find a replacement to purchase a significant amount of the loans it originates.  There can be no assurance that BD Funding will have sufficient capital in the future to continue to purchase the Company's loans.  Further, the overhead that the Company currently carries to conduct the operations in BD Funding is significant, and a significant portion of it is fixed expenses that are necessary for BD Funding's operations.  As a result, the Company must expend its capital to continue operations in BD Funding regardless of the amount of loans originated and sold to BD Funding.  As a result, there can be no assurance that the Company will originate a sufficient number of loans to sell to BD Funding and will earn sufficient profits from its ownership in BD Funding to continue to conduct operations and become profitable.

### BD Funding Requires Less Expensive Capital.

The debt financing available to BD Funding from the PE Investors is priced at 10%, which has been reduced to 8% on a temporary basis until February 2012. These are historically high expense rates and cause the Company to need to charge historically high yields on its loan products. As such, this has depressed any possible production growth by the Company. If the Company is unable to find less expensive capital for BD Funding, the amount and types of loans the Company is able to originate will be continue to be limited and may not be sufficient to allow the Company to achieve profitability.

### Need for Increased Loan Production.

The Company's ability to return to profitability is heavily dependent upon its ability to originate and increase its loan production. Currently, the Company's loan production is limited for a number of reasons as set forth in this Memorandum, including, but not limited to, the cost of funds from the PE Investors in BD Funding, banks unwilling to lend capital to the Company and competition. Further, financial institutions are employing more stringent underwriting standards which negatively affect the amount of real estate financing available, which in turn reduces the amount of transactions that may be used to pay off loans made by the Company. If the Company is unable to address these reasons and increase its loan production, the Company's loan production will continue to be limited and may not be sufficient to allow the Company to achieve profitability.

### Dependence on Gary D. Levine and Kimberly L. Hubbard.

The Company's success is dependent upon the efforts, abilities and decision-making of its senior management, particularly Gary D. Levine, President and Chief Executive Officer, and Kimberly L. Hubbard, Executive Vice President – Residential/Small Commercial Lending. The loss of services of either of these individuals for whatever reason could have an adverse effect upon the Company's business and to continue its operations. The Company does not maintain insurance on the life of any employee of the Company. If Mr. Levine or Ms. Hubbard were no longer serving in his or her capacities at the Company for whatever reason, the Company's operations and financial performance could be adversely affected. Further, the Company may be unable to renew or extend any of its agreements with its Senior Lenders if either Mr. Levine or Ms. Hubbard were not associated with the Company. Mr. Levine's Employment Agreement contains a non-competition covenant whereby Mr. Levine agrees that if he resigns from the Company, he will not compete with the Company's business in the Denver and Phoenix metropolitan areas for two years following his resignation. Mr. Levine's Employment Agreement also contains covenants restricting his ability to solicit employees of the Company (except for his brother and his secretary) upon termination of his employment with the Company. Ms. Hubbard's employment agreement contains covenants restricting her ability to solicit employees of the Company (except two employees who joined the Company with Ms. Hubbard) upon termination of her employment with the Company, but her employment agreement does not contain non-competition covenants or non-solicitation covenants relating to employees or customers of the Company or of Company referral sources.

*Leverage*.

The Company's operations historically required that it borrow additional amounts on its existing lines of credit and borrow against new credit lines and financing facilities. With limited exceptions, the Company's Senior Lenders have stopped funding new loans, and the Company has negotiated and executed amendments to the bank agreements with certain, but not all, of the Senior Lenders which cure or temporarily waive all defaults and allow for the pay down of the amounts due on these credit facilities as the collateral pledged to the Senior Lenders is liquidated. Historically, the Company's debt-to-equity limitations in its institutional borrowings treat the Company's subordinated debt as equity (subject to the institutional lenders' consent to such treatment). Consequently, the Company's issuance of subordinated debt enabled the Company to increase its debt. The consequences of increased leverage include: (i) the Company's increased vulnerability to changes in general economic conditions and competition; (ii) potential limitations on the Company's access to capital markets and ability to refinance its secured financing facilities; and (iii) the dedication of a substantial portion of the Company's available cash to debt service, thereby reducing cash available for use by the Company. The occurrence of these has, and will continue to have, a material adverse effect upon the Company and its operations.

The Company anticipates paying down its debt from cash flow from operations, a substantial portion of which is derived from repayments of principal on loans made by the Company, the origination fees earned on new loans and from cash received from BD Funding's operations. There is no assurance, however, that these payments will be sufficient to continue to allow the Company to pay down its debts to the Senior Lenders.

In the event any of the Company's lines of credit or financing facilities has an additional default and is not cured, this default may cause a default under the other lines of credit and financing facilities. The lenders on the Company's secured lines of credit and financing facilities would be entitled to take over the Company's position on loans pledged as security for these lines of credit and financing facilities and would be an unsecured creditor for the remaining outstanding balance, if any. A default on any of the Company's lines of credit and financing facilities could result in enforcement action by a Senior Lender. Such enforcement action could cause the Company to file a Chapter 7 bankruptcy protection, some of the consequences of which are described in "**Bankruptcy**" below. In the event that Company sought bankruptcy protection, it would have a material adverse effect upon the Company and may result in the Company having to cease operations.

### *Impact of Terrorist Attacks, War, Acts of God or Other Similar Events.*

The terrorist attacks of September 11, 2001, the government's military response to the terrorist attacks, the wars in Iraq and Afghanistan, increased deficit spending, the crises in the financial markets and poor worldwide economic conditions have all contributed to a significant economic decline in the United States. Further terrorist attacks, prolonging the war against terrorism, or continued concerns and action increasing the United States deficit or other events such as acts of God or other major catastrophes may have an adverse effect on the general economy in the areas in which the Company operates, on the Company's business and on the business of the Company's lenders.

*Interest Rate Risks.*

The Company's interest and fees on loans, gains from sales of loans and interest expense are affected by the level of, and changes in, interest rates, which affect the Company's spread between interest income received on its loans and the interest expense of its borrowings. The Company is likely to be adversely affected by interest rate increases if the interest rates on its borrowings exceed the interest rates on its loans to customers, or if the interest rates on its borrowings increase sooner or to a greater extent than the interest rates on its loans to its customers. The Company previously mitigated this risk by making virtually all of its loans to borrowers with provisions for floating interest rate terms that are prime-rate sensitive and adjusted daily. However, the interest yield on such loans has increased to the point that the Company has made, and plans to continue to make, fixed yield loans over the normal 15-month term of most of the loans it originated and longer terms on some of the loans it currently originates. Although the interest rate risk is not mitigated by a floating rate yield as in the past, the substantially increased yield provides the Company with a larger spread over the cost of funds than it has historically experienced. All of the institutional debt of the Company with its Senior Lenders adjusts to changes in either the prime rate or the London Inter-Bank Offer Rate ("LIBOR") daily. Because of the use of "floors" on some of the loans made to borrowers, there is not always a perfect match in the adjustment of interest rates for income and interest rates for expense when either the LIBOR or the prime rate is adjusted. Additionally, "floors" on interest income rates can sometimes provide the Company with higher than market spreads. However, the loans made by the PE Investors to BD Funding are being made at fixed rates and will not be impacted by fluctuations in interest rates. As interest rates increase, the Company's return, if any, will not increase until the variable rates exceed the interest rate floors. Furthermore, when these loans mature, if interest rates are higher than the current rates, the Company may not be able to increase its interest rate floors, because the market may not be willing to pay higher floors until market interest rates have increased substantially. Despite the steps the Company takes to protect its earning spread, the average spread earned on loans made by the Company can vary due to changes in the interest rates.

*Federal Reserve Board policies, other government policies and credit market policies can significantly impact business and economic conditions and the Company's financial results and condition.*

The Federal Reserve Board ("FRB") regulates the supply of money and credit in the United States. Its policies determine in large part the Company's cost of funds for lending and investing and the return the Company earns on those loans and investments, both of which affect the Company's net interest margin. Its policies also can affect the Company's borrowers, potentially increasing the risk that they may fail to repay their loans. Changes in FRB policies are beyond the Company's control and can be difficult to predict. Policies of other government agencies and policies of companies operating in the credit markets can also impact the Company's borrowers and thereby impact the Company's financial results and condition. For example, borrowers of the Company's Residential Loans previously were able to refinance the loans made by the Company using conventional long term market products, such as Federal National Mortgage Association ("FNMA") non-owner occupied financing. Such borrowers were previously able to obtain up to 10 such loans from FNMA at any one time. FNMA has since changed its policies, limiting any one investor to a maximum of four such loans. Similarly,

many of the Company's borrowers relied on the availability of loans where qualification was based on "stated income" to refinance the loans made to them by the Company.  Stated income loans are generally no longer available in the market.  The impact of these credit restrictions has been to make it more difficult for the Company's borrowers to refinance the loans they have with the Company, potentially increasing the risk that such loans will not be repaid.

*Uncertainty Relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act.*

Recently enacted and potential further financial regulatory reforms could have a significant impact on our business, financial condition and results of operations. On July 21, 2010, President Obama signed the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") into law. The Dodd-Frank Act is expected to have a broad impact on the financial services industry, including significant regulatory and compliance changes. Many of the requirements called for in the Dodd-Frank Act will be implemented over time and most will be subject to implementing regulations over the course of several years. Given the uncertainty associated with the manner in which the provisions of the Dodd-Frank Act will be implemented by the various regulatory agencies and through regulations, the full extent of the impact such requirements will have on our operations is unclear. The changes resulting from the Dodd-Frank Act may impact the profitability of business activities, require changes to certain business practices, impose more stringent capital, liquidity and leverage requirements or otherwise adversely affect our business. In particular, the potential impact of the Dodd-Frank Act on our operations and activities, both currently and prospectively, include, among others:

• increased cost of operations due to greater regulatory oversight, and supervision;

• the limitation on the ability to expand consumer product and service offerings due to anticipated stricter consumer protection laws and regulations.

Further, we may be required to invest significant management attention and resources to evaluate and make any changes necessary to comply with new statutory and regulatory requirements under the Dodd-Frank Act, which may negatively impact results of operations and financial condition.

Additionally, we cannot predict whether there will be additional proposed laws or reforms that would affect the U.S. financial system or financial institutions, whether or when such changes may be adopted, how such changes may be interpreted and enforced or how such changes may affect us.  However, the costs of complying with any additional laws or regulations could have a material adverse effect on our financial condition and results of operations.

*Competition.*

The mortgage finance business has historically been highly competitive, with competition occurring primarily on the basis of customer service and the terms and interest rates of the loans. Competition for 1-4 Family Residential Loans traditionally has come from a variety of private money (also known as "hard money") lenders, conventional mortgage brokers, banks such as Wells Fargo that specifically offer a fix and flip loan program and other smaller, local banks.

Some of the traditional competitors' lending programs are not specifically designed for fix and flip loans and are therefore less flexible.  The real estate market crisis which began in 2007 and continues with depressed values and lower activity to today has certainly changed the competitive landscape but has not changed the fact that there is competition. The Company currently faces competition from privately financed real estate lenders who are competing with the Company on both price and loan terms for 1-4 Family Residential Loans.  There can be no assurance that the Company will not face increased competition from companies engaged in the lending business.  The Company faces competitors with greater financial resources, lower costs of funds and better access to public capital.  Management believes that the Company is able to compete effectively in its various niches by offering superior service and a level of expertise that helped it build lasting relationships.  The Company's ability to meet demand with a competitive price has been adversely affected by the high cost of funds it has experienced in BD Funding and its own limited liquidity.  If the Company is unable to successfully compete in the marketplace, it will adversely affect the Company and its operations by affecting both the volume of the Company's business and the spread between the Company's cost of borrowing money and the interest rate on the Company's loans.

### *Underwriting Guidelines and Policies.*

The Company's underwriting guidelines differ in many respects from the standardized guidelines used by most institutional lenders, and the Company makes loans that many institutional lenders are not willing to make, either because the borrowers do not conform to their standards or because the collateral is not of a type against which such lenders typically lend.  The Company's underwriting guidelines and lending policies may expose the Company to higher degrees of underwriting risk on some loans than most institutional lenders are willing to accept.  The Company's management believes that this increased risk generally is mitigated by certain of its loan requirements, such as lower loan-to-value collateral ratios and higher borrower down payments.  In response to the changes in the real estate markets and in general economic conditions, as well as losses in its loan portfolio incurred by the Company, and based upon the Company's relationship with BD Funding, the Company has significantly tightened its underwriting guidelines and credit policies.  However, there can be no assurance that the Company's current guidelines and credit policies will be adequate to protect the Company against substantial losses in the future, which would have a material adverse effect upon the Company's financial condition. Further, the Company intends to reenter the consumer loan industry.  Generally the loans made in the consumer lender area would not be made by larger financial institutions who are employing more stringent underwriting standards.  As a result, the ability of a borrower to repay such loans from a more conventional may have a material adverse effect upon the ability of the borrower's to repay such loans to the Company and may have a material adverse impact the Company's results of operation.

### *Regulation and Licensing.*

The operations of the Company are subject to regulation by federal, state and local government authorities and are subject to various laws and judicial and administrative decisions imposing various requirements and restrictions, including licensing requirements, regulating credit-granting activities, establishing maximum interest rates and finance charges, requiring disclosures to customers and governing secured transactions and lending practices.  In addition, certain states have enacted legislation that restricts the subdivision of rural land.

In June 2011, the Colorado Board of Mortgage Loan Originators adopted the Rule interpreting the statutory term "residential mortgage loan" as including loans obtained by the borrower for business, commercial or investment purposes such as residential construction loans for home builders and "fix and flip" or "fix and hold" loans where the borrower plans to acquire and rehabilitate the property and either sell it or hold it for rental income. As a result of the Rule, the Company's employees would need to be licensed as mortgage loan originators for it to continue to offer these loan products and the Company would have to comply with various loan disclosure and other requirements. While the Company has brought an action alleging the Rule is unlawful, there can be no assurance the Company will be successful in the lawsuit and the Rule will not be enforced.

Further, certain provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") may impose limitations on the rates the Company is able to charge for consumer loans that the Company has begun to offer in Colorado and Arizona. As a result, there can be no assurance that the Company will remain competitive in the market due to the restrictions imposed by Dodd-Frank.

Although the Company believes that its activities are in compliance in all material respects with applicable federal, state and local laws and rules and regulations, there can be no assurance that more restrictive laws, rules and regulations or interpretations thereof, including, but not limited to, the expansion of the requirements for the Company to be licensed in the states in which it offers loans, will not be adopted or enforced in the future, which could make compliance much more difficult or expensive, restrict the Company's ability to originate, purchase or sell loans, further limit or restrict the amount of interest and other charges earned under loans originated or purchased by the Company or otherwise adversely affect the business or prospects of the Company.

### *Loans in Other States – Regulatory Risks.*

Many states attempt to license out-of-state companies that solicit real estate loans from the residents of those states or which are secured by real estate located in such states. Failure to comply with these licensing requirements may result in penalties. The severity of the penalty depends on the regulations of particular states, and the Company is at risk for penalties associated with the failure to obtain a license in such states. The Company is licensed in Colorado, Arizona and Arkansas. In addition, some states regulate the interest rates that can be charged in a loan transaction and various other provisions and terms of a loan. The Company's investor loan documents provide that Colorado law applies to its loans; however, provisions such as these may not be enforced by the courts. The risk to the Company is that the interest rate charged or the terms of the loan may violate the laws of other states. Violation of these regulations may result in penalties and a reduction, in whole or in part, of the interest due on a particular loan. The reduction of interest by a significant number of loans of the Company may have a material adverse effect upon the Company and its results of operations.

**Investment Risks Relating to the Newly Issued Units**

***Different and detrimental terms of the Newly Issued Units.***

The characteristics of the Newly Issued Units are different from, and may be more detrimental to, the Holders than those of the Outstanding Securities that may be exchanged for the Newly Issued Units.

Examples of certain terms of the Preferred A Units compared to the Debentures that may be exchanged that should be considered prior to making a decision to exchange for the Preferred A Units include, but are not limited to, the following:

- The Preferred A Units are not a debt security, and the Holder will not be a creditor of the Company;

- Because the Preferred A Units are not debt instruments, there is no maturity date on which the Holders of the Preferred A Units will be repaid their investment in the Company; and

- There are no affirmative covenants, negative covenants and events of default that would provide certain protection for the Holders of the Preferred A Units.

Examples of certain terms of the Common A Units compared to the Existing Preferred Units that may be exchanged that should be considered prior to making a decision to exchange for the Common A Units include, but are not limited to, the following:

- There is no preferential return to the Holders of the Common A Units;

- The Common A Units are junior to the Preferred A Units and upon a liquidation, may not receive any Cash Flow From Sale (as defined in the Amended and Restated Operating Agreement) due to the liquidation preference allocated to the Preferred A Units;

- There are limited voting rights for the Holders of the Common A Units;

- The capital accounts of the Holders of the Common A Units will be fixed at zero on the Unit Transfer Date; and

- The Common A Units rank pari-passu with the Common B Units.

Examples of certain terms of the Common B Units compared to the Existing Common Units that may be exchanged that should be considered prior to making a decision to exchange for the Common B Units include, but are not limited to, the following:

- The Common B Units are junior to the Preferred A Units and upon a liquidation, will likely not receive any Cash Flow From Sale due to the liquidation preference allocated to the Preferred A Units;

- The capital accounts of the Holders of the Common B Units will be fixed at zero on the Unit Transfer Date; and

- The Common B Units rank pari-passu with the Common A Units.

Accordingly, each investor in the Newly Issued Units is encouraged to review the Company's Amended and Restated Operating Agreement in its entirety, compare the terms of the Newly Issued Units they are to receive to the terms of the security that may be exchanged for the Newly Issued Units if the Plan is Confirmed by the Bankruptcy Court and determine if he, she or it is willing to accept the terms of the Newly Issued Units. The different and adverse changes to the terms of the Newly Issued Units compared to the Outstanding Securities will have a material adverse effect upon an investment in the Newly Issued Units.

### *Issuance of Additional Units by the Company and Dilution.*

In the 12 months following the Confirmation of the Plan, the Company intends to raise up to $10 million dollars through an offering of securities in the Subsequent Offering. Further, the Company anticipates creating the Incentive Interests to grant, issue or otherwise sell to officers, Managers, agents, key employees and consultants to allow them to profit from any future growth of the Company. The terms and conditions of the Subsequent Offering and the Incentive Interests have not been determined, and the securities to be issued have not been created. Management believes that the Subsequent Offering may consist of an offering of debt that is convertible into limited liability company membership units issued by the Company that will rank senior to the Newly Issued Units in rights of preferences upon distributions and liquidation. The terms and conditions and the seniority of the Incentive Interests in terms of rights of preference upon distributions and liquidations has not been determined but may provide for rights of preferences upon distributions and liquidation that will rank in senior to or in pari-pass to those of the Newly Issued Units. Upon a determination of the Managers to proceed with the Subsequent Offering and the creation of the Incentive Interests and any other future creation of a class of limited liability company membership interests, the Management Committee and a majority of the Holders of the Company's Common B Units at a meeting at which a quorum of the Common B Units are present will be required to amend and restate the Company's Amended and Restated Operating Agreement to authorize and create the new securities to be offered. As a result, the holders of the Preferred A Units rights to the Preferential Return and Liquidation Preference may be amended to be junior to those of the securities issued in the Subsequent Offering, the Incentive Interests and any future class of limited liability company membership interests created. Further, the holders of the Common A Units and the Common B Units may be diluted through the issuance of the securities in the Subsequent Offering, the Incentive Interests and any future class of limited liability company membership interests created. In addition, the holders of the Preferred A Units and the Common A Units will have no right to vote upon the amendment of the Amended and Restated Operating Agreement to create the units sold in the Subsequent Offer, the issuance of the Incentive Interests and any future class of limited liability company membership interests created and will be bound by the decision of the Management Committee and the vote of the Common B Units regarding the terms and conditions and the seniority of the securities sold in the Subsequent Offering, the issuance of the Incentive Interests and any future class of limited liability company membership interests created in terms of rights of preference upon distributions and liquidations.

*Lack of Market Liquidity; Restrictions on Transfer.*

There will be no organized public market for the Newly Issued Units. The Newly Issued Units have not been registered under the federal or state securities laws, and their subsequent sale or transfer is restricted. Accordingly, you will not be able to liquidate your investment in the event of an emergency or other circumstances.

*No Independent Counsel.*

No independent counsel has been retained to represent the interests of the Holders of the Outstanding Securities. The interests of the Holders of the Outstanding Securities may be inconsistent in some respects with the interests of the Company and its managers. Each potential Investor is therefore urged to consult his or her own counsel as to the terms and provisions of the Newly Issued Units and in all other documents related thereto.

*We have not obtained a third-party determination that the Offers under the Plan are fair to Holders of the Outstanding Securities.*

The Company has not retained, and does not intend to retain, any unaffiliated representative to act solely on behalf of the Holders of the Outstanding Securities for purposes of negotiating the Offers or preparing a report concerning the fairness of the Offers under the Plan. You must make your own independent decision regarding your vote if to accept the Plan.

*No Reliance on Financial Projections.*

The financial projections attached hereto as Exhibit C have been prepared by the Company based upon assumptions concerning future events and circumstances. Some of the assumptions made in the Financial Projections inevitably will not materialize and unanticipated events and circumstances may occur that will materially affect the Financial Projections. There is no assurance that the actual operations of the Company following the Confirmation of the Plan will correspond to the assumptions made in the Financial Projections. Neither the Company, its officers, directors, its agents or affiliates give any assurance that Financial Projections will not vary materially from actual operating results. Further, the Financial Projections use assumptions that may vary significantly and adversely from actual operating results.

**Risks Relating to each of the Preferred A Units, Common A Units and Common B Units**

*No Guarantee of Distributions.*

Subject to the limitations contained in the Amended and Restated Operating Agreement, the Members may receive distributions of the Company's Distributable Cash Flow From Operations after the repayment of its obligations. Furthermore, Members may be allocated profits, resulting in taxable income to such Members, but not receive any distributions from the Company to pay such taxes. Any distributions are totally dependent upon receipt of Distributable Cash Flow From Operations. Holders of Preferred A Units are entitled to the Preferential Return. Newly Issued Unit Holders may be paid out of earnings, if any, after the Preferred A Unit Holders have been paid. However, there can be no assurance the Holders of the Newly Issued Units will receive any cash distributions for the foreseeable future, if at all.

*Negative Common Members' Equity.*

The Company has experienced significant reductions to its combined Common and Preferred Unit equity as a result of the losses incurred during the fiscal years ended December 31, 2009, 2010 and the nine months ended September 30, 2011.  During the fiscal years ended December 31, 2009 and 2010, the Company experienced an operating loss of $7.3 million and $16.4 million, respectively, which reduced the combined Common and Preferred Unit equity to a deficit of $9,173,132, and a $4,442,557 loss for the nine months ended September 30, 2011, reduced the combined Common and Preferred Unit equity further to a deficit of $13,606,251. There can be no assurance that the Company will not continue to experience negative Common Members' equity, which may have a material adverse effect upon an investment in the Common Units.

*Limited Rights of Holders of Newly Issued Units.*

The success of the Investors' investment will depend largely on the Company's Managers. Each of the investors who exchange their Outstanding Securities for the Newly Issued Units will be Members of the Company.  The limited rights and obligations of the Members are governed by the provisions of the Colorado Limited Liability Company Act and by the Amended and Restated Operating Agreement.   Pursuant to the Amended and Restated Operating Agreement, Holders of the Newly Issued Units will be unable to exercise any management functions with respect to the Company's operations.   Furthermore, the Holders of the Newly Issued Units will have limited voting rights as set forth in the Amended and Restated Operating Agreement and discussed in this Memorandum below.

*Potential Liability to Creditors.*

As a Holder of the Newly Issued Units, your liability to creditors of the Company would be limited to your capital contribution and undistributed profits.  However, if a Member received a return of all or part of such Member's capital contribution in violation of the Amended and Restated Operating Agreement or the Colorado Limited Liability Company Act, the Member may be liable to the Company for a period of three years thereafter for the amount of the contribution wrongly returned.

*Limitation on Management Liability and Releases.*

The Company's Amended and Restated Operating Agreement provides that neither the Company's Managers nor its officers will be liable to the Company or its Members, except for acts or omissions performed or omitted as a result of gross negligence, willful, wanton or fraudulent misconduct.   In addition, the Company's Amended and Restated Operating Agreement provides for indemnification by the Company of the Managers and officers of the Company for liability resulting from errors in judgment or any acts or omissions taken or failed to be taken, unless such acts or omissions constitute gross negligence, willful, wanton or fraudulent misconduct.  To the extent the indemnification provided for in the Amended and Restated Operating Agreement would be deemed to apply to liabilities arising under the Act, the Company and the Managers have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Act and is therefore unenforceable.

Nevertheless, as a result of these provisions of the Amended and Restated Operating Agreement, a Member holding Newly Issued Units may have a more limited right of action against the Management Committee and officers of the Company than he or she otherwise would have. Further, the Plan of Reorganization contains a release whereby, if approved by the Bankruptcy Court, the Company and its officers, directors and agents shall not incur any liability to any Holder of the Outstanding Securities and other claims that are discharged under the Plan that arise out of the filing of the Chapter 11 Case.  See "Release" below.

### Removal Rights.

Except for those Managers that each respective class of Newly Issued Units has the right to elect under the Amended and Restated Operating Agreement, the Holders of the Units have no right to remove the other Managers of the Company for any reason, including, without limitation, wrongful actions taken by them in managing and operating the Company or in their dealings with Members or any of their affiliates.

### Conflicts of Interest.

The interests of the Holders of the Units may be inconsistent in some respects with the interests of the Managers, and there can be no assurance that all conflicts will be resolved in the best interests of the Holders of the Units.

## Risks Relating to Retirement Plan Investors

### ERISA Considerations.

Employee Retirement Income Security Act ("ERISA") and the Internal Revenue Code of 1986, as amended (the "Tax Code") impose certain requirements on employee benefit plans subject to ERISA (such as employer-sponsored retirement plans) and upon other types of benefit plans and arrangements subject to Section 4975 of the Tax Code (such as IRA's) (individually, a "Qualified Plan").  ERISA and Section 4975 of the Tax Code also impose these requirements on certain entities in which the benefit plans or arrangements that are subject to ERISA and Section 4975 of the Tax Code invest.  Any person who is a fiduciary of a Qualified Plan is also subject to the requirements imposed by ERISA and Section 4975 of the Tax Code.  Before a Qualified Plan invests in the Newly Issued Units, the Qualified Plan fiduciary must consider whether the governing instruments for the Qualified Plan would permit the investment, and whether the Newly Issued Units would be a prudent and appropriate investment for the Qualified Plan under ERISA or Section 4975 of the Tax Code for which no exemption is available.

## Taxation Risk Factors

### Cancellation of Debt Income to the Holders of the Existing Units.

In general, the discharge of a debt obligation (such as the Debentures) by a company in exchange for cash and other property having a fair market value that is less than the discharged debt obligation gives rise to cancellation of indebtedness ("COD") income for U.S. federal income tax purposes to a company.  Because the Company is treated as a partnership for tax purposes, each member is required to take into account its allocable share of the Company's

income, gain, loss or deductions on a "pass through" basis. As a result, any COD income realized from the Plan of Reorganization passes through to the Company's Existing Common Unit Holders (and potentially the Existing Preferred Unit Holders) pursuant to the Company's current operating agreement. The Company believes that as a result of the Plan of Reorganization and the cancellation of the Debentures, it will receive COD income in the approximate amount of approximately $13.2 million during the fiscal year ending December 31, 2011. Pursuant to the Company's current operating agreement, the Company expects that all of this COD income will be passed through to the Holders of the Existing Common Units.

### *Treatment of the Company as a Partnership for Federal Income Tax Purposes.*

We are treated as a partnership for U.S. federal income tax purposes and not as a corporation, which means that our income and losses "pass through" to the members even if we do not make any distributions. If we were taxable as a corporation, the "pass through" treatment of our income and losses would not apply. Instead, we would, among other things, pay income tax on our earnings in the same manner and at the same rate as a corporation, and our losses, if any, would not be deductible by the members. In that case, members generally would be treated as shareholders in a corporation and would be taxed only upon distributions that were treated as dividends for U.S. federal income tax purposes.

### *Your Tax Liability May Exceed the Cash You Receive.*

Your tax liabilities associated with an investment in the Newly Issued Units for a given year may exceed the amount of cash we distribute to you during such year. As a member, you will be taxed on your allocable share of our taxable income whether or not you actually receive cash distributions from us. Taxable income in excess of cash distributions also could result if we were to generate so-called "phantom income" (taxable income without an associated receipt of cash). Phantom income could be recognized from a number of sources, including, without limitation, cancellation of indebtedness income, repayment of principal on loans incurred by the Company as well as imputed income due to original issue discount, market discount, imputed interest and significant modifications to existing loans.

### *Your Ability to Offset Income With Our Losses May be Limited.*

For Holders of the Newly Issued Units that are subject to the passive activity loss rules and that do not materially participate in our business, we expect that our losses will be treated as passive activity losses, but that part or all of our net interest income in 2012 and subsequent taxable years potentially may be recharacterized as "equity-financed interest income" and therefore as non-passive income for purposes of certain limitations on the use of losses from passive activities. It is also possible that the Internal Revenue Service ("IRS") could assert that our income is properly treated as portfolio income for purposes of those limitations. Such treatment is subject to the interpretation of complex Treasury regulations and is dependent upon a number of factors, such as whether we are engaged in a trade or business, the extent to which we incur liabilities in connection with our activities and the proper matching of the allocable expenses incurred in the production of income. There can be no assurance that an IRS challenge to our characterization of our income will not succeed. It also is possible that we might be unable to allocate expenses to the income produced, in which case members might find their ability to

offset income with allocable expenses limited by the 2% floor on miscellaneous itemized deductions.

### *The Newly Issued Units May Not Be Well Suited for Foreign and Tax-Exempt Holders.*

The Newly Issued Units may not be a well suited investment for foreign Holders because there is a material risk that the income and gains allocable to Holders in the Company will constitute effectively connected income ("ECI") for U.S. federal income tax purposes. This may result in additional filing requirements and U.S. taxes owed since non-U.S. persons generally are fully subject to U.S. income taxation on ECI (as well as U.S. branch profits tax in the case of foreign corporations). In addition, the Company may not be a well suited investment vehicle for U.S. tax-exempt investors that are subject to tax on unrelated business taxable income ("UBTI") because there is a risk that some or all of the Company's income and gains will give rise to UBTI. Tax exempt investors who realize UBTI may be subjected to additional filing requirements and costs.

### *IRS Audits Could Result in Adjustments to Your Tax Returns.*

The IRS could challenge certain U.S. federal income tax positions taken by us if we are audited, including, but not limited to, those taken in connection with the Plan of Reorganization. Any adjustment to our return resulting from an audit by the IRS would result in adjustments to your tax returns and might result in an examination of items in such returns unrelated to your investment in the Newly Issued Units or an examination of tax returns for prior or later years. Moreover, we and our members could incur substantial legal and accounting costs in contesting any IRS challenge, regardless of the outcome.

### *You May be Subject to State and Local Tax Laws.*

The state in which you reside may impose an income tax upon your share of our taxable income. Differences may exist between U.S. federal income tax laws and state and local income tax laws. We may be required to withhold state taxes from distributions to members in certain instances. You are urged to consult with your own tax advisers with respect to state and local taxation.

### *Changes in Tax Laws Could Have an Adverse Effect on Your Investment.*

In recent years, legislative, judicial and administrative changes have been made in the provisions of the U.S. federal income tax laws applicable to investments similar to an investment in the Newly Issued Units. Additional changes to the tax laws are likely to continue to occur, and we cannot assure you that any such changes will not adversely affect the taxation of a member. Any such changes could have an adverse effect on an investment in our units or on the market value of our assets. You are urged to consult with your own tax advisor with respect to the impact of recent legislation on your investment in the Newly Issued Units and the status of legislative, regulatory or administrative developments and proposals and their potential effect on an investment in our units.

*Additional Tax Risks.*

The U.S. federal and state income tax consequences of an investment in the Newly Issued Units will have a material effect on your economic return from the investment. As a prospective Investor, you should be aware of the tax aspects of an investment in the Newly Issued Units. The Company urges you to consult with your own tax advisors prior to voting to approve the Plan of Reorganization and investing in the Newly Issued Units.

## DESCRIPTION OF THE PREFERRED A UNITS

The following summarizes the material terms of the Preferred A Units but does not purport to be complete and is subject to and qualified in its entirety by reference to the Amended and Restated Operating Agreement attached hereto as Exhibit B and incorporated herein by this reference. For additional information relating to the Preferred A Units not discussed in this section, see "The Amended and Restated Operating Agreement" below.

**General**

The Preferred A Units will not be convertible into, or exchangeable for, units of any other class or our other securities. The Preferred A Units have no stated maturity and will not be subject to any sinking fund, retirement fund or purchase fund or other obligation of the Company to mandatorily redeem, repurchase or retire the Preferred A Units.

The Preferred A Units will be fully paid and nonassessable when issued, which means that Holders will have paid their purchase price in full by tendering the Debentures and that we may not ask them to surrender additional funds, make additional capital contributions or "capital calls". Holders of the Preferred A Units will not have preemptive or subscription rights to acquire more of our membership interests.

**Ranking**

The Preferred A Units are equity interests in the Company and do not constitute indebtedness. In the event of bankruptcy, liquidation, dissolution, reorganization or similar proceeding with respect to the Company, indebtedness will effectively rank senior to the Preferred A Units, and the Holders of our indebtedness will be entitled to the satisfaction of any amounts owed to them prior to the payment of the liquidation rights of any equity units issued by the Company, including the Preferred A Units.

Subject to the consent of the Management Committee and the vote of the Common B Units as provided in the Amended and Restated Operating Agreement, without the vote or consent of the Preferred A Members, the Company may issue newly created units or Membership Interests from time to time in one or more classes, or one or more series of such classes, which classes or series shall have such designations, preferences and relative, participating, optional or other special rights that are senior to, or pari-passu to, those of the Preferred A Members, including but not limited to the units that debt may be converted into the Company's limited liability company membership interests in the Subsequent Offering, the

Incentive Units as discussed above and any other membership interests that the Management Committee may determine to issue.

The terms and conditions of the Subsequent Offering and the Incentive Interests have not been determined, and the securities to be issued have not been created. Upon a determination of the Managers to proceed with the Subsequent Offering or the creation of the Incentive Interests, the approval of the Management Committee and a Majority-In-Interest of the Holders of the Common B Units will be required to amend and restate the Company's Amended and Restated Operating Agreement to authorize and create the units sold or into which the debt instruments may be converted for the Subsequent Offering or for the Incentive Interests. **PURSUANT TO THE AMENDED AND RESTATED OPERATING AGREEMENT, THE MANAGEMENT COMMITTEE HAS THE RIGHT, WITHOUT THE VOTE OR APPROVAL OF THE HOLDERS OF THE PREFERRED A UNITS, TO CREATE ADDITIONAL CLASSES OF MEMBERSHIP INTERESTS THAT ARE SENIOR TO OR RANK IN PARI-PASSU TO THOSE OF THE PREFERRED A UNITS WITH RESPECT TO DISTRIBUTIONS OF ASSETS UPON LIQUIDATION, DISSOLUTION OR WINDING UP OF THE COMPANY AND DISTRIBUTIONS FROM CASH FLOW FROM OPERATIONS. THE HOLDERS OF THE PREFERRED A UNITS WILL HAVE NO RIGHT TO VOTE UPON AN AMENDMENT TO THE AMENDED AND RESTATED OPERATING AGREEMENT THAT MODIFIES OR AMENDS THE RELATIVE RIGHTS, PREFERENCES AND PRIVILEGES OF THE PREFERRED A UNITS, INCLUDING, BUT NOT LIMITED TO, NEW LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS CREATED FOR THE SUBSEQUENT OFFERING, THE INCENTIVE INTERESTS OR ANY OTHER ADDITIONAL CLASSES OF LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS THE MANAGEMENT COMMITTEE MAY DETERMINE TO ISSUE.**

**Distributions of Cash Flow From Operations**

Preferred A Members are entitled to preferential distributions of the Company's Distributable Cash Flow From Operations in an amount equal to the Preferential Return. All remaining Distributable Cash Flow From Operations is distributable to the Members as follows:

First, one hundred percent (100%) to the Common A Members and Common B Members until the Common A Members and the Common B Members have been distributed an aggregate amount equal to 11.11% of the Preferential Return (50% of this amount to the Holders of each of the Common A Units and the Common B Units); and

The balance, if any, ninety percent (90%) to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member), five percent (5%) to the Common A Members (based on the number of Common A Units held by each Common A Member) and five percent (5%) to the Common B Members (based on the number of Common B Units held by each Common B Member).

The amount and timing of distributions of Distributable Cash Flow From Operations will be as determined by the Management Committee in its discretion.

45

**Distributions of Cash Flow From Liquidation**

Upon any voluntary or involuntary liquidation, dissolution or winding up of the Company, Holders of the Preferred A Units and any parity units are entitled to receive out of the assets of the Company available for distribution to our members, before any distribution is made to Holders of our Junior Units, a liquidating distribution in an amount equal to $14,319,965 (the "Preferred A Units Liquidation Preference").  Following the distribution of the Preferred A Units Liquidation Preference and the distribution of an aggregate of 11.11% of the Preferred A Units Liquidation Preference to the Holders of the Common A Units and the Common B Units (50% of this amount to the Holders of each of the Common A Units and the Common B Units), to the extent that additional cash is available for distribution, the Holders of the Preferred A Units shall receive 90% of the remaining liquidation proceeds and the Holders of the Common A Units and Common B Units shall each receive 5% of the remaining liquidation proceeds.  In any such distribution, if our assets are not sufficient to pay the Preferred A Units Liquidation Preference in full to all Holders of the Preferred A Units and all Holders of any parity units, the amounts paid to the Holders of Preferred A Units and to the Holders of any parity units will be paid pro rata in accordance with the respective aggregate liquidation preferences of those Holders.

**Voting Rights**

The Holders of the Preferred A Units have the right to elect two Managers to the Management Committee.

Following the approval of the Plan of Reorganization, the Members of the Management Committee shall within 60 days following their initial appointments nominate the Managers that are to be elected by the Preferred A Members at a meeting called for such purpose pursuant to the Amended and Restated Operating Agreement, to either (i) elect such nominees, or (ii) elect other nominees as "write in" candidates at the meeting.

Each Manager appointed by the Preferred A Members may be removed at any time at the discretion of the Holders of the Preferred A Units.  Written notice must be given to the Management Committee immediately upon the selection or removal of such Managers.

The Company may hold elections to elect a new Manager appointed by the Preferred A Members as set forth below: (i) within 90 days after the vacancy of a Manager as a result of such Manager's death, incapacitation or resignation, (ii) within 30 days after the determination of the Management Committee, at its sold discretion, to hold a meeting to elect new Managers to the Management Committee, and (iii) within 30 days following the receipt of written notification from 33% of the Preferred A Members to elect one or more new Managers that may be elected by the Preferred A Members and to remove one or more of the then existing Managers elected by the Preferred A Members.

## DESCRIPTION OF THE COMMON A UNITS

The following summarizes the material terms of the Common A Units but does not purport to be complete and is subject to and qualified in its entirety by reference to the Amended and Restated Operating Agreement attached hereto as Exhibit B and incorporated herein by this reference. For additional information relating to the Common A Units not discussed in this section, see "The Amended and Restated Operating Agreement" below.

**General**

The Common A Units will not be convertible into, or exchangeable for, units of any other class or our other securities. The Common A Units have no stated maturity and will not be subject to any sinking fund, retirement fund or purchase fund or other obligation of the Company to mandatorily redeem, repurchase or retire the Common A Units.

The Common A Units will be fully paid and nonassessable when issued, which means that Holders will have paid their purchase price in full by tendering the Existing Preferred Units and that we may not ask them to surrender additional funds. Holders of the Common A Units will not have preemptive or subscription rights to acquire more of our membership interests. Further, the Common A Members will not be required to make any additional capital contributions or any "capital calls" to the Company.

**Ranking**

The Common A Units are equity interests in the Company and do not constitute indebtedness. In the event of bankruptcy, liquidation, dissolution, reorganization or similar proceeding with respect to the Company, indebtedness will effectively rank senior to the Common A Units, and the Holders of our indebtedness will be entitled to the satisfaction of any amounts owed to them prior to the payment of the liquidation rights of any equity units issued by the Company, including the Common A Units.

Subject to the consent of the Management Committee and the vote of the Common B Units as provided in the Amended and Restated Operating Agreement, without the vote or consent of the Common A Members, the Company may issue newly created units or Membership Interests from time to time in one or more classes, or one or more series of such classes, which classes or series shall have such designations, preferences and relative, participating, optional or other special rights that are senior to, or pari-passu to, those of the Common A Members, including but not limited to the units that debt may be converted into the Company's limited liability company membership interests in the Subsequent Offering, the Incentive Units as discussed above and any other membership interests that the Management Committee may determine to issue.

The terms and conditions of the Subsequent Offering and the Incentive Interests have not been determined, and the securities to be issued have not been created. Upon a determination of

the Managers to proceed with the Subsequent Offering or the creation of the Incentive Interests, the approval of the Management Committee and a Majority-In-Interest of the Holders of the Common B Units will be required to amend and restate the Company's Amended and Restated Operating Agreement to authorize and create the units sold or into which the debt instruments may be converted for the Subsequent Offering or for the Incentive Interests. **PURSUANT TO THE AMENDED AND RESTATED OPERATING AGREEMENT, THE MANAGEMENT COMMITTEE HAS THE RIGHT, WITHOUT THE VOTE OR APPROVAL OF THE HOLDERS OF THE COMMON A UNITS, TO CREATE ADDITIONAL CLASSES OF MEMBERSHIP INTERESTS THAT ARE SENIOR TO OR RANK IN PARI-PASSU TO THOSE OF THE COMMON A UNITS WITH RESPECT TO DISTRIBUTIONS OF ASSETS UPON LIQUIDATION, DISSOLUTION OR WINDING UP OF THE COMPANY AND DISTRIBUTIONS FROM CASH FLOW FROM OPERATIONS. THE HOLDERS OF THE COMMON A UNITS WILL HAVE NO RIGHT TO VOTE UPON AN AMENDMENT TO THE AMENDED AND RESTATED OPERATING AGREEMENT THAT MODIFIES OR AMENDS THE RELATIVE RIGHTS, PREFERENCES AND PRIVILEGES OF THE COMMON A UNITS, INCLUDING, BUT NOT LIMITED TO, NEW LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS CREATED FOR THE SUBSEQUENT OFFERING, THE INCENTIVE INTERESTS OR ANY OTHER ADDITIONAL CLASSES OF LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS THE MANAGEMENT COMMITTEE MAY DETERMINE TO ISSUE.**

**Distributions of Cash Flow From Operations**

The Common A Members are not entitled to any preferential distribution from operations. Preferred A Members are entitled to receive the Preferential Return. Following the payment of the Preferential Return to the Holders of the Preferred A Units, the Holders of the Common A Units and the Common B Units shall collectively be entitled to receive Distributions of Cash Flow From Operations of an aggregate of 11.11% of the Preferential Return (50% of this amount to the Holders of each of the Common A Units and the Common B Units). Thereafter, to the extent that additional Distributions of Cash Flow From Operations are available for distribution, Holders of the Preferred A Units are entitled to receive 90% of the Distributable Cash Flow From Operations and the Holders of the Common A Units and the Common B Units shall each receive 5% of the Distributable Cash Flow From Operations.

The amount and timing of distributions of Distributable Cash Flow From Operations will be as determined by the Management Committee in its discretion.

**Distributions of Cash Flow From Liquidation**

Following distribution to the Holders of the Preferred A Units equal to 100% of the Preferred A Units Liquidation Preference, the Holders of the Common A Units and the Common B Units collectively shall receive up to an aggregate of 11.11% of the Preferred A Units Liquidation Preference (50% of this amount to the Holders of each of the Common A Units and the Common B Units). Thereafter, the Holders of the Preferred A Units shall receive 90% of the remaining liquidation proceeds and the Holders of the Common A Units and Common B Units shall each receive 5% of the remaining liquidation proceeds.

**Voting Rights**

The Holders of the Common A Units have the right to elect one manager to the Management Committee.

Following the approval of the Plan of Reorganization, the Members of the Management Committee shall within 60 days following their initial appointments nominate the Manager that is to be elected by the Common A Members at a meeting called for such purpose pursuant to the Amended and Restated Operating Agreement, to either (i) elect such nominee, or (ii) elect another nominees as a "write in" candidate at the meeting.

The Manager elected by the Common A Members may be removed at any time at the discretion of the Holders of the Common A Units.  Written notice must be given to the Management Committee immediately upon the selection or removal of such Manager. The Company may hold elections to elect a new Manager appointed by the Common A Members as set forth below: (i) within 90 days after the vacancy of a Manager as a result of such Manager's death, incapacitation or resignation, (ii) within 30 days after the determination of the Management Committee, at its sold discretion, to hold a meeting to elect new Managers to the Management Committee, and (iii) within 30 days following the receipt of written notification from 33% of the Common A Members to elect a new Manager that may be elected by the Common A Members and to remove the then existing Manager elected by the Common A Members.

[REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

## DESCRIPTION OF THE COMMON B UNITS

The following summarizes the material terms of the Common B Units but does not purport to be complete and is subject to and qualified in its entirety by reference to the Amended and Restated Operating Agreement attached hereto as Exhibit B and incorporated herein by this reference.  For additional information relating to the Common B Units not discussed in this section, see "The Amended and Restated Operating Agreement" below.

**General**

The Common B Units will not be convertible into, or exchangeable for, units of any other class or our other securities.  The Common B Units have no stated maturity and will not be subject to any sinking fund, retirement fund or purchase fund or other obligation of the Company to mandatorily redeem, repurchase or retire the Common B Units.

The Common B Units will be fully paid and nonassessable when issued, which means that Holders will have paid their purchase price in full by tendering the Existing Common Units and that we may not ask them to surrender additional funds.  Holders of the Common B Units will not have preemptive or subscription rights to acquire more of our membership interests. Further, the Common B Members will not be required to make any additional capital contributions or any "capital calls" to the Company.

**Ranking**

The Common B Units are equity interests in the Company and do not constitute indebtedness.  In the event of bankruptcy, liquidation, dissolution, reorganization or similar proceeding with respect to the Company, indebtedness will effectively rank senior to the Common B Units, and the Holders of our indebtedness will be entitled to the satisfaction of any amounts owed to them prior to the payment of the liquidation rights of any equity units issued by the Company, including the Common B Units.

Subject to the consent of the Management Committee and the vote of the Common B Units as provided in the Amended and Restated Operating Agreement, the Company may issue newly created units or Membership Interests from time to time in one or more classes, or one or more series of such classes, which classes or series shall have such designations, preferences and relative, participating, optional or other special rights that are senior to, or pari-passu to, those of the Common A Members, including but not limited to the units that debt may be converted into the Company's limited liability company membership interests in the Subsequent Offering, the Incentive Units as discussed above and any other membership interests that the Management Committee may determine to issue.

The terms and conditions of the Subsequent Offering and the Incentive Interests have not been determined, and the securities to be issued have not been created.  Upon a determination of the Managers to proceed with the Subsequent Offering or the creation of the Incentive Interests, the approval of the Management Committee and a Majority-In-Interest of the Holders of the Common B Units will be required to amend and restate the Company's Amended and Restated Operating Agreement to authorize and create the units sold or into which the debt instruments

may be converted for the Subsequent Offering or for the Incentive Interests. **PURSUANT TO THE AMENDED AND RESTATED OPERATING AGREEMENT, THE MANAGEMENT COMMITTEE HAS THE RIGHT, WITHOUT THE VOTE OR APPROVAL OF THE HOLDERS OF THE COMMON A UNITS, TO CREATE ADDITIONAL CLASSES OF MEMBERSHIP INTERESTS THAT ARE SENIOR TO OR RANK IN PARI-PASSU TO THOSE OF THE COMMON A UNITS WITH RESPECT TO DISTRIBUTIONS OF ASSETS UPON LIQUIDATION, DISSOLUTION OR WINDING UP OF THE COMPANY AND DISTRIBUTIONS FROM CASH FLOW FROM OPERATIONS. THE HOLDERS OF THE COMMON A UNITS WILL HAVE NO RIGHT TO VOTE UPON AN AMENDMENT TO THE AMENDED AND RESTATED OPERATING AGREEMENT THAT MODIFIES OR AMENDS THE RELATIVE RIGHTS, PREFERENCES AND PRIVILEGES OF THE COMMON A UNITS, INCLUDING, BUT NOT LIMITED TO, NEW LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS CREATED FOR THE SUBSEQUENT OFFERING, THE INCENTIVE INTERESTS OR ANY OTHER ADDITIONAL CLASSES OF LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS THE MANAGEMENT COMMITTEE MAY DETERMINE TO ISSUE.**

### Distributions of Cash Flow From Operations

The Common B Members are not entitled to any preferential distribution from operations. Preferred A Members are entitled to receive the Preferential Return. Following the payment of the Preferential Return to the Holders of the Preferred A Units, the Holders of the Common A Units and the Common B Units shall collectively be entitled to receive Distributions of Cash Flow From Operations of an aggregate of 11.11% of the Preferential Return (50% of this amount to the Holders of each of the Common A Units and the Common B Units). Thereafter, to the extent that additional Distributions of Cash Flow From Operations are available for distribution, Holders of the Preferred A Units are entitled to receive 90% of the Distributable Cash Flow From Operations and the Holders of the Common A Units and the Common B Units shall each receive 5% of the Distributable Cash Flow From Operations.

The amount and timing of distributions of Distributable Cash Flow From Operations will be as determined by the Management Committee in its discretion.

### Distributions of Cash Flow From Liquidation

Following distribution to the Holders of the Preferred A Units equal to 100% of the Preferred A Units Liquidation Preference, the Holders of the Common A Units and the Common B Units collectively shall receive up to an aggregate of 11.11% of the Preferred A Units Liquidation Preference (50% of this amount to the Holders of each of the Common A Units and the Common B Units). Thereafter, the Holders of the Preferred A Units shall receive 90% of the remaining liquidation proceeds and the Holders of the Common A Units and Common B Units shall each receive 5% of the remaining liquidation proceeds.

**Voting Rights**

The Holders of the Common B Units have the right to elect two managers to the Management Committee.

Following the approval of the Plan of Reorganization, the Members of the Management Committee shall within 60 days following their initial appointments nominate the Managers that are to be elected by the Common B Members at a meeting called for such purpose pursuant to the Amended and Restated Operating Agreement, to either (i) elect such nominees, or (ii) elect other nominees as "write in" candidates at the meeting.

The Managers appointed by the Common B Members may be removed at any time at the discretion of the Holders of the Common B Units.  Written notice must be given to the Management Committee immediately upon the selection or removal of such Managers. The Company may hold elections to elect a new Manager appointed by the Common B Members as set forth below: (i) within 90 days after the vacancy of a Manager as a result of such Manager's death, incapacitation or resignation, (ii) within 30 days after the determination of the Management Committee, at its sold discretion, to hold a meeting to elect new Managers to the Management Committee, and (iii) within 30 days following the receipt of written notification from 33% of the Common B Members to elect one or more new Managers that may be elected by the Common B Members and to remove one or more of the then existing Managers elected by the Common B Members.

Further, the Common B Members have the right to vote only on the following after the approval of the Management Committee:

- A sale of all or substantially all of the assets of the Company;

- The merger or combination of the Company with any other entity;

- The Company's dissolution; and

- Certain amendments to the Amended and Restated Operating Agreement.

[REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**NO RULING WILL BE SOUGHT FROM THE IRS, AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE SOUGHT, WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.   THE DISCUSSION SET FORTH BELOW IS FOR GENERAL INFORMATION ONLY AND DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED.  THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE COMPANY OR HOLDERS OF CLAIMS OR INTERESTS, AND EACH SUCH HOLDER IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan to the Company and the Holders of Claims and Interests.  This summary is based upon the Tax Code and the Treasury Department regulations promulgated thereunder ("Treasury Regulations"), judicial decisions and current administrative rulings and practice as in effect on the date hereof.  These authorities are all subject to change at any time by legislative, judicial or administrative action, and any such change may be applied retroactively in a manner that could adversely affect Holders of Claims or Interests and the Company.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and Interests and the potential for disputes as to legal and factual matters, the tax consequences discussed below are subject to substantial uncertainties.

The Company has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS or a reviewing court might adopt.  In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities, Holders that hold Claims as part of a hedge, straddle or conversion transaction, Holders who acquired their Claims as compensation and Holders who do not hold their Claims as capital assets).  Holders should consult their own tax advisors regarding the tax consequences of the Plan.

### IRS Circular 230 Disclosure

**TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT (A) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS OR ENCLOSURES) WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES, (B) ANY SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE**

**TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A.     U.S. Federal Income Tax Consequences of the Plan to the Company

Generally, a taxpayer recognizes cancellation of indebtedness ("COD") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price. The amount of COD income is, in general, the excess of (i) the amount of the indebtedness satisfied, over (ii) the amount of cash and the fair market value of any other consideration (including any new indebtedness issued by the taxpayer or equity of the taxpayer) given in exchange for the indebtedness satisfied.

The Company is treated as a partnership for U.S. federal income tax purposes. In the case of a partnership, the COD income rules, in general, apply at the partner or member level, rather than the partnership level. Therefore, a partnership that recognizes COD income allocates that income to its members. A member of a debtor partnership generally must include in its gross income the amount of any COD income that is allocated to it during the taxable year. COD income generally is not included in gross income for a member if the discharge occurs in a formal Title 11 bankruptcy case of the member or when the member is insolvent. Because the members of the Company will not be debtors in the Company's bankruptcy proceeding, it is not expected that the bankruptcy exclusion will apply. If a member that is allocated COD income is insolvent, then that member would not include its allocable share of COD income in its gross income. Instead, the member generally would, after determining its tax liability for the taxable year of discharge, reduce its tax attributes by the amount of its share of COD income. The member's tax attributes that would be subject to reduction would include any net operating loss or capital loss carryovers and the tax basis of the member's assets. The rules relating to the reduction of tax attributes of an insolvent member are complex, and affected members should consult their tax advisors regarding the application of these rules.

When a partnership satisfies its outstanding indebtedness by issuing a capital or profits interest to the creditor, the partnership is treated as having satisfied the indebtedness with an amount of money equal to the fair market value of the interest. Any COD income recognized in this situation is allocated to the members in the partnership immediately before the discharge. As a result, any COD income recognized by the Company will be allocated to the Existing Common Units (and potentially to the Existing Preferred Units), but will not be allocated to the Preferred A Units. A member's tax basis in its partnership interest is generally increased by its share of COD income and decreased by its share of liability relief.

### B.     U.S. Federal Income Tax Consequences of the Plan to Holders of Claims and Interests

**THE FOLLOWING IS NOT INTENDED TO BE A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE U.S. FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN FOR HOLDERS OF CLAIMS AND INTERESTS ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.**

**ACCORDINGLY, EACH HOLDER OF A CLAIM OR AN INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN INDIVIDUAL TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER.**

1.   Consequences to Holders of Debentures that Receive Preferred A Units

A Holder of a Debenture that receives Preferred A Units in satisfaction of its Debentures generally will realize gain or loss in an amount equal to the difference, if any, between the fair market value of the Preferred A Units received by the Holder pursuant to the Plan (other than those attributable to accrued interest that has not previously been recognized by the Holder) and the Holder's adjusted basis in the Debenture. Although the Holder generally will realize a gain or loss upon consummation of the Plan, the Holder generally will not recognize such gain or loss immediately. Under newly issued Treasury Regulations, the exchange of a Debenture for Preferred A Units will be treated as a tax-deferred exchange (except to the extent of accrued interest accrued on or after the date that the Holder acquired the Debenture that has not previously been recognized by such Holder), with the result that any gain or loss realized by a Holder would not be recognized for tax purposes. As a result, a Holder generally would have a tax basis and holding period for its Preferred A Units equal to its adjusted basis and holding period for its Debenture.

A Holder of a Debenture will generally recognize ordinary income to the extent that the Preferred A Units received under the Plan are attributable to interest that has accrued on the Debenture on or after the date that the Holder acquired the Debenture but was not previously included in income by the Holder of the Debenture.

Holders of Debentures should consult their own tax advisors regarding the treatment of the exchange of Debentures for Preferred A Units.

**Holders receiving Preferred A Units should consult with their own tax advisors as to the recognition of any gain or loss realized under the Plan, the tax character of any gain or loss with respect to amounts received under the Plan and the application of any special limitations for any loss that is realized.**

2.   Consequences to Holders of Interests that Receive Common A Units and Common B Units

The Company expects to recognize COD income in connection with the discharge of the Debentures under the Plan. This COD income will be allocated to the Company's members immediately prior to the discharge. The Company expects that the aggregate amount of COD income allocated to all members will be approximately $13.2 million. The COD income will be allocated between the Existing Preferred Units and the Existing Common Units based on the profit and loss allocation provisions in the Company's existing Sixth Amended and Restated Operating Agreement dated November 21, 2001. It is currently expected that all COD income, along with the Company's operating loss for 2011, will be allocated to the Existing Common Units. Holders of Interests will not receive any cash in connection with the consummation of the Plan. As a result, Holders of Interests may have taxable income and a related tax liability

without a corresponding cash distribution from the Company.  See "*U.S. Federal Income Tax Consequences of the Plan to the Company*" above for a discussion of the ability of an insolvent member to exclude its allocable share of COD income from its gross income and instead to reduce its tax attributes.

The Company expects that the COD income will be treated as income from a passive activity.  The Company does not expect that the special recharacterization rules applicable to net interest income from an equity-financed lending activity will apply to COD income recognized during 2011.  See "*U.S. Federal Income Tax Consequences of Owning Newly Issued Units — Application of Rules for Income and Losses from Passive Activities*" below for a discussion of these recharacterization rules.  Holders of Interests should consult with their own tax advisors regarding the application of the passive activity loss rules.

The Interests represent equity interests in the Company prior to the consummation of the Plan.  The Common A Units and Common B Units (along with the Preferred A Units) represent equity interests in the Company after the consummation of the Plan. Holders of Interests generally should not recognize any gain or loss on their exchange of their existing equity interests in the Company for newly issued equity interests in the Company.

**Holders of Interests should consult with their own tax advisors regarding the recognition of COD income and the treatment of the Common A Units and Common B Units.**

### C.      U.S. Federal Income Tax Consequences of Owning Newly Issued Units

As a partnership, the Company is not subject to U.S. federal income tax on its net income.  Instead, each member, including Holders of the Newly Issued Units, will be required to report on its U.S. federal income tax return its distributive share of the Company's income, gain, loss, deductions or credits, whether or not it receives any actual distribution of money or property from the Company.  It is possible that a member's U.S. federal income tax liability with respect to its allocable share of the Company's taxable income in a particular year could exceed the cash distributions to the member, thus requiring an out-of-pocket tax payment by the member.  Any COD income recognized as a result of the Plan will be allocated to the Existing Common Units (and potentially to the Existing Preferred Units) as described above and will not be allocated to the Preferred A Units.

If it were determined that the Company should be taxable as a corporation for U.S. federal tax purposes (including as a result of changes in the Tax Code, Treasury Regulations or judicial interpretations thereof, a material change in facts, an election by the Company or otherwise), items of income, gain, loss, deduction and credit would not pass through to Holders as described below, and such Holders would be treated for U.S. federal (and certain state and local) income tax purposes as shareholders in a corporation.  In that case, the Company would be required to pay income tax at regular corporate rates on all of its income.  In addition, the Company likely would be liable for state and local income and/or franchise taxes on all of its income.  Distributions to Holders of the Newly Issued Units would constitute ordinary dividend income taxable to such Holders to the extent of the Company's earnings and profits, and these distributions would not be deductible by the Company.  The remainder of this discussion

assumes that the Company is properly treated as a partnership for U.S. federal income tax purposes.

*Allocations of Profits and Losses.*   For each of the Company's taxable years, its taxable income or loss and items of income, gain, loss, deduction or credit recognized by the Company will be allocated among the Newly Issued Units in accordance with their economic entitlement to, and sharing of, such amounts.   The allocable share of such amounts for a Holder will be determined by the Amended and Restated Operating Agreement, provided such allocations either have "substantial economic effect" or are determined to be in accordance with such Holder's interest in the Company.   If the allocations provided by the Amended and Restated Operating Agreement do not have "substantial economic effect" and were successfully challenged by the IRS, the redetermination of the allocations to a particular Holder for U.S. federal income tax purposes could be less favorable than the allocations set forth in the Amended and Restated Operating Agreement.

*Adjusted Tax Basis of Newly Issued Units.*   Distributions in respect of the Newly Issued Units generally will not be taxable to Holders to the extent of the Holder's adjusted tax basis in its Newly Issued Units.   In addition, a Holder will be allowed to deduct its allocable share of the Company's losses (if any) only to the extent of its adjusted tax basis in its Newly Issued Units.   As discussed above, a Holder's initial tax basis in its Newly Issued Units is expected to be the same as the Holder's adjusted tax basis in its Claim or Interest, respectively.   A Holder's adjusted tax basis in the Newly Issued Units generally will be increased by its allocable share of the Company's profits (and items of income and gain) and generally will be decreased (but not below zero) by its allocable share of the Company's losses (and items of loss, deduction, and expense), the amount of cash distributed to the Holder and the Company's tax basis in any property (other than cash) distributed to the Holder.   A Holder's adjusted tax basis will also include its allocable share of the Company's liabilities, if any.   The IRS has ruled that a member that acquires interests in the same partnership in separate transactions or different classes of interests in the same partnership must combine those interests for tax purposes and maintain a single combined tax basis for all interests in the same partnership.

*Distributions.*   A Holder's receipt of a distribution from the Company generally is not taxable.   However, gain (but not loss) will be recognized to the extent the Company distributes cash (or, in certain circumstances, marketable securities) in an amount that exceeds the Holder's adjusted basis for its Newly Issued Units immediately before the distribution.   A loss is not recognized in connection with a distribution, except where a member is distributed only cash (and no non-cash property) in liquidation of its interest.   A reduction in a Holder's allocable share of the Company's liabilities is treated as a cash distribution for U.S. federal income tax purposes.

*Dispositions of Newly Issued Units.*   A sale or other taxable disposition of all or a part of the Newly Issued Units generally will result in the recognition of gain or loss in an amount equal to the difference, if any, between the amount realized on the disposition (including the Holder's share of the Company's liabilities, if any) and the Holder's adjusted tax basis in the Newly Issued Units sold (as described in "*Adjusted Tax Basis of Newly Issued Units*" above).   Any gain or loss recognized with respect to such sale or other disposition generally will be treated as capital gain or loss and will be long-term capital gain or loss if the Holder's holding period for

the Newly Issued Units exceeds one year. With respect to a Holder of Preferred A Units, any gain recognized on a subsequent taxable disposition will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deduction incurred by the Holder on the consummation of the Plan or bad debt deduction taken by the Holder in respect of its Debenture and (ii) with respect to a cash basis Holder, in addition, any amount that would have been reported as ordinary income if the Holder's Debenture had been satisfied in full but which was not included in income by reason of the Holder's use of the cash method of accounting.

*Application of Basis and "At Risk" Limitations on Deductions.* The amount of any loss of the Company that a Holder is entitled to include in its income tax return is limited to its adjusted tax basis in its interest in the Company as of the end of the Company's taxable year in which such loss occurred. See "*Adjusted Tax Basis of Newly Issued Units*" above.

Similarly, a Holder that is subject to the "at risk" limitations (generally, noncorporate taxpayers and closely held corporations) may not deduct its allocable share of the Company's losses to the extent that they exceed the amount such Holder has "at risk" with respect to its Newly Issued Units at the end of the year. The amount that a Holder has "at risk" will generally be the same as its adjusted tax basis as described above, except that it generally will not include any amount attributable to the Company's liabilities (other than certain loans secured by real property and certain other assets of the Company) or any amount borrowed by the Holder on a non-recourse basis.

Losses denied under the basis or "at risk" limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

*Limitations on Deductibility of Certain Expenses.* If the Company incurs expenses that are not associated with its trade or business, then a noncorporate Holder's allocable share of such expenses would be deductible only to the extent such expenses, in addition to the Holder's other miscellaneous itemized deductions, exceed 2% of the noncorporate Holder's adjusted gross income (the "2% Limitation"). In addition, the Tax Code further restricts the ability of an individual with an adjusted gross income in excess of specified amounts to deduct such expenses. Under such provision, investment expenses in excess of 2% of adjusted gross income may only be deducted to the extent such excess expenses (along with certain other itemized deductions) exceed the lesser of (i) 3% of the excess of the individual's adjusted gross income over the specified amount or (ii) 80% of the amount of such itemized deductions otherwise allowable for the taxable year (the "3% Limitation"). Moreover, such expenses are miscellaneous itemized deductions which are not deductible by a noncorporate taxpayer in calculating its alternative minimum tax liability.

These limitations (including the 2% Limitation and 3% Limitation) would apply to a noncorporate Holder's share of the expenses of the Company that are investment expenses (as compared with trade or business expenses). The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, noncorporate Holders should consult their tax advisors with respect to the application of these limitations.

*Limitations on Deductibility of Capital Losses.*  A Holder that is an individual generally will be able to deduct its allocable share of the Company's capital losses, if any, or capital losses upon a disposition of Newly Issued Units, if any, only to the extent of the Holder's capital gains for the taxable year, plus up to $3,000 of ordinary income ($1,500 in the case of a married individual filing a separate return).  Excess capital losses may be carried forward by individuals indefinitely.  A Holder that is a corporation generally will be able to deduct its allocable share of the Company's capital losses, if any, or capital losses upon a disposition of Newly Issued Units, if any, only to the extent of the Holder's capital gains for the taxable year.  Corporations may carry capital losses back three years and forward five years.  Holders should consult their own tax advisors regarding the deductibility of capital losses.

*Application of Rules for Income and Losses from Passive Activities.*  The Tax Code restricts the deductibility of losses from a "passive activity" against certain income which is not derived from a passive activity.  This restriction applies to individuals, personal service corporations and certain closely held corporations.  In general, a member's distributive share of the Company's income and losses will be treated as income and losses from a passive activity.  However, temporary Treasury Regulations provide that the portion of the net interest income from an "equity-financed lending activity" that is attributable to equity financing (referred to as "equity-financed interest income") potentially may be recharacterized as income that is not from a passive activity.  For this purpose, net interest income refers to gross interest income minus operating expenses related to the equity-financed lending activity (other than interest expense on liabilities used to finance the activity).  Although the determination is based on a number of factual issues and is made on a taxable year basis, the Company expects that, after consummation of the Plan, it may be treated as engaged in an equity-financed lending activity, thereby potentially causing part or all of its net interest income for 2012 and subsequent taxable years to be treated as equity-financed interest income.  A Holder's distributive share of equity-financed interest income for a taxable year will be recharacterized as non-passive income, but only to the extent that it does not exceed the Holder's net passive income from the Company's equity-financed lending activity for that year.  Although the law is not entirely clear, it appears that a Holder could use passive activity loss carryovers attributable to the Company's lending activity to reduce the Holder's net passive income from the Company's equity-financed lending activity, so that, in effect, the Holder's share of the Company's equity-financed interest income would not be recharacterized as non-passive income unless and until those carryovers were exhausted.  Therefore, the impact of the equity-financed lending activity rules would be to prevent a Holder from using passive activity losses from other sources to offset the Holder's share of the Company's equity-financed interest income.  The passive activity loss rules are complex, and Holders that are subject to those rules should consult their tax advisors regarding the impact of those rules on the Newly Issued Units.

*Treatment of Foreign and Tax-Exempt Holders.*  The Newly Issued Units may not be well suited for foreign Holders because there is a material risk that the income and gains allocable to Holders in the Company will constitute effectively connected income ("ECI") for U.S. federal income tax purposes.  This may result in additional filing requirements and U.S. taxes owed since non-U.S. persons generally are fully subject to U.S. income taxation on ECI (as well as U.S. branch profits tax in the case of foreign corporations).  In addition, the Company may not be a well suited investment vehicle for U.S. tax-exempt investors that are subject to tax on unrelated business taxable income ("UBTI") because there is a risk that some or all of the

Company's income and gains will give rise to UBTI.  Tax exempt investors who realize UBTI may be subjected to additional filing requirements and costs.  **Foreign and tax-exempt Holders should consult their own tax advisors because the Newly Issued Units may not be well suited for such Holders.**

*State and Local Taxes.*  Holders of Newly Issued Units may be subject to state and local tax return filing requirements in the states in which the Company does business in addition to the states in which they reside.  Holders should consult their tax advisors regarding state and local tax consequences of investing in the Newly Issued Units, including state and local tax return filing requirements.

**The treatment of the Newly Issued Units is very complex and in many cases will depend on the particular circumstances of each particular Holder.  Holders receiving Newly Issued Units should consult with their own tax advisors regarding the U.S. federal, state and local income tax treatment of the Newly Issued Units.**

**D.    Withholding.**

The Company will withhold on distributions provided under the Plan as required by applicable law.  The Company will also withhold on any amounts distributed or income allocated to the Newly Issued Units where required by applicable law.  The Company will comply with all applicable reporting requirements of the Tax Code.

*Backup Withholding*

Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding."  Backup withholding generally applies if the Holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the Holder is not subject to backup withholding.  Your Ballot contains a place to indicate your TIN.

If any party fails to provide the Company with a requested TIN within sixty (60) days of that request, such failure will be deemed a waiver of rights to distributions under the Plan unless and until a TIN is provided.  Proceeds that would have been distributed to such a party will be distributed to the other parties based upon their pro rata beneficial interests.

*Withholding on Distributions and Allocations to Foreign Holders*

As noted above, the Newly Issued Units are not a suitable investment for foreign Holders because there is a material risk that the income and gains allocable to Holders in the Company will constitute ECI for U.S. federal income tax purposes.  If a partnership has ECI for a taxable year that is allocable to a foreign member, then the partnership is required to pay a withholding tax equal to the amount of such ECI multiplied by the highest applicable income tax rate.  For income that is not ECI, a foreign Holder will generally be subject to U.S. federal withholding taxes at a rate of 30% (or such lower rate provided by an applicable tax treaty) on its share of the Company's gross income from dividends, interest (other than "portfolio interest" under the Tax

Code) and certain other income that is not treated as ECI.  For distributions made after December 31, 2013 and sales made after December 31, 2014, U.S. federal withholding tax at a 30% rate will apply to distributions that constitute "withholdable payments," including "portfolio interest," and proceeds from sale if certain disclosure requirements related to U.S. ownership of the foreign Holder are not satisfied.

Any amount that the Company pays to the IRS in respect of backup withholding or U.S. federal withholding taxes will be treated as a distribution of cash to the Holder with respect to whom the payment was made and will reduce the amount of cash to which such Holder would otherwise be entitled.

## TAX RAMIFICATIONS

The following is an illustration of the possible tax ramifications of the Plan on a typical Holder of Existing Common Units who invested $100,000 in 2001.  It is not anticipated that there will be any allocation of reportable income or loss to the holders of Existing Preferred Units.  **EVERY INVESTOR'S TAX SITUATION IS UNIQUE AND THIS ILLUSTRATION SHOULD NOT BE INTERPRETED AS A PROJECTION OF THE TAX RESULT TO ANY INDIVIDUAL.  RATHER, EACH INVESTOR SHOULD REVIEW CAREFULLY "RISK FACTORS-TAX RISKS" AND "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN" INCLUDED ELSEWHERE IN THIS DOCUMENT, AND SHOULD CONSULT THEIR OWN TAX ADVISOR.**

| | Total | Common Unit Investor |
|---|---|---|
| Common Units outstanding | 1,104,267 | 3,508.77 |
| Percentage | 100% | 0.3177% |
| | | |
| Projected 2011 tax loss from operations | ($10,000,000) | ($31,774) |
| Projected 2011 cancellation of debt ("COD") income | $13,200,000 | $41,942 |
| Projected 2011 net taxable income (Passive income) | $3,200,000 | $10,168 |
| | | |
| Approximate amount of prior tax losses reported (2008-10) | ($29,000,000) | ($92,000) |

A typical Holder of Existing Common Units owning 3,508.77 units may have invested approximately $100,000 in order to purchase those Existing Common Units.  That investor has been allocated approximately ($92,000) in tax losses during the years 2008 – 2010.  The investor may be a passive investor and if so, such losses would have been passive losses.  As passive losses, such losses may or may not have been fully deductible to the investor depending on the investor's individual tax situation.  It is likely that many of the Company's investors who are passive investors have not been able to deduct a substantial portion of their losses from the years 2008 through 2010.  If that is the case, these losses are "suspended" and are likely available to be

deducted by the investor when that investor has passive income, or when that investor disposes of the investment which generated the "suspended" passive losses.

The Company is currently projecting a taxable loss of approximately ($10,000,000) for 2011. The Holder of Existing Common Units illustrated above would be allocated approximately ($31,774) of such loss. It is also projected that the Company will realize approximately $13.2 million of COD income due to the exchange of subordinated debentures for the to be issued Preferred A Units. The Holder of Existing Common Units above would be allocated $41,942 of the COD income to arrive at a net taxable income allocation of $10,168. If that investor is a "passive" investor, then this is expected to be treated as passive income.

This projected pass through of passive net taxable income of $10,168 may be eligible to be offset by the carryover of any suspended passive losses from prior years. What this means is if such Holder of Existing Common Units has not been able to deduct the prior year's losses due to the fact that such losses are passive, then these suspended losses may now be deducted to the extent of the 2011 allocation of passive income. Suspended passive losses in excess of a taxpayer's passive income might still be carried forward as suspended passive losses to be used when that taxpayer realizes future passive income, or may be deductible when the investor abandons or otherwise disposes of its investment.

The 2011 operating tax loss and the COD income are projected amounts being used in this illustration. The actual results will change from these amounts, and the change could be significant. It is not possible to project with certainty these amounts at this time. In addition, this is an illustration of the tax results for a single Holder of Existing Common Units. **EACH INDIVIDUAL'S TAX SITUATION IS UNIQUE AND EACH INVESTOR SHOULD CONSULT THEIR OWN TAX ADVISOR WHEN EVALUATING HOW THE PASS THROUGH OF THESE TAX ITEMS WILL AFFECT SUCH INVESTOR.**

[REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

## ABILITY TO WITHDRAW AS A MEMBER FROM THE COMPANY

The Company's current operating agreement, the Sixth Amended and Restated Operating Agreement provides that except as provided in that agreement, no Member may withdraw or resign from the Company. As a result, as of the date of this Memorandum and until the Plan is approved by the Bankruptcy Court, the existing operating agreement that governs the Company prohibits a Preferred Member or Common Member to withdraw or resign as a member of the Company. As indicated above, the Amended and Restated Operating Agreement attached hereto as Exhibit B that will become effective upon the Confirmation of the Plan by the Court provides that a member may withdraw or resign if consented to in advance by the Management Committee.

On the terms and conditions set forth herein, the Management Committee has determined to allow members to abandon the Newly Issued Units, withdraw from the Company and resign as a Member of the Company (the "Abandonment of Units") effective as of 6 p.m. MST on the Unit Transfer Date.

Members of the Company can provide the Company written notice of their desire to abandon their to be issued respective Newly Issued Units pursuant to a Form of Abandonment of Units (the "Notice of Abandonment") that is available from the Company upon written request at 7400 East Crestline Circle, Suite 250, Greenwood Village, Colorado 80111.

The Abandonment of Units is structured to occur following the adoption of the Amended and Restated Operating Agreement (and the allocation of the COD Income) because the current Operating Agreement governing the Company does not provide for the right of a Member to withdraw or resign from the Company and the Management Committee does not have the sole authority to amend this provision of the Operating Agreement to allow this to occur. As a result, no Member may withdraw from the Company, resign as a member and abandon their Preferred Units or Common Units. The Newly Issued Units may only be abandoned following the adoption of the Amended and Restated Operating Agreement and the allocation of the COD Income. Any attempt to abandon units prior to adoption of the Amended and Restated Operating Agreement will not be permitted by the Company.

If you submit a Notice of Abandonment on or before the Unit Transfer Date, your Newly Issued Units will be deemed issued as of 12:00 p.m. on the Unit Transfer Date and then abandoned at 6:00 p.m. on the same day. If the Court approves the Plan as written, the Company believes that the Unit Transfer Date will be 12:00 p.m. MST on December 31, 2011, which means that the abandonment would be effective at 6:00 p.m. MST on December 31, 2011. However, if for any reason the Unit Transfer Date is not deemed to be December 31, 2011, the abandonment date will be amended until the then applicable unit transfer date and the allocation of the COD Income to the Members. As a result, there can be no assurance a Newly Issued Unit will be deemed to be abandoned during the fiscal year ending December 31, 2011.

The Management Committee has agreed to accept a Notice of Abandonment until February 28, 2012. Any Notice of Abandonment received after December 31, 2011 but before February 28, 2012 will be deemed to have an effective abandonment date of January 1, 2012. Notices of Abandonment received after February 29, 2012 will not be accepted.

The ability to abandon your Units pursuant to the Abandonment of Units is contingent upon the Bankruptcy Court's Confirmation of the Plan.  If for any reason the Bankruptcy Court does not approve the Plan, you will have no right to withdraw from the Company, resign as a member and abandon any Existing Common Units or Existing Preferred Units issued by the Company.

The Company has received a verbal notification from an outside manager that he intends to withdraw from the Company, resign as a Member and abandon the Common B Units he and his family will be issued on the Unit Transfer Date.

**THE COMPANY IS NOT PROVIDING ANY TAX ADVICE RELATING TO THE ABANDONMENT OF THE NEWLY ISSUED UNITS AND YOU ARE ENCOURAGED TO CONSULT YOUR TAX PROFESSIONAL TO DETERMINE IF THIS MAY BENEFIT YOUR INDIVIDUAL TAX SITUATION.**

## USE OF PROCEEDS

The Company will not receive any proceeds from the exchange of the Outstanding Securities for the Newly Issued Units.

## THE COMPANY

### Organization and Background

The Company, Merchants Mortgage & Trust Corporation, LLC, a Colorado limited liability company, is an established interim real estate and mortgage finance company.  The Company is a portfolio lender, which makes loans secured by real estate.  As a short-term lender, the Company's operations bear a closer resemblance to a commercial bank than to a mortgage company, only fully concentrated in real estate related loans.  The Company is often able to charge higher interest rates than commercial banks because of its flexible loan structures, fast underwriting decisions, standardized documents and overall quick closing ability.  With limited exceptions, the Company services its own loans.

The Company was formed in 1961 as a corporation and was restructured as a limited liability company in 1995.  Lester Gold, who co-founded the Company, served as President and Chief Executive Officer of the Company until April 1997, when Gary D. Levine joined the Company and became its President and Chief Executive Officer.

The Company's existing loan portfolio, generated from its loan product offerings dating back to 2006, falls into three loan departments:  Residential Department, Commercial Loan Department and Recreational Loan Department.

Residential Loans are short-term specialty mortgages, which include Residential Loans (1-4 Family, Fix and Flip, Mini Perms or Bridge loans), Multi-Family Loans (apartment-to-condo conversions or new management fix-up and lease-up loans) and Small Commercial Loans (similar loans on small commercial property).

Commercial Loans include residential and commercial construction loans (loans to homebuilders and property developers), commercial loans (income property and land acquisition and development loans) and mezzanine loans, which the Company ceased originating in 2007.

Recreational Loans include real estate acquisition and development loans and hypothecation loans (loans secured by the developers' portfolio of consumer notes). The Recreational Loan Department also handles the purchase and sale of consumer notes from developers who have developed recreational properties (typically lots for second homes, vacation and retirement homes or timeshares).

The Company began operations by purchasing consumer notes from developers who had developed recreational lots (typically used for second homes, vacation and retirement homes or timeshares) and then sold those lots to consumers, providing financing to the buyers by carrying back the buyers' consumer notes. These are the Company's Recreational Loans that are called "Recreational Indirect Consumer Loans." The Company also provided Hypothecation Loans to developers secured by the consumer purchase money carry-back notes in which the developer retained ownership. The business then grew to include other financing for developers, providing loans for acquisition and development of recreational properties to be repaid from sales of lots and/or timeshares. These are the Company's Recreational Loans that are called "Recreational Acquisition and Development Loans" and "Recreational Hypothecation Loans."

In 1997, the Company only offered Recreational Loans. During 1998 and 1999, the Company's outstanding loan balance approximately doubled after the addition of Gary D. Levine as Chief Executive Officer of the Company and Kim Hubbard as executive vice president and manager of the new Residential Department. By 1999, the Company was offering a variety of residential and commercial loans, which included loan products that later evolved into loans offered by the Company's Commercial Loan Department. In 2004, the Company formed the Commercial Loan Department.

The Company's total assets grew from approximately $120 million as of December 31, 2004 to $216 million as of December 31, 2007 and have since been reduced to $57,094,701 as of September 30, 2011. Net income before distributions to common or preferred equity members grew from approximately $3.1 million as of December 31, 2004 to $6.1 million as of December 31, 2006. Net income before distributions to common or preferred equity members was $4.1 million as of December 31, 2007, reflecting the beginning of deterioration of the real estate market. During the year ended December 31, 2010, the Company recognized a net loss of $7,356,592. For the fiscal years ended December 31, 2008, 2009 and 2010, the Company has incurred net losses in the aggregate amount of $40,582,766.

The national real estate crisis and the related severe drop in real estate values beginning in 2007 and continuing through the date of this Memorandum caused the Company to sharply curtail its origination of new loans beginning in 2008 and continuing through 2009. The Company's net losses and decisions by many of the Company's banks to no longer fund loans caused a severe drop in the Company's liquidity and its ability to fund new loans. Beginning early in 2010, the Company established a relationship with new capital partners (see the description of the Company's relationship with BD Funding elsewhere in this Memorandum), which enables it to fund new loans; however, a high cost of funds necessitating high loan pricing has resulted in low loan production compared to the Company's historical standards.

The result is that the Company's new loan originations since 2009 (other than loan originations associated with the liquidation of the loan portfolio or OREO) has consisted predominantly of 1-4 Family Residential Loans. Almost all such new originations have been sold to private investors or to BD Funding, meaning that the Company's existing portfolio is made up almost entirely of loans originated prior to 2009.

The following chart provides summaries of the Company's Residential Loans and the Commercial Loans and Recreational Loans in the Legacy Loan Portfolio at December 31, 2010 and as of September 30, 2011.

| | September 30, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| Type of Loan | Balance Outstanding | # of Loans | Balance Outstanding | # of Loans |
| **Residential Loans** | | | | |
| 1-4 Family Residential Loans (Improvement Loans, Interim Loans and Bridge Loans) | $19,319,662 | 139 | $23,394,511 | 173 |
| Multifamily Residential Loans (Improvement Loans) | 683,764 | 5 | 1,510,314 | 6 |
| Other | 2,733,652 | 7 | 2,791,734 | 8 |
| **Total Residential Loans** | 22,737,078 | 151 | 27,696,559 | 187 |
| **Commercial Loans** | | | | |
| Commercial Real Estate Loans | 6,771,303.00 | 14 | 9,614,958 | 18 |
| Construction Loans | 3,551,411.00 | 5 | 5,556,088 | 14 |
| Mezzanine Loans | 500,000.00 | 1 | 1,405,000 | 1 |
| **Total Commercial Loans** | 10,822,714.00 | 20 | 16,576,046 | 33 |
| **Recreational Loans** | | | | |
| Indirect Consumer Loan(s) | 2,683,916 | 149 | 2,180,831 | 136 |
| Acquisition and Development Loans | 6,461,687 | 5 | 8,824,481 | 5 |
| Hypothecation Loans | 187,303 | 2 | 2,138,040 | 7 |
| **Total Recreational Loans** | 9,332,906 | 156 | 13,143,352 | 148 |
| **Total Loan Portfolio** | 42,892,698 [(1)] | 327 | $57,415,957 [(2)] | 368 |

(1)    Does not include the reduction for net deferred loan fees, premiums and discounts, which totaled $26,631.  These deferred loan fees are amortized over the term of the loans for accounting purposes.  This total also does not include an allowance for loan losses in the amount of $6,588,881.  After reduction of these deferred loan fees and the allowance for loan losses, the Company's total loan portfolio as of September 30, 2011 was $36,277,204.

(2)    Does not include the reduction for net deferred loan fees, premiums and discounts, which totaled $5,051.  These deferred loan fees are amortized over the term of the loans for accounting purposes.  This total also does not include an allowance for loan losses in the amount of $7,479,672.  After reduction of these deferred loan fees and the allowance for loan losses, the Company's total loan portfolio as of December 31, 2010 was $49,931,234.

In addition to the Recreational Indirect Consumer Loans purchased by the Company for its loan portfolio, the Company also purchased a substantial number of Indirect Consumer Loans that it sold to banks, for which the Company has recourse liability to the banks and as to which the developer from whom the Company purchased the loans has recourse liability to the

Company, which recourse liability is supported by developer reserves funded to the Company by the developer and included in the general assets held by the Company.

The Company services substantially all the loans in its loan portfolio, as well as consumer notes that four of its banks purchased from the Company, consumer notes from developers and loans owned by BD Funding and other private investors.

Other than in transactions related to the liquidation of existing loans or OREO and in other limited exceptions described in this Memorandum, including reentering the consumer loan market, the Company has, with isolated exceptions, suspended the new origination of its loan products except the Residential Department's 1-4 Residential Loan products, and the Company has not been retaining ownership in the new originations of the loans that it has been making. The following is a more detailed description of the Company's Residential Loans, Commercial Loans and Recreational Loans which are still included in the Company's existing portfolio and, in the case of the 1-4 Residential Loans, are still being originated by the Company:

## Residential Department

The Residential Department has been in existence for 13 years. It has been the largest department in the Company for most of that period and continues to originate loans. Since inception, the department has been led by Kim Hubbard. The three primary categories of Residential Loans originated by the Company and still in the portfolio of the Company are 1-4 Family Residential Loans, Multi-Family Residential Loans and Small Commercial Loans.

### 1-4 Family Residential Loans

The department's 1-4 Family Residential Loans are comprised of short-term loans, primarily for such purposes as;

- Fix and Flip, typically a short-term loan for acquisition, property rehabilitation and then sale;

- Fix and Hold, typically a two- to three-year loan for acquisition, property rehabilitation and then investment property rental, or consumer loan r refinance;

- Mini Perms, a two- to three-year loan for investment hold property; or

- Bridge, usually an interim loan to consumers in situations where the borrower needs short-term financing until the sale of his or her existing property or a similar liquidity event occurs.

In recent years the Company has originated such loans almost exclusively for real estate investors or developers. A small portion of the Company's loan originations in Arizona were to consumers. Historically, the Company made loans to consumers in both Arizona and Colorado. The Company is in the process of preparing to again originate such 1-4 Family Residential Loans to consumers in both Colorado and Arizona.

The rehabilitation to be completed on the properties tends to be cosmetic in nature. If the renovations are more extensive, the borrower is typically a seasoned rehabilitation property

investor or tradesperson or is working with qualified construction professionals. Major renovations, "scrapes," modulars, additions, etc., were underwritten by the Company's Commercial Loan Department as construction loans. Other 1-4 Family Residential Loan products include Mini Perms for relatively short-term (two to three years) investment hold and Bridge loans to Arizona homeowners in situations where the borrower needs short-term financing until the sale of his existing residence or a similar liquidity event occurs.

The Company is well known in the Denver and Phoenix markets as a specialist in fix and flip financing due to its long history and reputation, as well as its extensive marketing efforts. Additionally, many fix and flip investors are full-time investors. As a result, as much as 50% of the outstanding 1-4 Family Residential unit loan portfolio is with repeat clients.

### Multi-Family Residential Loans

The department's Multi-Family Residential Loans consist of short-term loans (typically one to two years) secured by five or more unit properties. The borrowers typically need interim financing either because they are purchasing or refinancing a multiple-unit property in order to rehabilitate and convert it to condominiums for sale or they are purchasing an apartment complex under market value and plan to hold the property as a long-term rental. However, due to the current condition of the property or because the property was mismanaged by the former owners, they are unable to obtain long-term financing. Once cosmetic rehabilitation to the property is complete, or new management has increased rents, lowered vacancies and stabilized the cash flow, the borrower is typically able to refinance with conventional long-term financing. The Company still retains ownership of Multi-Family Loans but is no longer originating new loans.

### Residential/Small Commercial Loans

Small commercial property loans include a variety of collateral types, such as small office buildings, warehouses, strip shopping centers and land. In general, the commercial loans handled by the Residential Department are in amounts of $1,000,000 or less. Commercial loans that exceed this dollar amount, or loans on projects whose rehabilitation is more than cosmetic, are underwritten by the Company's Commercial Loan Department.

As with the multi-family loans, the borrower usually needs interim financing (typically one to two years) until the property can be cosmetically rehabilitated and/or stabilized in order to refinance into permanent financing. The Company still retains ownership of Small Commercial Loans but is no longer originating new loans.

### Commercial Loan Department

The Commercial Loan Department was established in 2004. The department offered Commercial Loans, including real property acquisition and development loans, and Construction Loans. These borrowers are generally developers or investors that require short-term capital to efficiently leverage their investment in real estate properties. These loans typically have maturities linked to the projected completion of the borrower's business plan for the property. The majority of these loans had initial terms of six months to two years. The Company still retains ownership of the following described Commercial Loans, but with limited exceptions

described herein is no longer originating new loans.  However, the Company continues to make advances on existing loans in completion of its lender obligations.

### Commercial Loans

Commercial Loans are interim loans secured primarily by first mortgages on real estate such as land, income-producing commercial buildings, multi-family apartments or condominiums.  These properties are new acquisitions to be developed by the borrower or, as to existing projects, usually have suffered from weak management and are often being re-tenanted or repositioned in the market through a change of ownership, remodeling or conversion from apartment to condominium.  Improvements made to real property with the proceeds of a Commercial Loan tend to be more cosmetic than structural.  Land acquisition and development loans are often a loan to a developer, which enables the Company to obtain the Construction Loan for the development.

### Construction Loans

Construction Loans are interim loans secured by land and the building being constructed on it.  The Company's Construction Loans include residential for-sale housing as well as commercial property.  Residential housing includes both detached (single, free standing homes) and attached (townhomes or condominiums).  The Company looked for experienced and creditworthy developers capable of supporting and completing their developments.  The Company underwrote to the necessary criteria for projects to be sold or refinanced upon stabilization.

### Recreational Loan Department

The Company has been involved in recreational lending since its inception in 1961.  The Recreational Loan department is the smallest department in the Company.  The three Recreational Loan categories are Indirect Consumer Loans, Hypothecation Loans and Acquisition and Development Loans.  The Company's Recreational Loans have the highest concentrations in Texas, New Mexico, California and Colorado.  The Company still retains ownership of the following described Residential Loan Department products but with limited exceptions described herein is no longer originating new loans.  However, the Company continues to make advances on existing loans and acquires some indirect consumer loans in completion of its lender obligations or as the best strategy for liquidating the existing portfolio.

### Indirect Consumer Loans

Indirect Consumer Loans are acquired when the Company purchases consumer notes from developers.  The consumer notes may be:  (i) secured by deeded interests in real property; (ii) secured by personal property; or (iii) unsecured.  Indirect Consumer Loans are originated by the developer when it sells the recreational property to the consumer and carries back the purchase money financing.  These properties consist of timeshare interests, fractional ownership interests, lot loans on second homes or recreational properties, personal property or membership interests.  The Company maintains recourse back to the developer for most of its consumer note purchases.  This recourse is in the form of an obligation on the part of the developer to repurchase all non-performing consumer notes, as well as the establishment of a reserve account.

The Company typically requires reserve accounts of 10% (initially) of the consumer note's balance. The Indirect Consumer Loans are the only loan products the Company does not usually retain in its loan portfolio. The Company sells most of these loans to some of its senior lending banks and maintains an interest strip income stream as its profit from the sale of these notes. The purchasing bank has recourse to the Company on the Indirect Consumer Loans sold. Historically this contingent liability has, with one exception, always been adequately covered by the reserve accounts maintained by the developers for the benefit of the Company. However, as a result of the current economic crisis with rising delinquencies on consumer notes, most developers are no longer able to perform on repurchase or replacement obligations, which will likely result in defaulted notes in excess of the developer reserves. The Company has ceased offering Indirect Consumer Loans but may do so from time to time in connection with the sale of OREO.

### Hypothecation Loans

Hypothecation Loans are made to developers and are secured by consumer notes held by the developers. The consumer notes may be: (i) secured by deeded interests in real property; (ii) secured by personal property; or (iii) unsecured. Property securing the consumer notes may be improved lots for second homes, retirement homes, timeshare or fractional ownership interests and tangible personal property, all of which were purchased by the consumer from the developer.

### Acquisition and Development Loans

Acquisition and Development Loans are made directly to developers for the purposes of land or resort acquisition, land development, resort refurbishment and construction and refinancing of existing debt. Typically, these loans are packaged with Hypothecation Loans or Indirect Consumer Loans once the project is completed and sales to consumers have begun.

## Current Real Estate Market and Impact on the Company

The continued poor economic conditions that began in 2008 have continued to have a material and adverse effect upon the Company and its results of operations. The depressed real estate market has continued to impact the Company adversely with continued defaulted loans.

### Operations

Declining real estate values, a housing market that has not recovered in a timely manner and the unavailability of real estate secured financing for both consumers and businesses continue to be part of an extended weak real estate market that is having a significant negative impact on the Company. The sale of a new or renovated home to a consumer, the sale of residential home lots to a home builder or the refinance of renovated income property with a long-term mortgage are examples of the types of transactions which have been used to pay off the loans the Company has made to its borrowers through the years. Both consumer and lender confidence continues to be extremely low, leading to a sharp drop-off in these transactions. This has resulted in the Company's loans not being paid off, the borrowers being financially weakened to the point, in some cases, of not being able to make the interest payments and a significant drop in the value of the underlying real estate collateral. For the Company, this causes more loans that are past due or in default, with the collateral taken back from the borrower being worth much less than originally anticipated, and in addition, the collateral can be

very difficult to sell.  The end result to the Company is lower interest earnings and much higher expenses due either to provisions for loan loss reserves, write-downs or losses related to loans and real estate owned and expenses associated with holding OREO.

**Liquidity**

The liquidity of the Company has been strained by the increase in non-performing assets, operating losses, lack of bank financing and the expenses associated with OREO.  Interest margin on earning assets no longer produces substantial liquidity due to the percentage of the portfolio that is now non-performing.  Liquidity is constrained due to the limited origination and other fees we earn through BD Funding and the liquidation proceeds from asset sales in our portfolio.

For assets in the Company's loan portfolio that are pledged to a bank, a release price of at least the amount borrowed from the bank on that asset is required to be made.  If the Company has borrowed 80% of a pledged loan from one of its banks, the agreement with the bank will likely require an application of at least 90% of the principal proceeds of a loan that pays off, against that bank's loan to the Company.  Prior to 2008, the Company always received any liquidity over what was necessary to pay off the bank's advance against that specific collateral.

The liquidity the Company has received from loan payoffs of its 1-4 Family Residential and Fix and Flip Loans continues to decline. These are depleting assets where the best loans pay off and the portfolio declines in value as it is reduced.  The Company believes that the rate of 1-4 Family Residential Loan payoffs from its existing portfolio will be limited in the future.

As of the date of this Memorandum, the Company is meeting its liquidity needs for managing the portfolio and paying its operating expenses.  The Company does not have adequate liquidity to fulfill its obligations to its Senior Lenders to pay off the bank advances on defaulted loans.  Without new capital or new bank relationships, the Company does not have the liquidity to fund significant loan originations other than those within BD Funding which may result in profitable operations.

**Ability to Raise New Capital and Subordinated Debt**

Historically, the Company raised new subordinated debt or capital in order to pay off maturing subordinated debt and fund the growth of its balance sheet.  The Company, due to its operating losses, declining liquidity and pressure from certain of its Senior Lenders, suspended payments of interest to the Holders of the Company's subordinated debt beginning with interest accruing at November 1, 2008.  In addition, the Company's Series 2009 subordinated debentures in the amount of $4.7 million were due to be repaid in May of 2009 and were not paid, and various demand notes, revolving demand notes and Series 2016 Debentures were put to the Company but not redeemed pursuant to their terms.  These defaults, coupled with operating losses which have resulted in the Company having deficit equity in excess of $13 million and the state of the real estate market, have made it impossible for the Company to raise new subordinated debt or capital as it has done in the past.  In February and March of 2010, the Company conducted an exchange offer to exchange all of its outstanding subordinated debt for the Debentures.  All but $100,000 of the Company's subordinated debt was exchanged for the Debentures.  The Series 2012EX and Series 2012AEX are due and payable on December 31,

2012.  Due to the Company's limited financial resources and continued loss from operations, the Company does not believe it will have the ability to repay these debentures and is soliciting acceptances of the Plan in an effort to obtain the highest possible return to these investors.

In the 12 months following the consummation of the Plan of Reorganization, the Company intends to attempt to raise up to $10 million dollars in the Subsequent Offering.  The terms and conditions of the Subsequent Offering have not been determined, and the units that will be sold in this offering have not been created.  There can be no assurance the Company will be able to raise such capital on terms and conditions the Managers deem reasonable, if at all.

### Equity Distributions

In April 2008, the Company imposed a moratorium on distributions to the Holders of the Company's Common Units.  Beginning November 1, 2008, the Company imposed a similar moratorium on distributions to the Holders of Preferred Units in the Company.

### Overhead and Operations

The Company has instituted significant cost saving measures in its operations, most notably by reducing staffing costs. Staffing has been cut from a high of 71 employees as of November 2007 to 24 employees as of September 30, 2011.  Staffing costs were $5,820,986 in 2007, $2,484,279 in 2010 and $1,463,086 during the nine months ended September 30, 2011. This reduction has been achieved not only through a reduction in staffing levels but also by the elimination of management incentive compensation.   Certain members of the executive management team have also temporarily consented to a reduction in amounts due to them pursuant to their employment agreements.  See "Employment Agreements with Executive Officers" below.

In 2010, the Company again reduced its office space and therefore its rent and occupancy expense, which has historically been the second largest expense.  The Company reduced its office space in Colorado from a peak of 14,968 to 8,770 square feet.  At the end of 2010, the Company increased its office space to 11,304 square feet but at the same time sub-leased space to a business which resulted in no net increase in costs associated for this office space.  In Phoenix, the Company reduced the monthly office rent expense in September 2009 from approximately $5,500 to $952, where it remains as of the date of this Memorandum. The Company also closed its office in Albuquerque.

The Company has reviewed all other controllable expenses and has eliminated virtually anything but absolutely necessary expenses.  Insurance, Furniture Fixtures and Equipment ("FF&E"), information technology, telephone, office supplies, contributions, travel, postage and advertising are just some examples of controllable expenses that have been reduced since 2007.

The Company has experienced a significant increase in its legal fees and OREO expenses as a result of the deterioration of its loan portfolio and the need to negotiate extension agreements with Senior Lenders.  Legal expenses were $739,262 in 2009, $529,784 in 2010 and $201,279 during the nine months ended September 30, 2011.  OREO expenses were $1,546,591 in 2009, $789,693 in 2010 and $425,274 during the nine months ended September 30, 2011.

**Reduction of Assets**

The Company's limited liquidity and diminishing bank capacity have substantially reduced new originations by the Company since 2008. The Company has continued to liquidate its non-performing assets for liquidity purposes. Normal runoff eventually results in the best loans paying off, with the weakest loans remaining. The result is a higher percentage of non-performing assets in a smaller portfolio.

**BD Funding**

In February 2010, the Company entered into agreements that formed a joint venture between the Company and the PE Investors. The agreements create a joint venture (the "Joint Venture") whereby BD Funding, LLC, a newly formed limited liability company ("BD Funding") owned 60% by the PE Investors and 40% by the Company, began to purchase and hold the Company's newly originated NOO Residential 1-4 Family loans (primarily Fix and Flip Loans). The Joint Venture was capitalized by an initial investment commitment of $22.2 million from the PE Investors consisting of both a loan and a capital investment and a $2.2 million capital investment commitment from the Company. This results in an initial funding commitment to purchase new originations of NOO Residential 1-4 Family Loans of $22.2 million, of which $2.2 million is a required investment from the Company. During 2010, the PE Investors doubled their commitment. The corresponding doubling of the Company commitment resulted in a Joint Venture investment commitment of $44.4 million as of December 31, 2010. During October, 2011 the PE Investors again increased their commitment by another $22.2 million, which resulted in a commitment adequate for funding a total purchase of new originations of NOO Residential 1-4 Family Loans of $66.6 million from the inception of the Joint Venture.

The Company's responsibilities under the Joint Venture are to market, underwrite, originate and then service the NOO Residential 1-4 Family Loans sold to and owned by BD Funding. BD Funding finances its acquisition of such loans with equity contributions from the PE Investors and the Company and a loan from either an entity owned by the PE Investors or other lenders. Under the Joint Venture, the Company earns loan origination fees, servicing fees and a 40% interest in the profits of BD Funding. The PE Investors have a right of first refusal to fulfill all of the Company's financing or capital needs until their investment commitment has expired.

As a result of the Joint Venture, the Company was again able to renew its energies toward the production of NOO Residential 1-4 Family Loans during the fiscal year ended December 31, 2010. The Company's new loan originations, which were primarily NOO Residential 1-4 Family Loans, increased to approximately $40 million during the fiscal year ended December 31, 2010, most of which were sold to BD Funding with a small number being sold to other private investors. For the nine months ended September 30, 2011, new loan originations totaled approximately $22 million.

The result is that the Company is continuing to liquidate its existing portfolios in order to pay down its indebtedness, while new loan originations are sold to BD Funding or other private investors.

### Business Plan

The business plan of the Company is to continue to aggressively manage the liquidation of its Legacy Loan Portfolio in order to first pay off the Senior Lenders, continue to originate new loans which are sold to BD Funding and service these loans, all while managing expenses to achieve profitability.

Financing for the new loan originations sold to BD Funding will continue to be obtained by BD Funding and will not be an obligation of the Company. The Company continues to seek new relationships with Senior Lenders to enable it to service the existing portfolio (some loans in the Company's Legacy Loan Portfolio need additional advances to complete projects) or facilitate the sale of existing collateral. It is the Company's intent to continue to pay down the amounts due to the Senior Lenders while the Company's portfolio is liquidated.

## The Company's Underwriting Guidelines

### Loan Approval Limits

The Company historically adopted loan approval authority limits in order to provide fast service and response to its customers while managing its exposure to risk. However, since 2008, due to the economic crisis in the real estate market and its negative effect on the liquidity of the Company and the limited capacity to borrow in the Company's bank lines, the Company has followed the policy that all loans must be approved by Gary Levine, President and Chief Executive Officer. In this period of limited liquidity and reduced lending capacity, Mr. Levine acts as the final authority regarding the approval of any loan. Loans that are made pursuant to the agreement with BD Funding include underwriting standards and parameters for "Qualified Loan Production." All Qualified Loan Production of the Company occurs through BD Funding. Each of these loans requires the approval of the investment manager for the PE Investors prior to originating the loan. Loans that the Investment Manager does not approve are then either not made or are funded with capital from other investors, with the Company retaining a subordinated interest.

The following narrative describes the basic underwriting principles of the Company's three Departments. Although only the Residential Department is expected to have new originations, the underwriting principles of all three departments are summarized here to illustrate the principles under which the Company's existing portfolio was originated.

### Residential Loans

The Company's underwriting guidelines for Residential Loans - 1-4 Family Residential Loans focus on the borrower's income, liquidity, net worth, the ratio of the monthly loan payment to the borrower's income, the borrower's credit history, the ratio of the loan to the value of the residential property and the borrower's real estate and real estate rehabilitation experience.

The Company's Residential Loans–Multi-Family Residential Loans secured by operating properties focus on all of the above items plus the debt service capacity provided by the cash flow from these properties.

Although the Company is no longer originating new loans secured by raw land, such loans remain in the Company's Legacy Loan Portfolio.  When underwritten, the Company's Residential Loans secured by raw land focused primarily on the value of the undeveloped land relative to the amount of the loan and the creditworthiness of the developer.  Relevant factors typically reviewed in underwriting Residential Loans secured by raw land included:  (i) whether the liquidation value of the land (ignoring any projected value increase from the development process) and any other collateral that was to be pledged to secure the loan was substantially in excess of the amount of the loan; (ii) the developer's track record in developing similar successful projects; (iii) the developer's financial condition; (iv) any encumbrances or other restrictions on the sale of the land securing the loan; and (v) whether the collateral consisted of real estate with which the Company was familiar.

### Commercial Loans

When underwritten, the underwriting guidelines for all Commercial Department Loans considered the creditworthiness attributes of the borrower.  Credit history, current financial condition, cash flow analysis, liquidity, income and other relevant factors were considered.  The collateral value as it relates to the loan amount, the borrower's investment, the borrower's track record and local market information relating to the collateral were also considered.  The various underwriting attributes were weighted differently for each situation depending upon the particular facts.

Commercial Loans for land acquisition and development were underwritten primarily on the value of the collateral and the creditworthiness of the borrower.  A cosmetic fix-up of an apartment intended to be held for investment was also underwritten based on the borrower's ability to refinance the property after fix-up and stabilization and analysis of the local rental market for the apartments "as complete" and vacancy rates.  Apartment-to-condominium conversions were also underwritten based on the local market "as complete" sale value of the units, as well as the expected ability to sell the units.

Construction Loan underwriting guidelines considered all of the above but with emphasis on the borrower's track record and ability to perform, the local market "as complete" value of the collateral and the local market information on the ability to rent or sell what was being constructed depending on the business plan of the borrower.  The properties to be developed with these loans must have been of a conforming design and marketability that was approved by the Company.  The developer must have had adequate building experience or have been using an experienced contractor and must have demonstrated the capability to complete and market the property.  A strong loss mitigation tool for Construction Loans is ongoing loan administration, which focuses on monitoring construction progress as part of the periodic construction disbursement process.

### Recreational Loans

The Company's underwriting guidelines for its Recreational Acquisition and Development Loans focused primarily on the value of the undeveloped land or other collateral relative to the amount of the loan and the creditworthiness of the developer.  Relevant factors typically reviewed in underwriting Recreational Acquisition and Development Loans included: (i) whether the liquidation value of the land and any other collateral that had been pledged to

secure the loan was substantially in excess of the amount of the loan; (ii) the developer's track record in developing similar successful projects; (iii) the developer's financial condition; (iv) the prospects for the planned development of the land securing the loan; (v) any encumbrances or other restrictions on the sale of the land securing the loan; and (vi) whether the collateral consisted of real estate with which the Company was familiar.

The Company primarily focused the underwriting of its Recreational Indirect Consumer Loans on the creditworthiness of the consumer, although the quality of the property and the financial strength of the developer selling the consumer note were considered as well. The consumer notes purchased by the Company were secured by first mortgages on the consumer borrower's recreational property. As additional credit protection, the Company maintained recourse back to the developer for most of its consumer note purchases. This recourse was in the form of an obligation on the part of the developer to repurchase all non-performing consumer notes, as well as the creation of a reserve account. With the continued weak real estate market, developers as a group have been severely weakened, and the Company can no longer rely on their ability to fulfill their obligations. The Company typically required an initial reserve account of 10% of the consumer notes' balance.

The underwriting guidelines for the Company's Recreational Hypothecation Loans were similar to its underwriting guidelines for Recreational Indirect Consumer Loans. As with its Recreational Indirect Consumer Loans, the Company underwrote consumer notes accepted as collateral for a Recreational Hypothecation Loan based on the credit of the underlying consumers, except where the loan was being secured with a developer's existing loan portfolio from prior recreational real estate developments. In this case, the Company underwrote the portfolio itself based on the age of the consumer notes in the portfolio and the history and performance of the portfolio. The Company typically services each consumer note and applies all collections on a priority basis to fees, interest and then principal on its Recreational Hypothecation Loans.

**Ownership of the Company's Loan Portfolio**

Prior to the end of 2008, the Company originated Residential Loans, Commercial Loans and Recreational Loans. Since 2008, other than transactions related to the liquidation of existing loans or OREO and other isolated transactions, the Company's only new originations have been its 1-4 Residential Loans. Beginning during 2009, almost all of the Company's new originations have been sold. The following summarizes the ownership of the Company's loan portfolio. The Residential Department, by design, is the only surviving loan production department in the Company and is expected to have new originations going forward. The ownership of the loan portfolio is summarized here to describe the ownership of loans that are included in the Company's existing portfolio.

Until May 2009, most of the Company's Residential Loans were transferred to Merchants Mortgage Acceptance Company, LLC ("MMAC"), a wholly-owned subsidiary of the Company, and pledged as part of a bank's $75 million financing facility, which is described in "**THE COMPANY'S BORROWINGS**." The Company has serviced these loans throughout the term of the financing facility, and for accounting purposes, the arrangement is treated as a financing arrangement whereby the Company retains ownership of the loans.

From July 2009 through February 2010, the Company originated and then sold approximately $10 million of 1-4 Family Residential Fix and Flip loans to a private investor. The Company retained 1% for the origination of the loan and was paid an annual 1% fee for servicing the loans.

In February 2010, the Company entered into the Joint Venture with BD Funding whereby BD Funding purchases and holds the Company's new originations, which are primarily 1-4 Residential Loans.  BD Funding is owned 60% by the PE Investors and 40% by the Company.

When the Company was making Commercial Loans on a regular basis, it generally retained ownership of them.  Some of the Commercial Loans were financed through the MMAC financing facility, and others were financed with the Company's other banks.  Sometimes, the Company sold participating interests in Commercial Loans, particularly in the situation where the Company was attempting to make a loan of an amount greater than the Company desired to be exposed to a single obligor.

When the Company was making Recreational Acquisition and Development Loans and Recreational Hypothecation Loans, it generally retained ownership of them throughout the loan term.  On occasion, the Company sold a participating interest in a Recreational Acquisition and Development Loan and/or Recreational Hypothecation Loan that it originated.

When the Company was making Recreational Indirect Consumer Loans, it generally sold a substantial portion of them to banks.  When a bank bought a consumer note from the Company, the bank paid the Company the outstanding principal amount of the consumer note, unless the interest rate on the note was less than the bank's required yield, in which case the bank paid a discounted amount.  As payments were, and are, made by the consumer borrower, the bank retains a portion of each payment that includes principal payments plus its agreed-upon rate of return, and then the remaining balance is paid to the Company, which is essentially an interest spread accounted for by the Company as a gain on sale of consumer notes.  The Company's consumer note sales are all with recourse to the Company, and the Company is obligated to repurchase any defaulted consumer notes.  As such, the Company was contingently liable at September 30, 2011 and December 31, 2010 for approximately $2,515,000 and $4,119,000, respectively, from its note sales.  The developers, in turn, are obligated to repurchase those defaulted consumer notes from the Company.  With the dramatic economic downturn beginning in 2008, the Company no longer has the financial strength to fulfill its repurchase obligations to the banks, and a number of developers also do not have the financial strength to fulfill their repurchase obligations to the Company.

**Geographic and Customer Concentration**

As of September 30, 2011 approximately $11.3 million, or 49.7%, of the Company's Residential Loan portfolio and approximately $4.3 million, or 40.2%, of the Company's Commercial Loan portfolio was secured by real property in Colorado, and approximately $9.2 million, or 40.7%, of the Company's Residential Loan portfolio and approximately $5.6 million, or 51.8%, of the Company's Commercial Loan portfolio was secured by real property in Arizona.  The Company's Recreational Acquisition and Development Loans and Recreational Hypothecation Loans historically were made to developers in the western United States, with most transactions relating to land in New Mexico and Colorado.  As of September 30, 2011,

approximately 82.1% ($5.5 million) of the Company's outstanding loan portfolios for its Recreational Acquisition and Development Loans and Recreational Hypothecation Loans related to land in New Mexico and 17.2% ($1.1 million) to land in Colorado.

The recreational properties financed with the consumer notes purchased by, or pledged to, the Company in its Recreational Indirect Consumer Loan transactions are located primarily in Texas, California and Arkansas.

As of September 30, 2011, loans to the ten largest lending relationships (based on outstanding loan commitments) of the Company totaled approximately $20,121,000, or 46.9%, of the total loan portfolio of the Company; loans to the five largest lending relationships of the Company totaled approximately $14,725,000, or 34.3%, of the total loan portfolio of the Company; and the aggregate loan balance to the largest lending relationship of the Company totaled approximately $5,459,000, or 12.7%, of the total loan portfolio of the Company.

**Loan Servicing**

The Company services its Residential Loans, Commercial Loans and Recreational Loans (including consumer notes held as collateral for the Company's Recreational Hypothecation Loans) with very limited exceptions.  On some of these loans, the Company has sold participation interests to investors, so the Company is servicing such loans on behalf of a third party.  Further, the Company services all of the loans sold to BD Funding.

The Company also services consumer notes purchased by the Company in its Recreational Indirect Consumer Loan business if it retained those consumer notes in its loan portfolio.  In addition, the Company services consumer notes it sold or pledged to banks.  The Company also services some consumer notes of its developer customers, even though those consumer notes are not part of the Company's loan portfolio.

The Company uses the "Jack Henry Silverlake" loan servicing system to service all Company loans.

### Market

The Company's business plan and its marketing efforts are focused almost exclusively on 1-4 Family Residential Loans, which include loans commonly known as Fix and Flip, Fix and Hold, Mini-Perms and Bridge loans.  Although the Company occasionally originates loans other than these, its business plan and marketing efforts are focused on the 1-4 Family Residential Loans.

The market has changed considerably since 2006, and management of the Company believes that it presents increased opportunity for the Company's Residential Loan products. The high number of foreclosures in today's real estate market creates bargain "buy" opportunities for investors and homeowners alike, often of properties in distressed condition. However, at this time the Company is unable to take full advantage of these opportunities due to its limited liquidity and bank borrowing capacity and the high cost of funds associated with the Joint Venture.

The following summarizes the market for 1-4 Family Residential Loans, which are the primary focus of the Company's plan for new originations going forward.

**Residential Loans**

The customers for the Company's Residential Loans generally have a credit history which in normal credit conditions would allow them to qualify for more traditional bank financing. The geographic markets for new production are Colorado and Arizona, with an emphasis on the metropolitan areas surrounding Denver and Phoenix.

1-4 Family Residential Loan customers of the Company's Fix and Flip loan product are generally small investors who seek short-term loans to enable them to purchase investment property in need of repair at below-market prices, make cosmetic improvements and then sell or lease that property. The same type of investors are customers seeking the Fix and Hold or Mini-Perm loans for property for which their plans include a two- or three-year hold period.

Owner occupied 1-4 Family Residential Loan customers of the Bridge loan product are homeowners who desire to purchase a home prior to the sale of their current residence. Home buyers who wish to purchase a home with the intent of "rehabbing" that property may also be customers of the Company's Fix and Hold loan product.

The Company's Residential – Multi-Family Loans market are investors who purchase small apartments and plan to cosmetically improve the property, which results in increased stabilized rents and the ability to secure traditional long-term financing to hold for investment. Similarly, an investor may improve apartments and market the units for sale as condominiums.

The Company's Small Commercial Loan market customers are investors purchasing small retail spaces such as a retail strip or free-standing restaurant with a plan to cosmetically improve the property and stabilize rents. Similarly, the borrower may be a creditworthy business which is purchasing a building in need of renovation for use by the business. The consolidation of commercial banks has created a market for the Company's Small Commercial Loans because of the decreasing availability of construction or improvement funds for loan opportunities under $1,000,000.

As stated above, the Company's primary focus of its business plan and marketing effort are its 1-4 Residential Loans. Multi-Family and Small Commercial Loans are not the focus of the Company's business plan and are pursued only when advantageous opportunities present themselves.

The market for the Company's Residential Loans has been generated to some degree by the consolidation and acquisition of locally owned commercial banks in Colorado and Arizona. Large regional banks now dominate both of these markets and enjoy market shares in excess of 80% of commercial loans made and deposits managed. A commercial real estate loan of less than $2,000,000 generally is not available at these regional banks, which target institutional-quality real estate for their loan portfolios. This lending environment has also created a market for the Company's Small Commercial Loans. Additionally, when credit markets tighten at commercial banks, usually the first type of loan to be eliminated or reduced is the small commercial real estate loan.

The current tightening of credit poses additional opportunities for expanding the Company's Residential Loans. There is currently strong demand for the Company's Residential Loans, particularly its Fix and Flip loans. The Company obtains most of its Residential Loans through referrals from real estate brokers and mortgage brokers. With respect to the Fix and Flip loans, the Company has developed many repeat clients who fix and flip homes as a primary or secondary business pursuit.

**Competition**

Competition for 1-4 Family Residential Loans traditionally has come from a variety of private (Hard Money) lenders, conventional mortgage brokers, banks such as Wells Fargo that specifically offer a fix and flip loan program and other smaller, local banks. Some of the traditional competitors' lending programs are not specifically designed for fix and flip loans and are therefore less flexible.

The real estate market crisis which began in 2008 and continues with depressed values and lower activity to today has changed the competitive landscape but has not eliminated competition. Many community and regional banks reacted to the real estate crisis by pulling away from new originations of this type of loan, either because of an inability to make new loans or in an effort to reduce their real estate exposure. This created a temporary void in this market that allowed the Company to increase its yields on 1-4 Family Residential Loans at a time when the Company's own ability to lend was severely restricted.

However, the market, as expected, has adjusted. New, privately financed real estate lenders are now competing with the Company on both price and loan terms for 1-4 Family Residential Loans. In addition, community banks have now reentered this market as well. A brief summary of the characteristics of the competition is as follows:

- Privately Financed "Hard Money" Lenders. These are usually higher-priced loan products to real estate investors but usually offer attractive advance terms (often at 100% of cost), which allow investors to acquire properties with little or no capital invested.

- Privately Financed Real Estate Lenders. These offer lower prices than the Hard Money Lenders. They may be funded by financial investors seeking a reasonably safe and higher yield than the stock and bond markets now provide. Some of these lenders may be small lenders which only loan to a limited number of known investors. There are many of this type of lender.

- Community Banks. Commercial banks have reentered this market. Their pricing is attractive to the investor who can qualify, but their terms, including down payment requirements and inability to act quickly may offset that advantage for many investors.

Now, as in the past, management believes that the Company is able to compete effectively in its various niches by offering superior service and a level of expertise that helped it build lasting relationships. The Company's ability to meet demand with a competitive price has

been adversely affected by the high cost of funds it has experienced in its Joint Venture to date and by its own limited liquidity.

During the fiscal year ended December 31, 2010 and the nine months ended September 30, 2011, the Company originated $35 million and $21 million 1-4 Family Residential Loans, respectively. Substantially all of these loans were sold to BD Funding. During 2009, the Company had almost no new originations other than 1-4 Residential Loans.

## THE AMENDED AND RESTATED OPERATING AGREEMENT

The Seventh Amended and Restated Operating Agreement of the Company, attached hereto as Exhibit B and incorporated herein by this reference, is the governing instrument establishing the Company's right under the laws of the State of Colorado to operate as a limited liability company and contains the rules under which the Company is operated and the rights and obligations of the Company's Members and Managers following the consummation of the Offers and the Plan of Reorganization. The terms of the Newly Created Units are contained in the Amended and Restated Operating Agreement, which will only be in full force and effect following the Confirmation of the Plan by the Bankruptcy Court. Each of the Holders of the Preferred A Units, Common A Units and Common B Units will not be required to execute a copy of the be bound by the Amended and Restated Operating Agreement but regardless will be bound by the terms and conditions if the Plan is Confirmed by the Bankruptcy Court. Certain provisions of the Amended and Restated Operating Agreement are summarized below, but the information is not purported to be complete. The provisions of the Amended and Restated Operating Agreement that are summarized below are qualified in their entirety by the actual provisions of the Amended and Restated Operating Agreement. Capitalized terms have the meaning ascribed to them in the Amended and Restated Operating Agreement. **YOU SHOULD READ AND MAKE SURE YOU UNDERSTAND THE AMENDED AND RESTATED OPERATING AGREEMENT IN ITS ENTIRETY PRIOR TO MAKING A DECISION TO VOTING TO APPROVE OR REJECT THE PLAN OF REORGANIZATION.**

**Classes of Members**

There are three classes of Members: Preferred A Members, Common A Members and Common B Members.

**Withdrawal of Members; Admission of Additional Members**

Except as consented to in advance by the Management Committee, no Member may withdraw or resign from the Company or abandon all or a portion of their Units in the Company. Additional Members may be admitted to the Company with the consent of the Management Committee.

On the terms and conditions set forth in this Memorandum, the Management Committee has determined to allow members to abandon the Newly Issued Units, withdraw from the Company and resign as a Member of the Company effective as of 6:00 p.m. MST on the Unit Transfer Date.

Members of the Company can provide the Company written notice of their desire to abandon their to be issued respective Newly Issued Units pursuant to a Form of Abandonment of Units (the "Notice of Abandonment") that is available from the Company upon written request at 7400 East Crestline Circle, Suite 250, Greenwood Village, Colorado 80111.

The Management Committee has agreed to accept a Notice of Abandonment until February 28, 2012. Any Notice of Abandonment received after December 31, 2011 but before February 28, 2012 will be deemed to have an effective abandonment date of January 1, 2012. Notices of Abandonment received after February 29, 2012 will not be accepted.  For additional information on your ability to withdraw from the Company, resign as a Member and abandon your Newly Issued Units, see "Ability to Withdraw as a Member of the Company" above.

**Voting Rights of Members**

Holders of the Newly Issued Units will be unable to exercise any management functions with respect to the Company's operations. The Preferred A Members have the right to vote upon and elect two Managers to the Management Committee.  The Common A Members have the right to vote upon and elect a Manager to the Management Committee. The Common B Members have the right to vote on the following after the approval of the Management Committee:

- A sale of all or substantially all of the assets of the Company;

- The merger or combination of the Company with any other entity;

- The Company's dissolution; and

- Certain amendments to the Amended and Restated Operating Agreement.

The matters set forth above must be approved by Common B Members holding a majority of the Common B Units voting on such matter at a meeting at which quorum is present. In lieu of holding a meeting, Common B Members may act by written consent signed by Members holding sufficient membership units for approval of the action at a meeting.

Further, any matter submitted to a vote of one or more class of holders of Units requires the approval of such classes of Members holding a majority of such classes of Units in which a quorum is present. Such vote of a class of Units and approval shall be binding up the entire class of Units for any and all purposes whatsoever, even if a Member did not vote or vote to approve any for such action.

**The Management Committee; Designation of Managers**

The management of the Company rests solely with the management committee (the "Management Committee").  The Management Committee has the power to make all decisions relating to the management of the Company's business affairs and property.

82

The Management Committee consists of the seven Managers of the Company.   The Managers shall be selected as follows:

- L. Gold Corp. shall appoint one Manager, initially, Brett Perry;
- Gary D. Levine shall appoint one Manager, initially, Gary D. Levine;
- The Preferred A Members voting as a class shall appoint two Managers, initially Donald L. Kortz and Raymond T. Baker;
- The Common A Members voting as a class shall appoint one Manager, initially Gerald S. Gray; and
- The Common B Members voting as a class shall appoint two Managers, initially Jack Keane and Edward C. Gruben.

Each Manager appointed serves at the Discretion of the class of Unit Holders, entity or individual who selected that Manager (i.e., the Managers elected by the Common B Members serve at the Discretion of the Common B Members), and a Manager may be removed at any time at the Discretion of the person, class of Unit Holders, entity or individual who selected that Manager.

The Members of the Management Committee shall within 60 days following their initial appointments set forth above (which for avoidance of doubt shall be within 60 days following the Confirmation of the Plan of Reorganization by the Bankruptcy Court) nominate the Managers that are to be appointed by the Preferred A Members, Common A Members and Common B Members.   The Preferred A Members, Common A Members and Common B Members shall then within 60 calendar days thereafter hold a meeting called for such purpose to either (i) elect such nominees, or (ii) elect other nominees as "write in" candidates at the meeting (the "Initial Election").

Thereafter, the Company may hold elections to elect one or more new Managers as hereinafter provided: (i) within 90 days after the vacancy of a Manager as a result of such Manager's death, incapacitation or resignation, (ii) within 30 days after the determination of the Management Committee, at its discretion, to hold a meeting to elect new Managers to the Management Committee, and (iii) within 30 days following the receipt of written notification from 33% of the Members of any one class (i.e. Preferred A Members as a class, Common A Members as a class or Common B Members as a class) requesting that the Company hold a meeting of their respective class of Units to elect one a new Manager(s) to the Management Committee and to remove one or more of the then existing Managers elected by the Holders of such Units.

**Decisions of the Management Committee**

Four of the Managers appointed and serving at the time of a meeting of the Management Committee constitute a quorum for transacting business, and the act of four Managers present at a meeting in which a quorum is present shall be the act of the Management Committee.

**Establishment of Reserves by the Management Committee**

The Management Committee may establish and maintain reserves for working capital and for payment of taxes, insurance, debt service, repairs, replacements or renewals, contingent liabilities or other costs and expenses incident to the operation of the Company so long as such reserves do not conflict with another provision of the Amended and Restated Operating Agreement requiring disbursements or distributions.  Further, the Management Committee, in its sole and absolute discretion, may retain cash for operations, future cash needs or any other reasonable purpose.

**Authorized Units**

There are currently 24,400.214 authorized Preferred A Units, a maximum number of authorized Common A Units of 98,833 and a maximum number of Common B Units of 1,104,267.  The Management Committee and the Holders of the Common B Units have discretion to increase, authorize, create, establish and set the prices and terms and conditions of any new or existing units, equity units, Membership Interests, Incentive Units or other securities issued by the Company, including those with relative rights and preferences senior to the Preferred A Units, Common A Units and Common B Units.  See "Future Issuances of Membership Interests and Dilution to the Members" below.

**Capital Contributions**

The table below reflects the Members' (as a class) aggregate capital contributions to the Company, as shown on the books of the Company.

| Class of Units | Aggregate Capital Contribution (As a Class) |
|---|---|
| Preferred A Units | $14,319,965 |
| Common A Units | $0 |
| Common B Units | $0 |

A Member will be required to make no additional capital contribution or "capital call" to the Company, other than when a Member has received a distribution in return of his or her capital contribution and after such distribution, the Company's liabilities exceed the fair value of its assets, in which case the Member will be liable to the Company for up to three years after the distribution for the amount distributed.

**Withdrawal of Contributions; Interest on Contributions**

No Member is entitled to withdraw any portion of his or her capital contribution until liquidation of the Company.  No Member is entitled to interest on his or her capital contribution.

[REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

**Distributions of Cash Flow From Operations**

The Members are entitled to distributions of Distributable Cash Flow From Operations as follows:

| Level of Distribution | Amount as a Class | Preferred A Members | Common A Members | Common B Members |
|:---:|:---:|:---:|:---:|:---:|
| 1 | Until the Preferred A Members as a class have been distributed an amount equal to the Preferential Return | 100% | 0% | 0% |
| 2 | Until the Common A Members and the Common B Members have been distributed an aggregate amount equal to 11.11% of the aggregate distributions made to the Preferred A Members pursuant to Level 1 above | 0% | 50% | 50% |
| 3 | The balance, if any | 90% | 5% | 5% |

"Distributable Cash Flow From Operations" is defined in the Amended and Restated Operating Agreement as the Company's gross receipts for any fiscal period minus:  (a) the Company's operating expenses during such period; (b) the timely servicing of the Company's obligations (including repaying principal of loans to the Company); (c) net increases in cash reserves during such period, as determined by the Management Committee, in its discretion and (d) cash retained by the Company for operations, future cash needs, investments, loans or any other purpose, as determined by the Management Committee, in its discretion.

The amount and timing of distributions of Distributable Cash Flow From Operations will be as determined by the Management Committee, in its discretion.

[REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

**Distributions of Cash Flow From Sale**

The Members are entitled to distributions of Distributable Cash Flow From Sale as follows:

| Level of Distribution | Amount as a class | Preferred A Members | Common A Members | Common B Members |
|---|---|---|---|---|
| 1 | Until the Preferred A Members have received an aggregate amount equal to $14,319,965 (the Preferred A Units Liquidation Preference) | 100% | 0% | 0% |
| 2 | Until the Common A Members and the Common B Members have been distributed an aggregate amount equal to 11.11% of the Liquidation Preference | 0% | 50% | 50% |
| 3 | The balance, if any | 90% | 5% | 5% |

"Distributable Cash Flow From Sale" is defined in the Amended and Restated Operating Agreement as the net proceeds from sale or other disposition of all or substantially all the Company Property (as defined in the Amended and Restated Operating Agreement) after payment of all expenses associated with the sale or other disposition and all outstanding liabilities of the Company and establishment of reserves for contingent liabilities.

**Future Issuances of Membership Interests and Dilution to the Members**

Subject to the consent of the Management Committee and the Common B Members without the vote or consent of the Preferred A Members and the Common A Members, the Company may issue newly created units or Membership Interests from time to time in one or more classes, or one or more series of such classes, which classes or series shall have, subject to the provisions of applicable law, such designations, preferences and relative, participating, optional or other special rights that are senior to, or pari-passu to, those of the Preferred A Members, the Common A Members, the Common B Members and such other units or Membership Interests that are created from time to time by the Management Committee, including, but not limited to, senior or pari-passu rights to those of the Preferred A Members, the Common A Members and the Common B Members, including but not limited to the units contemplated to be sold (or that debt may be converted into) in the Subsequent Offering and the Incentive Units as discussed in this Memorandum, with respect to:

(i)      The allocation of Profits or Losses to each such class or series of units or Membership Interests;

(ii)     The right of each such class or series to share in Distributable Cash Flow From Operations and Distributable Cash Flow From Sale and the priority of such distributions;

(iii)     The rights of each such class or series of units or Membership Interests upon dissolution and liquidation of the Company;

(iv)     The rate at which, and the terms and conditions upon which, each such class or series of units or Membership Interests may be converted into another class or series of units or Membership Interests; and

(vi)     The right of each such class or series of units or Membership Interests to vote on, or take action with respect to, Company matters, including matters relating to the relative rights, preferences and privileges of such class or series of units or Membership Interests, to the extent permitted by applicable law, if any such class or series is granted such voting rights.

**Transfers of Membership Interests**

Members may transfer their membership interests only in compliance with the Company's Amended and Restated Operating Agreement.  Section 10.2.1 of the Amended and Restated Operating Agreement provides that if any Member desires to sell all or any portion of such Member's Units to any Person (as defined in the Amended and Restated Operating Agreement) other than a person who is an Affiliate (also as defined in the Amended and Restated Operating Agreement) of such Member, such Member must first offer to sell such Units to the Company by written notice to the Company, in the form and manner provided in the Amended and Restated Operating Agreement, for a period of 10 days, at the price and terms set forth in a bona fide third-party offer to purchase such Units, or if there is no such bona fide third party offer, at a price and upon terms established by the selling Member and set forth in the notice.

If, at the end of such 10-day period, the Company has not exercised its option to purchase all of the Units offered, then the selling Member may assign his or her Common Units to the proposed purchaser, if any, stated in the notice and at the price and on the terms stated therein, at any time within 60 days after the foregoing option expires, but not thereafter unless and until the selling Member gives a new notice to the Company and the Company again fails to exercise its option under the foregoing provisions.  An assignee of a Member in accordance with Section 10.2.1 of the Amended and Restated Operating Agreement shall have the right to become a substituted Member with the consent of the Management Committee as provided in Section 10.3 of the Amended and Restated Operating Agreement.

Federal and state securities laws may impose additional restrictions on the transfer of Units.

**Limits on Management's Liability; Indemnification**

Neither the Management Committee nor any officer of the Company will be personally liable to the Company or its Members for breach of fiduciary duty, for any mistake of fact or judgment or for any act or failure to act when conducting the business operations and affairs of the Company which may cause or result in any loss or damage to the Company or its Members. This limitation does not apply only if a non-appealable ruling establishes that the conduct was

grossly negligent, willful, wanton or fraudulent. The provisions of such indemnification also shall extend to all affiliates, employees, consultants and agents of the Company for any action taken by any of them on behalf of the Company and shall continue after such person ceases to be an agent of the Company. The Company shall advance expenses incurred in defending an action within a reasonable period of time after receiving an itemized accounting of such expenses with reasonable supporting documentation.

**Transactions with Affiliates**

Members, Managers and officers can, but are not obligated to, lend money to the Company, and may contract with, or transact other business with, the Company. When transacting business with the Company, Members, Managers and officers have the same rights and obligations as an independent third party. The Management Committee must approve all transactions between the Company and any Members, Managers or officers, and the terms of such transactions must be no less favorable than if the transaction had been made with an independent third party.

**Other Activities of Members, Management Committee and Officers**

The Company's Management Committee and officers are obligated to devote only such time to the business of the Company as they deem proper. Members, Managers and officers of the Company otherwise are free to engage in any business, including activities that may compete with the Company's business.

**Dissolution of Company; Liquidation and Distribution of Assets**

The Company will be dissolved and liquidated upon: (i) the written decision of the Management Committee and the approval of that decision by the Common B Members; (ii) the sale of all or substantially all of the assets of the Company; or (iii) the entry of a decree of judicial dissolution.

Upon liquidation of the Company, the Chief Executive Officer or another person selected by the Management Committee will proceed to wind up the Company's affairs.

**Amendments**

The Management Committee has discretion to amend the Amended and Restated Operating Agreement without approval by any Member to:

- Increase the Management Committee's duties;

- Surrender certain powers of the Management Committee;

- Cure any ambiguities or inconsistencies in the Amended and Restated Operating Agreement;

- Delete or add any provision of the Amended and Restated Operating Agreement required to be so deleted or added by a state "Blue Sky" commissioner when such

commissioner deems the proposed addition or deletion is necessary for the benefit or protection of the Members; or

- Conform the Amended and Restated Operating Agreement to legal requirements or changes in law.

Any other amendments to the Amended and Restated Operating Agreement will require the consent of the Management Committee and the approval of Common B Members. Once approved in accordance with the Amended and Restated Operating Agreement, an amendment will bind all Members.

## Power of Attorney

By becoming a party to the Amended and Restated Operating Agreement, each Member appoints the Management Committee as his or her attorney-in-fact and empowers and authorizes the Management Committee to make, execute, sign, acknowledge, swear and file on behalf of the Member with respect to the Company:

- Such amended Articles of Organization as may be required by law or pursuant to the provisions of the Company's Amended and Restated Operating Agreement and such documents as may be required by law to reconstitute and continue the business of the Company in accordance with the provisions of the Amended and Restated Operating Agreement;

- All amendments of the Amended and Restated Operating Agreement adopted in accordance with the terms thereof;

- All papers the Management Committee deems necessary or desirable to effect the dissolution and termination of the Company; and

- All such other instruments, documents and certificates that may be required by the State of Colorado or any other jurisdiction in which Company conducts business, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the Company's valid existence.

The Power of Attorney will survive and not be affected by the subsequent death, bankruptcy, incompetency or dissolution of a Member and the transfer or assignment of all or any part of the Membership Interest of a Member; provided, however, that in the event of the transfer by a Member of his or her Membership Interest, the power of attorney will survive the transfer only until such time as the transferee has been admitted to the Company as a substituted Member.

## Accounting, Records and Reports

At its principal place of business, Company will keep the following books and records:

- True and full information regarding the state of the business and financial condition of the Company;

89

- Copies of the Company's financial statements for the three most recent years;

- Copies of the Company's federal, state, and local income tax returns and reports for the three most recent years;

- A current list of the name and last known business, residence or mailing address of each Member;

- The Articles of Organization, the Amended and Restated Operating Agreement and all amendments thereto, all Powers of Attorney and copies of all minutes of meetings or consents to action in lieu of meetings of the Management Committee and the Members (if any); and

- Other information specified by the Management Committee in its discretion.

Upon three business days' notice, any Member will have the right, at such Member's own expense, to examine, audit and make copies of the foregoing books and records, in person or by duly authorized agent or attorney, during normal business hours at the principal place of business of the Company.

Members may inspect only those books and records of the Company listed above. Although the Company also will maintain records and accounts of all operations and expenditures of the Company as required by law, no Member will have the right to review the books and records of the Company relating to the day-to-day operations of the Company or books and records of the Company that the Management Committee deems proprietary to the Company.

Within 45 days after the end of each fiscal quarter, the Company will furnish to each Member an unaudited balance sheet and income statement of the Company for such quarter. By April 14 of each fiscal year, the Company will furnish each Member financial statements, together with a Schedule K-1 showing the capital account of such Member; such Member's allocable share of the Company's items of income, deduction, credit, gain and loss for the year; the distributions to such Member and the amount thereof reportable for such year for state and federal income tax reporting purposes; a copy of the Company's federal, state and local income tax or information returns for the year; and such other information as may be appropriate for such Member to prepare his or her state and federal income tax returns. In the discretion of the Management Committee, such financial statements may be unaudited.

**Certain Tax Audits and Tax Claims**

If there is any tax audit or tax claim against the Company arising out of Company operations, Gary D. Levine, as the Tax Matters Member (as defined in the Amended and Restated Operating Agreement) for the Company, will have the right to cause the Company to defend the claim, select the forum and take actions he deems appropriate in connection with the defense thereof. The Tax Matters Member also is authorized to initiate refund suits on behalf of the Company.

**Dispute Resolution**

All disputes arising in connection with, or relating to, the Company, including interpretation and enforcement of the Amended and Restated Operating Agreement, must be resolved by arbitration in the manner provided in the Amended and Restated Operating Agreement.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis should be read in conjunction with the internally prepared Consolidated Financial Statements for the fiscal years ended December 31, 2010 and 2009 and Notes to the Consolidated Financial Statements and Unaudited Consolidated Financial Statements for the Company for the nine-month periods ended September 30, 2011 and 2010. The Internally Prepared Consolidated Financial Statements for the Company for the fiscal years ended December 31, 2010 and 2009 and Unaudited Consolidated Financial Statements for the nine-month periods ended September 30, 2011 and 2010 are attached hereto as Exhibit A.

**Overview**

Since the last half of 2007, the deterioration of the U.S. economy, falling real estate values resulting in a significant increase in defaulted loans and foreclosures nationally and the related credit crisis have had a devastating impact upon the Company's operations. The result of this market for the Company beginning in 2008 has been its own rapidly increasing defaulted loans and foreclosures, accompanied by a significant drop in value of the collateral securing the Company's portfolio. The increase in non-earning assets has caused a reduction in net interest earnings and an increase in the provision expense for loan loss reserves and real estate owned valuation allowance. The loss in collateral value resulted in sharply increased loan charge-offs and real estate owned carrying costs and losses on disposition. In total, the effect is a significant reduction in the Company's revenues, accompanied by an increase in the Company's portfolio related expenses. The impact on the operating results of the Company has been significant and adverse. During the year ended December 31, 2010, the Company recognized a net loss of $7,356,592. Since January 1, 2008, the Company has incurred net losses of $40,582,766.

The national real estate crisis and the related severe drop in real estate values beginning in 2007 and continuing through the date of this Memorandum have caused the Company to sharply curtail its origination of new loans. The Company's net losses and decisions by the Company's banks to no longer fund new loan production caused a severe drop in the Company's liquidity and the Company's earning power.

The result is that the Company's new loan originations since 2009 (other than isolated loan originations associated with the liquidation of the loan portfolio or OREO) has consisted almost exclusively of 1-4 Family Residential Fix and Flip Loans, which are sold to investors. Since 2008, total assets of the Company have been reduced through portfolio liquidation from approximately $206,921,501 as of December 31, 2008 to $57,094,701 as of September 30, 2011.

The operating losses suffered by the Company reduced its liquidity and in 2009 caused the Company to default on its subordinated debentures, resulting in a default on its Senior Debt.  In 2009, the Company's Senior Lenders ceased funding to the Company for its new loans.

As of the date of this Memorandum, the Senior Lenders have, for the most part, cooperated with the Company to manage the orderly liquidation of the existing portfolio, but each of the lenders has pressured the Company to reduce their individual credit exposure to the Company.

In February 2010, the Company entered into agreements that formed a joint venture between the Company and the PE Investors. The agreements created the Joint Venture whereby BD Funding began to purchase and hold the Company's newly originated NOO Residential 1-4 Family Loans (primarily Fix and Flip Loans). The Joint Venture was capitalized by an initial investment commitment of $20 million from the PE Investors consisting of both a loan and capital investment and a $2.2 million capital investment commitment from the Company.  This resulted in an initial funding commitment to purchase new originations of NOO Residential 1-4 Family Loans of $22.2 million, of which $2.2 million was a required investment from the Company. During 2010 the PE Investors doubled their commitment.   Added to the corresponding doubling of the Company commitment, this resulted in a Joint Venture investment commitment of $44.4 million as of December 31, 2010.  During October, 2011 the PE Investors again increased their commitment by another $22.2 million, which resulted in a commitment adequate for funding a total purchase of new originations of NOO Residential 1-4 Family Loans of $66.6 million from the inception of the Joint Venture.

During the fiscal year ended December 31, 2010, the Company made a net investment in BD Funding of approximately $1,915,000, and BD Funding purchased $28.9 million of new origination loans from the Company.

The debt financing available to BD Funding from the PE Investors has been priced at 10%.  This is a historically high expense rate and causes the Company to need to charge historically high yields on its loan products.  As such, management believes that this has depressed production growth by the Company.  In order to improve on this, the Company is now in the process of negotiating potential loans or business credit lines on behalf of BD Funding with various community banks in the Denver area.  The plan is to put together a consortium of local banks, which will allow BD Funding to replace the existing 10% financing provided by the PE Investors with lower yielding debt from local bank facilities.  In addition, to help stimulate higher production, the PE Investors have temporarily lowered the interest rate of their loan to BD Funding to 8% for new production over a six-month period beginning August 22, 2011.

If successful in lowering its cost of funds, BD Funding plans to first utilize the interest cost savings to lower the pricing of its loan product in order to increase production and then use further interest cost savings to increase the spread realized by BD Funding.

To date, secured bank facilities at cost of funds significantly lower than 10% have been arranged as follows:

- One credit facility of $500,000 was closed with a bank in February 2011, and the bank has stated its desire to increase the facility size to up to $2 million at the time of its annual renewal if collateral performance is as expected;

- A second bank closed a $3 million loan to BD Funding during May 2011 with the desired pricing but with pledge terms that restrict the usage of the facility. Based on good collateral performance, that bank is currently attempting to make the pledge terms more user friendly to BD Funding.

- A third bank closed a $1 million credit facility in August 2011 and has indicated its interest in substantially increasing the size of that credit facility after collateral performance can be established.

The Company is soliciting acceptances of the Plan in order to improve the balance sheet and liquidity of the Company. The Company does not believe there is any possibility it will be able to repay the Series 2012EX and Series 2012AEX debentures on their maturity date. Effecting the Plan will position the Company to raise new capital with the goal of increasing the origination of new loans and ultimately returning to profitability. The failure to effect the Plan would seriously increase the doubts about the ability of the Company to continue as a going concern.

In the 12 months following the Confirmation of the Plan by the Bankruptcy Court, the Company intends to raise up to $10 million dollars in the Subsequent Offering. Management believes that the Subsequent Offering may consist of an offering of debt that is convertible into limited liability company membership units issued by the Company that will rank senior to the Newly Issued Units in rights of preferences upon distributions and liquidation. Although the terms of any such future securities that may be created have not been determined, it is logical to assume that any future contributor of debt or equity to the Company would only do so if those investors were in a senior position to the Holders of the Newly Issued Units of the Company.

**<u>Business Plan for the Company</u>**

The summary business plan of the Company encompasses two distinct business activities:

**Liquidation of the Legacy Loan Portfolio.** The Company plans to continue to aggressively manage the liquidation of its existing portfolio of Residential, Commercial and Recreational Department Loans in order to pay off or settle its indebtedness with the Senior Lenders while managing ongoing operating costs, as well as the ongoing portfolio losses of such liquidation. Operationally, the interest income from the Legacy Loan Portfolio continues to be higher than the interest expense to the Senior Lenders. However, this positive interest "spread" no longer covers all the operating costs associated with the liquidation activity such as servicing, foreclosure, OREO maintenance, accounting and administration, plus any portfolio losses on collateral liquidation. The liquidation of the Legacy Loan Portfolio is a process in which losses and expenses are being managed and minimized, but it will not be profitable to the Company. However, to abandon this process to the Senior Lenders will, in the opinion of management, result in "quick sale" instead of "managed" liquidations by the Senior Lenders. Quick sale

liquidations will result in substantial losses to the Senior Lenders, which are deficiencies which would likely be enforced against the Company. Such enforcement of sizable deficiencies against the Company could result in the bankruptcy and liquidation of the Company, from which nothing could be salvaged for the investors.

**New Loan Production.** The Company plans to continue to originate loans, sell them to BD Funding and service these loans, all while managing expenses to achieve profitability. Management believes that growth in its loan production, and the related growth in profitability of this segment of the Company, will be the source of future profitability of the Company. BD Funding is profitable as of the date of this Memorandum. However, the Company's share of BD Funding profits, along with the fees generated by such production and servicing activity, are not enough to cover the Company's infrastructure costs of loan production and servicing and the expenses and losses incurred in the Legacy Loan Portfolio liquidation. Substantially increased loan production is necessary for the Company to attain a profit. In order to substantially increase loan production the Company must:

1. Lower the cost of debt financing for BD Funding in order to lower the loan pricing on the Company's loan products. Such lower loan pricing will help enable the Company to increase production.

2. Successfully reorganize the capital of the Company. It will be very difficult to raise additional capital in the Company if the Subordinated Debt is not converted to equity.

Raise additional capital (either in the form of equity or debt) in the Company to provide the necessary liquidity to increase loan production and to increase the Company's investment in BD Funding commensurate with the expected growth of the BD Funding loan portfolio. In addition, the Company is expanding its product offerings to include owner occupied loans. It is the opinion of management that creditworthy consumers' need for products such as Bridge Loans is an underserved market, and offering such loans could rapidly increase loan production.

Financing for the new loan originations sold to BD Funding will continue to be obtained by BD Funding (of which the Company owns 40%) and will not be a direct obligation of the Company. The Company continues to seek continued cooperation with its Senior Lenders to enable it to continue the managed liquidation of its existing portfolio. In addition, the Company continues to seek relationships with private investors, including related parties, in order to facilitate the sale of existing collateral. The Company will continue to pay down Senior Debt while the Company's portfolio is liquidated.

A brief status summary of each department is as follows:

### Residential Department

The Residential Department is the only active loan production department in the Company. It continues to originate loans in Colorado and Arizona, specifically the Denver and Phoenix metropolitan areas. Total Company loan production for 2010 was approximately $35 million, almost all of which was generated by the Residential Department, and the great majority of the Residential Department loans are Fix and Flips. Loan production for the eight months

ended August 31, 2011 was $18.1 million.  With the recently initiated lower loan pricing, September production was $3.8 million in new loans, and management believes this increased production will continue.

In addition, the Residential Department participates in the servicing, monitoring and ultimate liquidation of the Residential Department loans included in the Legacy Loan Portfolio.

### Commercial and Recreational Loan Departments

The Commercial and Recreational Loan Departments no longer have organized loan production activity.  However, an occasional opportunity presents itself on a Commercial Loan, and the Company may infrequently underwrite and originate a Commercial Loan.  Other than these occasional "one-off" transactions, the Commercial and Recreational Departments are minimally staffed to assist in the servicing, monitoring and ultimate liquidation of the remaining loans in the Legacy Loan Portfolio.

### Selected Consolidated Financial Information

The following selected consolidated financial information has been derived from the financial statements of the Company and should be read in conjunction with the financial statements, the notes to those financial statements and "**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**."

The following two tables show Financial Information on a comparative basis (i) at and for the twelve months ended December 31, 2010, and (ii) at and for the nine months ended September 30, 2011 and September 30, 2010.

[REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

| | Nine Months Ended | Nine Months Ended | Fiscal Year Ended |
| --- | --- | --- | --- |
| | September 30, 2011 (Unaudited) | September 30, 2010 (unaudited) | December 31, 2010 (internally prepared) |
| Income Statement Data | | | |
| Interest and Fee Income | 2,856,115 | 5,026,971 | $6,206,426 |
| Interest Expense | 1,590,180 | 2,726,703 | 3,482,586 |
| Net Income Before Provision for Loan losses | 1,265,935 | 2,300,268 | 2,723,840 |
| Provision for Loan Losses | 1,444,772 | 1,957,728 | 4,463,690 |
| Other Losses [1] | (1,749,786) | (232,378) | (1,181,302) |
| Operating Expenses | 2,513,934 | 3,530,671 | 4,462,440 |
| Net Income (Loss) | (4,442,557) | (3,420,509) | (7,356,592) |
| Preferred Members' Distribution | -- | -- | -- |
| Net Income (Loss) Applicable to Common Unit Members | $(4,442,557) | $(3,420,509) | $(7,356,592) |
| | | | |
| Balance Sheet Data | | | |
| Assets: | | | |
| Cash and Cash Equivalents | 139,349 | 1,399,379 | 1,112,382 |
| Restricted cash | 1,381,858 | 3,485,013 | 3,216,931 |
| Loans Held for Sale | 2,843,768 | 1,248,024 | 1,703,207 |
| Loans, Net | 36,277,204 | 60,103,040 | 49,931,234 |
| Interest Receivable | 283,367 | 461,599 | 319,491 |
| Other Real Estate Owned | 11,336,152 | 11,720,727 | 10,968,969 |
| Total Assets | 57,094,701 | 82,585,317 | 70,989,380 |
| Liabilities: | | | |
| Notes Payable | 40,086,197 | 56,819,674 | 49,522,552 |
| Accrued Interest Payable | 2,590,928 | 2,258,510 | 2,395,887 |
| Escrows Payable | 923,399 | 868,507 | 798,861 |
| Accounts Payable and other | 825,338 | 845,568 | 869,335 |
| Developer Reserves | 844,876 | 1,563,653 | 1,145,663 |
| Total Subordinated Debt | 25,400,214 | 25,400,214 | 25,400,214 |
| Total Liabilities | 70,700,952 | 87,822,367 | 80,162,512 |
| | | | |
| Members' Equity: | | | |
| Preferred Members' Equity | 9,136,225 | 9,197,852 | 9,136,225 |
| Common Members' Equity | (22,317,471) | (14,174,518) | (17,746,996) |
| Redeemable Common Units Equity | (12,432) | 308,875 | 6,896 |
| Notes Receivable from Members | (412,573) | (569,259) | (569,257) |
| Total Members' Equity | (13,606,251) | (5,237,050) | (9,173,132) |

(1) Primarily attributable to the holding, maintaining and selling of OREO.

## Results of Operations

The Results of Operations discussed below compares the nine months ended September 30, 2011 to the nine months ended September 30, 2010.

## Pro Forma Financial Information for the Nine Months Ended September 30, 2011, as Compared to Nine Months Ended September 30, 2010

During the nine months ended September 30, 2011, interest and fee income was $2,856,115, as compared to $5,026,971 during the nine months ended September 30, 2010, a decrease of $2,170,856, or 43%. Interest and fee income decreased primarily as a result of a reduction in the size of the Company's loan portfolio and continual transition of performing loans to non-performing assets

During the nine months ended September 30, 2011, interest expense was $1,590,180, as compared to $2,726,703 during the nine months ended September 30, 2010, a decrease of $1,136,523, or 42%. Interest expense decreased primarily due to the reduction of the Company's loan portfolio, as well as the liquidation of OREO, both of which caused pay-downs to Senior Lenders that resulted in a reduction in the amount of bank borrowings. The borrowing rate charged by the Company's Senior Lenders remained relatively steady over these two periods.

During the nine months ended September 30, 2011, provision for loan losses was $1,444,772, as compared to $1,957,728 during the nine months ended September 30, 2010, a decrease of $512,956. The loan loss allowance, net of charge-offs, was $6,588,881 at September 30, 2011, as compared to $6,617,606 at September 30, 2010. Such provisions for loan losses reflect the continued deterioration of the loan portfolio both due to continued deterioration of real estate values and the credit quality deterioration of the borrowers.

Non-interest loss was $1,749,786 during the nine months ended September 30, 2011, as compared to a loss of $232,378 during the nine months ended September 30, 2010, a loss increase of $1,517,408. The increased loss was primarily the result of a loss and expenses on real estate owned. The loss and expense on real estate owned was $2,431,089 during the nine months ended September 30, 2011, as compared to a loss and expense on real estate owned of $971,174 during the nine months ended September 30, 2010, an increased loss of $1,459,915.

Non-interest expense was $2,513,934 during the nine months ended September 30, 2011, as compared to $3,530,671 during the nine months ended September 30, 2010, a decrease of $1,016,737, or 29%. The decrease in non-interest expense was primarily the result of: (i) a decrease in salaries and employee benefits of $445,918; (ii) a decrease in professional fees (primarily legal fees) of $291,528; (iii) a decrease in rent and occupancy of $101,897; (iv) a decrease in depreciation of $64,673; and (v) a decrease in other expenses of $112,646.

As a result of the above factors, net loss for the nine months ended September 30, 2011 was $4,442,557, as compared to a net loss of $3,420,509 for the nine months ended September 30, 2010, a decrease of $1,022,048. Net earnings have been, and continue to be, adversely

affected by the increase in non-performing assets and a corresponding high provision for loan losses.

**Liquidity and Capital Resources**

Net cash used in operating activities during the nine months ended September 30, 2011 was approximately $2,698,000, as compared to $863,000 during the nine months ended September 30, 2010, an increase of approximately $1,800,000, or 212%.  This increase is primarily attributed to the operating loss for the nine months ended September 30, 2011 of approximately $4,400,000, as compared to the operating loss for the nine months ended September 30, 2010 of approximately $3,100,000, or an increase of approximately $1,300,000.

Net cash used in investing activities was approximately $9,200,000 during the nine months ended September 30, 2011, as compared to approximately $17,300,000 used in investing activities during the nine months ended September 30, 2010, or a decrease of approximately $8,200,000, or 47%.  This increase is primarily attributed to the balances in outstanding loans receivable, which decreased dramatically during the nine months ended September 30, 2011 as the Company liquidated its loans, cut production and stopped retaining new production in its portfolio.

Net cash used in financing activities during the nine months ended September 30, 2011 was approximately $9,300,000, as compared to approximately $19,900,000 provided by financing activities during the nine months ended September 30, 2010, a decrease of approximately $10,600,000, or 53%.  This result was due primarily to the same reason cited directly above.  Other factors affecting this net cash flow include fluctuations in escrow payments.

At September 30, 2011, unrestricted cash and cash equivalents was $139,349, as compared to $1,112,382 at December 31, 2010, a decrease of $973,033, or 87%.

At September 30, 2011, loans held for sale was $2,843,768 as compared to approximately $1,703,207 at December 31, 2010, an increase of approximately $1,100,000, or 67%.

As of September 30, 2011, notes payable, exclusive of subordinated debt, was $40,086,197, as compared to $49,522,552 at December 31, 2010, a reduction of $9,436,355, or 19%.

The Company currently has no access to immediate cash through secured or unsecured credit lines.  Further, there can be no assurance Senior Lenders will continue to act cooperatively with the Company to manage the orderly liquidation of the existing portfolio.

There can be no assurance that the Company will be successful in realizing this plan of operations.  If it is not successful, the Company will require additional funds from other sources to continue operations, and the Company may have to seek capital resources from other sources to meet its obligations in the future.  If the Company is not successful with its plan of operations, including, but not limited to, the Plan of Reorganization or if Senior Lenders do not continue to act cooperatively with the Company to manage the orderly liquidation of the existing portfolio, there is no assurance it will be able to continue to conduct operations.

**The Company's Lines of Credit and Financings**

Prior to December 2008, the Company's principal sources of funds for its loan originations and purchases were various secured and unsecured lines of credit from banks and other commercial lenders. These facilities were primarily revolving facilities renewable annually. Included in these Senior Lenders were seven Denver area banks, one U.S. subsidiary of a German bank with an office in New York and several Denver area private equity groups, which included a related party of the Company (see the table below for a listing of all such facilities with balance information as of September 30, 2011).

The Company has very longstanding relationships with most of these financial institutions, including one relationship approaching fifty years' duration, and most relationships are over ten years' duration. The Company's large operating losses caused it to fail to meet its financial covenants or the cross-default provisions with its then-outstanding subordinated debentures and resulted in a technical default with all of the Senior Lenders. Each of the Senior Lenders of the Company's revolving facilities stop accepting new loans for funding.

As of September 30, 2011, the Company had secured and unsecured lines of credit and secured financing facilities with outstanding balances totaling $40,086,197 from approximately eight financial institutions. These amounts have decreased significantly since December 31, 2008, when the Company had secured and unsecured lines of credit and secured financing facilities with outstanding balances of $159,455,138. None of the facilities is accepting new loans or making advances to the Company.

| Outstanding as of  9/30/11 | Creditor | Interest Rate | Interest Rate as of 9/30/11 | Due Date | Collateral | Use |
|---|---|---|---|---|---|---|
| | | **Unsecured Lines of Credit** | | | | |
| 1,100,000 | L. Gold Corp. | Wall St. Journal Prime Rate | 3.25% | December 31, 2011 | None | General Corporate |
| 1,100,000 | Total Unsecured Lines of Credit | | | | | |
| | | **Secured Lines of Credit** | | | | |
| 8,654,389 | Lender A | Wall St. Journal Prime Rate plus 1.00%, with a floor of 4.50% | 4.50% | October 31, 2011 | Real Estate Mortgages and OREO | All Loans Except Consumer |
| 715,885 | Lender C (1) | Prime plus 1.00% with a floor of 4.25% | 4.50% | December 31,2011 | OREO property | Collateral Financing |

| Outstanding as of 9/30/11 | Creditor | Interest Rate | Interest Rate as of 9/30/11 | Due Date | Collateral | Use |
|---|---|---|---|---|---|---|
| 375,000 | Lender C (1) | 6% fixed for 5 years than prime plus 2% | 6.00% | September 15, 2021 | OREO property | OREO Purchase |
| 2,043,508 | Lender D | Prime plus 1.00% with a floor of 4.50% | 4.50% | September 30, 2011 | Secured loans and OREO | General Corporate and all loans |
| 1,200,000 | Lender E (1) | 10.0% | 10.0% | June 1, 2012 | Secured loans | General Corporate |
| 203,736 | Lender F | Prime rate plus 0.75% | 4.00% | June 2, 2012 | Hypothecated consumer notes | Consumer loans |
| 1,700,000 | Lender G | Prime Rate with a floor of 5.0% | 5.00% | Upon 90 days written notice | Notes and OREO properties | General Corporate and all loans except consumer |
| 2,693,170 | Lender H | Lender B Prime Standard Rate Prime plus 1.00% with a 4.50% floor | 4.50% | June 12, 2012 | Real Estate Mortgages | All Loans Except Consumer |
| $25,292,652 | **Total Secured Lines of Credit** | | | | | |
| $26,392,652 | **Total Lines of Credit** | | | | | |
| | **Secured Non-Recourse Financing Facility** | | | | | |
| $13,693,545 | Lender I | One Month LIBOR plus 3.00% | 3.247% | July 31, 2011 (2) | Real Estate Mortgages | Res. & Comm. |
| $40,086,197 | **Total Lines of Credit and Secured Financing Facilities as of September 30, 2011** | | | | | |

(1) Personally guaranteed by Gary D. Levine.

(2) The Company believes the maturity date of this loan will be extended until December 21, 2011, at which time it intends to negotiate an additional extension.

Included in the Notes Payable is a note to L. Gold Corp., a Member of the Company and an affiliate of Lester Gold, deceased former Chairman of the Board of the Company (the "L. Gold Corp. Demand Note"). This note was originally a demand note and was participated to Lester Gold and various individuals and entities that are "friends and family" of Lester Gold. None of the "friends and family" was active in the management of the Company. Effective December 8, 2008, to assist the Company in restructuring its debt, Mr. Gold agreed to amend and

restate the L. Gold Corp. Demand Note into a 36-month term note (the "L. Gold Corp. Term Note"). As of September 30, 2011, the L. Gold Corp. Term Note had an outstanding balance of $1,100,000, which was unchanged since December 31, 2008. The L. Gold Demand Note matures December 31, 2011. The L. Gold Corp. Term Note bears interest at the Wall St. Journal Prime Rate per annum. The L. Gold Corp. Term Note is also Senior Indebtedness.

Included in the above-described lines of credit and secured financing facilities is a secured financing facility with a German bank (Lender I). This was a $75 million facility but is shown on the table below at its outstanding balance because the facility will no longer accept new loans for pledging. This facility differs from the rest of the Company's financing facilities in that MMAC, a wholly-owned subsidiary of the Company, holds the facility with the bank. The Company has sold or contributed to MMAC various Residential Loans and Commercial Loans originated by the Company. MMAC then pledged those loans to the bank at an advance rate that was generally 80% of the outstanding principal amount of the loans. Cash flow from collections on the portfolio is divided as follows:

- Currently principal collections are first applied to the bank's advance and any excess (the equity of the Company) is split, 50% to be applied as an additional principal payment to the bank and 50% to be returned to the Company;

- For sales of OREO, 92.5% of the net sales proceeds are paid to the bank as a principal payment and 7.5% is distributed to the Company; and

- Interest income collections are used to pay interest expense to the bank, custodial and back-up servicer fees and a servicer fee to the Company, and the remaining balance is split, 50% to be applied as an additional principal payment to the bank and 50% to be returned to the Company.

The bank interest rate on its advances is equal to 3.0% over the LIBOR. Technically, the transaction is a sale by the Company to MMAC, followed by a loan and pledge of security between MMAC and the bank. The debt is nonrecourse to the Company, and therefore the Debentures are not subordinated to Lender I. However, for accounting purposes, the operations of MMAC and the Company are consolidated, and the transaction is treated as a loan by the bank to the Company.

Since June 2009, half of the excess monthly cash flow (as described above) has been distributed to the Company and half applied as an advance payment on the principal owed to the German bank. As of the date of this Memorandum, the balance due to Lender I is approximately $13,693,545.

The Company has three outstanding series of subordinated debentures with a total principal amount of $25,400,214. The following is a summary of this subordinated debt, demand notes, revolving demand notes and convertible subordinated debentures as of September 30, 2011:

## Subordinated Debentures

| Series<br>Date | Principal<br>Amount | Interest Rate | Interest Rate<br>as of 9/30/11 | Due |
|---|---|---|---|---|
| Series 2016 | $100,000 | Wall St. Journal Prime Rate + 3%,<br>12% Ceiling, 8% Floor | 8% | 6/30/16 |
| Series 2012EX | $23,250,214 | 3% per annum | 3% | 12/31/12 |
| Series 2012AEX | $2,050,000 | 3% per annum | 3% | 12/31/12 |

The aggregate annual maturities of the Company's subordinated debt as of September 30, 2011 are as follows:

| | |
|---|---|
| 2012 | $25,300,214 |
| 2016* | $    100,000 |
| | $25,400,214 |

*The series 2016 debenture is in payment default.  The Series 2012EX and Series 2012AEX debentures are not in payment default.

## Lender covenants

The Company's lines of credit and financing facilities provide for payments of interest monthly and payment of principal based on liquidation proceeds received related to the collateral, with the payment of the principal balance at maturity.  The lines of credit and financing facilities have certain covenants and restrictions, including, but not limited to, certain minimum net worth and debt to net worth covenants.  The Company is currently in technical default of several of the covenants and restrictions.  See "**RISK FACTORS**" above.

## The Company's Allowance for Possible Loan Losses and Bad Debt Experience and Valuation Reserves for OREO

The Company maintains an allowance for possible loan losses at a level management believes is adequate to absorb potential losses in its loan portfolio.  The Company bases its determination of the adequacy of the allowance for possible loan losses primarily on a review of the Company's outstanding loans that includes an evaluation of each borrower's continued ability to pay and the fair value of collateral securing the loans.

The Company maintains allowances for loan losses on all loans it considers to be impaired, i.e., it is probable that the Company will be unable to collect all principal and interest amounts according to the contractual terms of the loan agreement.

When the Company acquires a property through foreclosure, the property is recorded on the Company's books at its estimated fair market value (as determined by appraisal or other appropriate valuation method), less estimated selling costs.  If the Company estimates at the time

of acquisition that the property will be sold at a loss, this estimated loss is charged to the allowance for the loan losses.

Prior to 2002, the Company experienced immaterial losses in its Recreational Loan and Residential Loan portfolios.  During 2002 and 2003, the Company experienced substantial losses in its loan portfolios and charged off approximately $1,800,000 and approximately $300,000, respectively.  Between 2003 and 2005, the Company charged off loans in the aggregate of approximately $155,000.  Since 2005, the Company has charged off approximately $35,200,000. If the real estate market does not improve or experiences continued deterioration, the Company expects to continue to have to charge off a significant amount of loans for the foreseeable future.

The Company's allowances for losses and loans charged off for the nine months ended September 30, 2011, and the fiscal years ended December 31, 2010 and December 31, 2009 are shown below:

|  | Nine Months Ended September 30, 2011 (Unaudited) | Fiscal Year Ended 2010 (Internally Prepared) | December 31, 2009 (Internally Prepared) |
|---|---|---|---|
| Allowance for Possible Loan Losses at Beginning of Year or Quarter | $7,479,672 | $9,157,264 | $7,525,000 |
| Provision for Possible Loan Losses During Year or Quarter | 1,444,772 | 4,436,690 | 12,711,319 |
| (Loans Charged Off) Recovered During Year Shown as Net | (2,335,563) | (6,114,282) | (11,079,055) |
| Balance in Allowance for Possible Loan Losses at End of Year or Quarter | $6,588,881 | $7,479,672 | $9,157,264 |

The Company may also be required periodically to measure certain other financial assets at fair value on a nonrecurring basis in accordance with accounting principles generally accepted in the United States.  If it is probable that the Company will not receive all of its contractual payments required pursuant to the terms of a loan when it is due, the loan is deemed impaired and is written down to its then-estimated fair value, with the amount of the write-down accounted for as a realized loss.

**Write Downs/Valuation Allowances and Expenditures for Properties Acquired in Foreclosure**

During the nine months ended September 30, 2011 and 2010, the Company's write-downs and expenditures with regard to all properties acquired in foreclosure were:

|                                                | Nine months ended |               |
|                                                | 9/30/11           | 9/30/10       |
| Write-downs                                    | $ (1,970,140)     | $  (445,969)  |
| Gain (loss) on sales                           | (58,062)          | 2,470         |
| Costs incurred to operate or dispose of property | (402,887)       | (527,675)     |
| TOTAL                                          | $(2,431,089)      | $(971,174)    |

The Company has also written down the value of the real estate it acquired through foreclosure to its estimated realizable value and will continue to do so as market conditions dictate.

**Non-Performing Assets and Real Estate Owned**

Non-performing assets and OREO as of September 30, 2011 were approximately $23,100,000, as compared to $27,300,000 as of September 30, 2010, a decrease of approximately $4,200,00, or 15%.  Non-performing assets, including OREO, as of December 31, 2010 were $24,600,000.

If the real estate market does not improve or experiences continued deterioration, the Company expects that its impaired loans and OREO will continue to increase and will result in a charge to the Company's earnings.

**Regulation of the Company's Business**

The Company's loan business is subject to, or affected by, government regulation primarily in three areas:  lender licensing, land development and land sales regulations and loan regulations.  The following is an overview of the regulations to which the Company is subject or which affect the Company in these three areas. Although only residential loans and consumer loans are expected to be originated in the future, this section includes a discussion of the regulation of all of the loans in the Company's portfolio.

**Lender Licensing**

Many states attempt to license companies that solicit real estate loans from the residents of those states or which are secured by real estate located in such states.  Licensing requirements vary from state to state and may apply to some, none or all of the loan products offered by the Company.  Failure to comply with licensing requirements may result in penalties.  The severity of the penalty depends on the regulations of particular states and the nature of the infraction.  The Company or a subsidiary is licensed in Colorado, Arizona and Arkansas.

**Land Development and Land Sales Regulations**

Both developers and sellers of land may be subject to state and federal regulations concerning the development and sale of land.  Failure to comply with land development regulations can result in an inability to complete a project, increased project costs, changes to the

project and other issues.  Failure to comply with land sales regulations may result in penalties against the developer or give consumer buyers of the land the right to rescind the sales transaction.

The borrowers of the Company's Residential Loans may be subject to laws regulating the development and sale of real estate.  Although the Company cannot ensure that all such borrowers comply with all such laws, the Company attempts to identify applicable areas of regulation and, following such identification, reviews the borrower's efforts or plans for compliance by its internal due diligence review of the project as set forth in, and in accordance with, the applicable underwriting standards.  The Company may require a review of same by the Company's counsel or may require that the borrower provide the Company with an opinion letter from the borrower's counsel that, as to such regulations, the project is in compliance therewith.  The Company may also require the project developer to give representations, warranties and covenants that the developer has complied, and will continue to comply, with these laws and regulations.

With respect to the Company's Commercial Construction Loans, Commercial Loans and Mezzanine Loans in its portfolio, developers of land projects are subject to federal and state laws regulating the development and sale of the land.  When originating these loans, the Company sought to ensure that these developer borrowers complied with applicable federal and state laws regulating the development and sale of the real estate projects that were funded by the Commercial Construction Loans, Commercial Loans and Mezzanine Loans.  However, the Company cannot ensure such compliance in every case.  The Company attempted to identify applicable areas of regulation and, following such identification, reviewed the developer's efforts or plans for compliance by its internal due diligence review of the project as set forth in, and in accordance with, the applicable underwriting standards.  The Company typically required the developer borrower to provide the Company with an opinion letter from the project developer's counsel that the development and sale of the project was in compliance with key land development and sales laws and regulations and required the project developer to give representations, warranties and covenants that the developer had complied, and would continue to comply, with all applicable laws and regulations.

With respect to the Company's Recreational Loans, developers of lots and timeshare interests for sale to consumers are subject to federal and state laws regulating the development and sale of these lots and timeshare interests and the financing of same.  The Company sought to ensure that these developer borrowers complied with applicable federal and state laws regulating the development and sale of the real estate projects that were funded by the Company's Recreational Acquisition and Development Loans or Recreational Hypothecation Loans or were the source of the consumer notes purchased by the Company in its Recreational Indirect Consumer Loan program.  The Company attempted to identify applicable areas of regulation and, following such identification, reviewed the developer's efforts or plans for compliance by its internal due diligence review of the project as set forth in, and in accordance with, the applicable underwriting standards.  Violations of some of these laws can give a consumer the right to rescind the sales transaction and any related financing and receive repayment of all principal and interest the consumer paid prior to rescission.  The Company typically required the project developer from whom it purchased consumer notes or to whom it lent funds secured by consumer notes to provide the Company with an opinion letter from the project developer's counsel that the development and sale of the project and the related consumer financing was in

compliance with land development and sales and consumer financing laws and regulations and required the project developer to give representations, warranties and covenants that the developer had complied, and would continue to comply, with these laws and regulations.

### Loan Regulations

The Company provides consumer loans through Residential Loans offered by the Residential Department and Residential Construction Loans through the Commercial Loan Department. In its Recreational Indirect Consumer Loans, the Company owns consumer notes or, through its recourse obligations to banks that have purchased those consumer notes from the Company, has an obligation to re-acquire an ownership interest in consumer notes. With respect to the Company's Recreational Hypothecation Loans, the Company is a collateral assignee of consumer notes or, in the event of a default under a Recreational Hypothecation Loan, may become the owner of consumer notes.

Consumer lending is heavily regulated by the federal government and often by state governments. Federal government regulations include regulating credit-granting activities, establishing maximum interest rates and finance charges for certain types of consumer loans and requiring a variety of disclosures to consumers. While state laws often parallel federal laws, significant differences and additional restrictions may apply.

Violations of consumer lending laws can lead to a variety of remedies for the consumer and sanctions and liabilities for the lender. By way of example, violation of certain federal consumer lending laws can give the consumer the right to rescind the transaction and recover all money paid by the consumer in the transaction. This remedy can be available even as against an assignee of the loan if the violation is one deemed by the federal regulations to be material and which is apparent from the face of the loan documents. Both the original lender and an assignee of the original lender can, under certain circumstances, be liable to the consumer for actual damages, a statutory penalty and the consumer's costs and reasonable attorney's fees. A material failure to comply with federal regulations regarding certain high-rate, high-fee mortgage loans carries potential civil liability equal to all finance charges and fees paid by the consumer.

Generally, the commercial loans made by the Company have been subject to little regulation by federal, state or local authorities, although many states do regulate the maximum interest rates and finance charges that can be charged in a commercial loan transaction. A violation of these regulations may cause the loan to be unenforceable in whole or in part.

### Consumer Loans

With respect to the Company's loans to consumers, whether originating from the Residential Department or from the Residential Construction Loans offered by the Commercial Loan Department, the Company has policies and procedures in place to ensure compliance with the applicable state and federal laws and regulations governing consumer lending. The Company previously offered direct consumer loans in Colorado and discontinued making such loans. However, recently the Company began making these loans in Colorado and Arizona. The Company's consumer loan documents for use in consumer loans in Colorado have been approved by Colorado counsel. Arizona also has separate regulatory requirements, and the Company's consumer loan documents for use in consumer loans in Arizona have been reviewed by Arizona

counsel. The employees originating such loans are or will be properly licensed to make such loans under applicable state law and will comply with state and federal disclosure requirements. The Company, or the subsidiary making such loans, is properly registered or licensed under applicable state law and will comply with state and federal laws and regulations governing the origination and servicing of such loans.

In connection with its Recreational Loans and Indirect Consumer Loans, the Company typically had its counsel review the form of consumer note documents used by the developer that sold those consumer notes to the Company or was borrowing against those consumer notes from the Company in order to ensure compliance with applicable federal consumer lending laws and regulations. Additionally, the Company typically obtained an opinion letter of counsel from the attorney for the developer as to the compliance of the form of the developer's consumer note documents with applicable federal and state laws and regulations governing consumer lending.

**Non-Consumer Loans**

Generally, the non-consumer loans made by the Company are subject to little regulation by federal, state or local authorities, although many states do regulate the maximum interest rates and finance charges that can be charged in a commercial loan transaction. A violation of these regulations may cause the loan to be unenforceable in whole or in part.

In its non-consumer loans in Arizona, Colorado, Utah, New Mexico and Nevada, the Company used local counsel to ensure its standard loan documents are in substantial compliance with applicable loan and interest rate regulations. In its non-consumer loans in other states, the Company generally relied upon the provisions of its loan documents which provide that Colorado law applies to its loans; however, provisions such as these are not always upheld by the courts. For example, if the collateral for a loan is a 1-4 family dwelling, Arizona state law presently prohibits lawsuits seeking to recover the deficiency amount remaining due on a loan following a foreclosure of the real property securing same, but Colorado law does not. It is unknown whether a Colorado court would uphold the Company's ability to obtain a deficiency judgment arising out of such a loan in Arizona.

In the Commercial Loan Department, the Company typically required, in transactions in states in which the Company is not licensed, an opinion from the borrower's attorney that the loan was enforceable and did not violate applicable interest rate regulations if state law, rather than Colorado law, applied to the loan. Furthermore, in connection with its Recreational Acquisition and Development Loans and its Recreational Hypothecation Loans, the Company typically required borrowers to provide an opinion from the borrower's attorney that the loan was enforceable and did not violate applicable interest rate regulations if state law, rather than Colorado law, applied to the loan.

**Other Potential Regulation**

Federal legislation (the S.A.F.E. Mortgage Licensing Act of 2008) includes provisions designed to cause all states to establish licensing of individuals originating residential mortgage loans and to create a national registry of licensees. Under this law, a mortgage loan originator is an individual who takes a residential mortgage loan application or who offers or negotiates the terms of a residential mortgage loan. A residential mortgage loan is a loan primarily for

personal, family or household use that is secured by residential real estate on which is, or will be, constructed a dwelling with four or fewer units.  In the event that the Company's employees are required to be licensed in any or all states in which the Company operates, it could have a material adverse effect upon the Company if its employees were unable to obtain a license such that the Company was prohibited from making loans or if the cost of compliance with related regulations increases the Company's cost of operations.

Consistent with the S.A.F.E. Mortgage Licensing Act of 2008, residential mortgage loan originators in Colorado and Arizona are required by such states' laws to be licensed and mortgage lenders must be licensed or registered. Under the S.A.F.E. Act and related state laws and regulations, the residential mortgage loan originator owes certain duties or responsibilities to the borrower.  In Colorado and Arizona, a residential mortgage loan originator is an individual who takes a residential mortgage loan application or who offers or negotiates the terms of a residential mortgage loan.  In both such states, a residential mortgage loan is a loan primarily for personal, family or household use that is secured by residential real estate on which is, or will be, constructed a dwelling with four or fewer units.   The Company believes the licensing requirement in Colorado and Arizona is limited to individuals who originate consumer-purpose mortgage loans secured by residential 1-4 family dwellings.  The Company made such consumer purpose mortgage loans in Colorado and Arizona in the past, but  stopped offering them in Colorado in mid-2007 and has only occasionally been making such loans in Arizona. The Company anticipates making more of these loans.   An employee who is licensed in the applicable state originates such loan and is responsible for ensuring compliance with any disclosure or other requirements of the law.

### State of Colorado Legal Proceeding Relating to Regulation

Mortgage loan originator licensing in Colorado is administered by the DRE.   The Colorado Board of Mortgage Loan Originators (previously defined herein as the "Board") has the authority to delegate any enforcement and administrative authority to the director of the DRE.

In June 2011, the Board adopted the Rule interpreting the statutory term "residential mortgage loan" as including loans obtained by the borrower for business, commercial or investment purposes such as residential construction loans for home builders and "fix and flip" or "fix and hold" loans where the borrower plans to acquire and rehabilitate the property and either sell it or hold it for rental income.  As a result of the Rule, the Company's employees would need to be licensed as mortgage loan originators and comply with various loan disclosure and other requirements for it to continue to offer these loan products.

In August 2011, the Company and three of its employees brought an action under the Colorado Administrative Procedures Act and the Declaratory Judgment Act against the DRE, the director of the DRE and the Board asserting that the Rule is unlawful and should be enjoined because of a statutory limitation that a loan cannot be regulated as a "residential mortgage loan" unless it is a consumer purpose loan that is primarily for "personal, family and household use" *of the borrower*.  The Company asserts that because its borrowers use such loans primarily for business, commercial or investment purposes, such loans are not subject to Colorado residential

lending regulations and are therefore outside the scope of the Board and the DRE's regulatory authority.

The outcome of this matter cannot be determined at this time.  In the event that employees are required to be licensed as mortgage loan originators, it could have a material adverse effect upon the Company if the Company were prohibited from making such loans or if the cost of compliance with related regulations increases the Company's cost of operations.

Furthermore, as a result of recent market conditions and the responses thereto of regulators, legislative authorities and others, U.S. federal and state lawmakers and regulatory authorities have announced that they are evaluating the current regulatory oversight over financial industry participants, including the Company. At the federal level, the adoption of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and the creation of the Consumer Financial Protection Bureau is expected to result in the adoption of many new regulations governing the consumer finance industry.  It is possible that federal and state lawmakers and regulators will continue to review and/or adopt changes to established rules and policies.  Any new laws, regulations or increased regulatory oversight or enhanced capital requirements may adversely affect the Company's financial condition, prospects or results of operations.

**Employees**

As of September 30, 2011, the Company had 24 employees, as compared to a high of 71 employees as of November 2007.  The following table details the marketing and origination, administration and part time employees for the Company as of September 30, 2011.

| Department | Portfolio Management/ Origination | Administration | Commission Only | Part-time | Total |
|---|---|---|---|---|---|
| Loan Production Departments: | | | | | |
| Residential/Small Commercial | 6 | 3 | 2 | 0 | 11 |
| Commercial | 0 | 1 | 0 | 0 | 1 |
| Recreational | 0 | 1 | 0 | 1 | 2 |
| Overhead and Administration: | | | | | |
| Operations | 0 | 2 | 0 | 0 | 2 |
| Accounting | 0 | 2 | 0 | 0 | 2 |
| Administration, including executive officers | 0 | 4 | 0 | 2 | 6 |
| Total | 6 | 13 | 2 | 3 | 24 |

**Facilities**

The Company leases an aggregate of 11,304 square feet of office space located in the Crestline Office Center at 7400 East Crestline Circle, Greenwood Village, Colorado. Of the total 11,304 square feet, 8,770 square feet are leased under a ten-year lease that ends on October 31, 2020, and 2,534 square feet are leased under a five-year lease that ends on December 31, 2015 but may be extended by the Company until October 31, 2020. The base rent of the Company for all 11,304 square feet is currently $19,078 per month, or $228,940 per year, and increases by 2.5% on November 1 of each year.

The lease is a triple-net lease. The Company is responsible for 18.38% of the operating expenses of the building in addition to the base rent.

The Company subleases a portion of the Crestline Office Center space on a five-year sublease ending December 31, 2015 to a real estate investment company for $2,800 per month, which increases by 2.5% per year. The sub-tenant has a conditional option to extend its sublease until October 20, 2020.

The Company also subleases several offices on a month-to-month basis to a related party for approximately $1,800 per month. The lease rate is calculated to pass through the cost of the space to the subtenant. The lease rate is subject to the same annual increases and expense add-ons that the Company pays for its space.

The Company owns a 12.5% membership interest in Crestline Office Center Associates, LLC, the owner of the Crestline Office Center. The Company has provided a limited indemnification to Guarantee Life Insurance Company of America to hold that lender harmless from and against environmental liabilities of the Crestline Office Center building. The Company's indemnification is limited to 12.5% of any environmental liabilities associated with Crestline Office Center Associates, LLC.

The Company also leases approximately 350 square feet of office space in Scottsdale, Arizona on a month-to-month basis. The Company's base rent is $952 per month, or $11,424 per year.

## <u>COMPANY CAPITALIZATION</u>

The following table sets forth the capitalization of the Company at September 30, 2011 and as adjusted to reflect the exchange of the Outstanding Securities for the Newly Issued Units.

[REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

|  | September 30, 2011 | Pro-Forma as of September 30, 2011 (assuming confirmation of the Plan and the exchange for the Newly Issued Units as if it were effective September 30, 2011) [1] |
|---|---|---|
| Liabilities: |  |  |
| Liabilities not including Loans from Affiliates and Subordinated Debt [2] | $42,774,737 | $41,674,737 |
| Accrued Interest on Debentures | 2,526,001 | 0 |
| Loans from Affiliates [3] | 1,100,000 | 1,100,000 |
| Series 2012EX Subordinated Debentures and Series 2012AEX Convertible Subordinated Debentures and Series 2016 Subordinated Debentures [4] | $25,400,214 | 0 |
| TOTAL LIABILITIES | 70,700,952 | 42,774,737 |
| Members' Equity: [5][6] |  |  |
| Notes Receivable from Members [7] | (412,573) | (412,573) |
| Common Members' Equity [8] | (22,317,471) | 0 |
| Redeemable Common Members' Equity | (12,432) | 0 |
| Preferred Members' Equity [9] | 9,136,225 | 0 |
| Preferred A Members' Equity [10] | n/a | 14,319,964 |
| Common A Members' Equity [11] | n/a | $0 |
| Common B Members' Equity [12] | n/a | $0 |
| TOTAL MEMBERS' EQUITY | (13,606,251) | $14,319,964 |
| TOTAL LIABILITIES AND MEMBERS' EQUITY | $57,094,701 | $57,094,701 |

(1)      This column of this table assumes that the confirmation of the Plan by the Court is effective as of September 30, 2011. However, the Plan current provides that the Unit Transfer Date is 12:00 p.m. MST on December 31, 2011.  As a result, the amounts in this column are subject to change and upon the confirmation of the Plan and on the Unit Transfer Date, the amounts will be vary significant and likely adversely as a result of the projected loss from operations.  The Company has

provided this capitalization table for illustration only. Accordingly, Investors should place limited reliance upon the amounts set forth in this column.

(2)     The Company's outstanding bank and finance Company indebtedness is described in "**THE COMPANY - The Company's Lines of Credit and Financings**."

(3)     Represents loans from L. Gold Corp. See "**THE COMPANY - The Company's Lines of Credit and Financings**."

(4)     Represents the Debentures and the Series 2016 Subordinated Debentures that may be exchanged for Preferred A Units pursuant to the Plan.

(5)     Members' Equity at September 30, 2011 excludes an option held by Gary D. Levine to purchase 40,000 Common Units of Membership interest in the Company and options held by Raymond T. Baker, Donald L. Kortz, and Edward C. Gruben to each purchase 20,000 Common Units at an exercise price of $25.98 per Common Unit. Members' Equity also excludes an option held by Kimberly L. Hubbard to purchase 5,000 Common Units. The exercise price of Ms. Hubbard's option is $25.98 per Common Unit. If the Plan is confirmed by the Court, these options will be extinguished.

(6)     Members' Equity also excludes options held by seven key employees of the Company to purchase 17,000 Common Units at an exercise price of $25.98 per unit and options held by two key employees to purchase up to 500 Common Units at an exercise price of $32.00 per Common Unit. If the Plan is confirmed by the Court, these options will be extinguished.

(7)     Members' Equity at September 30, 2011 also excludes the rights of the Holders of the Company's Series 2012AEX Convertible Subordinated Debentures to convert all or a portion of these debentures into Common Units of the Company at a conversion price of 1.5 Common Units for every $100 principal amount of debentures converted ($57.47 per Common Unit as of September 30, 2011), or 35,668 Common Units. Anti-dilution provisions adjust the conversion price of the convertible subordinated debentures upon the occurrence of a recapitalization, merger or other event that would dilute the value of the Common Units or in the event the Company issues, for less than $57.47 per unit, as adjusted, additional units of Membership interest in the Company. If the Plan is confirmed by the Court, the Series 2012AEX Convertible Subordinated Debentures will be exchanged for Preferred A Units.

(8)     The Company has facilitated the acquisition of Common Units by certain of its key employees by loaning funds to the employees to purchase the Common Units or by agreeing to purchase certain notes from one of the Company's Senior Lenders which were used by the employee to purchase Common Units in the event of an uncured default, death or bankruptcy or if the banking relationship with the bank is terminated. The ownership of certain of the Company's executive officer's Common Units is pledged as security for the Company's obligations. See "**Related Party Transactions**" below.

(9)     Following the Unit Transfer Date, in the event of a further write-off of the Company's loans or OREO, the Preferred A Members' Equity would be reduced by a corresponding amount. See "Non-Performing Assets and Real Estate Owned."

(10)     The Holders of the Preferred Units have the right at any time to convert all or a portion of their Preferred Units into Common Units at an exchange rate of 2.25 Common Units per Preferred Unit ($40.00 per Common Unit as of December 31, 2010), or 248,767 Common Units. The Preferred Units contain anti-dilution provisions for the protection of the Holders of the Preferred Units. These provisions adjust the conversion price of the Preferred Units upon the occurrence of a recapitalization, merger or other event that would dilute the value of the Common Units or in the event the Company issues, for less than $44.44 per unit, as adjusted, additional Common Units of Membership interest in the Company. If the Plan is confirmed by the Court, the Preferred Units will be exchanged for the Common A Units.

(11)     The Preferred A Units capital contribution on the Unit Transfer Date will be $14,319,964, which represents 100% of the net asset value of the Company as of September 30, 2011 and is also Preferred A Units Liquidation Preference.

(12)     The Common A Units and the Common B Units capital contributions on the Unit Transfer Date will be $0.

## THE COMPANY'S MANAGERS, EXECUTIVE OFFICERS
## AND CERTAIN COMMON MEMBERS

**Managers and Executive Officers**

The Company is managed by a management committee comprised of the Company's seven Managers.  Pursuant to the Company's current Amended and Restated Operating Agreement, three of the Managers are designated by L. Gold Corp., two are designated by Gary D. Levine, one is designated by the person holding the position of Chief Executive Officer (which presently is Gary Levine) and one is appointed by Raymond T. Baker, an investor in the Company.

The current managers and executive officers of the Company are as follows:

| Name | Position |
|------|----------|
| Gary D. Levine | President, Chief Executive Officer, Manager |
| Justin Land | Executive Vice President |
| Kimberly L. Hubbard | Executive Vice President – Residential/Small Commercial Lending |
| Jack Keane | Chief Financial Officer and Manager |
| Edward C. Gruben | Outside Manager |
| Raymond T. Baker | Outside Manager |
| Gerald S. Gray | Outside Manager |
| Donald L. Kortz | Outside Manager |
| Brett Perry | Manager |

The Amended and Restated Operating Agreement provides that the Holders of the Preferred A Units will appoint two managers to the Management Committee, the Holders of the Common A Units will appoint one manager to the Management Committee, the Holders of the Common B Units will appoint two managers to the Management Committee, Gary D. Levine will appoint one manager to the Management Committee and L. Gold Corp. will appoint one manager to the Management Committee.  See "Amended and Restated Operating Agreement – Appointment of Managers" above.

**Biographies of the Current Managers and Executive Officers**

**Gary D. Levine**, age 59, has served as President, Chief Executive Officer and a Manager of the Company since April 1997.  Mr. Levine was Executive Vice President of KeyBank of Colorado from March 1995 until March 1996 when he became President and Chief Executive Officer of KeyBank of Colorado until he left to join the Company in April 1997.  From October 1983 until March 1995, Mr. Levine was employed at OmniBank Southeast, Denver, Colorado, a commercial bank with $450 million in assets.  Mr. Levine became President and Chief Executive Officer of OmniBank Southeast in May 1985 and held that position until KeyCorp acquired the bank in February 1995.  Mr. Levine has been employed in banking and finance since 1975 and holds a Bachelor of Science degree in Business from the University of Denver.

**Justin Land**, age 30, joined the Company in November 2002 and has served the Company as Executive Vice President since 2010.  Other positions Mr. Land has held at the Company include Vice President of the Commercial Department, Loan Analyst, Loan Officer, Collections Manager, and Assistant Vice President.  Mr. Land has been a licensed Colorado Real Estate Broker since 2004 and is active in Denver Metro Commercial Association of REALTORS and other real estate organizations.  Mr. Land holds a Bachelor of Science degree in Economics with a concentration in Finance from The Wharton School of the University of Pennsylvania.  Mr. Land is Mr. Levine's son-in-law.

**Kimberly L. Hubbard**, age 48, joined the Company in October, 1997 and currently serves as Executive Vice President and manages the Residential Department.  Prior to joining the Company, Ms. Hubbard was first a loan officer and then headed residential loan origination for KeyBank (and its predecessor OmniBank) from October 1993 until October 1997.  From 1986 until she joined OmniBank in 1993, Ms. Hubbard was a Savings and Loan Examiner for the United States Treasury Department – Office of Thrift Supervision.  Ms. Hubbard has 15 years of banking-related experience and holds a Bachelor of Science Degree in Business Administration from the University of Nebraska - Lincoln.

**Jack Keane,** age 60, was appointed the Chief Financial Officer of the Company, effective January 1, 2009.  Mr. Keane previously served as a Senior Vice President of the Company from May 2005 to January 2009 and has been a Manager of the Company since June, 2009. Prior to that, Mr. Keane provided consulting services and at one prior interval before 2000 served as a Manager of the Company.  Mr. Keane is in charge of financial reporting for the Company, manages the credit relationships of the Company and evaluates the different alternatives of financing the growth of the Company.  Prior to 2004, Mr. Keane served for 12 years first as a consultant and then as Executive Vice President of The Chotin Group Corporation, where he was responsible for the evaluation, analysis, deal structuring and negotiation of new business initiatives, acquisitions or investments.  Prior to his term at The Chotin Group Corporation, Mr. Keane was an employee and later a shareholder and officer of Lehman, Butterwick and Company, P.C., a public accounting firm.  Mr. Keane received a B. S. degree in Business with an emphasis in Accounting from Regis University (formerly College) in 1973 and a J.D. from the University of Denver Law School in 1978.

**Edward C. Gruben**, age 64, has served as a Manager of the Company since April of 2003.  Mr. Gruben served as Chief Financial Officer of the Company from April of 2003 to

January of 2009. Mr. Gruben has over 30 years' experience in financial and tax consulting. Since January of 2009, Mr. Gruben has served as the Chief Financial Officer ("CFO") of Karman, Inc. Mr. Gruben provides financial consulting and contract CFO services through Cambridge Consulting Group, LLP, an entity controlled by Mr. Gruben and of which he is the Managing Partner. Mr. Gruben has served as a Managing Partner of Cambridge Consulting Group, LLP since April of 1996. From January of 1988 to April of 1996, Mr. Gruben was the Chief Financial Officer of The Chotin Group Corporation, a company that specialized in the securitization of financial assets. During his tenure with this company, Mr. Gruben was involved in over $400 billion of structured financings. Mr. Gruben also served as the CFO of Uniwest Financial Corporation, a non-diversified savings and loan holding company from January of 1985 to December of 1987. Prior to 1987, Mr. Gruben was the Director of Taxation of Lehman Butterwick & Company, P.C., a regional public accounting firm, the Vice President of Finance and Operations for Karman, Inc., an international apparel manufacturing company, a member of the tax department of Fox & Company (now Grant Thornton), a national accounting firm, and a field agent with the Internal Revenue Service. Mr. Gruben attended the University of Colorado, where he received a BSBA degree in accounting and physical sciences, with extended studies at the University of Denver in its Graduate Tax Program. Among Mr. Gruben's credits are current membership in the Colorado Society of Public Accountants and the American Institute of Certified Public Accountants.

**Raymond T. Baker,** age 60, is an outside Manager of the Company. Since 1974, Mr. Baker has been an officer, director and controlling shareholder of Gold Crown Management Company, an asset management company located in Denver, Colorado. Gold Crown owns and operates a mixed portfolio of real estate, including student and conventional housing, multi-purpose office and industrial properties, as well as triple-net retail properties. Mr. Baker is also co-founder, President and a director of the Gold Crown Foundation, Inc., a Colorado non-profit corporation that supports and sponsors youth sport programs. Mr. Baker currently serves as Chairman and a board member of the Denver Metropolitan Major League Baseball Stadium District and Metropolitan Football Stadium District, a Commissioner of the Colorado Commission on Higher Education and a member of the board of directors of Alpine Banks of Colorado and the Denver Zoological Foundation. Mr. Baker is past President of Colorado Apartment Association and Apartment Association - Metro Denver, a former member of the Blue Ribbon Transportation Panel and former member and Chairman of the Colorado Economic Development Commission. Mr. Baker was named "Man of the Year" of the Anti-Defamation League in 1996.

**Gerald S. Gray**, age 82, is an outside Manager of the Company. Mr. Gray was a partner in the Certified Public Accounting firm of Stone, Gray & Company from September 1949 until September 1977. Mr. Gray joined Marvin Davis in September 1977 as Chief Financial Officer for Davis Oil Company and various other companies controlled by Mr. Davis. In January 1978, Mr. Gray became a partner in the newly-formed real estate company of Miller, Klutznick, Davis, Gray Co. In September 1997, Mr. Gray retired from Davis Companies and pursues other business interests, along with serving on the board of directors for several not-for-profit organizations. Mr. Gray holds a Bachelor of Science Degree in accounting from the University of Denver.

**Donald L. Kortz**, age 71, is an outside Manager of the Company. Mr. Kortz is the Chairman of the Board of Cassidy Turley Fuller Real Estate ("Fuller"), a national real estate

services company.  Mr. Kortz was employed by Fuller from 1969 to 1995, first as Executive Vice President and General Counsel (from 1969 to 1987) and next as President and Chief Executive Officer (from 1987 to 1995).  In 1995, Mr. Kortz took a three-year leave of absence to become the President and Chief Executive Officer of Rose Community Foundation, formed as a result of the sale of Rose Medical Center.  Mr. Kortz rejoined Fuller as Chairman of the Board in 1999.  During his years with Fuller, Mr. Kortz has been involved in real estate transactions in excess of $1 billion and has served as a consultant in a variety of real estate matters.  Mr. Kortz holds a Bachelor of Business Administration from Tulane University and an LLB from the University Of Denver College Of Law.  Mr. Kortz is a past Chairman of the Board of The Children's Hospital, Denver, Colorado.  Mr. Kortz currently serves as a Director or Trustee of Steele Street State Bank, Fuller and Rose Medical Center.

**Brett Perry**, age 40, is a Manager of the Company.  Since July 2002, Mr. Perry has served as a Manager of Bravada Partners, LLC where he manages its investments, including improved and unimproved real estate, oil and gas holdings, joint ventures and other alternative investments.  Prior to Bravada Partners, LLC, Mr. Perry practiced law, most recently at the law firm of Brownstein, Hyatt & Farber, P.C., where he specialized in real estate transactions.  While practicing law, Brett was also involved in commercial litigation, insurance defense, real estate finance and business entity formation.  Mr. Perry is a member of the National Young Leadership Cabinet for the Jewish Federations of North America and is philanthropically involved with many organizations, including the Global Down Syndrome Foundation, BMH-BJ Congregation, and The Jewish Experience.

## Audit Committee

The Company maintains an Audit Committee.  The members of the Audit Committee are Raymond T. Baker, Gerald S. Gray and Edward Gruben.  Messrs Baker, Gray and Gruben are all outside managers of the Company.

## Employment Agreements with Executive Officers

The Company currently has employment agreements with Gary D. Levine and Kimberly L. Hubbard.  These employment agreements are terminable by the Company or the employee at any time, with or without cause.  The Company formerly had an employment agreement with Scott Karas, Executive Vice President of the Recreational Department.  Mr. Karas executed a termination of employment agreement with the Company effective January 1, 2011 which provided for Mr. Karas to work a reduced schedule for reduced compensation until December 31, 2011, at which time Mr. Karas' employment with the Company will be terminated.

Mr. Levine's employment agreement contains a non-competition covenant prohibiting him from competing with the Company's business in the Denver metropolitan area or the Phoenix metropolitan area for a period of two years following termination of his employment with the Company.  The employment agreements of Mr. Levine and Ms. Hubbard both contain covenants restricting their ability to solicit employees (except, in the case of Mr. Levine, his brother or his secretary and, in the case of Ms. Hubbard, two employees who joined the Company with her) upon termination of their employment with the Company.   These employment agreements also contain confidentiality clauses to protect the Company's proprietary information.  The Company's other managerial employees who do not have executed

employment agreements with the Company have signed confidentiality agreements which protect the Company's proprietary information.

Mr. Levine's present employment agreement provides for a base salary of $220,000 per year. At the initiative of Mr. Levine, his base salary was reduced from $270,000 per year, as provided under his prior employment agreement with the Company, effective August 1, 2009. At the same time, Mr. Levine indefinitely suspended his rights to certain incentive compensation and benefits due to him under his prior employment agreement with the Company. His present employment agreement with the Company now reflects these concessions by Mr. Levine. The suspended incentive compensation, which can be reinstated by the Management Committee of the Company, is as follows:

If the Company's annual GAAP earnings are less than $2.5 million, Mr. Levine's incentive bonus is 1% of the first $1 million of the Company's GAAP earnings and 1.5% of the next $1.5 million of the Company's GAAP earnings. If the Company's annual GAAP earnings are $2.5 million or greater, Mr. Levine's incentive bonus is 2% of the first $3 million of the Company's GAAP earnings, 3% of the next $1 million of the Company's GAAP earnings and 4% of the Company's GAAP earnings above $4 million, up to a maximum incentive bonus of $270,000 per year.

Mr. Levine's employment agreement also provides him with an interest bonus equal to the interest he owes to the Company on a promissory note he gave the Company in connection with the acquisition of his membership interest in the Company. Mr. Levine is required to apply all of his interest bonus to interest on his promissory note.

Ms. Hubbard's employment agreement provides for a base salary determined by the Company's chief executive officer (the amount of her base salary currently is $92,000), plus commissions based on Residential Loan originations. Ms. Hubbard has a guaranteed minimum total compensation of $150,000.

Effective June 30, 2008, the executive management team of the Company indefinitely waived its right to receive all incentive bonuses.

The employment agreements of Mr. Levine and Ms. Hubbard also provide for participation in the Company's profit sharing plan, the use of a Company automobile for Mr. Levine and payment of health and life insurance premiums. In addition, Mr. Levine maintains a residence in Arizona, and the Company pays him a $125.00 per diem expense reimbursement when he or other individuals use the residence while on Company business in Arizona.

Mr. Levine's employment agreement expires on December 31, 2012 and automatically renews for successive one year periods unless otherwise terminated.

The employment agreements of Mr. Levine and Ms. Hubbard provide for a termination payment equal to three months' base salary in the case of Mr. Levine, and three months' base salary plus average commissions in the case of Ms. Hubbard if their respective employment is terminated by the Company other than for cause.

The employment agreements of Mr. Levine and Ms. Hubbard provide for options to purchase Common Units, and the employment agreements of Ms. Hubbard provide for redemption rights relating to her Common Units upon termination of employment.  The options held by Mr. Levine and Ms. Hubbard are described in Note 1 to the table in "**Common Units Owned by Managers, Executive Officers and Certain Common Members**" and Note 4 to the table in "**COMPANY CAPITALIZATION**."  The redemption rights are described in Note 9 to the table in "**COMPANY CAPITALIZATION**."

## Executive Compensation

The following table contains information as to the compensation paid for the Company's fiscal years ended December 31, 2010 and 2009 and the projected cash compensation to be paid for the Company's current fiscal year ending December 31, 2011 to the Company's Chief Executive Officer, Chief Financial Officer and the two highest paid executive officers of the Company:

| NAME & PRINCIPAL POSITION | PERIOD | ANNUAL COMPENSATION | | | |
| | | SALARY | COMMISSION | BONUS | OTHER COMPENSATION[2] |
| --- | --- | --- | --- | --- | --- |
| Gary D. Levine, President and Chief Executive Officer[1] | 12/31/11* | 228,000 | 0 | 32,354 | 21,186 |
| | 12/31/10 | 228,000 | 0 | 32,354 | 20,265 |
| | 12/31/09 | 257,167 | 0 | 32,711 | 17,804 |
| Justin Land, Executive Vice President[3] | 12/31/11* | 117,500 | 12,182 | 0 | 17,518 |
| | 12/31/10 | 90,000 | 23,973 | 0 | 7,594 |
| | 12/31/09 | 90,000 | 33,713 | 0 | 6,767 |
| Kimberly L. Hubbard, Executive Vice President[4] | 12/31/11* | 92,000 | 52,960 | 0 | 14,965 |
| | 12/31/10 | 92,284 | 62,604 | 0 | 13,826 |
| | 12/31/09 | 108,557 | 44,836 | 0 | 12,386 |
| Jack Keane, Chief Financial Officer | 12/31/11* | 120,000 | 0 | 0 | 14,187 |
| | 12/31/10 | 120,000 | 0 | 0 | 7,490 |
| | 12/31/09 | 120,000 | 0 | 0 | 6,690 |

* Projected cash compensation amounts for 2011

(1)      Mr. Levine is entitled to an incentive bonus and an interest bonus as described in "**Employment Agreements with Executive Officers**."  Amounts included for Mr. Levine do not include a $125 per diem reimbursement paid to Mr. Levine

for housing at his residence in Arizona while he and other employees of the Company are in Arizona conducting business on behalf of the Company. During the fiscal years ended December 31, 2010 and 2009, amounts paid to Mr. Levine for reimbursement for housing at his residence in Arizona were $10,625 and $5,250, respectively, and he is projected to be reimbursed approximately $5,350 for use of the residence during the fiscal year ending December 31, 2011.

(2) In addition to salaries, commissions and bonuses, management receives additional benefits, including participation in the Company's profit sharing plan, the use of Company automobiles (for Mr. Levine) and payment of health insurance and life insurance premiums. The annual estimated cash amounts of these additional benefits are set forth in "Other Compensation" in the chart above. Management also receives reimbursement of out-of-pocket expenses incurred on behalf of the Company.

(3) Mr. Land received incentive compensation relating to new loan production, loan extensions and sale of loans or OREO through June 30, 2011. Mr. Land, as a proprietor operating under Blue Spruce Realty, also received commissions for listing collateral and OREO as described in "Related Party Transactions" below until June 30, 2011. As of July 1, 2011 Mr. Land's compensation was changed to a salaried amount with no additional incentive compensation. Mr. Land is the son-in-law of Mr. Levine.

(4) Ms. Hubbard is entitled to commissions based on Residential Loan originations as described in "**Employment Agreements with Executive Officers**" and has a total minimum guaranteed compensation of $150,000.

Following the Confirmation of the Plan, for the fiscal year ended December 31, 2012, the Company expects its executive compensation will remain substantially similar to that set forth in the table above for the estimated amount for the fiscal year ended December 31, 2011.

The Company intends in the future to create the Incentive Interests as incentive compensation for the benefit of the Company's executive officers, members of the Management Committee and employees and agents. See "Future Capital Raises and Incentive Interests" and "The Amended and Restated Operating Agreement" above.

**Related Party Transactions**

Effective December 8, 2008, the Company and L. Gold Corp. entered into an amended and restated promissory note in the principal amount of $1,100,000, of which $1,100,000 was outstanding on September 30, 2011. The L. Gold Corp. Term Note is a term note payable on December 31, 2011. See "The Company's Lines of Credit and Financings."

**Notes Receivable – Equity Purchases.** The Company has engaged in various transactions and programs over the years in which it made loans to key employees to facilitate their investment in the Company. Key employees who desired to invest in the common equity of the Company were often allowed to purchase equity units by making a down payment and executing a promissory note to the Company. The notes receivable in such cases have been recorded as a Member contribution with a corresponding reduction in Members' equity, resulting in the amount still owing on the note receivable not being included in the total equity of the Company. The following is a description of such notes which still have balances due to the Company by the Members at September 30, 2011:

In May 1997, contributions of cash and a note receivable (with recourse) for the purchase of Member's equity totaling $1,139,989 was received from the Company's Chief Executive Officer. The member's equity has been pledged to secure the note. The note receivable bears interest at 8.5%, payable annually, and is payable by means of a compensation bonus from the Company. Principal is payable in an

amount equal to the discretionary distribution to the officer, with any outstanding principal and accrued interest due September 30, 2010. The balance due on the note receivable was an unchanged $375,116 at December 31, 2009 through September 30, 2011. The note matured on September 30, 2010 and was extended and amended to now be non-recourse and is now due and payable on September 30, 2020. The Management Committee agreed to amend this note to be non-recourse and to extend it until September 30, 2020 due to the efforts of Mr. Levine to the Company for the following matters: (i) in personally guaranteeing certain indebtedness of the Company of approximate amount of $5 million and has offered to personally guarantee up to $10 million of secured debt as the Company and BD Funding seek additional credit facilities, (ii) the purchase of certain participation interests in loans made by the Company to increase the Company's liquidity by over $2 million, and (iii) the voluntary reduction in salary of approximately $50,000 and the reduction of other benefits and compensation provided for in his employment agreement. The balance due on the note receivable remained at $375,116 as of September 30, 2011.

In May 2003, the Company issued 18,825 Common Units to ten key employees for $394,572 in cash and $94,502 in notes receivable (with recourse) from four of the employees. The notes receivable bear interest at prime plus 2%, with a floor of 8.0% and a ceiling of 10.0%, payable quarterly. Commencing at the end of the first year and continuing each successive year thereafter, the employees are required to make principal reduction payments of 10% of the original outstanding principal amount of the loan, with the entire balance due and payable in 2013. Two of the four notes have been paid in full.

In March 2005, the Company facilitated the acquisition by two key employees of 400 Common Units for $10,392. Of this amount, half was paid in cash and $5,196 paid in notes receivable from the employees. The notes receivable bear interest at prime plus 2%, with a floor of 8.0% and a ceiling of 12.0%, payable quarterly. Commencing at the end of the first year and continuing each successive year thereafter, the employees are required to make principal reduction payments of 10% of the original outstanding principal amount of the loan, with the entire balance due and payable in 2015.

In January 2006, the Company facilitated the acquisition by one key employee of 1,000 Common Units with $16,000 in cash and $16,000 in a note receivable from the employee. The note receivable bears interest at prime plus 2%, with a floor of 8.0% and a ceiling of 12.0%, payable quarterly. Commencing at the end of the first year and continuing each successive year thereafter, the employee is required to make principal reduction payments of 10% of the original outstanding principal amount of the loan, with the entire balance due and payable in 2016.

In March 2007, the Company facilitated the acquisition by one key employee of 1,000 Common Units with $16,000 in cash and $16,000 in a note receivable from the employee. The note receivable bears interest at prime plus 2%, with a floor of 8.0% and a ceiling of 12.0%, payable quarterly. Commencing at the end of the first year and continuing each successive year thereafter, the employee is required to make

principal reduction payments of 10% of the original outstanding principal amount of the loan, with the entire balance due and payable in 2017.

The balances due on the notes discussed in the prior four paragraphs were $37,457, $46,394 and $55,336 at September 30, 2011 and at December 31, 2010 and 2009, respectively. As of September 30, 2011, all obligors were current with their payment obligations.

In August 2006, contributions of cash and notes receivable (with recourse) for the purchase of Members' equity totaling $180,215 were received from one Member. Commencing at the end of the first year, the employee is required to make principal reduction payments of $2,000. During subsequent years, quarterly principal payments in the amount equal to the discretionary distribution received for the prior calendar quarter are due, with a minimum annual payment of $18,468, and any outstanding principal and accrued interest are due July 31, 2016. The balances due on the notes were $147,747 and $163,858 at December 31, 2010 and 2009, respectively. The employee had the right to demand that the Company redeem a substantial portion of this equity he owned in the Company for approximately $500,000, and he attempted to exercise this right, which the Company rejected. In an employee termination agreement executed in January 2011, the employee waived all claims against the Company, and the note receivable was sold to a designee of the employee for a nominal amount.

**Related Party Lease and Expense Sharing.** The Company provides office space and office expense overhead, and leases several employees, to an entity owned by the family of the former chairman of the Company. Such expenses are fully reimbursed by the entity to the Company on a monthly basis. For the nine months ended September 30, 2011 and the years ended December 31, 2010 and 2009, the Company charged the related party $214,018, $277,146 and $268,047, respectively, for compensation and benefits reimbursement, rent and office expenses. As of September 30, 2011, December 31, 2010 and December 31, 2009, the Company had accounts receivable of $23,502, $27,270 and $26,392, respectively, from such arrangement.

**Officer Equity Purchases Financed by a Bank with Assistance from the Company.** During December 2004 and again during August 2006, the Company assisted certain key executive officers in obtaining a loan from one of the Company's banks, the proceeds of which were paid to the Company as partial payment of the officers' purchase price of common equity units in the Company. To facilitate the loan to the employees from the bank, the Company agreed to purchase such loan from the bank at par in the event of an uncured default, death or bankruptcy by the officers, or if the banking relationship between the bank and the Company were terminated. To secure the Company's obligation to the bank to purchase the officer notes, the Company pledged assets it owned on its credit facility with the bank. The officers secured their potential individual obligations on the notes to the Company with the total 92,807 common units purchased in such transactions, and the Chief Executive Officer also pledged 125,000 common units already owned as additional collateral on his obligation. The following summarizes the above described notes the Company has agreed to purchase from the bank related to the four executive officers:

Executive vice-president in charge of the Commercial Department:

- A $500,000 promissory note to the bank, executed December, 2004.  This note was amended as of September 1, 2005 and increased to $633,000 as part of a purchase of additional common units.  This note is current as of September 30, 2011, with a balance of $305,952.

- A $519,600 promissory note to the bank, executed August, 2006.  This note is current as of September 30, 2011, with a balance of $338,850.

- During March 2010, the Company entered into an employee termination and long-term consulting agreement with this executive officer.  The individual is the obligor on the two promissory notes described immediately above.  These two notes had a total balance due to the bank at December 31, 2010 of $748,302.  Under the consulting agreement, the Company is obligated to pay the former officer consulting fees in an amount equal to the debt service on the two bank notes until January 31, 2012, and the former officer is obligated to make the debt service payments on the two bank notes.  The obligation to the former officer averages approximately $11,500 per month for this period.  The Company has the right, but not the obligation, to extend such consulting agreement under similar terms through October, 2016.

Chief Executive Officer of the Company:  A $225,000 promissory note to the bank, executed August, 2006.  This note is current as of September 30, 2011, with a balance of $139,051.

Executive Vice President in charge of the Recreational Department:  A $106,830 promissory note to the bank, executed August, 2006.  This promissory note has been paid off by the officer.

Chief Financial Officer of the Company:  A $216,320 promissory note to the bank, executed August, 2006.  This note is current as of September 30, 2011, with a balance of $131,624.

The Company's outstanding obligations on the note purchase agreements described above are $915,477, $1,056,929 and $1,223,944 at September 30, 2011, December 31, 2010 and 2009, respectively.

**Loans and Participation Interests Purchased by Related Parties.**  Beginning in 2010, the Chief Executive Officer, as well as the Chairman of the Board of the Company prior to his death in March 2011, along with members of their family, through several family members owned investment entities and purchased loans, as well as partial interests in existing subordinated participation interests in loans, from the Company.  The Company believes that these transactions have been a substantial benefit to the Company by providing liquidity and financing on loans the Company otherwise could not finance elsewhere.

When loans were purchased, the Company bought back a subordinated participation interest, at an enhanced yield to the Company.  When the related parties purchased a partial interest in an existing subordinated participation interest held by the Company, the terms of the purchase provided the Company an enhanced yield over and above the yield the Company would have realized by retaining full ownership of the subordinated participation interest.

122

The Chief Executive Officer, Chairman of the Board and other members of their family informally committed up to $2 million in one investment entity (LGB Holdings, LLC, or "LGB") to this investment process in order to provide the Company with the liquidity necessary to originate loans when BD Funding declines to purchase a loan. See the description of the Joint Venture elsewhere in this Memorandum. On loans sold to LGB, the Company earned fees, sold the loan and bought back a subordinated participation interest at terms and yield to the Company of the same or better than the Company was experiencing with its other private equity investors. All loans purchased by LGB were first offered to BD Funding. At December 31, 2010, the related party entities owned loans with total principal balances of $2,106,398, of which the Company retained a participation balance of $608,976. As of September 30, 2011, LGB owned loans with total principal balances of $2,360,395, of which the Company retained a participation balance of $740,640.

In addition, an investment entity (C&G Holdings, LLC, or "C&G") owned by the Chief Executive Officer and his wife, besides being an investor in LGB, also purchased loans from the Company under the above described participation structure. During 2011, one of the Company's banks requested that the Company reduce its outstanding balance due to the bank. As an accommodation to the Company and a condition of the bank to extend a loan to the Company, the Chief Executive Officer personally borrowed funds from the bank to enable C&G to purchase two loans from the Company so the bank could be paid down. C&G has not realized any profit on the transaction. As of September 30, 2011, C&G owned loans with total principal balances of $1,290,689, of which the Company retained a participation balance of $367,487.

**Sale of Participation in Loans to an Affiliate.** During 2007, the Company acquired a $16,994,000 promissory note in the Turtleback Asset, of which the Company sold at par participation interests totaling 79.4% interests in the promissory note to various investors, including the following related parties:

- During 2007, the Company sold $8,497,000 of participation interests in the Turtleback Mountain Resort loans to the Chairman of the Board and affiliates of the Chairman on terms that were comparable to those extended to unrelated participants. Because of development costs and working capital needs, advances have continued to be made on these loans, and as of September 30, 2011 and December 31, 2010, $12,482,040 and $11,364,540, respectively, remained outstanding on the participation interests in the Turtleback Mountain Resort loans.

- During 2007, the Company sold $2,000,000 of participation interests in the Turtleback Mountain Resort loans to five Company investors, including one member of the Management Committee, on terms that were comparable to those extended to unrelated participants. As of December 31, 2010, two of the investors sold their participation interests back to the Company at a substantial discount, and three investors remain participants. During April, 2011, one of the remaining investors who is a member of the Management Committee purchased from the Company 50% of the participation interests the Company had purchased at a discount in December, 2010 at the same price as the Company purchased such interest from the two investors. As of September 30, 2011, December 31, 2010 and December 31, 2009,

$1,934,399, $1,612,249 and $2,330,199 respectively, remain outstanding to the three investors on the participation interests.

- During 2007, the Company sold $1,500,000 of a participation interest in the Turtleback Mountain Resort loans to a Management Committee member on terms that were comparable to those extended to unrelated participants. As of September 30, 2011, December 31, 2010 and December 31, 2009, $2,132,940, $1,935,665 and $1,701,318 respectively remains outstanding on the participation interest.

During 2007, the Company sold $2,186,860 of participation interests in two loans to the Chairman of the Board and affiliates of the Chairman on terms that were comparable to those extended to unrelated participants. One of these loans was paid off prior to December 31, 2008, and a second loan was paid off during the first nine months of 2009.

During 2006, the Company sold $2,457,500 of a participation interest in a loan to a Management Committee member on terms that were comparable to those extended to unrelated participants. The loan was sold at a loss during the first nine months of 2009, and the loss was shared proportionately by the participants.

Justin Land, an Executive Vice President of the Company, maintains a Colorado Realtors license, and performs realty business as a sole proprietorship under the name of Blue Spruce Realty. The Company lists some of the Colorado OREO for sale with Blue Spruce Realty under terms which, through 6/30/11, paid net commissions to Blue Spruce Realty of between 1.5% to 2.5%. These terms are no more favorable to Mr. Land than the Company has provided to other real estate agents in other listing relationships. The Company paid Blue Spruce Realty total net commissions of $37,364, $28,589 and $25,503 during the nine months ended September 30, 2011 and the years ended December 31, 2010 and 2009, respectively. Effective July 1, 2011, Blue Spruce Realty continues to assist with the sale of some of the Company's OREO but shall not be paid a commission from any sales. As of September 30, 2011, Blue Spruce Realty had one listing for OREO owned by the Company.

During 2009, the Company financed a secured 15-month 5% note receivable from Mr. Land generated by the sale of a defaulted promissory note owed to the Company from a customer. The secured note receivable from the officer was for 90% of the sales price of the defaulted promissory note and was on terms that were comparable to those extended to third party borrowers who have acquired OREO or other non-performing assets from the Company. The sale price of such promissory note was based on the estimated value of the collateral for the note and saved the Company the time and expense of a foreclosure action. At its maturity, the secured note from the officer was extended for six months at the same terms for a $500 fee. As of December 31, 2010 and 2009, outstanding balances related to the note receivable from related parties amounted to $158,400. This note was paid off during 2011, and there is no balance due at September 30, 2011.

In April 2009, the Company provided a $54,000 loan to facilitate the sale of a distressed asset to an entity owned and controlled by an employee of the Company in Arizona. The terms of the sale and financing were no more favorable then the Company has provided on the sale of other distressed assets. This loan bears interest at a rate of 8.5% per annum and is due and

payable on July 22, 2013.  Monthly interest is current on the loan, and the outstanding balance at September 30, 2011 remains $54,000.

### Other Matters

Messrs. Levine, Land and Ms. Hubbard, have formed LHL, LLC ("LHL") as an entity for the purpose of holding personal real estate investments.  The three members each own one-third of LHL.  The real estate investments are to this point, and anticipated to be in the future, primarily 1-4 family and in particular single family rehabilitation properties.  LHL has also formed the entity FML, LLC ("FML") with other individuals in order to make real estate related investments.  LHL is a 35% equity holder in FML.  FML has invested in a number of real estate projects in Denver and Phoenix.  Each project has a builder/developer in charge of day to day operations and decision making and so does not require hands on management time of the three executive officers of the Company.  Personal investment are specifically permitted pursuant to the terms of Section 2.10 of the Company's Sixth Amended and Restated Operating Agreement.  However, Messrs. Levine, Land and Ms. Hubbard, have agreed to make full disclosures of such personal investment transactions which might be considered business opportunities to the Company, and have agreed to offer to the Company the right to purchase any LHL investment position at LHL cost at the time of acquisition.  As of the date of this Memorandum, the Company has not purchased any investment position in a real estate project with LHL.

### Related Parties Ownership of Outstanding Securities, Newly Issued Securities and Right to Vote on  the Plan

Related parties consisting of the Company's managers, officers and 10% and greater Existing Common Members of the Company hold certain of the Outstanding Securities and are allowed to vote to approve the Plan and exchange the Outstanding Securities for the Newly Issued Securities.  As with the Outstanding Securities exchanged by all other Investors, these Newly Issued Units will be held for investment and not for resale.  Related parties of the Company own the securities contained in the table below under the heading "Outstanding Securities" and have indicated they intend to vote for the approval of the Plan of Reorganization. If the Bankruptcy Court Confirms the Plan, related parties of the Company would hold the percentage of the Newly Issued Securities indicated in the table below.

| Type of Security | # (or $ amount) of Outstanding Securities | % of Outstanding Securities | # of Newly Issued Securities (1) | % of Newly Issued Securities (1) |
|---|---|---|---|---|
| Debentures | $1,474,214 | 5.8% | 1,474.214 Preferred A Units | 5.8% |
| Existing Preferred Units | 5,000 | 5.1% | 5,000 Common A Units | 5.1% |
| Existing Common Units | 670,141 | 60.7% | 600,141 Common B Units | 58.03% |

**Common Units Owned by Managers, Executive Officers and Certain Common Members**

The following table contains information, calculated as of September 30, 2011, regarding Members who are the beneficial owners of more than 5% of the Company's Existing Common Units or who are Managers or Executive Officers of the Company.  The numbers of Existing Common Units listed in the table represent "beneficial ownership" only for purposes of SEC rules, because the numbers listed include certain options to acquire Existing Common Units as shown in the notes following the table.  The numbers do not represent the actual beneficial ownership of the Existing Common Units based on Existing Common Units currently outstanding.

| Name of Beneficial Owner | Existing Common Units Owned [1] | Percentage Beneficially Owned [2] |
|---|---|---|
| L Gold Corp. [3] | 333,700.00 | 29.96% |
| Gary D. Levine | 238,000.00 | 20.63% |
| Dennis A. Houck | 71,657.69 | 6.43% |
| Gerald S. Gray | 70,000.00 | 6.29% |
| Raymond T. Baker | 54,456.03 | 4.80% |
| Donald L. Kortz | 23,828.45 | 2.10% |
| Kimberly L. Hubbard | 22,000.00 | 1.97% |
| Edward C. Gruben | 20,000.00 | 1.77% |
| Jack L. Keane | 13,108.77 | 1.18% |
| Managers & Executive Officers as a Group (eight persons) | 775,140.77 | 69.60% |

[1]     "Common Units Owned" as listed in the table include Common Units beneficially owned by each person named above and options held by the following persons to acquire the following number of Common Units:

| | |
|---|---|
| Gary D. Levine | 40,000 |
| Raymond T. Baker | 20,000 |
| Kimberly Hubbard | 5,000 |
| Donald L. Kortz | 20,000 |
| Edward C. Gruben | 20,000 |

The exercise price for the foregoing options is $25.98.  If the Plan of Reorganization is confirmed by the Bankruptcy Court, all options to acquire Common Units will be terminated, and these options will no longer be issued and outstanding.

[2]     Under SEC rules, the percentage ownership of each person who holds exercisable options is calculated by adding (1) the number of exercisable options for that person only to (2) the number of total shares outstanding and dividing that result into (3) the total number of shares and exercisable options owned by that person. Accordingly, the percentages shown in the table are not the percentages of Common Units that are currently owned by each person, nor are these percentages that would be owned by each person if all the exercisable options were actually exercised.

[3]     Brett Perry, Ricki Rest and Ari Silverman are the directors of L. Gold Corp. and have voting dispositive power over the Existing Common Units held by the L. Gold Corp.

## OWNERSHIP OF UNITS FOLLOWING THE OFFERING

### Units Owned by Managers, Executive Officers and Certain Common Members

The following table contains information regarding the Managers, executive officers and Members who Management believes will be beneficial owners of more than 5% of the Company's Common B Units, assuming the Confirmation of the Plan. To the extent that a Manager or an executive officer is not listed on the table below, they will not be the beneficial owner of any Common B Units issued by the Company the day after the Unit Transfer Date. It is important to note that each of the individuals listed below has the right to abandon their Common B Units on or after the Unit Transfer Date. As a result, there can be no assurance the table below will remain accurate prior to or after the Unit Transfer Date. The calculations set forth below reflect the reduced number of Common B Units outstanding (1,034,267) after the anticipated abandonment of certain Common B Units discussed above. The Company has elected not to disclose in this Memorandum the names of the Holders of 5% or greater of the Preferred A Units and Common A Units who are not management following the consummation of the Plan of Reorganization. A complete list of the Holders of these securities is attached to the Plan.

| Name of Beneficial Owner | Common B Units Owned | Percentage Beneficially Owned |
|---|---|---|
| L. Gold Corp. [1] | 333,700 | 32.26% |
| Gary L. Levine | 198,000 | 19.14% |
| Dennis Houck | 71,658 | 6.93% |
| Raymond T. Baker | 34,506 | 3.34% |
| Donald L. Kortz | 3,826 | 0.37% |
| Kimberly L. Hubbard | 17,000 | 1.64% |
| Jack L. Keane | 13,109 | 1.27% |
| Managers & Executive Officers as a Group (eight persons) | 600,141 | 58.03% |

(1) Brett Perry, Ricki Rest and Ari Silverman are the directors of L. Gold Corp. and have voting dispositive power over the Existing Common Units held by the L. Gold Corp.

## TERMS OF THE OFFERING

### General

Section 5 of the Act provides generally that no person may offer or sell securities in the United States unless: (i) the securities are exempt from registration, (ii) the transaction is exempt from registration, or (iii) the securities are registered with the SEC. Section 3(a)(9) of the Act provides an exemption from Section 5 for securities exchanged by an issuer exclusively with its existing security holders where no commission is paid for soliciting the exchange. Thus, this pre-petition solicitation of the Plan which will have the effect of issuing the Newly Issued Units falls within the scope of this exemption and is in compliance with the provisions of Section 5 of the Act. Further, the Offers are further exempt from the registration requirements because the Offers are being made in accordance with Section 4(2) of the Act.

**Restricted Resale**

The Newly Issued Units have not been registered with the SEC under the Act or state securities laws, and, therefore, cannot be resold unless they are so registered or unless an exemption from registration is available. You may wish to seek independent legal advice regarding the effect of these restrictions and investment representations on the transferability of the Newly Issued Units. The Newly Issued Units will constitute restricted securities that will not be registered and will not be transferable unless certain conditions are met, including, but not limited to, those set forth in the Amended and Restated Operating Agreement. The Newly Issued Units will bear legends stating that they have not been registered under the Act and are subject to the requirements for transfer set forth above.

## REPORTS TO HOLDERS OF NEWLY ISSUED UNITS

Pursuant to the Amended and Restated Operating Agreement, the Company will furnish quarterly and annual financial statements to the Holders of the Newly Issued Units.

## FINANCIAL STATEMENTS

The internally prepared consolidated financial statements for the Company for the fiscal years ended December 31, 2010 and 2009 and unaudited consolidated financial statements for the nine-month periods ended September 30, 2011 and 2010 are attached hereto as Exhibit A.

## FINANCIAL PROJECTIONS

The Company has prepared Financial Projections of the Company's projected operations following the Confirmation of the Plan. The Financial Projections are attached hereto as Exhibit C. The Financial Projections is subject to uncertainties inherent in Financial Projections, and you should use your own expertise and that of your own advisors to judge the reliability of such financial projections. There is no assurance that the actual operations of the Company will correspond to the assumptions made in the Financial Projections. The financial projections use assumptions that may vary significantly and adversely from actual operating results. See "Risk Factors" above.

## INDUSTRY AND MARKET DATA

In this Memorandum, we rely on and refer to information and statistics regarding our industry. As with all statistical information, you may be able to find information and statistics that conflict with the information and statistics included herein. We obtained this market data included in this Memorandum from independent industry publications or other publicly available information. Although we believe that these sources are reliable, we have not independently verified and do not guarantee the accuracy and completeness of this information.

## LEGAL PROCEEDINGS

As of the date of this Memorandum, the Company was subject to one lawsuit in which it is the plaintiff that is discussed above under "State of Colorado Legal Proceeding Relating to Regulation." Further, the Company is subject to certain other legal proceedings and claims that have not been fully resolved and that have arisen in the ordinary course of business, including, but not limited to, foreclosure actions and title claims against collateral for loans made by the Company that are not discussed below. Results of legal proceedings cannot be predicted with certainty. Should the Company fail to prevail in any of these legal matters or should several of these legal matters be resolved against the Company, the operating results of the Company could be materially adversely affected.

## RELEASE

Pursuant to the Plan, neither the Company, nor any of its current or former members, officers, managers, directors, employees, advisors, attorneys, accountants, professionals or agents, shall have or incur any liability to any Holder of a Claim or Interest for any act or omission in connection with, relating to, or arising out of, the filing and administration of the Chapter 11 Case; the formulation, negotiation or implementation of the Plan; the solicitation of acceptances of this Plan prior to or after the Filing Date; the pursuit of Confirmation of the Plan; the Confirmation of the Plan; the consummation of the Plan; or the administration of the Plan or the property to be distributed under the Plan except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct.

## ADDITIONAL INFORMATION

This Memorandum contains summaries of certain material documents relating to the Company, its operations, the Plan and the Newly Issued Units. However, these summaries do not purport to be complete and are qualified in their entirety by reference to the full original and complete copies of such documents. You and your representatives may review documents and obtain answers to questions at the office of the Company. Each of the exhibits attached to this Memorandum constitutes an integral part of the information with which each prospective Investor should thoroughly be familiar. Therefore, if you are considering an investment in the Newly Issued Units and intend to vote to approve the Plan, you should carefully study and fully understand each of the exhibits.

You will be given an opportunity to ask questions of, and receive answers from, the Company or any person acting on its behalf concerning the terms and conditions of the Offers and the Plan and to obtain any additional information necessary to verify the accuracy of the information contained in this Memorandum, to the extent the Company possesses such information or can acquire it without unreasonable effort or expense. If you have any questions regarding the terms and conditions of the Offers or the Plan of Reorganization or desire any additional information or documents to verify the information contained in this Memorandum, please write the Company at 7400 East Crestline Circle, Suite 250, Greenwood Village, Colorado 80111-3654; Attn: Gary D. Levine, or call the Company at (303) 773-3000.

Except for information or documents provided in accordance with the immediately preceding paragraph, no person is authorized to give you any information or make any

representation not contained in this Memorandum or in any agreement contemplated by this Memorandum, and any information or representation not contained in this Memorandum or in such agreement must not be relied upon.

This Memorandum constitutes an offer only to the Holders of the Outstanding Securities. This Memorandum does not constitute an offer or solicitation to anyone in any jurisdiction in which an offer or solicitation is not authorized, nor shall there be any sale of these securities in any state in which the offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of that state.

This Memorandum contains confidential information relating to the business of the Company. Any reproduction or distribution of this Memorandum in whole or in part or the divulgence of any of its contents is prohibited. By accepting this Memorandum, you agree to abide by the foregoing prohibition.

**NOTICE TO CALIFORNIA RESIDENTS: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE, IF SUCH REGISTRATION IS REQUIRED.**

**NASAA UNIFORM LEGEND: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NO FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS RECOMMENDED THESE SECURITIES. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

**FOR FLORIDA RESIDENTS ONLY: THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT AND ARE BEING SOLD IN RELIANCE UPON AN EXEMPTION PROVIDED BY SECTION 517.061 THEREOF. UNLESS THE SECURITIES ARE REGISTERED, THEY MAY NOT BE REOFFERED FOR SALE OR RESOLD IN THE STATE OF FLORIDA EXCEPT AS AN EXEMPT SECURITY OR IN AN EXEMPT TRANSACTION UNDER SAID ACT. EACH OFFEREE WHO IS A FLORIDA RESIDENT SHOULD BE AWARE**

**THAT ANY SALE MADE TO RESIDENTS OF FLORIDA SHALL BE VOIDABLE WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER.  EACH PERSON ENTITLED TO EXERCISE SUCH RIGHT TO WITHDRAW AND WHO WISHES TO EXERCISE SUCH RIGHT MUST CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE ISSUER WITHIN THE AFOREMENTIONED THREE-DAY PERIOD.**