THE SECURITIES REPRESENTED BY THIS AGREEMENT ARE FOR INVESTMENT ONLY. THE ISSUANCE AND SALE OF SUCH SECURITIES WAS NOT REGISTERED UNDER FEDERAL OR STATE SECURITIES LAWS. THE MANAGEMENT COMMITTEE MUST CONSENT TO ANY TRANSFER OF THESE SECURITIES; THE MANAGEMENT COMMITTEE WILL NOT CONSENT TO ANY TRANSFER WITHOUT A SATISFACTORY LEGAL OPINION THAT THE PROPOSED TRANSFER WILL NOT VIOLATE FEDERAL OR STATE SECURITIES LAWS.

SEVENTH AMENDED AND RESTATED OPERATING AGREEMENT

FOR

MERCHANTS MORTGAGE & TRUST CORPORATION, LLC

a Colorado limited liability company

December 31, 2011

**SIXTH AMENDED AND RESTATED OPERATING AGREEMENT FOR**
**MERCHANTS MORTGAGE & TRUST CORPORATION, LLC**

**TABLE OF CONTENTS**

**ARTICLE I.  DEFINITIONS**

**ARTICLE II.  THE COMPANY**
SECTION 2.1.    FORMATION, REGISTRATION & DURATION ........................................................ 8
SECTION 2.2.    PURPOSES ........................................................................................................ 8
SECTION 2.3.    NAME ............................................................................................................... 8
SECTION 2.4.    PRINCIPAL PLACE OF BUSINESS ....................................................................... 8
SECTION 2.5.    REGISTERED OFFICE & AGENT .......................................................................... 8
SECTION 2.6.    QUALIFICATIONS IN OTHER STATES ................................................................... 9
SECTION 2.7.    OFFICIAL FILINGS ............................................................................................ 9
SECTION 2.8.    NO PERSONAL LIABILITY FOR COMPANY OBLIGATIONS ..................................... 9
SECTION 2.9.    TRANSACTIONS BETWEEN COMPANY AND A RELATED PARTY ............................ 9
SECTION 2.10.   RELATED PARTIES' OUTSIDE VENTURES ........................................................... 9

**ARTICLE III.  MANAGEMENT**
SECTION 3.1.    THE MANAGEMENT COMMITTEE .......................................................................... 9
SECTION 3.2.    OFFICERS ........................................................................................................... 9
SECTION 3.3.    SELECTION OF MANAGEMENT COMMITTEE .......................................................... 10
SECTION 3.4.    APPOINTMENT OF MANAGERS ............................................................................ 10
SECTION 3.5.    MANAGEMENT COMMITTEE MEETINGS ................................................................ 11
SECTION 3.6.    MANAGERIAL DECISIONS .................................................................................... 11
SECTION 3.7.    MANAGEMENT COMMITTEE DELEGATION OF AUTHORITY ..................................... 12
SECTION 3.8.    THIRD PARTY RELIANCE ON OFFICER'S CERTIFICATION ....................................... 12
SECTION 3.9.    STANDARD OF CARE .......................................................................................... 12
SECTION 3.10.   EXPENSES ........................................................................................................ 13

**ARTICLE IV.  RIGHTS AND OBLIGATIONS OF MEMBERS**
SECTION 4.1.    ADMISSION OF MEMBERS ................................................................................... 13
SECTION 4.2.    MEMBERS REPRESENTATIONS, WARRANTIES AND COVENANTS ........................... 13
SECTION 4.3.    MEMBERSHIP INTERESTS (UNITS) ....................................................................... 14
SECTION 4.4.    NO MANAGEMENT AUTHORITY. MEMBER'S VOTING RIGHTS ................................. 15
SECTION 4.5.    MEMBER MEETINGS ........................................................................................... 16
SECTION 4.6.    LIABILITY OF MEMBERS; LIABILITY FOR RETURN OF CONTRIBUTION. ................... 17
SECTION 4.7.    COVENANT NOT TO RESIGN, WITHDRAW OR DISSOLVE ......................................... 17
SECTION 4.8.    WAIVER OF PARTITION RIGHTS ........................................................................... 17

**ARTICLE V.  FINANCIAL AND ACCOUNTING MATTERS**
SECTION 5.1.    FISCAL YEAR AND ACCOUNTING METHOD ............................................................. 17
SECTION 5.2.    COMPUTATIONS & VALUATIONS ........................................................................... 17
SECTION 5.3.    NO PAYMENT OF PERSONAL OBLIGATIONS ........................................................... 17
SECTION 5.4.    COMPANY PROPERTY .......................................................................................... 17
SECTION 5.5.    BANK ACCOUNTS ............................................................................................... 18
SECTION 5.6.    ESTABLISHMENT OF RESERVES ........................................................................... 18
SECTION 5.7.    BOOKS AND RECORDS ........................................................................................ 18
SECTION 5.8.    FINANCIAL STATEMENTS AND REPORTS ............................................................... 18
SECTION 5.9.    CONFIDENTIALITY ............................................................................................. 19

**ARTICLE VI.  CONTRIBUTIONS, CAPITAL ACCOUNTS AND DESCRIPTION OF UNITS**
SECTION 6.1.    CAPITAL CONTRIBUTIONS ................................................................................... 19
SECTION 6.2.    CAPITAL ACCOUNTS ........................................................................................... 19
SECTION 6.3.    PREFERRED A UNITS ........................................................................................... 21
SECTION 6.4.    COMMON A UNITS .............................................................................................. 21
SECTION 6.4.    COMMON B UNITS .............................................................................................. 21

**ARTICLE VII.  ALLOCATIONS AND DISTRIBUTIONS**

SECTION 7.1.   ALLOCATION OF PROFITS AND LOSSES ...................................................... 21
SECTION 7.2.   LIMITATIONS ON ALLOCATION OF LOSSES CREATING ADJUSTED CAPITAL ACCOUNT DEFICIT ..... 23
SECTION 7.3.   QUALIFIED INCOME OFFSET ...................................................................... 23
SECTION 7.4.   MINIMUM GAIN CHARGEBACK ................................................................... 23
SECTION 7.5.   ALLOCATIONS RELATING TO ADJUSTMENTS UNDER IRC SECTIONS 734(B) OR 743(B) ............. 23
SECTION 7.6.   CURATIVE ALLOCATIONS .......................................................................... 24
SECTION 7.7.   TAX ALLOCATIONS: IRC SECTION 704(C) ....................................................... 24
SECTION 7.8.   ALLOCATION UPON ASSIGNMENT OF A MEMBERSHIP INTEREST ................................ 24
SECTION 7.9.   COMPLIANCE WITH IRS REGULATIONS ......................................................... 24
SECTION 7.10.  DISTRIBUTIONS OF COMPANY DISTRIBUTABLE CASH FLOW ................................... 25

**ARTICLE VIII.  TAX MATTERS**
SECTION 8.1.   GENERAL TAX MATTERS .......................................................................... 26
SECTION 8.2.   MEMBERS' TAX INFORMATION ................................................................... 26
SECTION 8.3.   TAX REPRESENTATIONS AND WARRANTIES OF MEMBERS ...................................... 26
SECTION 8.4.   TAX MATTERS MEMBER; AUDIT ................................................................. 27
SECTION 8.5.   TAX ELECTIONS ................................................................................... 28
SECTION 8.6.   WITHHOLDING TAXES ............................................................................ 28

**ARTICLE IX.  LIABILITY LIMITATIONS & INDEMNIFICATION OF MANAGEMENT AND ADVISORS**
SECTION 9.1.   LIMITATIONS ON MANAGEMENT'S LIABILITY ................................................... 28
SECTION 9.2.   INDEMNIFICATION OF AGENTS ................................................................... 28
SECTION 9.3.   NOTICE OF CLAIMS ............................................................................... 29
SECTION 9.4.   INSURANCE FOR AGENTS ......................................................................... 29
SECTION 9.5.   INDEMNIFICATION PERMITTED FOR RELATED PARTY TRANSACTIONS ......................... 29
SECTION 9.6.   NO RIGHTS TO THIRD PARTIES .................................................................. 30
SECTION 9.7.   NO INDEMNIFICATION OBLIGATION FOR MEMBERS ........................................... 30
SECTION 9.8.   ONLY PROSPECTIVE MODIFICATION ............................................................ 30

**ARTICLE X.  TRANSFERS OF UNITS**
SECTION 10.1.  EXCLUSIVE METHOD; GENERAL PROHIBITION .................................................. 30
SECTION 10.2.  TRANSFER OF INTEREST BY MEMBERS .......................................................... 30
SECTION 10.3.  SUBSTITUTED MEMBER ........................................................................... 32
SECTION 10.4.  NATURE OF ASSIGNEE'S INTEREST .............................................................. 32

**ARTICLE XI.  DISSOLUTION**
SECTION 11.1.  NO RIGHT TO DISSOLUTION ...................................................................... 32
SECTION 11.2.  DISSOLUTION EVENTS ............................................................................ 32
SECTION 11.3.  LIQUIDATOR ...................................................................................... 32
SECTION 11.4.  WINDING UP, DISSOLUTION & LIQUIDATION OF ASSETS ...................................... 32
SECTION 11.5.  DISTRIBUTIONS IN-KIND ......................................................................... 34
SECTION 11.6.  TIMING OF DISTRIBUTIONS TO MEMBERS ..................................................... 35

**ARTICLE XII.  DISPUTE RESOLUTION**
SECTION 12.1.  MANDATORY ARBITRATION ...................................................................... 35
SECTION 12.2.  ARBITRATION DEMAND ........................................................................... 35
SECTION 12.3.  PROCEDURAL RULES .............................................................................. 36
SECTION 12.4.  AWARD ............................................................................................ 36
SECTION 12.5.  FEES AND COSTS ................................................................................. 36
SECTION 12.6.  INJUNCTIVE RELIEF .............................................................................. 36

**ARTICLE XIII.  GENERAL PROVISIONS**
SECTION 13.1.  FURTHER ASSURANCES ........................................................................... 36
SECTION 13.2.  NOTICES .......................................................................................... 36
SECTION 13.3.  AMENDMENTS TO AGREEMENT .................................................................. 37
SECTION 13.4.  EFFECTIVE DATE AND TIME, AND BINDING EFFECT ......................................... 37
SECTION 13.5.  SOLE, ABSOLUTE AND SUBJECTIVE DISCRETION ............................................. 37
SECTION 13.6.  APPLICABLE LAW ................................................................................ 37
SECTION 13.7.  CONSTRUCTION & INTERPRETATION ........................................................... 37

SECTION 13.8.   ENTIRE AGREEMENT ................................................................................................ 38

**ARTICLE XIV.  HUD**
  SECTION 14.      DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Exhibit A: Members, Capital Contributions and Units*
*Exhibit B: Confirmation Order*
*Exhibit C: Membership Signature Page*
*Exhibit D: Power of Attorney*

### SEVENTH AMENDED AND RESTATED OPERATING AGREEMENT FOR
### MERCHANTS MORTGAGE & TRUST CORPORATION, LLC

This SEVENTH AMENDED AND RESTATED OPERATING AGREEMENT ("Operating Agreement" or "Agreement"), is made effective as of December 31, 2011 by and among Merchants Mortgage & Trust Corporation, LLC, a Colorado limited liability company ("Company"), and all persons admitted as Company Members ("Members", whose names are set forth on <u>Exhibit A</u>), recites and provides as follows:

### RECITALS

The Company was formed as a limited liability company under the laws of the State of Colorado pursuant to Articles of Organization filed with the Colorado Secretary of State on February 18, 1995;

The Company is governed by an *Operating Agreement* dated February 15, 1995, as amended by a *First Amended and Restated Operating Agreement* dated as of May 1, 1996, a *Second Amended and Restated Operating Agreement* dated as of May 2, 1997, a *Third Amended and Restated Operating Agreement* dated as of May 5, 1998, a *Fourth Amended and Restated Operating Agreement* dated as of July 1, 1999, a *Fifth Amended and Restated Operating Agreement* dated effective as of January 1, 2001, a *Sixth Amended and Restated Operating Agreement* dated effective November 21, 2001, a First Amendment to the *Sixth Amended and Restated Operating Agreement* dated as of August 23, 2004 (Section 10.2.1 of this Agreement approved by the members on August 23, 2004) and a Second Amendment to the *Sixth Amended and Restated Operating Agreement* dated as of March 17, 2005 (Article XIV of this Agreement approved by the members on March 17, 2005); and

The Company's Members hereby desire to amend and restate this Operating Agreement as previously amended in its entirety;

NOW THEREFORE, in consideration of their mutual promises, covenants and agreements and the Recitals, the Company and the Members agree:

### ARTICLE I. DEFINITIONS

The terms listed below have the following meanings in this Agreement:

"*Act*" means the Colorado Limited Liability Company Act, codified at Colorado Revised Statutes §7-80-101 *et seq*.

"*Action*" includes threatened, pending, or completed actions, suits, or proceedings, whether administrative, civil, criminal or investigative.

"*Adjusted Capital Account*" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

    (a)    Credit to such Capital Account any amounts which such Member is obligated to restore (or which such Member is deemed to be obligated to restore for such Member's share of Company Minimum Gain (as defined in IRS Regulations Section 1.704-2(d)(1)) pursuant to the penultimate sentences of IRS Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5); and

    (b)    Debit to such Capital Account allocations of loss and deduction and distributions that, as of the end of such year, reasonably are expected to be made to such Member in accordance with IRS Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

"***Adjusted Capital Account Deficit***" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the adjustments described in the definition of Adjusted Capital Account above. The definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the IRS Regulations and shall be interpreted consistently therewith.

"***Advisors***" include legal counsel, accountants, appraisers, management consultants, investment bankers and other advisors.

"***Affiliate***" means, with respect to a specified Person:  (a) any other Person, directly or indirectly controlling, controlled by or under common control with such specified Person; (b) being any officer, director, partner, legal representative (including trustee for the benefit of such specified Person) or employee of such specified Person; (c) any person for which such specified Person acts as an officer, director, partner or employee; and (d) any Person related by blood, adoption or marriage.  As used in this definition, the term "control" and any derivatives thereof mean possession, directly or indirectly, of the power to direct or cause the direction of the management and the policies of a Person (whether through ownership of owning securities by contract or otherwise).

"***Agent***" includes Management, their Affiliates and Company employees.

"***Agreement***" means this Seventh Amended and Restated Operating Agreement, as amended from time to time.

"***Any***" includes 'any,' 'if any,' 'all,' 'any or all,' or 'any and all,' as the context requires.

"***Bankrupt***" means a Person who is a debtor or bankrupt under the federal bankruptcy code of 1978, Title 11 of the United States Code, as amended, or an insolvent under any state insolvency act.

"***Business Information***" includes all Documents, records and other information concerning the business of the Company.  The Management Committee and the CEO have Discretion to designate what constitutes Business Information and any such designations shall be broadly construed.

"*Capital Account*" means the capital account maintained for a Member pursuant to Section 6.2.

"*Capital Contributions*" means, with respect to any Member, the amount of money and Deemed Property Value of any property (other than money) contributed to the Company in exchange for the Member's Units or such other amount as may be fixed by the Management Committee in its Discretion (for example, the amount of the deemed capital contribution of the holders of the Preferred A Units) at the time such person become a Member of the Company.

"*CEO*" or "*Chief Executive Officer*" means the principal executive officer of the Company.

"*Claims*" include grievances, charges, liabilities, complaints, claims, administrative proceedings, actions, causes of action (however characterized, whether in tort, contract or otherwise), suits, rights, demands, damages, costs, losses, debts and expenses (including attorney fees) and costs incurred, of any nature whatsoever, whether currently known or unknown.

"*Common A Members*" means all Company Members who own Common A Units.

"*Common A Units*" means those certain common A units issued by the Company.

"*Common B Members*" means all Company Members who own Common B Units.

"*Common B Units*" means those certain common B units issued by the Company.

"*Company*" means Merchants Mortgage & Trust Corporation, LLC, a Colorado limited liability company.

"*Company Property*" means all property owned by the Company.

"*Deemed Property Value*" means, with respect to any property, the property's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Deemed Property Value of any property contributed by a Member to the Company shall be the gross fair market value of such property at the time of contribution, as agreed by the contributing Member and the Company;

(b)    The Deemed Property Values of Company Property shall be adjusted to equal their respective gross fair market values (taking IRC Section 7701(g) into consideration), as determined by the Management Committee, as of the following times:  (i) the acquisition of Units (or additional Units) by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company Property or money as consideration for Units; and (iii) the liquidation of the Company within the meaning of IRS Regulations §1.704-1(b)(2)(ii)(g);

(c)     The Deemed Property Values of Company Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to IRS Regulations §1.704-1(b)(2)(iv)(m); provided, however, that Deemed Property Values shall not be adjusted pursuant to this subsection (c) to the extent the Members determine that an adjustment pursuant to subsection (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (c); and

(d)     If the Deemed Property Value of a property has been determined or adjusted pursuant to subsections (a), (b) or (c) above, such Deemed Property Value shall thereafter be adjusted by the depreciation taken into account with respect to such property for purposes of computing Profits and Losses.  In determining depreciation, if the Deemed Property Value of a property differs from its adjusted basis for federal income tax purposes, depreciation for any year or other period shall be an amount which bears the same ratio to the Deemed Property Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to the adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such fiscal year is zero, depreciation shall be determined with reference to such beginning Deemed Property Value using any reasonable method selected by the Management Committee.

"***Determine***" or "***Discretion***" means a Person's sole, absolute and subjective choice.

"***Dissolution Event***" means any event (specified in Section 11.2) requiring the Company to dissolve, commence winding-up and liquidate its assets.

"***Dissolve***" means to dissolve, commence winding-up and liquidate the Company's assets and thereby terminate the Company as a legal entity.

"***Distributable Cash Flow From Operations***" means for any fiscal period, the Company's gross receipts during that period minus:

(a)     the Company's operating expenses during such period;

(b)     timely servicing of the Company's obligations (including repaying principal of loans made to the Company);

(c)     net increases in cash reserves during the period, as Determined by the Management Committee, in its Discretion; and

(d)     cash retained by the Company for operations, future cash needs, investments, loans or any other reasonable purpose, as Determined by the Management Committee, in its Discretion.

"***Distributable Cash Flow from Sale***" means the net proceeds from sale or other disposition of all or substantially all the Company Property after payment of all expenses associated with the

sale or other disposition and all outstanding liabilities of the Company and establishment of reserves for contingent liabilities.

"***Documents***" include any agreements, contracts, certificates, instruments and all other documents with legal effect.

"***Effective Date***" means the date that this Agreement is effective as set forth in the first sentence of this Agreement.

"***Expenses***" include liabilities, expenses, damages, court costs, attorneys' fees, judgments, fines, penalties, and amounts paid in settlement.

"***Incapacitated***" means a Manager unable to perform his duties as an active member of the Management Committee or an Officer unable to perform his duties; whether such inability arises from death, disability or otherwise.

"***Incentive Units***" means those certain limited liability company membership interests that the Company may create to grant or otherwise issue or to sell to officers, Managers, agents, key employees and consultants.

"***Include***" and "***including***" mean 'including without limitation.

"***IRC***" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"***IRS Regulations***" means the Income Tax Regulations promulgated under IRC, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"***JAG***" means the Denver office of the Judicial Arbiter Group.

"***Laws***" include constitutions, statutes, rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, restrictions and charges; a reference to a specific statute also refers to regulations relating to that statute; a reference to a specific Law refers to that Law as revised or amended at the time that Law is being applied.

"***Levine***" means Gary D. Levine.

"***LGC***" means *L. Gold Corp*., a Colorado corporation.

"***Liquidation Preference***" means $14,319,965.

"***Liquidator***" means the Person responsible for winding up the Company's affairs when the Company is Dissolved.

"***Majority***" means more than 50%.

"***Management***" collectively means the members of the Management Committee and all Officers, including, without limitation, any person who served on the Management Committee and/or as an Officer on or prior to the date hereof, regardless of whether such members of the Management Committee or Officers continue to hold any such positions or offices as members of the Management Committee or as Officers.

"***Management Committee***" exclusively manages the Company's property, affairs and business.

"***Manager***" means a member of the Management Committee.

"***Members***" means all Company Members, including the Preferred A Members, Common A Members and the Common B Members, where no distinction is required by the context in which the term is used herein.  "***Member***" means any one of the Members.

"***Membership***" means all Company Members collectively.

"***Management Committee Consent***" means that the Management Committee, in its Discretion, must approve the proposed action in accordance with Section 3.5.

"***Notice***" or "***notify***" means to deliver a notice in accordance with Section 13.2.

"***Officers***" includes the Chief Executive Officer and all officers appointed by the Management Committee.

"***Owners***" includes a Person's equity owners, principals, partners and members, both direct or indirect.

"***Person***" means any individual, partnership, corporation, trust, or other entity.

"***Preferred A Members***" means all Company Members who own Preferred A Units.

"***Preferred A Units***" means those certain preferred A units issued by the Company.

"***Preferential Return***" means a non-cumulative, non-compounded return on the Capital Contributions of the Preferred A Members in an amount equal to 3% per annum.

"***Profits***" and "***Losses***" means for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC Section 703(a) (for this purpose all items of income, gain, loss, or deduction required to be stated separately pursuant to IRC Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

> (a)  Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or subtracted from such taxable loss;

(b)    Any expenditures of the Company described in IRC Section 705(a)(2)(B) or treated as IRC Section 705(a)(2)(B) expenditures pursuant to IRS Regulation §1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or added to such taxable loss;

(c)    Gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Deemed Property Value of the Company Property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Deemed Property Value;

(d)    In the event the Deemed Property Value of any Company Property is adjusted as provided in subsection (c) of the definition of Deemed Property Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such Company Property, for purposes of computing Profits or Losses;

(e)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such fiscal year or other period which, if the Deemed Property Value of a property differs from its adjusted basis for federal income tax purposes, shall be an amount which bears the same ratio to the Deemed Property Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to the adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such fiscal year is zero, depreciation shall be determined with reference to such beginning Deemed Property Value using any reasonable method selected by the Management Committee; and

(f)    Any items which are specially allocated pursuant to the last sentence of Section 7.2 and Sections 7.3, 7.4, 7.5 and 7.7 hereof shall not be taken into account in computing Profits or Losses.

"**Rulings**" include injunctions, judgments, writs, orders, decrees, rulings or charges.

"**Related Party**" includes Members, Managers and Officers.

"**Subsequent Offerings**" shall mean:  (i) any private offering of the Company's equity securities made in reliance upon Regulation D or another exemption from the registration requirements with the United States Securities and Exchange Commission, or (ii) any public offering of the Company's securities registered with the United States Securities and Exchange Commission under Section 5 of the Securities Act of 1933, as amended.

"**Substitution Member**" means an assignee of a former Member's Units who becomes a Member in place of the assignor by complying with Section 10.3.

"**Tax Matters Member**" means the Person designated under IRC Section 6231(a)(7) who is designated to receive all communications from the Internal Revenue Service which pertain to the Company's tax affairs.  The initial Tax Matters Member will be Levine.

"*Transfer*" means as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, or otherwise alienate.

"*Unit*" means an ownership interest in Company, including any benefits to which the holder of such an interest may be entitled in profits, losses and distributions, as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement. As of the Effective Date of this Agreement, there are three classes of Units: Preferred A Units, Common A Units and Common B Units.

## ARTICLE II. THE COMPANY

**Section 2.1.   Formation, Registration & Duration**.   On February 18, 1995, the Company's Articles of Organization were filed with the Colorado Secretary of State, which thereby created the Company pursuant to the Colorado Limited Liability Company Act, C.R.S. §7-80-1101 *et. seq.* (the "Act").   The Company's existence will continue until dissolved in accordance with Article XI.

**Section 2.2.   Purposes**. The Company was formed to engage in the mortgage banking business and in any other lawful business for which limited liability companies may be organized under the Act.   The Company is specifically authorized to offer shares of beneficial interest in the Company to the public and to engage in any transaction deemed necessary or appropriate by the Management Committee in order to effectuate a public offering of Company shares.

**Section 2.3.   Name**.   The name of the Company is **Merchants Mortgage & Trust Corporation, LLC**.   The Company's business generally shall be conducted in that name unless its business must be conducted under a different name in a jurisdiction other than Colorado.   In such a case, the business may be conducted under such other name(s) as the Management Committee shall determine.

**Section 2.4.   Principal Place of Business**.   The Company's principal place of business is located at:

> 7400 East Crestline Circle, Suite 250
> Greenwood Village, Colorado 80111-3654

The Management Committee may change the location of such office to another location, provided that the Management Committee give notice of any such change to all Members and the Company's registered agent.

**Section 2.5.   Registered Office & Agent**.   The Company's registered office for purposes of the Act is:

> 7400 East Crestline Circle, Suite 250
> Greenwood Village, Colorado 80111-3654

The registered agent of the Company for purposes of the Act is *Lisa K. Shimel*, whose business office is identical with the Company's registered office.  The registered agent's sole duty is to forward to the Company at its principal place of business any notice that is served on her as registered agent.  The registered office and registered agent may be changed by the Management Committee at any time in accordance with the Act.

**Section 2.6.   *Qualifications in Other States***.  The Management Committee shall arrange for the Company to qualify to conduct business in any other jurisdiction in which the Company's activities or ownership of property requires such qualification.  The Management Committee may replace the registered agent and registered office in such jurisdictions at any time.

**Section 2.7.    *Official Filings***.  The Company shall execute any further documents (including the tax application and trade name registrations required by the Colorado Department of Revenue) appropriate to comply with all legal requirements for forming and operating a limited liability company in Colorado and in all other jurisdictions where the Company elects to conduct business.

**Section 2.8.   *No Personal Liability for Company Obligations***.  No Member or Manager shall be personally responsible for any Company debts or obligations.  This Agreement neither creates a general partnership among the Members nor establishes a relationship for any activities other than the Company.

**Section 2.9.   *Transactions Between Company and a Related Party***.  Except as otherwise provided by applicable law, a Related Party can, but shall not be obligated to, lend money to the Company, act as surety for the Company, contract with the Company or transact other business with the Company.  When transacting business with the Company, a Related Party has the same rights and obligations as an independent third party.  The Management Committee must approve all transactions between the Company and any Related Party and the terms of such transactions must be no less favorable to the Company than if the transaction had been made with an independent third party.

**Section 2.10.   *Related Parties' Outside Ventures***.  A Related Party may engage in or possess any interest in Outside Ventures of any nature and description, independently or with others whether or not competitive with the business of the Company.

### ARTICLE III.  MANAGEMENT

**Section  3.1.    *The Management Committee***.    The Company has a Management Committee that exclusively manages the Company's property, affairs and business.  All powers of the Company are vested in the Management Committee.  Without limiting the foregoing, the Management Committee shall decide all policy matters of the Company, as well as any matter involving Related Parties.  The Management Committee supervises all management, operating, accounting and administrative functions regarding the Company's operations and affairs.

**Section 3.2.   *Officers***.  The Management Committee shall appoint the following Officers from the employees of the Company:   a Chairman, a Chief Executive Officer, a President, Treasurer, Chief Financial Officer, Secretary and all other Officers above the level of Vice-

President.  An individual may serve in more than one Company Officer position.  Officers shall perform the duties designated by the Management Committee; Officers may act on behalf of the Company only when authorized by the Management Committee.  Subject to any Officer's employment agreement, the Management Committee has sole Discretion to remove or replace any Officer.  Vice-Presidents and lesser officers may be appointed, removed or replaced by the Chief Executive Officer.

**Section 3.3.  Selection of Management Committee**.  The Management Committee shall consist of seven Managers. The Managers shall be selected as follows:

3.3.1.  LGC shall appoint one Manager: initially, Brett Perry;

3.3.2.  Levine shall appoint one Manager: initially, Gary D. Levine;

3.3.3.  The Preferred A Members voting as a class shall appoint two (2) Managers, initially Donald L. Kortz and Raymond T. Baker;

3.3.4  The Common A Members voting as a class shall appoint one (1) Manager, initially Gerald S. Gray; and

3.3.5  The Common B Members voting as a class shall appoint two (2) Managers, initially Jack Keane and Edward C. Gruben;

Except as provided in Section 3.4 below, each Manager appointed pursuant to 3.3.1, 3.3.2, 3.3.3, 3.3.4, or 3.3.5 above serves at the Discretion of the entity, individual or class of Unit holders who selected that Manager (i.e. the Manager appointed by the Common B Members serves at the Discretion of the Common B Members) and a Manager may be removed at any time at the Discretion of the class of Unit holders, entity or individual who selected that Manager or as otherwise provided herein.  Written notice must be given to the Management Committee by the entity, individual or class of Unit holders who selected that Manager immediately upon the selection or removal of such Manager.  If a vacancy in the office of a Manager occurs because of the resignation or removal of a Manager, the class of Unit holders who appointed that Manager shall hold a meeting pursuant to Section 4.5 of this Agreement to elect a replacement Manager.

**Section 3.4.  Appointment of Managers.**

3.4.1  The Members of the Management Committee shall within 60 days following their initial appointments set forth above nominate the Managers that are to be appointed by the Preferred A Members, Common A Members and Common B Members.  The Preferred A Members, Common A Members and Common B Members shall then within 60 calendar days thereafter hold a meeting called for such purpose pursuant to Section 4.5 to either (i) elect such nominees, or (ii) elect other nominees as "write in" candidates at the meeting (the "Initial Election");

3.4.2  Thereafter, the Company may hold elections to elect one or more new Managers as hereinafter provided:  (i) within 90 days after the vacancy of a Manager as a result of such Manager's death, incapacitation or resignation, (ii) within 30 days after the Determination of the Management Committee, at its Discretion, to hold a meeting to elect Managers to the Management Committee, and (iii) within 30 days following the receipt of written notification from 33% of the Members of any one class (i.e. Preferred A Members as a class, Common A Members as a class or Common B Members as a class) requesting that the Company hold a

meeting of their respective class of Units to elect one or more new Manager(s) to the Management Committee and to remove one or more of the then existing Managers appointed by that respective class of Units. The process by which such meeting is to be held is set forth in Section 4.5 below;

3.4.3    Each Manager, including the initial Managers named in this Agreement, will serve until the Manager's successor is appointed, or the Manager dies, becomes incapacitated, resigns, or is removed;

3.4.4    A Manager may resign at any time by delivering a written resignation to the Management Committee. The resignation will be effective when received by the Management Committee unless a later effective date is specified in the written resignation. The class of Unit holders, if any, who appointed a Manager may remove that Manager at any time, with or without cause. But a Manager may be removed by the Members only at a meeting of the Members called for the purpose of removing the Manager. The notice of the meeting must state that the purpose, or one of the purposes, of the meeting is the removal of a Manager. The resignation or removal of a Manager who is also a Member will not constitute a withdrawal or expulsion of the Manager as a Member of the Company or otherwise affect the Manager's rights as a Member. If a Manager resigns or is removed, a meeting of Members to elect a successor must be called promptly and held as soon as reasonably possible.

**Section 3.5.   Management Committee Meetings: Written Consent in Lieu of a Meeting.** Regular Management Committee meetings shall be held monthly on the fourth Monday of each month or on such other day as the Management Committee determines. When requested by the CEO or any two Managers, the Secretary shall schedule a special meeting of the Management Committee. The Secretary shall notify (in the manner provided in Section 13.2) each Manager of each regular and special meeting at least 48 hours before the meeting time. The notice shall specify the time and location of the Management Committee meeting and the matters to be considered at the meeting. A Manager may attend a regular or special meeting by telephone, video conference or any means permitting virtually instantaneous transmission of that Manager's remarks to all meeting participants. In lieu of a meeting, the Management Committee may act by written consent signed by four Managers provided that as soon as reasonably possible, notice of such action taken by the four managers is sent to the Managers who have not signed the written consent.

**Section 3.6.    Managerial Decisions**. The Management Committee must approve all material Company actions. The Management Committee shall make all decisions as follows.

3.6.1.   Four of the Managers appointed and serving at the time of a meeting constitutes a quorum for transacting business; provided that all Managers have received notice of the meeting as required by Section 3.5;

3.6.2.   The act of four Managers present at a meeting at which a quorum is present shall be the act of the Management Committee.

After the Management Committee approves a matter, any authorized Officer may act on the Company's behalf (*e.g.*, executing relevant Documents) to effectuate the Management Committee's decision.

**Section 3.7.  Management Committee Delegation of Authority.**  The Management Committee may delegate to its Officers the authority to act on behalf of the Company and to run the day to day operations of the Company.

**Section 3.8  Third Party Reliance on Officer's Certification**.  Any person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Chief Executive Officer, Chief Financial Officer or Chairman as to:

3.8.1.  the identity of the Officers and Managers;

3.8.2.  the existence or non-existence of any fact or facts which constitute a precedent to acts by the Officers or which are in any other manner germane to the affairs of the Company;

3.8.3.  the persons who are authorized to execute and deliver any Company instrument or document;

3.8.4.  any act or omission by Company or any other matter involving the Company or the Management Committee.

An authorized Officer's signature shall be necessary and sufficient to execute documents of any kind.  Any document executed by an Officer on behalf of Company shall constitute the binding, legal and enforceable obligation of the Company.

**Section 3.9.  Standard of Care**.  The Management Committee and the Officers (collectively, "Management") shall act in good faith and shall exercise their business judgment when managing the Company's business, operations and affairs in a manner they reasonably believe to be in the best interests of the Company.

3.9.1.  Management may rely and shall be protected in acting or refraining from acting upon any certificate, document, or other instrument they believe to be genuine and to have been signed or presented by the proper party or parties;

3.9.2.  Management may select and seek advice from legal counsel, accountants, appraisers, management consultants, investment bankers and other Advisors, all of whom are collectively referred to for purposes of this Section 3.9.2 as Advisors.  Management shall be entitled to rely on information, opinions, reports or statements of any such Advisors as to matters Management believes to be within an Advisor's professional or expert competence, unless Management has knowledge concerning the matter in question that would cause such reliance to be unwarranted;

3.9.3.  Management shall be entitled to rely on information, opinions, reports or statements of one or more employees or other agents of the Company whom Management reasonably believes to be reliable and competent in the matters presented unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted;

3.9.4.  Management may exercise any power granted by this Agreement and perform any duties hereunder either directly or by or through independent contractors.  To the extent permitted by law, Management shall not be responsible for any misconduct or negligence on the part of any such independent contractor.

Management shall devote as much time to the performance of their duties as they deem proper.

**Section 3.10.  Expenses**.  The Company shall pay all expenses incurred on its behalf and reimburse all out-of-pocket expenses attributable to the Company within 20 business days after receiving an itemized accounting of such expenses with reasonable supporting documentation.

### ARTICLE IV.  RIGHTS AND OBLIGATIONS OF MEMBERS

**Section 4.1.  Admission of Members**.  Those Members whose names and addresses are listed in Exhibit A hereby are confirmed as Members of the Company.  Members to be admitted on or after the Effective Date of this Agreement must provide the Management Committee with:

4.1.1.  their initial Capital Contribution;
4.1.2.  executed Signature Pages similar to Exhibit C ("Signature Page");
4.1.3.  executed Powers of Attorney similar to Exhibit D ("Power of Attorney");
4.1.4.  the tax information required by Section 8.2.

In its Discretion, the Management Committee may then admit the prospect as a Member and direct an Officer to countersign the Signature Page.

**Section 4.2.  Members Representations, Warranties and Covenants**.  When admitted, each Member represents and warrants to the Company and the other Members that, on the date the Member was admitted:

4.2.1.  *Organization and Existence*.  If an entity, such Member is duly organized, validly existing and, if a corporation, is in good standing under the laws of its jurisdiction of incorporation;

4.2.2.  *Power and Authority*.  If an entity, such Member has the full power and authority to execute, to deliver and to perform this Agreement, to own Units and to perform the transactions contemplated hereby;

4.2.3.  *Authorization and Enforceability*.  Such Member's execution and delivery of this Agreement and its performance of the transactions contemplated hereby have been duly authorized by all requisite action, this Agreement has been duly executed and delivered by such Member.  This Agreement constitutes the legal, valid and binding obligation of such Member, enforceable against it or him in accordance with the terms hereof, subject to Laws affecting enforcement of creditors' rights generally and to general principles of equity;

4.2.4.  *No Consents*.  No additional authorization, consent, approval or order of, notice to or registration, qualification, declaration or filing with, any governmental authority or other third parties is required for such Member to execute, deliver and perform the transactions contemplated hereby;

4.2.5.  *No Conflict or Breach*.  None of the execution, delivery and performance by such Member of this Agreement, the compliance with the terms and provisions hereof and the carrying out of the transactions contemplated hereby conflicts or will conflict with or will result in a breach or violation of any of the terms, conditions or provisions of any Law or, if the Member is an entity, the charter documents or

bylaws of such Member or Ruling against such Member or by which it or him or any of its or his properties (other than its or his Units), is bound, or any loan agreement, indenture, mortgage, bond, note, resolution, contract or other agreement or instrument to which such Member is a party or by which it or him or any of its or his properties is bound, or constitutes or will constitute a default thereunder or will result in the imposition of any lien upon any of its or his properties;

4.2.6. *No Pending Legal Proceedings*.   There is no suit, action, hearing, inquiry, investigation or proceeding, at law or in equity, pending, or, to the knowledge of such Member threatened, before, by, or in any court or before any regulatory commission, board or other governmental administrative agency against or affecting such Member which could have a material adverse effect on the business, affairs, financial position, results of operations, property or assets, or condition, financial or otherwise, of such Member or on its or his ability to fulfill its obligations hereunder;

4.2.7. *Investment Representation*.   Such Member has acquired its Units for such Member's own account for investment purposes only, and not with a view to the resale or distribution of such Units;

4.2.8. *Transferees Bound*.   Such Member agrees that it will not withdraw from the Company and will not Transfer its Units or any portion thereof to any Person who does not similarly represent, warrant and agree.

All representations and warranties contained in this Section shall survive the Member's execution and delivery of this Agreement.

**Section 4.3.  Membership Interests (Units)**.  Upon admission or upon making additional Capital Contributions, Members shall be issued Units in the Company.

4.3.1.   There are three classes of Units: "Preferred A Units", "Common A Units" and "Common B Units.";

4.3.2.   As of the date of this Agreement, there shall be a maximum number of authorized Preferred A Units of 25,400.214 and a maximum number of authorized Common A Units of 98,833.  There shall be a maximum number of Common B Units of 1,104,267.  The Management Committee has Discretion to increase, authorize, create, establish and set the prices and terms and conditions of any new or existing Units, equity units, Membership Interests, Incentive Units or other securities sold pursuant to Section 4.3.8 below;

4.3.3.   Units are personal property for all purposes;

4.3.4.   Units need not be certificated;

4.3.5.   The Management Committee, in its Discretion, may issue Units, securities convertible into Units (*e.g.*, convertible debentures) or rights to purchase Units (*e.g.*, options or warrants), at any time and from time to time without the consent of the Preferred A Members, the Common A Members and the Common B Members, in any newly formed equity units, Membership Interests or other securities;

4.3.6.   The Company is authorized to enter into agreements for the redemption of Units (*e.g.*, when an employee ceases to be employed by the Company);

4.3.7.   Exhibit A lists each Member and their respective Units.  The Treasurer shall adjust Exhibit A as new Members are admitted, as Units are sold, as Members Transfer their Units or as otherwise necessary;

4.3.8    For the purpose of conducting any Subsequent Offering, any additional offering to raise capital for the Company through the sale of newly created Units, creating and Offering the Incentive Units or for any other purpose whatsoever at the Discretion of the Management Committee, the Company may issue newly created Units or Membership Interests from time to time in one or more classes, or one or more series of such classes, which classes or series shall have such designations, preferences and relative, participating, optional or other special rights that are senior to or pari-passu to those of the Preferred A Members, the Common A Members and the Common B Members and such other units or Membership Interests that are created from time to time by the Management Committee, including, but not limited to, senior or pari-passu rights with respect to:

(i)      The allocation of Profits and Losses to each such class or series of Units;

(ii)     The right of each such class or series of Units to share in distributions and the priority of such distributions of the Company's Distributable Cash Flow From Operations and Distributable Cash Flow From Sale;

(iii)    The rights of each such class or series of Units upon dissolution and liquidation of the Company;

(iv)     The rate at which, and the terms and conditions upon which, each such class or series of Units may be converted into another class or series of Units; and

(vi)     The right of each such class or series of Units to vote on, or take action with respect to, Company matters, including matters relating to the relative rights, preferences and privileges of such class or series of Units, to the extent permitted by applicable law, if any such class or series of Units is granted such voting rights.

4.3.9.   No Member shall have any preemptive, preferential or other right with respect to: (i) making additional Capital Contributions; (ii) the issuance or sale of Units by the Company; (iii) the issuance of any obligations, evidences of indebtedness or securities of the Company convertible into, exchangeable for, or accompanied by, any rights to receive, purchase or subscribe to, any Units; (iv) the issuance of any right of, subscription to or right to receive, or any warrant or option for the purchase of, any of the foregoing; or (v) the issuance or sale of any other interests, Units or securities by the Company.

**Section 4.4.   No Management Authority, Member's Voting Rights**.   Except for Members that are Managers or are Officers of the Company, Members may not, under any circumstances, participate in the management of the Company.  Except for Members that are Managers or are Officers of the Company, no Member has any power or authority to bind the Company in any way, to pledge the Company's credit, or to render the Company pecuniarily

liable for any purpose.  In addition to the right to elect Managers as provided in Section 3.3, Common B Members shall have the right to vote only on the matters set forth in Sections 4.4.1:

4.4.1.   Common B Members shall have the right to vote only on the following:

4.4.1.1. A sale of all or substantially all the assets of the Company;

4.4.1.2. The merger or combination of the Company with any other entity;

4.4.1.3. The Company's Dissolution;

4.4.1.4. Certain amendments to this Agreement.

The matters set forth in Section 4.4.1.1, 4.4.1.2, 4.4.1.3 and 4.4.1.4 must be approved by Common B Members holding a Majority of the Common B Units (voting as a single class) at a meeting called for that purpose in accordance with the requirements of Section 4.5 in which a quorum is present, or by a written consent of Common B Members holding sufficient Units for approval of the action at a meeting.

**Section 4.5.  Member Meetings**.  Except for meetings of the Members to vote on matters as to which a vote of Members is required by the terms of this Agreement, the Company is not required to hold meetings of the Members.  As to matters upon which Members are entitled to vote, or any other matters the Management Committee, in its Discretion determine to submit to a vote of one or more class of Units, and as to any meetings of the Members that are requested by either the Chief Executive Officer or the Management Committee, the Secretary shall schedule a meeting of the Members, in which event the following procedures and standards shall apply:

4.5.1.   At least 5 business days before the meeting the Secretary shall notify all Members entitled to vote on the action under consideration at the meeting of the time and location of the meeting and the matters to be voted on at the meeting;

4.5.2.   33% of the Members entitled to vote on the action under consideration at the meeting, represented in person or by proxy, shall constitute a quorum for conducting the Membership meeting.  Any matter submitted to a vote of one or more class of holders of Units requires the approval of such classes of Members holding a Majority of such classes of Units in which a quorum is present.  Such vote of a class of Units and approval shall be binding up the entire class of Units for any and all purposes whatsoever;

4.5.3.   A Member may attend by telephone, video conference or any means permitting virtually instantaneous transmission of that Member's remarks to all meeting participants;

4.5.4.   The order of business at all Membership meetings shall be determined by the Chief Executive Officer.  The Chief Executive Officer will appoint a chairman for the meeting;

4.5.5.   The Secretary shall maintain a record of the Membership meeting;

4.5.6.   The Chairman of the meeting will select the rules of procedure, such as Robert's Rules of Procedure, for the conduct of business at any meeting, provided that any such rule shall not be inconsistent with this Agreement;

4.5.7.   When requested by the Chairman of the meeting, any Person voting at the meeting shall present its authorization to vote for the relevant Member.

If so requested by the Chief Executive Officer or the Management Committee, in lieu of a

meeting the Members may act by written consent signed by Members of each respective class of Units holding sufficient Units entitled to vote upon such matter for approval of the action at a meeting. The written action is effective when signed by Members owning the required number of Membership Units, unless a different effective time is provided in the written action. When written action is taken by less than all Members, the Company will notify all Members of the action's text and effective date. Failure to provide the notice does not invalidate the written action.

      **Section 4.6. Liability of Members; Liability for Return of Contribution.** No Member shall be personally liable for any of the debts, obligations or liabilities of the Company. However, if a Member receives the return of any part of such Member's Capital Contribution in violation of this Agreement or the Act, such Member will be liable to the Company for a period of three years thereafter for the amount of the Capital Contribution so returned.

      **Section 4.7. Covenant Not to Resign, Withdraw or Dissolve.** Except as consented to in advance by the Management Committee, no Member may withdraw or resign from the Company or abandon all or a portion of their Units in the Company. Additional Members may be admitted to the Company with the consent of the Management Committee.

      **Section 4.8. Waiver of Partition Rights**. Each Member irrevocably waives any right to require partition, apportionment or sale of the Company, its assets or its property. No Member shall directly or indirectly attempt to require such action.

### ARTICLE V. FINANCIAL AND ACCOUNTING MATTERS

      **Section 5.1. Fiscal Year and Accounting Method**. The Company's fiscal year shall be a calendar year. For financial accounting purposes, the Company shall use the accrual method of accounting. The Management Committee shall determine the appropriate method of accounting for federal income tax reporting purposes.

      **Section 5.2. Computations & Valuations**. The Management Committee shall Determine all matters concerning the computation or valuation of securities, property and other non-cash assets, the determination of the Deemed Property Value of Company Property, Capital Contributions, allocations, distributions, Capital Account balances and other financial matters. The Management Committee will make such Determinations on an equitable basis and in accordance with federal income tax principles or GAAP (generally accepted accounting principles) as applicable and as recommended by the Company's accountants. Such Determinations shall be final and conclusive as to all Members.

      **Section 5.3. No Payment of Personal Obligations**. The Company's funds and assets shall be used solely for the Company's benefit and no asset of the Company shall be Transferred or used for personal obligations of any Related Party.

      **Section 5.4. Company Property**. All real or other property of the Company shall be deemed owned or leased by the Company as an entity. While Company Property may be registered in the name of the Company, a nominee or a "street name", the Company remains the

beneficial owner of all Company Property.  Members shall have neither personal ownership of any Company Property nor any right to specific Company Property.

   *Section 5.5.  Bank Accounts*.  All Company funds shall be deposited in the name of the Company in a separate account or accounts.  There shall be no commingling of the Company's monies with those of any other person; however, expense sharing, cost allocation arrangements with Affiliates and other *de mininis* transactions, when properly accounted for, will not constitute commingling of funds.  Withdrawals from such accounts shall be made on the signatures of the Officers or such persons designated by an Officer.

   *Section 5.6.  Establishment of Reserves*.  The Management Committee may establish reserves for working capital and for payment of taxes, insurance, debt service, repairs, replacements or renewals, contingent liabilities or other costs and expenses incident to the operation of the Company and for such other purposes as the Management Committee may Determine.  Thereafter the Company shall maintain such reserves in such amounts as the Management Committee deems appropriate but any such reserves must not conflict with another provision of this Agreement concerning required disbursements or distributions.

   *Section 5.7.  Books and Records*. At its principal place of business, Company shall keep the following books and records:

   5.7.1.  true and full information regarding the state of the business and financial condition of the Company;
   5.7.2   copies of the Company's financial statements for the three most recent years;
   5.7.3.  copies of the Company's federal, state, and local income tax returns and reports for the three most recent years;
   5.7.4.  a current list of the name and last known business, residence or mailing address of each Member;
   5.7.5.  the Articles of Organization, this Agreement and all amendments hereto, all Powers of Attorney and copies of all minutes of meetings or consents to action in lieu of meetings, of the Management Committee and the Members (if any); and
   5.7.6.  other information specified by the Management Committee in its Discretion.

   Upon three business days notice, any Member shall have the right, at such Member's own expense, to examine, audit and make copies of the books and records, in person or by duly authorized agent or attorney, during normal business hours at the principal place of business of the Company.

   *Section 5.8.  Financial Statements and Reports*.  At Company's expense, the Company shall maintain records and accounts of all operations and expenditures of the Company as required by law.  Members may inspect only those books and records of the Company as required by law as set forth in Section 5.7.  No Member shall have the right to review the books and records of the Company relating to (i) the day to day operations of the Company; or (ii) such books and records of the Company as the Management Committee may deem proprietary to the Company.  Within 45 days after the end of each fiscal quarter, Company shall furnish to each Member an unaudited balance sheet and income statement of the Company for such quarter. Promptly after the close of each fiscal year, Company shall cause the Company's financial

statements for that year to be prepared.  In the Discretion of the Management Committee, such financial statements may be unaudited.  On or before April 14 of each fiscal year, such financial statements shall be furnished to each Member.  Company shall prepare and deliver to each Member, no later than April 14 of each fiscal year a Schedule K-1 showing the capital account of each Member and such Member's allocable share of the Company's items of income, deduction, credit, gain or loss for the year, a copy of Company's informational tax return (IRS Form 1065), and such other reports setting forth in sufficient detail all such information and data with respect to the transactions effected by or involving the Company during such fiscal year as shall enable each Member to prepare its federal, state, and local income tax returns.

**Section 5.9.   Confidentiality**.   All Business Information is deemed confidential and proprietary information.   Only the Chief Executive Officer may authorize disclosure of any Business Information to third parties.   Without the Chief Executive Officer's prior specific authorization, a Member may not disclose to any third party any Business Information that such Member learns in any capacity (*e.g.*, as an employee or independent contractor).

### ARTICLE VI.   CONTRIBUTIONS, CAPITAL ACCOUNTS AND DESCRIPTION OF UNITS

**Section 6.1.   Capital Contributions**.   To purchase Units from the Company, a Member must make the Capital Contribution Determined in the Management Committee's Discretion.

6.1.1.  The Members admitted prior to the Effective Date of this Agreement have made Capital Contributions to the Company in amounts reflected in their Capital Accounts, which are set forth in the books and records of the Company.  Such amounts hereby are acknowledged and accepted as their Capital Contributions;

6.1.2  Upon admission of a Member on or after the Effective Date of this Agreement, such Member shall make a Capital Contribution to the Company as determined by the Management Committee and as set forth on Exhibit A;

6.1.3.  Members are not obligated under any circumstances to make any additional Capital Contributions;

6.1.4.  No Member may demand or receive the return of its Capital Contributions;

6.1.5  Neither Management nor other Members are personally responsible for the return of any Member's Capital Contribution;

6.1.6.  Capital Contributions become the sole property of the Company and no Member shall have an independent right to such funds;

6.1.7.  Except as otherwise provided herein, no interest shall be paid upon Capital Contributions, undistributed income or reinvested income of the Company;

6.1.8.  Interest earned on Company funds shall inure solely to the Company's benefit.

**Section 6.2.   Capital Accounts**.   A Capital Account shall be maintained for each Member in accordance with the following provisions:

6.2.1.  To each Member's Capital Account there shall be credited such Member's Capital Contributions (including the Deemed Property Value of any non-cash property contributed to the Company by such Member), such Member's distributive share of Profits, and any items in the nature of income or gain that are specially allocated pursuant to Article VII hereof, and the amount of any Company

liabilities that are assumed by such Member or that are secured by any Company Property distributed to such Member;

6.2.2.  To each Member's Capital Account there shall be debited the amount of cash and the Deemed Property Value of any Company Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated pursuant to Article VII hereof, and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company;

6.2.3.  In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the assignee shall succeed to the Capital Account of the assignor to the extent it relates to the transferred interest;

6.2.4.  The Company shall increase or decrease the Capital Accounts (a "Revaluation") according to the rules of IRS Regulations § 1.704-1(b)(2)(iv)(f) and § 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company assets as of the following times (and in no other circumstances) (any such time, an "Adjustment Event"):  (i) the acquisition of an additional interest in the Company by any existing Member or new Member in exchange for more than a *de minimis* capital contribution; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company; (iii) the liquidation of the Company within the meaning of IRS Regulations § 1.704-1(b)(2)(ii)(g); or (iv) the grant of more than a *de minimis* interest in the Company as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity or by a new Member acting in a partner capacity or in anticipation of being a partner; provided that, for this purpose, any such capital contribution, Company property, or interest in the Company shall be considered more than *de minimis* unless otherwise determined by the Management Committee.  For purposes of any Revaluation of the Capital Accounts, the Company's assets shall be deemed sold for their fair market value as of the date of the Adjustment Event, and any resulting gain or loss shall be allocated to the Capital Accounts of the Members based on their interests in the Company immediately prior to the Adjustment Event in accordance with IRS Regulations Sections 1.704-1(b)(2)(iv)(f) and (g).  All valuations and other determinations relevant to a Revaluation shall be made as determined by the Management Committee.  Any gain or loss allocated to the Capital Accounts pursuant to a Revaluation shall be allocated pursuant to the rules set forth in Article VII hereof, so that any gain or loss incurred subsequent to such Revaluation shall be determined and allocated without duplication of any gain or loss allocated in connection with the Revaluation;

6.2.5   In determining the amount of any liabilities for purposes of Sections 6.2.1 and 6.2.2 above, there shall be taken into account IRC Section 752(c) and any other applicable provisions of the IRC and IRS Regulations; and 6.2.6.  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with IRS Regulation §1.704-1(b), and shall be interpreted and applied in a manner consistent with such IRS Regulations. In the event the Management Committee shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto,

are computed in order to comply with such IRS Regulations, the Management Committee may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article XI hereof upon the Dissolution of the Company.  The Management Committee shall adjust the amounts debited or credited to Capital Accounts with respect to (a) any property contributed to the Company or distributed to the Members, and (b) any liabilities that are secured by such contributed or distributed property or that are assumed by the Company or the Members, in the event the Management Committee shall determine such adjustments are necessary or appropriate pursuant to IRS Regulations §1.704-1(b)(2)(iv).  The Management Committee also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with IRS Regulations §1.704-1(b).  Absent manifest error or bad faith, all allocations or adjustments to Capital Accounts made by the Management Committee shall be binding upon all Members.

**Section 6.3.  Preferred A Units**.  The Company's Preferred A Units have the following principal features:

6.3.1.   distributions of Distributable Cash Flow From Operations pursuant to Section 7.10;
6.3.2.   distributions of Distributable Cash Flow From Sale pursuant to Section 7.10;
6.3.3.   allocations of Company Profits and Losses pursuant to Section 7.1.

**Section 6.4.  Common A Units**.  The Company's Common A Units have the following principal features:

6.4.1   distributions of Distributable Cash from Operations pursuant to Section 7.10;
6.4.2   distributions of Distributable Cash Flow From Sale pursuant to Section 7.10; and
6.4.3   allocations of Company Profits and Losses pursuant to Section 7.1.

**Section 6.5.  Common B Units.**  The Company's Common B Units have the following principal features:

6.5.1   distributions of Distributable Cash from Operations pursuant to Section 7.10;
6.5.2   distributions of Distributable Cash Flow From Sale pursuant to Section 7.10; and
6.5.3   allocations of Company Profits and Losses pursuant to Section 7.1.

### ARTICLE VII.  ALLOCATIONS AND DISTRIBUTIONS

**Section 7.1.  Allocation of Profits and Losses**.  Except as otherwise provided in this Article VII, Profits and Losses shall be allocated among the Members as follows:

7.1.1   *Profits.*  Except as provided in Section 7.3 or 7.4, Profits for any fiscal year shall be allocated in the following order and priority:

(a)     First, ninety percent (90%) to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member), five percent (5%) to the Common A Members (based on the number of Common A Units held by each Common A Member), and five percent (5%) to the Common B Members (based on the number of Common B Units held by each Common B Member) until the cumulative Profits allocated pursuant to this Section 7.1.1(a) are equal to the cumulative Losses allocated pursuant to Section 7.1.2(d);

(b)     Second, one hundred percent (100%) to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member) until the Preferred A Members have an aggregate Capital Account balance equal to the Liquidation Preference;

(c)     third, one hundred percent (100%) to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member) until the cumulative Profits allocated pursuant to this Section 7.1.1(c) are equal to the cumulative amount distributed to the Preferred A Members pursuant to Section 7.10.1(a) in respect of the Preferential Return;

(d)     Fourth, in the event of a sale or other disposition of all or substantially all of the Company Property, any gain from such sale or other disposition shall be allocated fifty percent (50%) to the Common A Members (based on the number of Common A Units held by each Common A Member) and fifty percent (50%) to the Common B Members (based on the number of Common B Units held by each Common B Member) until the Common A Members and the Common B Members have been allocated an aggregate amount equal to 11.11% of the Liquidation Preference pursuant to this Section 7.1.1(d); and

(e)     The balance of the Profits, if any, ninety percent (90%) to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member), five percent (5%) to the Common A Members (based on the number of Common A Units held by each Common A Member), and five percent (5%) to the Common B Members (based on the number of Common B Units held by each Common B Member).

7.1.2   *Losses*.  Except as provided in Section 7.2, Losses for any fiscal year shall be allocated in the following order and priority:

(a)     First, ninety percent (90%) to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member), five percent (5%) to the Common A Members (based on the number of Common A Units held by each Common A Member), and five percent (5%) to the Common B Members (based on the number of Common B Units held by each Common B Member) until the cumulative Losses allocated pursuant to this Section 7.1.2(a) are equal to the cumulative Profits allocated pursuant to Section 7.1.1(e);

(b)     Second, fifty percent (50%) to the Common A Members (based on the number of Common A Units held by each Common A Member) and fifty percent (50%) to the Common B Members (based on the number of

Common B Units held by each Common B Member) until their Adjusted Capital Account balances are reduced to zero;

(c)     Third, one hundred percent (100%) to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member) until their Adjusted Capital Account balances are reduced to zero; and

(d)     The balance of the Losses, if any, ninety percent (90%) to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member), five percent (5%) to the Common A Members (based on the number of Common A Units held by each Common A Member), and five percent (5%) to the Common B Members (based on the number of Common B Units held by each Common B Member).

**Section 7.2.   Limitations on Allocation of Losses Creating Adjusted Capital Account Deficit**.  Notwithstanding any other provisions of this Article VII, no allocation of Losses or deduction may be made to a Member if such allocation would cause or increase an Adjusted Capital Account Deficit in such Member's Capital Account as of the end of the Company's taxable year to which such allocation relates.  Any allocation of Losses or deduction (or portion thereof) disallowed to a Member pursuant to this Section 7.2 shall be specially allocated on a pro rata basis to Members, if any, with positive Adjusted Capital Account balances at the time such allocation is made.  If a Member is specially allocated Losses or deductions pursuant to this Section 7.2, there subsequently shall be specially allocated to such Member Profits in an amount equal to said Losses or deduction previously specially allocated to such Member hereunder.

**Section 7.3.   Qualified Income Offset**.  If, notwithstanding the limitations of Section 7.2, a Member unexpectedly receives an allocation of Losses or deduction or a distribution, and such unexpected allocation or distribution creates or increases an Adjusted Capital Account Deficit in the Member's Capital Account, such Member shall be allocated items of Company income and gain in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such allocation or distribution as quickly as possible.

**Section 7.4.   Minimum Gain Chargeback**.  Notwithstanding any other provision of this Article VII, if there is a net decrease in Company Minimum Gain (as defined in IRS Regulations. §1.704-2(d)(1)) during a Company taxable year, each Member shall be allocated, in the manner prescribed by IRS Regulations §1.704-2(f), before any other allocation is made pursuant to this Article 6 for such taxable year, items of income and gain for such year in an amount equal to such Member's share of the net decrease in the Company Minimum Gain (within the meaning of IRS Regulations §1.704-2(g)(2).  This Section 7.4 is intended to comply with the Minimum Gain chargeback requirement of IRS Regulations §1.704-2(f) and shall be interpreted consistently therewith.

**Section 7.5.   Allocations Relating to Adjustments under IRC Sections 734(b) or 743(b)**.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to IRC §§734(b) or 743(b) is required, pursuant to IRS Regulations §1.704-1(b) (2)(iv)(m), to be taken into account in determining Capital Accounts, such adjustment shall be treated as an item of gain (if the adjustment increased the basis of the asset) or loss (if the adjustment decreased such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent

with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the IRS Regulations.

   **Section 7.6.  Curative Allocations**.  The allocations set forth in Sections 7.2, 7.3, 7.4 and 7.5 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of IRS Regulations §1.704-1(b).   The Regulatory Allocations may not be consistent with the manner in which the Members intend to divide Company distributions.   Accordingly, the Members are hereby authorized to divide other allocations of Profits, Losses, and other items among the Members so as to prevent the Regulatory Allocations from distorting the manner in which Company distributions will be divided among the Members pursuant to Section 7.10 hereof.  In general, the Members anticipate that this will be accomplished by specially allocating other Profits, Losses, and items of income, gain, loss, and deduction among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Member is zero.  However, the Management Committee shall have discretion to accomplish this result in any reasonable manner.

   **Section 7.7.   Tax Allocations: IRC Section 704(c)**.  In accordance with IRC Section 704(c) and the IRS Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the Company by a Member shall be allocated among the Members, solely for tax purposes, in a manner which takes into account the difference between the adjusted basis of such property to the Company for federal income tax purposes and its initial Deemed Property Value.   In the event the Deemed Property Value of any Property is adjusted pursuant to paragraph (b) of the definition of Deemed Property Value, subsequent allocations of income, gain, loss and deduction with respect to such Property shall take into account the difference between the adjusted basis thereof for federal income tax purposes and its Deemed Property Value in the same manner as under IRC Section 704(c) and the IRS Regulations thereunder. Allocations pursuant to this Section 7.7 are solely for purposes of federal, state and local taxes, and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses or other items or distributions under this Agreement.

   **Section 7.8.  Allocation Upon Assignment of a Membership Interest**.  In the event of the assignment of all or any part of the Membership Interest of a Member, the allocable share, with respect to the Membership Interest so assigned, of Company Profits and Losses shall be allocated between the assignor and the assignee to take into account their varying interests in the Company during the year in which the assignment occurred, based upon the number of days during such year that each was the record owner of the Company Interest on the books of the Company (without regard to actual operating results of the Company); provided, however, that if under IRC Section 706 and applicable IRS Regulations other methods of allocations will be recognized for federal income tax purposes, including, without limitation, allocations based upon actual operating results accompanied by a closing of the Company's books as of the date of assignment or the use of a 15 day monthly convention, such other method may be used in the discretion of the Management Committee.

   **Section 7.9.  Compliance With IRS Regulations**.  The foregoing provisions and other provisions of this Agreement relating to the allocations of Profits and Losses are intended to comply with the IRS Regulations under IRC §704 and shall be interpreted and applied in a manner consistent with such Regulations.

**Section 7.10.  *Distributions of Company Distributable Cash Flow*.**  Distributions of Company Distributable Cash Flow for each fiscal year of the Company shall be made to the Members in the following manner:

7.10.1 *Distributable Cash Flow from Operations*.  Distributable Cash Flow from Operations for such fiscal year shall be distributed in the following order and priority:

(a) First, one hundred percent (100%) of Distributable Cash Flow from Operations to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member), nothing to the Common A Members and nothing to the Common B Members, until the Preferred A Members as a class have been distributed an amount equal to their Preferential Return;

(b) Second, fifty percent (50%) to the Common A Members (based on the number of Common A Units held by each Common A Member) and fifty percent (50%) to the Common B Members (based on the number of Common B Units held by each Common B Member) until the Common A Members and the Common B Members have been distributed an aggregate amount equal to 11.11% of the aggregate distributions made to the Preferred A Members pursuant to Section 7.10.1(a) above; and

(c) The balance of the Distributable Cash Flow from Operations, if any, after the distributions pursuant to Section 7.10.1(a) and 7.10.1(b) above shall be distributable ninety percent (90%) to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member), five percent (5%) to the Common A Members (based on the number of Common A Units held by each Common A Member) and five percent (5%) to the Common B Members (based on the number of Common B Units held by each Common B Member), at such times and in such amounts as are Determined by the Management Committee in its Discretion.

7.10.2 *Distributable Cash Flow from Sale*.  Distributable Cash Flow from Sale shall be distributed in the following order and priority:

(a) First, 100% to the Preferred A Members (based on the number of Preferred A Units held by each Preferred A Member) until the Preferred A Members have received an aggregate amount equal to their Liquidation Preference; and

(b) Second, fifty percent (50%) to the Common A Members (based on the number of Common A Units held by each Common A Member) and fifty percent (50%) to the Common B Members (based on the number of Common B Units held by each Common B Member) until the Common A Members and the Common B Members collectively have received an aggregate amount equal to 11.11% of the Liquidation Preference; and

(c) The balance of the Distributable Cash Flow from Sale, if any, after the distributions pursuant to 7.10.2(a) and (b) above shall be distributable ninety percent (90%) to the Preferred A Members (based on the number of

Preferred A Units held by each Preferred A Member), five percent (5%) to the Common A Members (based on the number of Common A Units held by each Common A Member) and five percent (5%) to the Common B Members (based on the number of Common B Units held by each Common B Member).

7.10.3 *Limitation on Distributions*. Notwithstanding the foregoing, no distribution of Company Distributable Cash Flow may be made to Members to the extent that, at the time of the distribution, after giving effect to the distribution, liabilities of the Company, other than liabilities to Members on account of their Capital Contributions, exceed the assets of the Company;

7.10.4 *Non-cash Distributions*. No Member has the right to demand or receive any distributions from the Company in any form other than cash. However, the Management Committee has Discretion to cause the Company to make distributions in forms other than cash.

### ARTICLE VIII. TAX MATTERS

**Section 8.1. General Tax Matters**. Management shall prepare and timely file all tax or information returns or reports required to be filed by the Company pursuant to the IRC, and of all other tax returns and reports required in the jurisdictions in which the Company does business. Management shall use its best efforts to cause the Company's tax returns to be prepared as soon as practicable after the end of each fiscal year. No later than April 14th, Management also shall annually provide each Member with the information about the Company's operations during the preceding fiscal year that the Member needs for the preparation and timely filing of such Member's own federal, state and local income tax returns as provided in Section 5.8.

**Section 8.2. Members' Tax Information**. Within five business days after a request from Management, each Member shall provide the following Documents to the Company:

8.2.1. a properly completed Internal Revenue Service Form W-9, "Request for Taxpayer Identification Number and Certification";

8.2.2. any Documents needed to claim exemption from withholding or a reduced rate of withholding;

8.2.3. any Documents requested by the Tax Matters Member;

Any Member that is itself a partnership for United States federal income tax purposes shall cause each of its Owners to provide the Documents required by this Section. A Member must provide updated Documents when the item previously provided is no longer accurate. The Management Committee may withhold distributions from any Member not complying with this Section.

**Section 8.3. Tax Representations and Warranties of Members**. Each Member represents and warrants that:

8.3.1. it will remain the beneficial owner of any Units it acquires; and

8.3.2.   any forms, certificates, statements, notices or information it provides to Company pursuant to Section 8.2 shall be (and until revised shall continue to be) true, correct & complete.

Any Member that is itself a partnership for U.S. federal income tax purposes shall cause each of its Owners to make these representations and warranties as though the Member's Owners were Company Members.

**Section 8.4.   Tax Matters Member; Audit**. Levine is the "Tax Matters Member" for purposes of IRC Section 6231(a)(7) and shall be designated to receive all notices from the Internal Revenue Service which pertain to the Company's tax affairs.   The Members hereby agree to sign any forms that are required by the IRS to designate Levine (or any successor chosen by the Management Committee) as the Tax Matters Member.

8.4.1   The Tax Matters Member may extend the statute of limitations for assessing or computing any tax liability against the Company or compromise, settle or concede the amount of any Company tax item.   To the extent that any tax audit or tax claim initiated or asserted by any taxing authorities against the Company or any Member involves matters arising out of the operations of the Company, the Tax Matters Member, in its discretion, may cause the Company to undertake the defense against such audit or claim (either administratively or in court); select the forum for any court action relating to such defense; incur expenses (including, without limitation, attorneys', accountants' and appraisers' fees) to be paid by the Company in connection with such defense; and take any other steps it may deem appropriate.   The Tax Matters Member, in its discretion, may initiate and pursue (either administratively or in court) any tax refund that under law may be initiated at the Company level, incur expenses (including, without limitation, attorneys', accountants' and appraisers' fees) and take any other steps it may deem appropriate in connection therewith;

8.4.2   If the Company is audited by any federal, state or local taxing authority, to the extent the audit treats the Company as an separate entity, including administrative settlement and judicial review, the Tax Matters Member is authorized, empowered and directed to act for the Company.   The Tax Matters Member's decisions shall be final and binding upon the Company and each Member. In the event of such an audit, investigation, settlement or review, the Tax Matters Member shall, at the Company's expense, participate in, and retain accountants and other professionals to participate in, the audit, investigation, settlement or review, and if deemed appropriate by the Tax Matters Member in its sole discretion, contest assertions by the auditing agent or otherwise that may be adverse to the Members, the Company and the Company's filing position. Each Member shall cooperate (a Member that is an entity (*e.g.*, corporation or partnership) shall obtain the cooperation of each of its partners, members or equity owners) with the Tax Matters Member and do or refrain from doing (and cause any such member to do or refrain from doing) any and all things reasonably required by the Tax Matters Member in connection with such audit or contest, administrative settlement, judicial review, or other resulting administrative or judicial proceedings;

8.4.3   The Company will promptly inform the Members regarding the commencement of any tax audit that is deemed to be material.  The Company will also inform the Members of any material developments regarding such an audit.

**Section 8.5.   Tax Elections**.  The Management Committee has Discretion to make any elections required or permitted to Company under the IRC.

8.5.1.   If the election could have a material adverse effect on a Member, then that Member must consent to the election;

8.5.2.   When requested by a Member, the Management Committee shall cause the Company to make an election under IRC Section 754 in connection with that Member's Transfer of any Units.  Such election shall be made only if the requesting Member or its transferee agrees to indemnify the Company (and other Members) against the cost of such election.  Each Member will furnish the Company with all information necessary to give effect to such election.

No election shall be made by the Company or any Member for the Company to be excluded from the application of any of the provisions of IRC Subchapter K, Chapter I of Subtitle A or from any similar provisions of any state or local tax Laws.

**Section 8.6.   Withholding Taxes**.  The Company may pay monies otherwise available for distribution to the Members to the Internal Revenue Service and appropriate U.S. and state tax authorities, at such times and in such amounts as the Tax Matters Member reasonably determines are necessary in order to comply with the requirements of the IRC and any applicable U.S., state or local laws with respect to withholding on a Member's allocable share of any Company Profits (or items thereof).  Any amounts withheld pursuant to this Section and Section 7.10.1(b) shall be treated for all purposes of this Agreement as a Distribution to such Member and shall be applied against Distributions that would otherwise be made to such Member.

ARTICLE IX.  LIABILITY LIMITATIONS & INDEMNIFICATION OF MANAGEMENT AND ADVISORS

**Section 9.1.   Limitations on Management's Liability**.  To the fullest extent permitted by law, Management and their Affiliates shall not be personally liable to the Company or its Members for breach of fiduciary duty, for any mistake of fact or judgment, or for any act or failure to act when conducting the business operations and affairs of the Company, which may cause or result in any loss or damage to the Company or its Members.  This limitation does not apply only if a non-appealable Ruling establishes that the conduct of Management or their Affiliates was grossly negligent, willful, wanton or fraudulent.

**Section 9.2.   Indemnification of Agents**.  To the fullest extent permitted by law and by this Article, Company shall indemnify any Person against all Expenses incurred in any Action by reason of the fact that the Person was an Agent of the Company.

9.2.1.   The Expenses of Agents incurred in defending an Action must be paid by Company as such Expenses are incurred and in advance of the final disposition of the Action.  In the case of Officers other than the Chairman (and for avoidance of doubt, excluding all Management, in their capacities as such) before advancing

any Expenses, Company must receive a notarized undertaking by the Agent promising to repay all amounts advanced if a court ultimately determines that the Agent is not entitled to indemnification by the Company;

9.2.2.   The Company shall pay such Expenses within 10 business days after receiving an itemized accounting of such Expenses with reasonable supporting documentation;

9.2.3.   The indemnification provided in this Section shall continue as to a Person who was an Agent prior to the date hereof or who ceases to be an Agent on or following the date hereof and shall inure to the benefit of any such Agent's estate, heirs, personal representatives, executors and administrators;

9.2.4.   Indemnification under this Section is not available if a non-appealable Ruling finds that either the Agent's misconduct was grossly negligent, willful, wanton.

The indemnification provided in this Section shall not exclude any other right which such Agents may have or hereafter acquire, and, without limiting the generality of such statement, they shall be entitled to their respective rights of indemnification under any agreement, vote of the Members, provision of law, or otherwise, as well as their rights under this Article.

**Section 9.3.   Notice of Claims**. With respect to any Claim for which such Agent might be entitled to indemnification under this Article, the Agent shall:

9.3.1.   Notify the Management Committee about the Claim within a reasonable period of time after learning of such Claim.  This notice must specify in reasonable detail the nature of the Claim and the estimated Damages (to the extent practicable);

9.3.2.   Within a reasonable period of time of any request, provide the Management Committee with such information and cooperation with respect to such Claim as the Management Committee may reasonably request;

9.3.3.   Use commercially reasonable efforts to cooperate and take all such commercially reasonable steps as the Management Committee may reasonably request to preserve and protect any defense to such Claim;

9.3.4.   If an Action is brought with respect to such Claim, upon prior notice, afford the Management Committee the right, which the Management Committee may exercise in its sole Discretion and at its expense, to participate in the investigation, defense and settlement of such Claim;

9.3.5.   Neither incur any material Expense to defend against nor release or settle such Claim or make any admission with respect thereto without the prior written consent of the Management Committee.

**Section 9.4.   Insurance for Agents**.   In Management Committee's Discretion, the Company may purchase and maintain insurance on behalf of Agents against any Claims asserted against such Agents and incurred in any such capacity or arising out of such status, whether or not the Company would have the power to indemnify such Agent.

**Section 9.5.   Indemnification Permitted for Related Party Transactions**.  An Agent shall not be denied indemnification in whole or in part under this Article above solely because the Agent had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by this Agreement.

*Section 9.6.   No Rights to Third Parties*.   This Article is for the benefit of Agents and their heirs, successors, assigns, administrators and legal representatives, all of whom are express third party beneficiaries hereof, and shall not create any rights for the benefit of any other persons.

*Section 9.7.   No Indemnification Obligation for Members*.   The indemnification obligations under this Article are limited to the Company and are payable only from Company assets.  No Member shall incur any personal liability under this Article.

*Section 9.8.  Only Prospective Modification*.   Any repeal or modification of this Article shall be prospective only, and shall not adversely affect any limitation on the personal liability of Management or their Affiliates for acts or omissions prior to such repeal or modification.

## ARTICLE X.  TRANSFERS OF UNITS

*Section 10.1.  Exclusive Method; General Prohibition*.   No Member may sell, exchange, encumber, transfer or otherwise assign, in whole or in part, any Units that such Member now owns or may hereafter acquire, except as specifically provided herein.

*Section 10.2.   Transfer of Interest by Members*.   Subject to any restrictions on transferability by operation of law or contained elsewhere in this Agreement, a Member may assign, sell, pledge, hypothecate or otherwise encumber (hereafter "assign") all or a portion of his or its Membership Interest only in accordance with and to the extent permitted by this Section 10.2 as follows:

10.2.1 If any Member desires to sell all or any portion of such Member's Units to any Person other than a person who is an Affiliate of such Member within the meaning of phrases (a) and (d) of the definition of "Affiliate" (and excluding phrases (b) and (c) of that definition) in Article I of this Agreement, such Member must first have a bona fide offer to sell such Units to the Company and shall offer the Units by written notice to the Company, for a period of 10 days, at the price and terms set forth in a bona fide third party offer to purchase such Units, or if there is no such bona fide third party offer, at a price and upon terms established by the selling Member and set forth in the notice.  If the Common B Member desiring to sell Common B Units is Gary D. Levine or LGL, then immediately upon the Company's receipt of the written notice of the offer to sell, the Company shall send a copy of the notice to all the other Members.  Upon receipt of a notice of an offer to sell Units, the Company, by a decision of the Management Committee (excluding the vote of any Manager who is an Affiliate of the Member making the offer) within such 10 day period, may accept such offer as to all or a portion of the Units so offered.  If, at the end of such 10 day period, the Company has not exercised its option to purchase all of the Units offered then the selling Member shall be free to sell those Units to the proposed purchaser.  If this option is exercised by the Company within the foregoing 10 day option period, a closing shall take place within 30 days following the expiration of the option period.  All offers to sell Units in the Company in accordance with this Section 10.2.1 shall be in writing, shall be sent to the Company, shall state the proposed purchase price

and terms and shall identify the prospective purchaser, if any, by name and address;

10.2.2   Subject to Section 10.2.5 below, a Member shall have the right to sell, assign or otherwise transfer all or a portion of such Member's Units to any Person who is an Affiliate of such Member, within the meaning of phrases (a) and (d) of the definition of "Affiliate" (and excluding the phrases (b) and (c) of that definition) in Article I of this Agreement;

10.2.3   Except as provided in Section 10.2.1 or Section 10.2.2 above, a Member may assign, sell, pledge, hypothecate or otherwise encumber (hereafter "assign") all or a portion of his Units only upon the written consent of the Management Committee, which consent may be withheld in its Discretion.  As a condition of assignment, the assignee shall consent in writing in form satisfactory to the Management Committee to be bound by the terms of this Agreement, deliver to the Management Committee a duly executed and acknowledged written instrument of assignment and, except as otherwise consented to by the Management Committee, meet all of the requirements applicable to an original subscriber for Units.  By executing this Agreement, each Member shall be deemed to have consented to any assignment consented by the Management Committee.  Each Member agrees, upon request of the Management Committee, to execute such certificates or other documents and perform such acts as the Management Committee deems appropriate in connection with any assignment of Units in the Company.  Each assigning Member agrees to pay, prior to the time the Management Committee consents to an assignment of such Member's Units in the Company, all reasonable expenses, including attorney's fees, incurred by the Company in connection with such assignment;

10.2.6   No consent to any assignment shall be given by the Management Committee and no assignment shall be made by any Member, if such assignment would jeopardize the status of the Company as a limited liability company taxed as a partnership for Federal income tax purposes, would cause a termination of the Company for the purposes of the then applicable provisions of the IRC, or would violate, or cause the Company to violate, any applicable law or governmental rule or regulation, including, without limitation, any applicable Federal or state securities law and unless, if requested by the Management Committee, an opinion of counsel to the assignee (which counsel and opinion shall be satisfactory to counsel for the Company) is furnished to the Company stating that, in the opinion of said counsel, such assignment would not jeopardize the status of the Company as a limited liability company taxed as a partnership for Federal income tax purposes, or cause a termination of the Company for the purpose of the then applicable provisions of the IRC, or violate, or cause the Company to violate, any applicable law or governmental rule or regulation, including, without limitation, any applicable Federal or state securities laws;

10.2.7   Upon the death, incapacity or adjudicated incompetency of a Member, the dissolution of a Member or if a Member becomes Bankrupt, the rights of such Member to share in Company distributions and allocations and to assign such Member's Membership Interest pursuant to this Section 10.2 or cause the substitution of a substituted Member pursuant to Section 10.3 shall devolve on such Member's successor, personal representative, administrator, guardian,

conservator, trustee in bankruptcy, or other legal representative for the purpose of settling its estate or administering its property, or in the event of the death of a Member whose interest is held in joint tenancy, pass to the surviving joint tenant ("successor"), subject to the terms and conditions of this Agreement. The successor of the deceased, incapacitated, incompetent, dissolved or Bankrupt Member shall be liable for all the obligations of the deceased, incompetent, incapacitated, dissolved or Bankrupt Member and shall be assignees of the incompetent, incapacitated, deceased, dissolved or Bankrupt Member's Membership Interest as provided in Section 10.3 hereof. Upon compliance with Section 10.3 hereof, such assignee(s) may become a substituted Member(s) with respect to the Membership Interest of the deceased, incompetent, incapacitated, dissolved or Bankrupt Member;

10.2.8   Anything herein to the contrary notwithstanding, both the Company and the Management Committee shall be entitled to treat the assignor of Units as the absolute owner thereof in all respects, and shall incur no liability for distributions made in good faith to it, until such time as an assignment that conforms to the requirements of this Article has been received by and recorded on the books of the Company.

Any purported assignment of a Membership Interest which is not in compliance with this Agreement is hereby declared to be null and void and of no force and effect whatsoever.

**Section 10.3.   Substituted Member**.   An assignee of any Member's Units may become a Substituted Member in place of its assignor provided:  (i) all the requirements of Section 10.2 are fulfilled; (ii) a duly executed and acknowledged written instrument setting forth the intention of the assignor that the assignee become a Substituted Member in its place is delivered to the Management Committee; (iii) the Management Committee consents in writing to substitution of the assignee as a Substituted Member, which consent may be withheld in its Discretion; (iv) the assignee executes a signature page to this Agreement, accepting, adopting and agreeing to be bound by all the terms and conditions hereof; and (v) the assignor and assignee execute and acknowledge such other instruments, in form and substance satisfactory to the Management Committee, as the Management Committee may deem necessary or desirable to effect such substitution.

**Section 10.4.   Nature of Assignee's Interest**.   An assignment of a Member's Units in the Company entitles the assignee to receive only the allocations of Company Profits and Losses and the distributions to which the assignor would have been entitled with respect to the Units (or portion thereof) so assigned.  An assignment of Units shall not entitle the assignee to exercise any rights of a Member unless and until an assignee of Units becomes a Substituted Member.

# ARTICLE XI. DISSOLUTION

**Section 11.1.   No Right to Dissolution**.   The Company shall Dissolve only upon the events listed in Section 11.2.  Except as provided in Section 11.2.4 and notwithstanding anything contained in the Act, no Member shall have the right to Dissolve the Company and no Member shall commence any Action seeking to Dissolve the Company.  So long as one Member remains, the Company shall not Dissolve upon withdrawal of any Members.

*Section 11.2.   Dissolution Events*.   The Company shall be Dissolved, and its affairs wound up upon the earliest to occur of the following Dissolution Events:

11.2.1.   the Management Committee's written decision to Dissolve the Company and the approval of that decision by Common B Members holding a holding a Majority of the Common B Units (voting as a single class) at a meeting called for that purpose in accordance with the requirements of Section 4.5, or by a written consent of Common B Members holding sufficient Units for approval of the action at a meeting;

11.2.2.   entry of a decree of judicial dissolution under Act section 7-80-808; or

11.2.3.   the sale of all or substantially all the assets of the Company.

Unless otherwise mandated by the Act, the resignation, bankruptcy, dissolution, liquidation or insolvency of any Manager or Member shall not dissolve the Company.

*Section 11.3.   Liquidator*. Within five days after a Dissolution Event, the Chief Executive Officer (unless the Management Committee previously appointed someone else) shall become the Liquidator and immediately proceed to wind up the Company's affairs.   The Liquidator shall be entitled to fair compensation for its services, in an amount Determined by the Management Committee.

*Section 11.4.   Winding Up, Dissolution & Liquidation of Assets*.   When winding up the Company's affairs, the Liquidator shall:

11.4.1.   direct the Company's independent accountants to prepare an accounting of the Company's assets, liabilities, accounts and operations, from the date of the last previous accounting until the Dissolution Event;

11.4.2.   sell or otherwise liquidate all Company assets as promptly as practicable (except to the extent the Liquidator may determine to distribute any assets to the Members in kind);

11.4.3.   allocate any Profits or Losses resulting from such sales to the Members' Capital Accounts as provided in Article VII. If the assets of the Company are sold in a transaction in which, by reason of the provisions of IRC §453, gain is realized but not recognized, such gain shall be taken into account in computing Profits or Losses (or items thereof) of the Company for allocations to the Members under Article VII.

11.4.4.   discharge all liabilities of the Company (other than liabilities to Members) including all costs relating to the dissolution, winding up, and liquidation and distribution of assets;

11.4.5.   establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purpose of determining the Capital Accounts of the Members, the amounts of such reserves shall be deemed to be an expense of the Company).   Such reserves shall be paid over by the Liquidator to a bank or other institutional escrow agent to be held for the purpose of disbursing such reserves in payment of the contingent liabilities, and at the expiration of such period as the Liquidator may deem advisable, to distribute the balance in the manner provided in this Section 11.4;

11.4.6.   discharge any liabilities of the Company to the Members other than on account of their interests in Company capital or profits; and

11.4.7.   distribute the remaining assets to the Members in accordance with their positive Capital Accounts after such Capital Accounts have been adjusted for allocations of Profits and Losses during liquidation pursuant to Section 11.4.3 and Section 11.5 and all other Capital Account adjustments for the Company taxable year during which the liquidation occurs.  Such distributions to the Members may be in cash or in kind, as determined by the Liquidator, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 11.5.  Distributions to the Members pursuant to this Section 11.4.7 shall be made within the time requirements set forth in Section 11.6;

11.4.8.   Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of IRS Regulation §1.704-1(b)(2)(ii)(g), if any Member has a Deficit Capital Account (after giving effect to all contributions, Distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to contribute to the Company's capital, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever;

11.4.9.   Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated;

11.4.10. The Liquidator shall comply with any requirements of Colorado Law pertaining to the winding up of the Company's affairs and the final Distribution of its assets. The Distribution of cash and/or property to the Members in accordance with the provisions of this Section shall constitute a complete return to the Members of their Capital Contributions and a complete Distribution to the Members of their respective Units.

It is intended that the amount to be distributed to a Member pursuant to this Section shall equal the amount such Member would receive if liquidation proceeds were instead distributed in accordance with Section 7.10.2 of this Agreement.  This intended Distribution amount for a Member is referred to as such Member's "Targeted Distribution Amount."  Notwithstanding anything to the contrary in this Section, if upon the termination and liquidation of the Company the ending Capital Account balances of any Member immediately prior to the Distributions to be made pursuant to Section 11.4.2 are more or less than their "Targeted Distribution Amounts," then Company Profit and Loss, including items of income, gain, loss and deduction shall be specially allocated between the Members for Capital Account purposes for such year (or for prior years to the extent amended tax returns can be filed for the Company) until the Members' actual Capital Account balances, to the extent possible, equals their Targeted Distribution Amounts. The special allocation provision provided by this subsection shall be applied in such a manner so as to cause the difference between each Member's Targeted Distribution Amount and the balance in its Capital Account (determined after this allocation, but immediately prior to the Distributions pursuant to Section 11.4.2) to be the smallest dollar amount possible.

**Section 11.5.  Distributions In-Kind**. If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members.  Such assets shall be deemed to have

been sold as of the date of dissolution for their fair market value so determined. The difference between the fair market value of each asset distributed in kind and its tax basis shall be treated as a gain or loss on sale of the asset and shall be credited or debited to the Members in according with Article VII. If any Company assets shall be distributed in kind, such assets shall be distributed to the Members entitled thereto as tenants-in-common (if real property) or joint owners without right of survivorship (if personal property) in the same proportions as the Members would have been entitled to cash distributions.

*Section 11.6.   Timing of Distributions to Members*.  Distributions to the Members in respect of their Capital Accounts pursuant to Section 11.4.7 shall be made within following the time requirements:

11.6.1   The distributions to Members with positive Capital Accounts shall occur within the later of the end of the Company's taxable year in which such Member's membership interest is liquidated or 90 days after the date of liquidation of such Member's membership interest; provided, however, that the reserves set aside pursuant to Section 11.4.4 and any installment obligations of the Company may be withheld by the Company and not distributed to the Members within said 90 day period so long as such withheld amounts are distributed as soon as practicable and in the ratios of the Members' positive Capital Account balances;

11.6.2   A Member's membership interest shall be deemed to have been liquidated upon the earlier of the date upon which there is a liquidation of the Company or the date upon which there is a liquidation of a Member's membership interest by means of a single distribution or the last in a series of distributions by the Company to such Member; and

11.6.3   The liquidation of the Company shall be deemed to occur upon the earlier of the date upon which the Company is constructively terminated under IRC Section 708(b)(1) by the transfer of 50% or more of the total membership interests within any 12 month period or the date the Company ceases to be a going concern (even though the Company may continue in existence for the purpose of winding up its affairs, paying its debts and distributing remaining balances to the Members).

## ARTICLE XII.  DISPUTE RESOLUTION

*Section 12.1.   Mandatory Arbitration*.  All disputes arising in connection with or relating to the Company, including interpretation and enforcement of this Agreement and disputes over consents or approvals, shall be resolved by arbitration in the manner prescribed by this Article. The parties commit to resolving all disputes in good faith and shall abide by this Article.

*Section 12.2.   Arbitration Demand*.  Any party seeking arbitration shall notify the other party(ies) of its demand to arbitrate.

12.2.1.   The notice shall specify with particularity the nature of the dispute, the provisions of this Agreement and Law at issue and the proposed relief sought by such party(ies);

12.2.2.   Within 20 days of receipt of such notice, the opposing party (ies) may submit a response with equivalent specificity;

12.2.3.  Within 30 days after service of the demand or after service of any response, the party seeking arbitration shall submit the dispute to the Denver office of the Judicial Arbiter Group ("JAG").

If JAG does not then exist then the Chief Executive Officer has Discretion to select a comparable private service to conduct the arbitration.

**Section 12.3.  *Procedural Rules***.  The arbitration shall be conducted by a single arbitrator who shall be a retired judge from a Supreme Court, Appellate Court, state District Court or federal District Court, if available, as Determined by the CEO.  The Colorado Arbitration Act shall govern such proceedings and the arbitrator shall be guided by but not bound by the Colorado Rules of Evidence.  The arbitrator shall not require or permit any discovery relating to:

12.3.1. Outside Ventures by any Related Party; or
12.3.2. the Company's activities before the Effective Date.

All arbitration proceedings shall be conducted to expedite resolution and minimize cost.

**Section 12.4.  *Award***. The arbitrator is authorized to enter an award for equitable relief, including without limitation, specific performance or injunction (including mandatory injunction) in addition to or in lieu of an award of money damages.  Neither party shall seek, and the arbitrator shall not be entitled to award, punitive or consequential damages.

**Section 12.5.  *Fees and Costs***.  Fees and costs of the arbitration, including reasonable attorneys' fees, shall be awarded to the prevailing party as Determined by the arbitrator.  If there is no prevailing party, such fees and costs may be awarded based on the arbitrator's Discretionary assessment of the relative good or bad faith of the parties throughout the dispute.

**Section 12.6.  *Injunctive Relief***.  If any party evidences an intention to violate this Agreement and injunctive or other equitable relief would be the only reasonable remedy, another party may file an action in any competent Colorado court for purposes of enjoining such activity and to obtain specific performance of the terms of this Agreement.  The parties agree that any final judgment by such court may be enforced in any other state or federal court.

## ARTICLE XIII. GENERAL PROVISIONS

**Section 13.1.  *Further Assurances***.  Each party agrees to perform all acts and to make, execute and deliver such written instruments, as reasonably required to carry out this Agreement.

**Section 13.2.  *Notices***.  All notices, elections, demands or other communications (collectively, "Notices") required or permitted by this Agreement shall be in writing.  All Notices shall be sent by hand delivery, first class U.S. mail with return receipt requested, overnight courier with all delivery charges prepaid or by facsimile.  All Notices shall be delivered to the applicable party at the address set forth on Exhibit A; any party may change its address by giving Notice to the other parties of its new address.  Notice to the Company shall be given to the Chief Executive Officer; Notices from Company shall be given by the Chief Executive Officer.

Notices will be effective when received by the addressee as indicated by the return receipt or on the facsimile.

*Section 13.3.  Amendments to Agreement*.  The Management Committee has discretion to amend this Agreement to:

13.3.1. increase the Management Committee's duties;

13.3.2. surrender certain powers of the Management Committee;

13.3.3. cure any errors, ambiguities or inconsistencies in the Agreement;

13.3.4. to delete or add any provision of this Agreement required to be so deleted or added by a state "Blue Sky" commissioner when such commissioner deems the proposed addition or deletion is necessary for the benefit or protection of the Members; or

13.3.5. conform the Agreement to legal requirements or changes in law;

Without further approval by any Members.  Amendments to this Agreement (including but not limited to those sections that that modify Sections 7.1 or 7.10 of this Agreement) require Management Committee Consent and the approval of a Majority of the Common B Units (voting as a single class) that vote upon such matter so long as quorum is present at any such meeting. Any vote for the amendment of this Agreement may be made in writing by the voting Members pursuant to Section 4.4.

*Section 13.4.  Effective Date and Time, and Binding Effect*.  The Effective Date and time of this Agreement is 12:00 p.m. mountain standard time on December 31, 2011.  Pursuant to the Confirmation Order of the United States Bankruptcy Court for the District of Colorado granted to the Company, this Agreement is binding upon each of the Members who are set forth on Exhibit A, as may be amended from time to time.  The United States Bankruptcy Court for the District of Colorado has not required that the Members provide the Company with signature pages to this Agreement.  A copy of the Confirmation Order is attached hereto as Exhibit B. Except as herein otherwise provided to the contrary, this Agreement shall bind and inure to the benefit of the Members and their respective heirs, legatees, executors, devisees, administrators, successors and assigns.

*Section 13.5.  Sole, Absolute and Subjective Discretion*.  Except as otherwise provided in this Agreement, all actions which a Person may take and all Determinations which a Person may make pursuant to this Agreement may be taken and made at the sole, absolute and subjective Discretion of that Person.

*Section 13.6.  Applicable Law*.  This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the Laws of the State of Colorado, without regard to the principles of conflicts of laws.

*Section 13.7.  Construction & Interpretation*.  Unless the context requires otherwise, words denoting the singular may be construed as denoting the plural and the words of the plural may be construed as denoting the singular as is appropriate.  The section titles are stated only for convenience and shall not control or affect the interpretation or construction of any provision of this Agreement.  If any particular provision of this Agreement is found to be illegal, invalid or

unenforceable, it is to that extent deemed to be omitted in the jurisdiction(s) where the provision is invalid or unenforceable and the remainder of this Agreement shall not be affected by such omission; furthermore, in lieu of any invalidated provision shall automatically be substituted as a part of this Agreement a provision as similar in terms to such invalidated provision as may be possible that is legal, valid, and enforceable.  Except as provided in this Agreement, no provision of this Agreement shall be altered, amended, revoked or waived, except by an instrument in writing signed by all parties.  A waiver of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent or other breach.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute a single instrument; provided, however, that this Agreement shall not bind any party unless and until counterparts are executed by all parties.  Each such counterpart shall be considered an original.  A facsimile signature shall constitute an original signature.

**Section 13.8.   *Entire Agreement***. This Agreement and the documents contemplated hereunder constitute the entire agreement of the Members with respect to the subject matter hereof, and fully supersede all prior agreements or negotiations, whether written or oral.  Each party hereby releases and discharges the other parties from all liabilities with respect to prior discussions, negotiations and commitments.

## ARTICLE XIV.  HUD

**Section 14.   *Department of Housing and Urban Development.   Relating to the Company's dealings with the Department of Housing and Urban Development ("HUD"):***

    14.1.1. Kimberly Hubbard, a Class B Member of the Company, is designated as the Member to manage the Company's relationship with HUD, with full power and authority to deal with HUD on behalf of the Company; and

    14.1.2. if for any reason Ms. Hubbard is unable to fulfill her duties then Levine will succeed her as the Member empowered by the Company to deal with HUD; and

    14.1.3. if for any reason the Company is to be dissolved, all Title II loans are to be transferred to an approved Title II mortgagee prior to the termination of the Company.

**IN WITNESS WHEREOF**, the parties hereto have read, understood, executed and acknowledged this Agreement effective as of December 31, 2011.

**COMPANY**:                       **MERCHANTS MORTGAGE & TRUST CORPORATION, LLC**,
                                    a Colorado limited liability company

                              By:  Gary D. Levine

                              By: ............................................................................

Gary D. Levine, Manager

**EXHIBIT A:  MEMBERS, CAPITAL CONTRIBUTIONS AND UNITS**

Class A Preferred Members

| Member Name and Address | Preferred A Units |
| --- | --- |
| TOTAL | 1,000,000 |

Exhibit A

Preferred A Members


Common A Members


Common B Members

**EXHIBIT B**

**CONFIRMATION ORDER**

## Exhibit C

### Membership Signature Page

**In Witness Whereof**, the undersigned hereby agrees to become a Member of ***Merchants Mortgage & Trust Corporation, LLC*** (the "Company"); adopts the Company's Seventh Amended and Restated Operating Agreement dated November __, 2011 and agrees to comply with the terms of that agreement.

............................................................................................................................................
Name (Print it exactly as you wish it to appear in the Company's records)

Signature: ............................................   Date: ............................................

Name: ............................................   Title: ............................................

Address: ......................................................................................................

City: ............................................   State: ............................................

Country: ............................................   Zip: ............................................

Telephone: ............................................   Fax: ............................................

e-mail: ......................................................................................................

Citizenship ............................................   Social Security/Taxpayer ID # ............................................

Form of Ownership (check one):
☐ Individual   ☐ Married Couple*   ☐ Joint Tenants*   ☐ Tenants in Common*
☐ Corporation**   ☐ Partnership**   ☐ Limited Partnership**   ☐ Limited Liability Company**
☐ Trust **   ☐ Retirement Plan**   ☐ Non-Profit**   ☐ Association**
☐ Other [Specify: ............................]

   \*   Each spouse, joint tenant or co-tenant must sign this Signature Page.
   \*\*   Attach the documents authorizing the Member to purchase the Units.

**Capital Contribution:  U.S. $** ............................................

**Number of Common A Units:** ............................................

**Number of Common B Units:** ............................................

**Number of Preferred A Units:** ............................................

### EXHIBIT D

### POWER OF ATTORNEY

The undersigned Member ("Principal") hereby irrevocably appoints any one or more members of the Company's Management Committee ("Agent"), as the Principal's true and lawful attorney with respect to all matters involving ***Merchant Mortgage & Trust Corporation, LLC***, a Colorado limited liability company (the "Company"). In such Principal's name, place and stead (it is expressly understood and intended that this Power of Attorney is coupled with an interest), Agent, with full power of substitution, can make, execute, sign, acknowledge, swear and file with respect to the Company:

- such amended Articles of Organization as may be required by law or pursuant to the provisions of the Company's Seventh Amended and Restated Operating Agreement (the "Operating Agreement"), as may be amended from time to time, and such documents as may be required by law to reconstitute and continue the business of the Company in accordance with the provisions of the Operating Agreement;

- all amendments of the Operating Agreement adopted in accordance with the terms thereof;

- all papers that Agent deems necessary or desirable to effect the dissolution and termination of the Company; and

- all such other instruments, documents and certificates which may be required by the State of Colorado or any other jurisdiction in which Company shall determine to conduct business, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the Company's valid existence.

This appointment shall continue so long as Principal remains a Company Member and following the transfer of all or a portion of the Units owned by Principal until such time as the transferee shall have been admitted to the Company as a Member; Principal's bankruptcy, insolvency, death, incompetence, or dissolution shall not affect Agent's appointment. If Agent ceases to serve as Company's Chief Executive Officer then any successor Chief Executive Officer of Company shall also succeed Agent as Principal's attorney. The Principal hereby releases Agent from any liability or claim in connection with the exercise of the authority granted by this Power of Attorney and in connection with any other action taken by Agent pursuant to which Agent purports to act as the attorney-in-fact for one or more Company Members if Agent believed in good faith that such action taken was consistent with the authority granted to Agent by this Power of Attorney.

**PRINCIPAL:**

Name: ...........................................................................................

Title: ............................................................................................

Signature: ....................................................................................

Date: ............................................................................................

WITNESSES:

.................................................................          .................................................................

*If the Principal is an organization (corporation, partnership, LLC, trust, business entity, retirement plan, etc.), please complete the following:*

STATE OF ................................................................)

) ss

COUNTY OF .......................................................................)

......................................................................... personally appeared before me and provided me with satisfactory evidence of his identity.   After being duly sworn, he stated he is the ......................................................................... of Principal, executed the foregoing POWER OF ATTORNEY ("Document") in that capacity, and certified that by his execution of this Document Principal executed and verified this Document.

WITNESS my hand and official seal.

Date: ................................................   Notary Public ...........................................................

My commission expires: ...........................................